JS 44  (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Ohio Security Insurance Co., as subrogee Five Star Mechanical Services

**DEFENDANTS**

Erie Insurance Exchange

**(b)** County of Residence of First Listed Plaintiff   Suffolk, MA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Erie, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kathleen K. Kerns (Post & Schell, P.C.)
Four Penn Ctr., 13th Fl., 1600 John F. Kennedy Blvd.
Philadelphia, PA  19103   (215) 587-5932

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending ☐ 380 Other Personal | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation -
Transfer

☐ 8   Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332; 28 USC 1391(b)

Brief description of cause:
Declaratory judgment action involving an insurance dispute between parties of diverse citizenship

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE

DOCKET NUMBER

DATE
09/05/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #        AMOUNT        APPLYING IFP        JUDGE        MAG. JUDGE

JS 44 Reverse (Rev. 02/19)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation -- Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII.   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.



**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 175 Berkeley Street, Boston, MA  02116 _____

Address of Defendant: _____ 100 Erie Insurance Place, Erie, PA  16530 _____

Place of Accident, Incident or Transaction: _____ Philadelphia, PA _____

**19    4075**

---

**RELATED CASE, IF ANY:**

Case Number: _____ N/A _____    Judge: _____ N/A _____    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____ 09/05/2019 _____    _____ (Must sign here) _____    _____ 57439 _____
      *Attorney-at-Law / Pro Se Plaintiff*                        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.    Federal Question Cases:**

☐  1. Indemnity Contract, Marine Contract, and All Other Contracts
☐  2. FELA
☐  3. Jones Act-Personal Injury
☐  4. Antitrust
☐  5. Patent
☐  6. Labor-Management Relations
☐  7. Civil Rights
☐  8. Habeas Corpus
☐  9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
       *(Please specify):* _____

**B.    Diversity Jurisdiction Cases:**

☑  1. Insurance Contract and Other Contracts
☐  2. Airplane Personal Injury
☐  3. Assault, Defamation
☐  4. Marine Personal Injury
☐  5. Motor Vehicle Personal Injury
☐  6. Other Personal Injury *(Please specify):* _____
☐  7. Products Liability
☐  8. Products Liability – Asbestos
☐  9. All other Diversity Cases
       *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Kathleen K. Kerns _____, counsel of record *or pro se plaintiff*, do hereby certify:

☐  Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑  Relief other than monetary damages is sought.

DATE: _____ 09/05/2019 _____    _____ Sign here if applicable _____    _____ 57439 _____
      *Attorney-at-Law / Pro Se Plaintiff*                        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

SEP - 5 2019

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

OHIO SECURITY INSURANCE CO., as subrogee
Five Star Mechanical Services, Inc.                  :          CIVIL ACTION
                                                     :
                        v.                           :
                                                     :
ERIE INSURANCE EXCHANGE                              :          NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus -- Cases brought under 28 U.S.C. § 2241 through § 2255.                                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                                            ( )

(c) Arbitration -- Cases required to be designated for arbitration under Local Civil Rule 53.2.              ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                                     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                                        ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.                            (X)

| | | |
|---|---|---|
| 9/5/2019 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 587-5932 | (215) 320-4181 | kkerns@postschell.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

OHIO SECURITY INSURANCE CO., as    :   CIVIL ACTION
subrogee Five Star Mechanical Services, Inc.   :
175 Berkeley Street          :   NO.
Boston, MA  02116,         :
        Plaintiff      :
                :
     v.           :
                :
ERIE INSURANCE EXCHANGE     :
100 Erie Insurance Place       :
Erie, PA  16530,         :
        Defendant    :

## COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT

    NOW COMES the Plaintiff, Ohio Security Insurance Co. ("Ohio Security"), as subrogee

of Five Star Mechanical Services, Inc. ("Five Star"), by and through its attorneys, Post & Schell,

P.C., and files the following Complaint against Erie Insurance Exchange ("Erie Insurance"), and

in support thereof avers as follows:

## THE PARTIES

    1.   Plaintiff, Ohio Security, as subrogee of Five Star, is an insurance company

incorporated in the State of New Hampshire with a principal place of business at 175 Berkeley

Street, Boston, Massachusetts 02116.

    2.   Defendant, Erie Insurance, is an insurance company incorporated in the

Commonwealth of Pennsylvania with its principal place of business at 100 Erie Insurance Place,

Erie, Pennsylvania 16530.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, in that complete diversity of citizenship exists between the plaintiff, on the one hand, and defendant, on the other hand, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.      Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1391(b), in that this case concerns an insurance contract, which was entered into in this judicial district.

5.      This Court has personal jurisdiction over Erie Insurance because it is a Pennsylvania corporation with its principal place of business in Pennsylvania.

6.      Venue is also proper because the *Wintersteen* Suit that is the subject of this action was filed in Philadelphia County, Pennsylvania.

## NATURE OF THE ACTION

7.      This is an action for declaratory judgment and breach of contract to determine the respective rights and obligations of Erie Insurance to Five Star under a liability insurance policy issued by Erie Insurance in connection with the defense and indemnity of Five Star in the action captioned *Mark Wintersteen, et al. v. Five Star Mechanical Services, Inc., et al.,* filed in the Court of Common Pleas of Philadelphia County, November Term 2017, No. 000138 (the "*Wintersteen* Suit").

## FACTUAL BACKGROUND

A.      **The *Wintersteen* Suit**

8.      The *Wintersteen* Suit was filed in the Court of Common Pleas of Philadelphia County on November 3, 2017.  A true and correct copy of the Complaint filed in the *Wintersteen* Suit is attached hereto as Exhibit A.

2

9.     In the Complaint filed in the *Wintersteen* Suit (hereinafter "Complaint"), both Five Star and Cromedy Construction Company ("Cromedy") were named as defendants. *Id.*

10.     The Complaint alleges that "Five Star was performing general contracting and/or construction management duties for the subject property." *Id.*, ¶ 9.

11.     The Complaint also alleges that "Cromedy was an HVAC/sheet metal contractor working at the aforementioned premises in connection with the subject project." *Id.*, ¶ 13.

12.     In his Complaint, Mr. Wintersteen alleges that on November 16, 2016, "his foot went into an open penetration in the floor that had been created by and left uncovered by Defendants," including Five Star and Cromedy, when he was attempting to step down and back from a ladder on the subject property, causing him to suffer serious and permanent injuries. *Id.*, ¶ 15.

13.     In his Complaint, Mr. Wintersteen alleges that the accident was caused by Five Star and Cromedy's actions or omissions, which includes among other things the following: failing to cover and/or guard the floor penetration in accordance with OSHA, ANSI, and other applicable industry safety regulations and standards; failing to ensure that the floor penetration was covered and/or guarded in accordance with OSHA, ANSI, and other applicable industry safety regulations and standards; and failing to ensure that the area where Mr. Wintersteen was working had sufficient and appropriate lighting. *Id.*, ¶¶ 18-20.

14.     The Complaint alleges that Mr. Wintersteen's injuries were caused by the negligence of Five Star and Cromedy. *Id.*, Counts I, III.

15.     In addition, Mrs. Wintersteen asserts a loss of consortium claim against Five Star and Cromedy, alleging that she has been deprived of the services, society, support, companionship, and consortium of her husband; has incurred expenses due to her husband's

3

injuries; and has experienced mental and emotional anguish all as the result of Five Star and Cromedy's negligence. *Id.*, Count IV.

**B.**   **The Cromedy/Five Star Contract**

16.     Cromedy and Five Star entered into a Subcontract (the "Subcontract Agreement") dated March 2, 2016 to perform certain work at the McKinely Elementary School project, located at 2101 North Orkney Street, Philadelphia, PA 19141.   A true and correct copy of the Subcontract Agreement is attached hereto as Exhibit B.

17.     The Subcontract Agreement was sent to Rich Hudson at Cromedy by Mary Ellen Strubilla at Five Star via e-mail on March 4, 2016.   A true and correct copy of the March 4, 2016 correspondence and attachment are attached hereto as Exhibit C.

18.     Cromedy performed work pursuant to the Subcontract Agreement.

19.     Cromedy submitted a notarized Request for Payment dated May 15, 2016, which states, "I hereby certify that the work performed and the materials supplied to date, as shown on the above represent the actual value of the accomplishment under the terms of the Contract (and all authorized changes thereof) between the undersigned and the Five Star Mechanical relating to the above referenced project. I also certify that the contractor has paid all amounts previously billed and paid by the owner."   A true and correct copy of the May 15, 2016 Request for Payment is attached hereto as Exhibit D.

20.     Cromedy was paid by Five Star for the work it performed pursuant to the Subcontract Agreement.

21.     Pursuant to paragraph 2 of the Addendum to the Subcontract Agreement, Cromedy agreed to provide, among other things, general liability insurance in the minimum amount of $2 million in the aggregate and $1 million per occurrence and $1 million in

4

commercial umbrella liability insurance and to name Five Star, its affiliates, parents and subsidiaries, Five Star's surety, if any, the owner and any other contractor that Five Star may be obligated to defend and indemnify in the Main Contract as an additional insureds. Pursuant to the Subcontract Agreement, the insurance afforded Five Star (and the other entities named in this paragraph) was to be primary and noncontributory. *See* Exhibit B, Addendum, ¶¶ 2.B., D., G., H.

22.     Pursuant to paragraph 4 the Subcontract Agreement, it was agreed: "Subcontractor assumes entire responsibility and liability and agrees to indemnify and save harmless the CONTRACTOR and/or Owner from any loss, liability, expense, including attorneys' fees, damage or injury caused or occasioned, directly or indirectly, but its failure to comply with any of the following: (a) The furnishing and paying for all necessary permits, licenses, inspection fees as called for in the CONTRACT DOCUMENTS as being the responsibility of the SUBCONTRACTOR[;] (b) The payment of all royalty and license fees and the defense of all suits or claims for infringement of any patent rights pertaining to the materials, articles and/or equipment furnished as part of the work by SUBCONTRACTOR[;] (c) The payment of any and all loss or damage, direct or consequential, and claims of any kind or nature whatsoever, for property damage or personal injury, including death, to any and all persons, whether employees of CONTRACTOR or others, caused by, resulting from, arising out of or from, or occurring in connection with the performance of the work undertaken by SUBCONTRACTOR hereunder, including, but not limited to claims due to the negligence of CONTRACTOR or Owner, or to any defect in material, equipment, or workmanship whenever the same may develop." *See* Exhibit B, Terms and Conditions Forming Part of Subcontract, ¶ 4.

23.     Under the Subcontract Agreement, "Contractor" is defined as Five Star, Cromedy

is referred to as "Subcontractor", and the "Job Location" is identified as 2101 North Orkney

Street, Philadelphia, PA 19141. *See* Exhibit B.

24.     Further, pursuant to paragraph 1 of the Addendum to the Subcontract Agreement,

it was agreed:

> INDEMNIFICATION. Subcontractor assumes entire responsibility and liability
> for any and all claims and/or damages of any nature or character whatsoever with
> respect to the work covered by this Subcontract Agreement (including but not
> limited to, work performed under this Subcontract Agreement, work performed
> under change order or any other work incidental thereto, whether performed at or
> off the project site) and Subcontractor agrees [to] defend, indemnify and hold
> harmless the Contractor, its affiliates, parents and subsidiaries, the Contractor's
> surety, if any, the owner, any other Contractor that the Contractor may be
> obligated to defend and indemnify in the Main Contract, the architect from and
> against any and all claims, demands, liabilities, interests, loss, damage, fires,
> penalties, attorney's fees, cost and expenses of whatever kind or nature,
> including property damage or for personal injuries (including death) to any and
> all persons (whether such persons are employees of Contractor or employees of
> Subcontractor, or employees of Subcontractor's subcontractors or others)
> resulting from the work covered by this Subcontract, arising therefrom or
> occurring in connection therewith and whether any such claims are alleged to
> have been caused in whole or in part, by a party indemnified hereunder. This
> indemnification expressly extends to (but is not in any manner limited to) any
> claims, damages or suits for infringement or violations or patents or patent rights.
> Subcontractor further agrees that the indemnification contained in this section
> shall not in any manner be limited by the applicable provisions of any Workers'
> Compensation Act and, for this purpose, Subcontractor waives its rights to
> immunity as an employer under any such Workers' Compensation Act in the
> event of a claim by one or more of its employees against Contractor (or any other
> party whom Subcontractor is obligated, by this paragraph, to indemnify) and
> Subcontractor further waives any defense that this Subcontract or any portions
> thereof was not executed by Subcontractor prior to the date of the occurrence
> giving rise to Subcontractors' indemnification responsibility hereunder.
>
> In the event that such claims, demands, liabilities, interests, loss, fines, penalties,
> attorney's fees, costs and expenses are made, asserted or threatened against
> Contractor or any other party whom Contractor is obligated to indemnify or
> defend in the Main Contract, Contractor shall have the right to withhold from
> any payments due, or to become due to the Subcontractor, an amount sufficient
> in Contractor's sole discretion to protect and indemnify it and such other parties
> against any and all such claims, demands, liabilities, interests, loss, damage,

fines, penalties, attorney's fees, costs and expenses, or Contractor, in its sole discretions, may require Subcontractor to furnish a surety bond satisfactory to Contractor guaranteeing such protection furnished by Subcontractor."

*See* Exhibit B., Addendum, ¶ 1.

**C.    Erie Insurance Policy**

25.    Erie Insurance issued Policy No. Q0370158532A to Cromedy, which was in effect for the period January 1, 2016 to January 1, 2017 ("Erie Insurance Policy").  A true and correct copy of the Erie Insurance Policy is attached hereto as Exhibit E.

26.    The Erie Insurance Policy was in effect on November 16, 2016, the date of the alleged accident in which Mr. Wintersteen alleges he was injured.

27.    The Erie Insurance Policy provides coverage in the amount of $1 million per occurrence and $2 million in the aggregate.

28.    The Commercial General Liability Coverage Form (Form CG 00 01 (Ed. 4/13) UF-9708) contained in the Erie Insurance Policy includes the following Insuring Agreement:

> 1.    Insuring Agreement
>
>    a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply....

*Id.*

29.    The Commercial General Liability Coverage Form also includes Section IV.4 Other Insurance, which states in relevant part:

> If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

7

a.   Primary Insurance
This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then we will share with all that other insurance by the method described in Paragraph e. below.

b.   Excess Insurance
1)   This insurance is excess over:

\*        \*        \*

b)   Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

*Id.*

30.   The Erie Insurance Policy contains three endorsements that are relevant in determining Erie Insurance's obligations to Five Star.

31.   First, the Additional Insureds – Owners, Lessees or Contractors – Automatic Status When Required In Construction Agreement With You Endorsement (Form UL-RH (Ed. 6/13) UF-3886) (the "Additional Insured Endorsement") states as follows:

A.   **SECTION II – WHO IS AN INSURED** is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused in whole or in part, by:

1.   Your acts or omissions; or

2.   The acts or omissions of those acting on your behalf;

8

> in the performance of your ongoing operations for the additional insured.

*Id.*

32.    Second, the Additional Insureds – Owners, Lessees or Contractors – Completed Operations Endorsement (Form CGF 20 37 (Ed. 4/13) UF-3293) (the "Completed Operations Endorsement") states as follows:

> A.    **SECTION II – WHO IS AN INSURED** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products- completed operations hazard".

*Id.*

33.    Third, the amended language of the Other Insurance provision, Primary and Noncontributory Insurance (Form UL-KS (Ed. 5/15) UF-8208), states as follows:

> The following is added to the Other Insurance Condition and supersedes any provision to the contrary:
>
> **Primary And Noncontributory Insurance**
>
> This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:
>
> 1)    The additional insured is a Named Insured under such other insurance; and
> 2)    You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

*Id.*

**D.**     **Ohio Security Policy**

34.     Ohio Security issued a commercial general liability policy number BKS 1757302771 to J. Mann-R Finley Inc. ("J. Mann") which was in effect on November 16, 2016 ("Ohio Security Policy"), the date of the alleged accident in which Mr. Wintersteen alleges he was injured.  A true and correct copy of the Ohio Security Policy is attached hereto as Exhibit F.

35.     The Ohio Security Policy contains a Commercial General Liability Extension (Form CG 88 10 04 13) wherein Section H, Primary and Non-Contributory Additional Insured Extension states:

> This provision applies to any person or organization who qualifies as an additional insured under any form or endorsement under this policy.
>
> Condition 4. Other Insurance of SECTION IV-COMMERCIAL GENERAL LIABILITY CONDITIONS is amended as follows:
>
> a.     The following is added to Paragraph a. Primary Insurance:
>
> If an additional insured's policy has an Other Insurance provision making its policy excess, and you have agreed in a written contract or written agreement to provide the additional insured coverage on a primary and noncontributory basis, this policy shall be primary and we will not seek contribution from the additional insured's policy for damages we cover.
>
> b.     The following is added to Paragraph b. Excess Insurance:
>
> When a written contract or written agreement, other than a premises lease, facilities rental contract or agreement, an equipment rental or lease contract or agreement, or permit issued by a state or political subdivision between you and an additional insured does not require this insurance to be primary or primary and non-contributory, this insurance is excess over any other insurance for which the additional insured is designated as a Named Insured.
>
> Regardless of the written agreement between you and an additional insured, this insurance is excess over any other insurance whether primary, excess, contingent or on any other basis for which the

10

> additional insured has been added as an additional insured on other
> policies.

*Id.*

36.    Ohio Security has been defending Five Star as an additional insured under the Ohio Security Policy throughout the course of the *Wintersteen* Suit.

37.    Ohio Security retained the firm of Marshall Dennehey Warner Coleman & Goggin to represent Five Star in the *Wintersteen* Suit.

38.    On January 18, 2018, Five Star tendered the defense and indemnification of the *Wintersteen* Suit to Cromedy pursuant to the status of Five Star as an additional insured under the Erie Insurance Policy, as well as under the contractual indemnification provisions of the Subcontract Agreement.  A true and correct copy of a letter dated January 18, 2018 to Rich Hudson from Joseph DeMarco, Esq. attached hereto as Exhibit G.

39.    On January 25, 2018, Five Star tendered defense and indemnity of the *Wintersteen* Suit directly to Erie Insurance.  A true and correct copy of a letter dated January 25, 2018 from Joseph DeMarco, Esq. to Debra Wilson at Erie Insurance is attached hereto as Exhibit H.

40.    Five Star again requested defense and indemnity from Erie Insurance for the *Wintersteen* Suit on February 9, 2018.  A true and correct copy of a letter dated February 9, 2018 from Joseph DeMarco, Esq. to Debra Wilson is attached hereto as Exhibit I.

41.    Erie Insurance acknowledged receipt of the tender on February 26, 2018. A true and correct copy of a letter dated February 26, 2018 from Debra Wilson to Joseph DeMarco, Esq. is attached hereto as Exhibit J.

42.    On March 5, 2018, Five Star again sent a copy of the *Wintersteen* Complaint along with a copy of the contract between Five Star and Cromedy and requested that Erie Insurance defend and indemnify Five Star as an additional insured for the *Wintersteen* Suit.  A

11

true and correct copy of a letter dated March 5, 2018 from Joseph DeMarco, Esq. to Debra Wilson is attached hereto as Exhibit K.

43.    On September 14, 2018 Ohio Security again tendered the defense and indemnification of the *Wintersteen* Suit to Cromedy pursuant to the status of Five Star as an additional insured under the Erie Insurance Policy, as well as under the contractual indemnification provisions of the Subcontract Agreement.    A true and correct copy of the September 14, 2018 letter from David Wolf, Esquire to Philip Priore, Esquire is attached hereto as Exhibit L.

44.    On December 19, 2018, Cromedy's counsel responded to the tender, denying Five Star's request for contractual indemnification and stated "We have noted that your tender also includes Five Star's status as an additional insured under Cromedy's insurance policy.  We have forwarded your letter requesting tender under the additional insured status to the carrier for Cromedy, and they will presumably respond to this request from your client."  A true and correct copy of the December 19, 2018 correspondence is attached hereto as Exhibit M.

45.    As Erie Insurance never provided a response to Ohio Security regarding this tender which was sent over a year ago, Ohio Security again wrote to Erie Insurance on March 5, 2019, requesting Erie Insurance's coverage position with respect to defense and indemnity for Five Star in connection with the *Wintersteen* Suit. A true and correct copy of correspondence (and attachment) between Cynthia Pasternak-Giocondo from Ohio Security and Debra Wilson between March 6, 2019 and March 11, 2019 is attached hereto as Exhibit N.

46.    On March 11, 2019, Erie Insurance forwarded a copy of a letter from Frances Lettieri, Esquire to Joseph DeMarco, Esquire dated February 27, 2019, denying Five Star's

12

tender for additional insured coverage and contractual indemnity for the *Wintersteen* Suit because the subcontract between Five Star and Cromedy was not executed. *Id.*

47.     On April 16, 2019 and again on May 5, 2019, Ohio Security retendered the claim on behalf of Five Star to Erie Insurance, stating that the Additional Insured Endorsement in the Erie Insurance Policy does not require that a written contract be executed.  A true and correct copy of the April 16, 2019 letter from Ms. Pasternak-Giocondo to Attorney Lettieri is attached hereto as Exhibit O; a true and correct copy of the May 5, 2019 letter from Ms. Pasternak-Giocondo to Attorney Lettieri is attached hereto as Exhibit P.

48.     Erie Insurance never responded to the April 16, 2019 or May 5, 2019 letters.

49.     Therefore, on June 17, 2019, John Sullivan, Esquire, wrote to Attorney Lettieri on behalf of Ohio Security requesting once again that Erie Insurance accept the defense and indemnity of Five Star in connection with the *Wintersteen* Suit. A true and correct copy of an email exchange between Attorney Sullivan and Attorney Lettieri dated June 17, 2019 to June 18, 2019 is attached hereto as Exhibit Q.

50.     On June 18, 2019, Attorney Lettieri responded, requesting any materials that speak to whether Cromedy knew of and accepted the contract between Five Star and Cromedy. *Id.*

51.     On July 1, 2019, Stacey Zavalas, Esquire, on behalf of Ohio Security, sent to Attorney Lettieri the deposition transcript of Rich Hudson from Cromedy with exhibits and referenced Cromedy's responses to discovery in the *Wintersteen* Suit as materials which evidence that Cromedy knew of and accepted the terms of the Subcontract Agreement between Cromedy and Five Star.  A true and correct copy of correspondence between Attorney Zavalas and Attorney Lettieri between July 1, 2019 and July 10, 2019 is attached hereto as Exhibit R.

52.     On July 9, 2019, Attorney Zavalas again wrote to Attorney Lettieri to obtain Erie Insurance's response to Five Star's tender and informing her that a settlement conference would be held in the *Wintersteen* Suit on August 22, 2019. *Id.*

53.     On July 9, 2019, Attorney Lettieri responded, with Erie Insurance still refusing to accept the tender of Five Star, requesting any additional materials Ohio Security may have. *Id.*

54.     On July 10, 2019, Attorney Zavalas wrote again to Attorney Lettieri rebutting Erie Insurance's arguments and asking once again that Erie Insurance accept the defense and indemnity of Five Star in connection with the *Wintersteen* Suit. *Id.*

55.     On August 14, 2019, Attorney Zavalas again followed up with Attorney Lettieri to determine whether Erie Insurance would provide coverage to Five Star in connection with the *Wintersteen* Suit. A true and correct copy of email correspondence between Attorney Zavalas and Attorney Lettieri dated August 14, 2019 and August 15, 2019 is attached hereto as Exhibit S.

56.     Attorney Lettieri wrote back on the same day, stating that Erie Insurance's investigation suggests that Five Star did not provide the written contract to Cromedy prior to the incident and thus Erie Insurance still would not accept Five Star's tender of the *Wintersteen* Suit. *Id.*

57.     On August 16, 2019, Attorney Zavalas forwarded to Attorney Lettieri an email dated March 4, 2016 from Mary Ellen Strubilla at Five Star attaching the Subcontract Agreement between Five Star and Cromedy to Rich Hudson at Cromedy, noting that the Subcontract Agreement between the parties was received by Cromedy several months prior to Mr. Wintersteen's alleged accident. A true and correct copy of Attorney Zavalas' August 16, 2019 email to Attorney Lettieri is attached hereto as Exhibit T.

58.     On August 16, 2019, Attorney Lettieri responded by requesting a copy of the Ohio Security Policy.  A true and correct copy of Attorney Lettieri's August 16, 2019 email to Attorney Zavalas is attached hereto as Exhibit U.

59.     On August 19, 2019, Attorney Zavalas sent a copy of the Ohio Security Policy to Attorney Lettieri, highlighting Section H of the CGL Extension quoted above, which states that the Ohio Security Policy is "excess over any other insurance whether primary, excess, contingent or on any other basis for which the additional insured has been added as an additional insured on other policies."  A true and correct copy of email correspondence between Attorney Lettieri and Attorney Zavalas is attached hereto as Exhibit V.

60.     Attorney Lettieri responded to Attorney Zavalas on the same day, requesting a copy of the subcontract between Five Star and J. Mann.  *Id.*

61.     On August 21, 2019, Attorney Zavalas sent a copy of the subcontract between Five Star and J. Mann to Attorney Lettieri, again requesting that Erie Insurance accept the defense and indemnity of Five Star in connection with the *Wintersteen* Suit.  A true and correct copy of email correspondence between Attorney Zavalas and Attorney Lettieri dated August 21, 2019 to August 22, 2019 is attached hereto as Exhibit W.

62.     On August 21, 2019, Attorney Lettieri responded that it was the position of Erie Insurance that based upon cases decided by states other than Pennsylvania, Erie Insurance did not have to address whether Erie Insurance was obligated to provide additional insured coverage to Five Star in connection with the *Wintersteen* Suit because it unilaterally made the decision that Ohio Security's insured owed contractual indemnity obligations to Five Star.  *Id.*

63.     On August 22, 2019, Attorney Zavalas countered the arguments made by Erie Insurance, setting forth the reasons Erie Insurance is obligated to provide additional insured

15

coverage to Five Star in connection with the *Wintersteen* Suit, and again requested that Erie Insurance immediately assume the defense and indemnity of Five Star or Ohio Security would file the instant action. *Id.*

64.    Although Five Star qualifies as an additional insured under the Erie Insurance Policy and an indemnitee of Erie's insured and the claim has been tendered to Erie Insurance numerous times over an almost two year period, Erie Insurance continues to refuse to defend or indemnify Five Star in connection with the *Wintersteen* Suit.

## COUNT I

## DECLARATORY JUDGMENT

65.    The allegations contained in paragraphs 1 through 64 of this Complaint are incorporated herein by reference as though set forth at length herein.

66.    Under the Erie Insurance Policy, Five Star qualifies as an additional insured in connection with the claims asserted in the *Wintersteen* Suit.

67.    Erie Insurance was requested to provide a defense and indemnity to Five Star in connection with the *Wintersteen* Suit on numerous occasions over an almost two year period, but failed to provide such defense or indemnity.

68.    All of the defense costs paid to date for Five Star have been paid by Ohio Security.

69.    The Ohio Security Policy is excess over any coverage the Erie Insurance Policy provides to Five Star in connection with the *Wintersteen* Suit.

70.    In failing to pay for the costs of defending and indemnifying Five Star in connection with the *Wintersteen* Suit, Erie Insurance has breached its obligations under the Erie Insurance Policy.

71.    By reason of the aforesaid, Ohio Security is entitled to a judicial declaration that Erie Insurance has a duty to pay 100% of the costs of defense and any indemnification of Five Star in connection with the *Wintersteen* Suit.

WHEREFORE, Ohio Security requests that this Court enter judgment against Erie Insurance:

    (1)    declaring that Erie Insurance is required to defend and pay the costs of any judgment or settlement in the *Wintersteen* Suit on behalf of its additional insured and indemnitee, Five Star;

    (2)    requiring Erie Insurance to reimburse Ohio Security in the full amount it paid on behalf of Five Star to defend the *Wintersteen* Suit, any amounts Ohio Security may pay during the course of this litigation in indemnity on behalf of Five Star in connection with the *Wintersteen* Suit, plus interest and Ohio Security's attorneys' fees and costs incurred in connection with this action; and

    (3)    making such other determinations and/or declarations and granting such other relief as this Court deems just and appropriate.

## COUNT II

## BREACH OF CONTRACT

72.    The allegations contained in paragraphs 1 through 71 of this Complaint are incorporated herein by reference as though set forth at length herein.

73.    Under applicable law, Erie Insurance owed an obligation to pay 100% of the costs of defending Five Star in the *Wintersteen* Suit and any judgment or settlement amount on behalf of Five Star in connection with the same.

74.     Erie Insurance has neither paid nor agreed to pay the defense costs that were incurred to defend Five Star and has not agreed to pay indemnity on behalf of Five Star in connection with the *Wintersteen* Suit.

75.     By refusing to defend and to pay the defense costs that were incurred to defend Five Star and any indemnity owed by Five Star in connection with the *Wintersteen* Suit, Erie Insurance has breached its contract.

WHEREFORE, Ohio Security requests that this Court enter judgment against Erie Insurance:

(1)     declaring that Erie Insurance is required to defend and pay the costs of any judgment or settlement in the *Wintersteen* Suit on behalf of its additional insured and indemnitee, Five Star;

(2)     requiring Erie Insurance to reimburse Ohio Security in the full amount it paid on behalf of Five Star to defend the *Wintersteen* Suit, any amounts Ohio Security may pay during the course of this litigation in indemnity on behalf of Five Star in connection with the *Wintersteen* Suit, plus interest and Ohio Security's attorneys' fees and costs incurred in connection with this action; and

(3)     making such other determinations and/or declarations and granting such other relief as this Court deems just and appropriate.

POST & SCHELL, P.C.

Date:  September 5, 2019

By _____
John C. Sullivan
Kathleen K. Kerns
Stacey M. Zavalas
Atty. I.D. Nos. 32262/57439/88537
Four Penn Center – 13th Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103
Phone:  (215) 587-1000
Fax:  (215) 587-1444
E-mail:  jsullivan@postschell.com
            kkerns@postschell.com
            szavalas@postschell.com
Attorneys for Plaintiff,
Ohio Security Insurance Co., as subrogee
of Five Star Mechanical Services, Inc.

# EXHIBIT A

Court of Common Pleas of Philadelphia County
Trial Division

**Civil Cover Sheet**

| | For Prothonotary Use Only (Docket Number) |
|---|---|
| **NOVEMBER 2017** | **000138** |

E-Filing Number: 1711009005

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| MARK WINTERSTEEN | FIVE STAR MECHANICAL SERVICES, LP |

Filed and Attested by the
Office of Judicial Records
01 DEC 2017 04:15 pm
E. MASCULLI

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 632 WREN SONG ROAD<br>YARDLEY PA 19067 | 9706 ROOSEVELT BOULEVARD<br>PHILADELPHIA PA 19115 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| KELLY WINTERSTEEN (H/W) | JACK PEARS & ASSOCIATES, LLC |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 632 WREN ROAD<br>PHILADELPHIA PA 19067 | 5762 JEFFERSON STREET<br>PHILADELPHIA PA 19131 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | CROMEDY CONSTRUCTION CORPORATION |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 5702 NEWTOWN AVENUE<br>PHILADELPHIA PA 19120 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 3 | [X] Complaint  [ ] Petition Action  [ ] Notice of Appeal<br>[ ] Writ of Summons  [ ] Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| [ ] $50,000.00 or less<br>[X] More than $50,000.00 | [ ] Arbitration<br>[X] Jury<br>[ ] Non-Jury<br>[ ] Other: | [ ] Mass Tort<br>[ ] Savings Action<br>[ ] Petition | [ ] Commerce<br>[ ] Minor Court Appeal<br>[ ] Statutory Appeals | [ ] Settlement<br>[ ] Minors<br>[ ] W/D/Survival |

| CASE TYPE AND CODE |
|---|
| 2O - PERSONAL INJURY - OTHER |

| STATUTORY BASIS FOR CAUSE OF ACTION |
|---|
| |

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | | IS CASE SUBJECT TO<br>COORDINATION ORDER?<br>YES      NO |
|---|---|---|
| | **FILED**<br>**PRO PROTHY**<br>NOV 03 2017<br>**M. BRYANT** | |

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: <u>MARK WINTERSTEEN , KELLY</u>
<u>WINTERSTEEN (H/W)</u>
Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| CHRISTOPHER P. SPINA | 1435 WALNUT STREET<br>7TH FLOOR<br>PHILADELPHIA PA 19103 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215)399-9255 | (215)241-8700 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 2_0086 | cspina@lbk-law.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| CHRISTOPHER SPINA | Friday, November 03, 2017, 04:29 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

Case ID: 171100138

- **ASSESSMENT OF DAMAGES HEARING IS REQUIRED**
- **THIS IS NOT AN ARBITRATION MATTER**
- **THIS IS NOT A MOTOR VEHICLE ACCIDENT**
- **A JURY OF 12 PERSONS IS DEMANDED**

Attested by the
of Judicial Records
01 NOV 2017 04:23 pm
N. BRYANT

| | |
|---|---|
| **LAFFEY, BUCCI & KENT, LLP**<br>BY:   JEFFREY F. LAFFEY, ESQUIRE<br>       IDENTIFICATION NO. 82284<br>       CHRISTOPHER P. SPINA, ESQUIRE<br>       IDENTIFICATION NO. 210086<br>       1435 WALNUT STREET, 7TH FLOOR<br>       PHILADELPHIA, PA 19102<br>       (215) 399-9255 | *Attorneys for Plaintiffs*<br>*Mark Wintersteen and Kelly*<br>*Wintersteen, h/w* |
| MARK WINTERSTEEN and KELLY<br>WINTERSTEEN, h/w<br>632 Wren Song Road<br>Yardley, PA 19067<br><br>                              Plaintiffs,<br><br>     v.<br><br>FIVE STAR MECHANICAL SERVICES, INC.<br>9706 Roosevelt Boulevard<br>Philadelphia, PA 19115<br><br>     and<br><br>JACK PEARS & ASSOCIATES, LLC<br>5762 Jefferson Street<br>Philadelphia, PA 19131<br><br>     and<br><br>CROMEDY CONSTRUCTION CORPORATION<br>5702 Newtown Avenue<br>Philadelphia, PA 19120<br><br>                              Defendants. | IN THE COURT OF<br>COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>CIVIL LAW DIVISION<br><br>JURY TRIAL DEMANDED<br><br>NOVEMBER TERM, 2017<br><br>NO: |

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if | Le han demandado a usted en la corte  Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación.  Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las |

1

Case ID: 171100138

Case ID: 171100138

you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone:  215-238-1701

demandas en contra de su persona  Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación.  Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE SI NO TIENE ABOGADO O SI NO TIENDE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCIÓN SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASSOCIACION DE LICENCIADOS DE FILADELFIA
SERVICIO DE REFERENCIA E INFORMACION LEGAL
One Reading Center
Filadelfia, Pennsylvania 19107
Telefono: 215-238-1701

## CIVIL ACTION COMPLAINT

**I.**     **THE PARTIES**

1.      Plaintiff Mark Wintersteen is an adult individual and citizen of the Commonwealth of Pennsylvania residing at 632 Wren Song Road, Yardley, Pennsylvania 19067.

2.      Plaintiff Kelly Wintersteen is an adult individual and citizen of the Commonwealth of Pennsylvania residing at 632 Wren Song Road, Yardley, Pennsylvania 19067.

3.      Plaintiffs were at all times material hereto and still are lawfully married.

4.      Defendant Five Star Mechanical Services, Inc. (hereinafter sometimes referred to as "Five Star") is a domestic business corporation duly organized under and existing by virtue of the laws of the Commonwealth of Pennsylvania with its principal place of business located at 9706 Roosevelt Boulevard, Philadelphia, Pennsylvania 19115.

5.      Defendant Jack Pears & Associates, LLC (hereinafter sometimes referred to as "Jack Pears") is a domestic limited liability company duly organized under and existing by virtue of the laws of the Commonwealth of Pennsylvania with its principal place of business located at 5762 Jefferson Street, Philadelphia, Pennsylvania 19131.

Case ID: 171100138
Case ID: 171100138

6.      Defendant Cromedy Construction Corporation (hereinafter sometimes referred to as "Cromedy") is a domestic business corporation duly organized under and existing by virtue of the laws of the Commonwealth of Pennsylvania with its principal place of business located at 5702 Newtown Avenue, Philadelphia, Pennsylvania 19120.

## II.    SUMMARY OF FACTS

7.      Plaintiffs incorporate herein by reference all of the averments contained in the preceding paragraphs of this Complaint as though fully set forth at length.

8.      On November 16, 2016, Mark Wintersteen was a union carpenter working in connection with a heating system installation project on the premises of William McKinley Elementary School located at 2101 N. Orkney Street, Philadelphia, Pennsylvania 19122 (hereinafter sometimes referred to as "the subject project").

9.      At all times material hereto, Five Star was performing general contracting and/or construction management duties for the subject project.

10.     As such, Five Star had a responsibility for site safety that included but was not limited to monitoring the aforementioned premises for safety violations and unsafe conditions, ensuring that everyone on the site was able to work under safe conditions, ensuring that no contractor created and/or left a condition that posed a danger to others, and enforcing compliance with site safety rules and plans and with all applicable industry safety regulations and standards.

11.     At all times material hereto, Jack Pears was a demolition contractor working at the aforementioned premises in connection with the subject project.

12.     As such, Jack Pears owed a duty of care to the employees of other contractors working on the subject project, including Mr. Wintersteen.

3

Case ID: 171100138
Case ID: 171100138

13. At all times material hereto, Cromedy was an HVAC / sheet metal contractor working at the aforementioned premises in connection with the subject project.

14. As such, Cromedy owed a duty of care to the employees of other contractors working on the subject project, including Mr. Wintersteen.

15. Mr. Wintersteen was injured on the subject project on November 16, 2016 after descending a ladder. While he was attempting to step down and back from the bottom of the ladder, his foot went into an open penetration in the floor that had been created by and left uncovered by Defendants, Five Star, Jack Pears, and Cromedy. A photograph of the penetration is attached hereto as Exhibit "A."

16. Mr. Wintersteen's ankle twisted causing him to fall to his left side and land on his left arm and shoulder.

17. Visibility at the location of the accident was poor due to inadequately placed temporary lighting that had been installed after the removal of the ceiling.

18. Defendants, Five Star, Jack Pears, and Cromedy had failed to cover and/or guard the aforementioned floor penetration in accordance with OSHA, ANSI, and other applicable industry safety regulations and standards.

19. Defendants, Five Star, Jack Pears, and Cromedy had failed to ensure that the aforementioned floor penetration was covered and/or guarded in accordance with OSHA, ANSI, and other applicable industry safety regulations and standards.

20. Defendants, Five Star, Jack Pears, and Cromedy had failed to ensure that the area where Mr. Wintersteen was working had sufficient and appropriate lighting.

21. As a result of the negligent acts or omissions of Defendants as described herein Plaintiff Mark Wintersteen sustained serious personal injuries including:

4

Case ID: 171100138
Case ID: 171100138

a.    injuries to the lower back, left shoulder/arm, and right ankle/foot;

b.    torn left shoulder rotator cuff;

c.    need for surgical repair of torn left shoulder rotator cuff;

d.    tear of the right peroneus brevis tendon;

e.    pain in lower back;

f.    bulging disc at L5-S1;

g.    radiating pain from lower back;

h.    need for future surgical intervention;

i.    need for nerve block injections;

j.    need for epidural injections;

k.    need for pain management;

l.    need for physical therapy;

m.    damage to the tendons, nerves, and/or ligaments of the left shoulder/arm;

n.    damage to the tendons, nerves, and/or ligaments of the right ankle/foot;

o.    aggravation/exacerbation of preexisting but quiescent and asymptomatic degenerative changes in the lower back, left shoulder/arm, and right ankle/foot;

p.    loss of range of motion in the left shoulder and arm;

q.    decreased range of motion in the left shoulder and arm;

r.    loss of range of motion in the right ankle and foot;

s.    decreased range of motion in the right ankle and foot;

t.    loss of mobility;

u.    loss of range of motion in the lower back;

v.    decreased range of motion in the lower back;

5

Case ID: 171100138
Case ID: 171100138

w.    difficulty with standing, sitting, walking, and bending; and

x.    pain, swelling, tenderness, discomfort, and decreased range of motion in the affected areas.

22.    The injuries and damages sustained by Mr. Wintersteen were a direct and proximate result of the negligence, carelessness, and tortious conduct of Defendants as described in this Complaint and were not due to any act or failure to act on the part of Mr. Wintersteen.

23.    The negligence, carelessness, and tortious conduct described herein of Defendants, themselves and through their agents, servants, employees, and/or representatives (whose identities are better known at this time to Defendants than they are to Plaintiffs), increased the risk of harm to Mr. Wintersteen and were substantial contributing factors to and a factual cause of his injuries and damages.

## III.   <u>CAUSES OF ACTION</u>

**COUNT I**
**NEGLIGENCE**
**MARK WINTERSTEEN v. FIVE STAR MECHANICAL SERVICES, INC.**

24.    Plaintiffs incorporate herein by reference all of the averments contained in the preceding paragraphs of this Complaint as though fully set forth at length.

25.    At all times relevant herein, Five Star undertook the supervision of the work that was being performed at the subject project and in connection therewith established plans, recommendations, designs, and specifications for the performance of said work.

26.    Having undertaken the duty to inspect, monitor, and supervise the subject project, Five Star owed a duty to those persons engaged in the performance of construction work there – including Mark Wintersteen, a business invitee – to provide a reasonably safe environment free from unreasonable hazards within which to perform their work.

6

Case ID: 171100138
Case ID: 171100138

27.     Five Star maintained, inspected, supervised, established safety rules for, and/or approved of the performance of said work, including the creation of penetrations in the flooring that served as walking/working surfaces.

28.     Five Star, itself and by and through its agents, servants, workmen, subcontractors, and/or employees, was careless and negligent with respect to the incident giving rise to Mr. Wintersteen's injuries that are the subject of this lawsuit by:

     a.     failing to provide Plaintiff with a safe place to work;

     b.     failing to adequately inspect the subject project for hazardous conditions and hazardous work practices, including but not limited to open, uncovered, and unguarded holes in walking/working surfaces;

     c.     creating holes in and/or allowing holes created in walking/working surfaces on the subject project to be left open, uncovered, and unguarded;

     d.     failing to cover, guard, or otherwise protect holes created in working/walking surfaces on the subject project;

     e.     failing to require that holes created in walking/working surfaces on the subject project be covered, guarded, or otherwise protected;

     f.     failing to take appropriate and necessary steps to ensure that holes created in walking/working surfaces on the subject project were covered, guarded, or otherwise protected;

     g.     failing to enforce compliance with site safety rules and plans;

     h.     failing to enforce compliance with OSHA, ANSI, and other applicable industry safety regulations and standards;

     i.     failing to appropriately, adequately, and effectively monitor the subject project;

     j.     failing to appropriately, adequately, and effectively monitor the work of contractors at the subject project;

     k.     failing to ensure proper and adequate lighting in work areas at the subject project;

Case ID: 171100138
Case ID: 171100138

l.   failing to discover that the floor penetration involved in Mr. Wintersteen's aforementioned accident had been left open, uncovered, and unguarded;

m.   failing to close, cover, or guard the floor penetration involved in Mr. Wintersteen's aforementioned accident;

n.   failing to take appropriate and necessary steps to ensure that the floor penetration involved in Mr. Wintersteen's aforementioned accident was closed, covered, or guarded;

o.   allowing a dangerous condition to be and remain in a walking/working surface on the subject project as described herein;

p.   exposing Mark Wintersteen and others similarly situated to a dangerous condition as described herein;

q.   failing to enforce compliance with OSHA and other industry regulations pertaining to safe work practices;

r.   violating applicable OSHA regulations, ACI standards, and ANSI standards;

s.   breaching its duties under §§ 324A, 343, 384, 392, 412, 414, 422, and 424 of the Restatement of the Law of Torts (Second);

t.   failing to properly train the project workers with respect to the identification of hazards;

u.   failing to hire competent safety inspectors on the subject project;

v.   failing to warn Plaintiff of the dangerous and unsafe condition then and there existing upon the subject project;

w.   failing to adopt, enact, employ, and/or enforce proper and adequate safety programs, precautions, procedures, measures, and plans that stressed safe work practices;

x.   violating all applicable federal and state statutes, local ordinances, and other rules, enactments, or regulations;

y.   failing to eliminate unreasonable hazards from the premises of the subject project;

z.   failing to properly supervise and direct Defendant, Jack Pears at the subject project; and

8

Case ID: 171100138
Case ID: 171100138

aa.    failing to properly supervise and direct Defendant, Cromedy at the subject project

29.    As a direct and proximate result of Defendant's negligence, carelessness, and tortious conduct as describe above, Mark Wintersteen sustained the injuries and damages described elsewhere in this Complaint.

30.    As a direct and proximate result of Defendant's negligence, carelessness, and tortious conduct as described above, Mark Wintersteen has been forced to expend and will continue to be forced to expend various sums of money on medical treatment and care.

31.    As a further direct and proximate result of Defendant's negligence, carelessness, and tortious conduct as described above, Mark Wintersteen sustained lost earnings, a loss of future earning capacity, a loss of life's pleasures, and a loss of his ability to pursue his normal duties, hobbies, occupation, and avocations, all to his great loss and detriment.   He has also endured and continues to endure extreme pain and suffering, also to his great loss and detriment.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant in an amount in excess of fifty thousand ($50,000) dollars, together with all lawful interest, costs, and damages for delay.

## COUNT II
## NEGLIGENCE
## MARK WINTERSTEEN v. JACK PEARS & ASSOCIATES, LLC

32.    Plaintiffs incorporate herein by reference all of the averments contained in the preceding paragraphs of this Complaint as though fully set forth at length.

33.    Jack Pears, itself and by and through its agents, servants, workmen, subcontractors, and/or employees, was careless and negligent with respect to the incident giving rise to Mr. Wintersteen's injuries that are the subject of this lawsuit by:

a.    failing to provide Plaintiff with a safe place to work;

9

Case ID: 171100138
Case ID: 171100138

b.    failing to adequately inspect the subject construction project for hazardous conditions and hazardous work practices, including but not limited to open, uncovered, and unguarded holes in walking/working surfaces;

c.    creating holes in and/or allowing holes created in walking/working surfaces on the subject project to be left open, uncovered, and unguarded;

d.    failing to cover, guard, or otherwise protect holes created in walking/working surfaces on the subject project;

e.    creating the floor penetration involved in Mr. Wintersteen's aforementioned accident;

f.    leaving the floor penetration involved in Mr. Wintersteen's aforementioned accident open, uncovered, and unguarded;

g.    failing to require that holes created in walking/working surfaces on the subject project be covered, guarded, or otherwise protected;

h.    failing to take appropriate and necessary steps to ensure that holes created in walking/working surfaces on the subject project were covered, guarded, or otherwise protected;

i.    failing to comply with site safety rules and plans;

j.    failing to enforce compliance with site safety rules and plans;

k.    failing to comply with OSHA, ANSI, and other applicable industry safety regulations and standards;

l.    failing to enforce compliance with OSHA, ANSI, and other applicable industry safety regulations and standards;

m.    failing to appropriately, adequately, and effectively monitor the subject project;

n.    failing to discover that the floor penetration involved in Mr. Wintersteen's aforementioned accident had been left open, uncovered, and unguarded;

o.    failing to close, cover, or guard the floor penetration involved in Mr. Wintersteen's aforementioned accident;

p.    failing to take appropriate and necessary steps to ensure that the floor penetration involved in Mr. Wintersteen's aforementioned accident was closed, covered, or guarded;

10

Case ID: 171100138

Case ID: 171100138

q.    allowing a dangerous condition to be and remain in a walking/working surface on the subject project as described herein;

r.    exposing Mark Wintersteen and others similarly situated to a dangerous condition as described herein;

s.    failing to comply with OSHA and other industry regulations pertaining to safe work practices;

t.    failing to enforce compliance with OSHA and other industry regulations pertaining to safe work practices;

u.    violating applicable OSHA regulations, ACI standards, and ANSI standards;

v.    breaching its duties under §§ 324A, 343, 384, 392, 412, 414, 422, and 424 of the Restatement of the Law of Torts (Second);

w.    failing to properly train the project workers with respect to the identification of hazards;

x.    failing to hire competent safety inspectors on the subject project;

y.    failing to warn Plaintiff of the dangerous and unsafe condition then and there existing upon the subject project;

z.    failing to adopt, enact, employ, and/or enforce proper and adequate safety programs, precautions, procedures, measures, and plans that stressed safe work practices;

aa.    violating all applicable federal and state statutes, local ordinances, and other rules, enactments, or regulations; and

bb.    failing to eliminate unreasonable hazards from the premises of the subject project.

34.    As a direct and proximate result of Defendant's negligence, carelessness, and tortious conduct as describe above, Mark Wintersteen sustained the injuries and damages described elsewhere in this Complaint.

Case ID: 171100138

Case ID: 171100138

35.     As a direct and proximate result of Defendant's negligence, carelessness, and tortious conduct as described above, Mark Wintersteen has been forced to expend and will continue to be forced to expend various sums of money on medical treatment and care.

36.     As a further direct and proximate result of Defendant's negligence, carelessness, and tortious conduct as described above, Mark Wintersteen sustained lost earnings, a loss of future earning capacity, a loss of life's pleasures, and a loss of his ability to pursue his normal duties, hobbies, occupation, and avocations, all to his great loss and detriment.  He has also endured and continues to endure extreme pain and suffering, also to his great loss and detriment.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant in an amount in excess of fifty thousand ($50,000) dollars, together with all lawful interest, costs, and damages for delay.

### COUNT III
### NEGLIGENCE
### MARK WINTERSTEEN v. CROMEDY CONSTRUCTION CORPORATION

37.     Plaintiffs incorporate herein by reference all of the averments contained in the preceding paragraphs of this Complaint as though fully set forth at length.

38.     Cromedy, itself and by and through its agents, servants, workmen, subcontractors, and/or employees, was careless and negligent with respect to the incident giving rise to Mr. Wintersteen's injuries that are the subject of this lawsuit by:

      a.      failing to provide Plaintiff with a safe place to work;

      b.      failing to adequately inspect the subject construction project for hazardous conditions and hazardous work practices, including but not limited to open, uncovered, and unguarded holes in walking/working surfaces;

      c.      creating holes in and/or allowing holes created in walking/working surfaces on the subject project to be left open, uncovered, and unguarded;

12

Case ID: 171100138
Case ID: 171100138

d.    failing to cover, guard, or otherwise protect holes created in walking/working surfaces on the subject project;

e.    creating the floor penetration involved in Mr. Wintersteen's aforementioned accident;

f.    leaving the floor penetration involved in Mr. Wintersteen's aforementioned accident open, uncovered, and unguarded;

g.    failing to require that holes created in walking/working surfaces on the subject project be covered, guarded, or otherwise protected;

h.    failing to take appropriate and necessary steps to ensure that holes created in walking/working surfaces on the subject project were covered, guarded, or otherwise protected;

i.    failing to comply with site safety rules and plans;

j.    failing to enforce compliance with site safety rules and plans;

k.    failing to comply with OSHA, ANSI, and other applicable industry safety regulations and standards;

l.    failing to enforce compliance with OSHA, ANSI, and other applicable industry safety regulations and standards;

m.    failing to appropriately, adequately, and effectively monitor the subject project;

n.    failing to discover that the floor penetration involved in Mr. Wintersteen's aforementioned accident had been left open, uncovered, and unguarded;

o.    failing to close, cover, or guard the floor penetration involved in Mr. Wintersteen's aforementioned accident;

p.    failing to take appropriate and necessary steps to ensure that the floor penetration involved in Mr. Wintersteen's aforementioned accident was closed, covered, or guarded;

q.    allowing a dangerous condition to be and remain in a walking/working surface on the subject project as described herein;

r.    exposing Mark Wintersteen and others similarly situated to a dangerous condition as described herein;

Case ID: 171100138
Case ID: 171100138

s.      failing to comply with OSHA and other industry regulations pertaining to safe work practices;

t.      failing to enforce compliance with OSHA and other industry regulations pertaining to safe work practices;

u.      violating applicable OSHA regulations, ACI standards, and ANSI standards;

v.      breaching its duties under §§ 324A, 343, 384, 392, 412, 414, 422, and 424 of the Restatement of the Law of Torts (Second);

w.     failing to properly train the project workers with respect to the identification of hazards;

x.      failing to hire competent safety inspectors on the subject project;

y.      failing to warn Plaintiff of the dangerous and unsafe condition then and there existing upon the subject project;

z.      failing to adopt, enact, employ, and/or enforce proper and adequate safety programs, precautions, procedures, measures, and plans that stressed safe work practices;

aa.    violating all applicable federal and state statutes, local ordinances, and other rules, enactments, or regulations; and

bb.    failing to eliminate unreasonable hazards from the premises of the subject project.

39.    As a direct and proximate result of Defendant's negligence, carelessness, and tortious conduct as describe above, Mark Wintersteen sustained the injuries and damages described elsewhere in this Complaint.

40.    As a direct and proximate result of Defendant's negligence, carelessness, and tortious conduct as described above, Mark Wintersteen has been forced to expend and will continue to be forced to expend various sums of money on medical treatment and care.

41.    As a further direct and proximate result of Defendant's negligence, carelessness, and tortious conduct as described above, Mark Wintersteen sustained lost earnings, a loss of future earning capacity, a loss of life's pleasures, and a loss of his ability to pursue his normal duties,

Case ID: 171100138
Case ID: 171100138

hobbies, occupation, and avocations, all to his great loss and detriment.   He has also endured and continues to endure extreme pain and suffering, also to his great loss and detriment.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant in an amount in excess of fifty thousand ($50,000) dollars, together with all lawful interest, costs, and damages for delay.

**COUNT IV**
**LOSS OF CONSORTIUM**
**KELLY WINTERSTEEN v. ALL DEFENDANTS**

42.    Plaintiffs incorporate herein by reference all of the averments contained in the preceding paragraphs to this Complaint as though fully set forth at length.

43.    As a direct and proximate result of the negligence, carelessness, and tortious conduct of Defendants as described elsewhere in this Complaint, Kelly Wintersteen has been deprived of the services, society, support, companionship, and consortium of her husband, Mark Wintersteen.

44.    As a further direct and proximate result of the negligence, carelessness, and tortious conduct of Defendants as described elsewhere in this Complaint, Kelly Wintersteen has been inconvenienced, incurred and continues to incur medical and other expenses in connection to the injuries to her husband, and has experienced and continues to experience mental and emotional anguish, all to her great loss and detriment.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants in an amount in excess of fifty thousand ($50,000) dollars, together with all lawful interest, costs, and damages for delay.

Case ID: 171100138
Case ID: 171100138

LAFFEY, BUCCI & KENT, LLP

By:     /s/ Jeffrey F. Laffey
        JEFFREY F. LAFFEY, ESQUIRE
        1435 Walnut Street, 7th Floor
        Philadelphia, PA  19102
        (215) 399-9255
        *Attorneys for Plaintiffs*
        *Mark Wintersteen and Kelly Wintersteen, h/w*

Date: November 3, 2017

16

Case ID: 171100138
Case ID: 171100138

## VERIFICATION

**Mark Wintersteen** hereby states that he is a plaintiff in this action and verifies that the statements made in the foregoing **Civil Action Complaint** are true and correct to the best of his knowledge, information, and belief. The undersigned understands that the statements therein are made subject to penalties of 18 Pa. C.S. Sect. 4904 relating to unsworn falsification to authorities.

*[signature]*

**MARK WINTERSTEEN**

Case ID: 171100138
Case ID: 171100138

## VERIFICATION

**Kelly Wintersteen** hereby states that she is a plaintiff in this action and verifies that the statements made in the foregoing **Civil Action Complaint** are true and correct to the best of her knowledge, information, and belief. The undersigned understands that the statements therein are made subject to penalties of 18 Pa. C.S. Sect. 4904 relating to unsworn falsification to authorities.

_Kelly Wintersteen_
**KELLY WINTERSTEEN**

Case ID: 171100138
Case ID: 171100138

Exhibit "A"

Case ID: 171100138
Case ID: 171100138

# EXHIBIT B

**FIVE STAR, INC.**
833 Lincoln Avenue, Unit 8
West Chester, PA 19380
(610) 719-6415
Fax (610) 719-6416

SUBCONTRACT NO. 16-198

Date:  March 2, 2016

**Above Number must appear on all Invoices**

SUBCONTRACT

(Labor and Materials to be furnished)

TO:  Cromedy Construction
       5702 Newtown Ave
       Philadelphia, PA 19120

Job Number:  B-090C of 2014/15

Job Name:  Mechanical Plant Replacement - William McKinley Elementary School

Job Location:  2101 North Orkney Street
                  Philadelphia, PA 19141

This SUBCONTRACT for the following materials, equipment and/or services to be furnished and performed in accordance with the Contract, General Conditions, Special Conditions, Plans, Specifications, Drawings, Bulletins and Addenda, (hereinafter called CONTRACT DOCUMENTS), prepared by  Princeton Engineering all of which form a part of the Contract between   **FIVE STAR, INC.**   and        Cromedy Construction , (hereinafter referred to as PRINCIPAL CONTRACT) and hereby becomes a part of this Subcontract as if set forth at length attached hereto.

SCOPE OF WORK:

Labor, materials and supervision necessary for a complete sheetmetal system as identified on the plans, specifications, addenda, all contract documents and Cromedy Construction's proposal dated 12/10/2015.
This is a prevailing wage project.
Contract is contingent upon approval from Owner/Architect.

ATTACHED ADDENDUM AS REPSECTS INSURANCE AND INDEMNIFICATION PROVISIONS FORMS A PART OF YOUR CONTRACT WITH FIVE STAR, INC.  Please note on certificate of insurance, Five Star as additional insured.  We are an equal opportunity employer.

In performing the foregoing work the Subcontractor shall furnish all labor, equipment, materials, supplies and everything necessary or incidental thereto or in connection with the performance by it of its work as required and called for under the provisions of the Principal Contract and Contract Documents.

TOTAL FIRM PRICE FOR ALL WORK UNDER THIS SUBCONTRACT IS:  $210,000.00
      Two Hundred Ten Thousand Dollars

ACCEPTED SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH ABOVE AND ON THE REVERSE SIDE HEREOF.

ALL OF THE TERMS AND CONDITIONS SET FORTH ABOVE AND ON THE REVERSE SIDE HEREOF ARE PART OF THIS SUBCONTRACT.

ORDER NOT VALID UNTIL ACCEPTED AND RETURNED

**FIVE STAR, INC.**

By: _____
                                    Title

By: _____
      Joseph Gaffney, Vice President

TERMS AND CONDITIONS FORMING PART OF SUBCONTRACT

1. This Subcontract between **FIVE STAR, INC.** (hereinafter called the CONTRACTOR) and the party to whom this Subcontract is addressed, (hereinafter called the SUBCONTRACTOR) shall, when accepted by SUBCONTRACTOR, become the exclusive contract between the parties, and all prior representations or agreements, whether written or oral, not incorporated herein, are superseded.

2. Work performed by SUBCONTRACTOR shall be in strict accordance with CONTRACT DOCUMENTS applicable to the work to be performed and materials, articles and/or equipment to be furnished hereunder. SUBCONTRACTOR shall be bound by all provisions of these documents and also by applicable provisions of the PRINCIPAL CONTRACT to which the CONTRACTOR is bound, and to the same extent. Where specific work as set forth in the CONTRACT DOCUMENTS is not described in this Subcontract, SUBCONTRACTOR shall perform all work normally construed to come within the scope of his activities, as required of the CONTRACTOR under the PRINCIPAL CONTRACT. Such work shall be performed to the complete satisfaction of the CONTRACTOR, the Architect and Owner.

3. Terms of payment, unless otherwise stated on this Subcontract, will be: (a) 90% of the value of the work performed monthly within ten (10) days of receipt of payment therefor from the Owner; and (b) final payment within ten (10) days after the work has been entirely completed, has been accepted by the Owner, and final payment has been received by **FIVE STAR, INC.**

4. SUBCONTRACTOR assumes entire responsibility and liability and agrees to indemnify and save harmless the CONTRACTOR and/or Owner from any loss, liability, expense, including attorneys' fees, damage or injury caused or occasioned, directly or indirectly, but its failure to comply with any of the following:

(a)   The furnishing and paying for all necessary permits, licenses, inspection fees as called for in the CONTRACT DOCUMENTS as being the responsibility of the SUBCONTRACTOR.

(b)   The payment of all royalty and license fees and the defense of all suits or claims for infringement of any patent rights pertaining to the materials, articles and/or equipment furnished as part of the work by SUBCONTRACTOR.

(c)   The payment of any and all loss or damage, direct or consequential, and claims of any kind or nature whatsoever, for property damage or personal injury, including death, to any and all persons, whether employees of CONTRACTOR or others, caused by, resulting from, arising out of or from, or occurring in connection with the performance of the work undertaken by SUBCONTRACTOR hereunder, including, but not limited to claims due to the negligence of CONTRACTOR or Owner, or to any defect in material, equipment, or workmanship however the same may develop.

SUBCONTRACTOR shall procure and maintain, at its own expense, the following insurance: Workmen's Compensation, including Occupational Disease within Statutory limits; Comprehensive General Liability, including Contractual, Statutory and Common Law coverage; and such other insurance as the CONTRACTOR or Owner may require in amounts satisfactory to the CONTRACTOR. Before commencing work, or delivering any materials, articles and/or equipment, SUBCONTRACTOR shall furnish a certificate or certificates to the CONTRACTOR establishing that all the insurance coverage required hereunder is in force and that it will not be cancelled with less than 10 days' written notice to CONTRACTOR and Owner. Failure of CONTRACTOR to require the production of such certificates of insurance shall not absolve SUBCONTRACTOR of its obligation in respect thereto.

5. SUBCONTRACTOR shall start work at the site within three (3) working days after notice from CONTRACTOR and shall supply sufficient materials, workmen and equipment to maintain progress of the work to the satisfaction of CONTRACTOR and perform the same at such times and places as designated by CONTRACTOR. In the event the SUBCONTRACTOR delays the progress of the work or the furnishing of materials, articles, and/or equipment, or fails in the performance of any of the provisions of this SUBCONTRACT, or if he should make a general assignment for the benefit of his creditors, or if a receiver should be appointed on account of his insolvency or inability to meet his obligations, CONTRACTOR shall have the right to cancel this SUBCONTRACT upon five (5) days' written notice mailed by Certified Mail, or delivered to SUBCONTRACTOR at its last known address. In case of such termination, CONTRACTOR may take possession (and for this purpose SUBCONTRACTOR does hereby assign title thereto) of all of the materials, tools and equipment of SUBCONTRACTOR on said premises and finish the work by whatever method CONTRACTOR may deem expedient, and SUBCONTRACTOR shall not be entitled to receive any further payments under this SUBCONTRACT until the performance of the CONTRACT has been completed by CONTRACTOR or others engaged by CONTRACTOR, at which time, if the unpaid balance due SUBCONTRACTOR exceeds the cost of completion, said amount shall be paid to SUBCONTRACTOR; but if such expense shall exceed such unpaid balance, then SUBCONTRACTOR shall pay the difference to CONTRACTOR. The costs and expenses incurred by CONTRACTOR shall include all damage and costs incurred through the default of the SUBCONTRACTOR as well as consequential damages for delay or otherwise.

6. SUBCONTRACTOR shall clean up and remove from the premises all debris caused by the execution of the work hereunder and will pay for any breakage or damage caused by SUBCONTRACTOR. Upon failure to remove such debris or to pay for such breakage or other damage, CONTRACTOR shall remove said debris and replace property so damaged, and charge the cost thereof to SUBCONTRACTOR.

7. SUBCONTRACTOR, as a condition precedent to payment hereunder, shall furnish all necessary releases, lien waivers, affidavits, and other documents required by CONTRACTOR to keep Owner's premises free from liens or claims for liens of all materialmen, subcontractors or laborers. Acceptance of final payment by SUBCONTRACTOR shall be a full and complete discharge of CONTRACTOR. No payment, including final payment, shall be construed to be an acceptance of defective work or improper materials.

8. CONTRACTOR may hold, as trust funds, all payments due SUBCONTRACTOR hereunder, which it is authorized to apply in payment of all labor, materials, equipment, services and other charges incurred by SUBCONTRACTOR in connection with the performance of this undertaking and said funds or the balance thereof shall not be payable to SUBCONTRACTOR until all such obligations have been satisfied in full.

9. SUBCONTRACTOR, for the price provided in this SUBCONTRACT, hereby accepts and assumes exclusive liability for, and shall save CONTRACTOR harmless against the payment of all contributions, taxes or premiums which may be payable under the Unemployment Insurance Law of any State or under the Federal Social Security Act, measured upon the payroll of employees, by whomsoever employed, engaged in the performance of the work included in this SUBCONTRACT and all Sales, Use or other taxes levied or assessed against Owner, CONTRACTOR or SUBCONTRACTOR, arising out of the Work, including, but not limited to, taxes on any kind of materials, articles or equipment. CONTRACTOR may, at its sole discretion, request production of evidence satisfactory to it by SUBCONTRACTOR that all obligations contained in the within paragraph have been paid in full as a condition to making any payment, whether final or otherwise, hereunder.

10. Unless a longer period is provided in the CONTRACT DOCUMENTS, SUBCONTRACTOR hereby guarantees all labor, materials, and work furnished hereunder against all defects which may develop within one year from date of acceptance by Owner, or within the guarantee period set forth in the CONTRACT DOCUMENTS, whichever is longer. Pursuant to such guarantee, SUBCONTRACTOR agrees to repair and/or replace, without charge to CONTRACTOR, any and all defective workmanship, materials, equipment and work; to pay all costs, including labor charges, in connection with such repairs and/or replacements, and, to remedy any defects latent or patent, except those due to ordinary wear and tear or improper use or maintenance. SUBCONTRACTOR shall, in any event, pay for all damage to the property of the Owner resulting from defects in the Work, including consequential damage, and all expenses to remove, replace and/or repair the Work and any other Work which may be damaged in removing or repairing the Work. All guarantees and warranties herein provided shall extend to the Owner or other awarding authority and/or CONTRACTOR.

11. SUBCONTRACTOR agrees: (a) That it will not assign this SUBCONTRACT or any of the monies due it, or to become due hereunder, nor sublet any portion of the Work without first obtaining written consent of the CONTRACTOR and (b) that CONTRACTOR shall have the right to set off against any monies due SUBCONTRACTOR under this SUBCONTRACT, any claim or claims against SUBCONTRACTOR, whether arising under this SUBCONTRACT or any other subcontract or subcontracts between the parties hereto.

12. In the event of the termination of the PRINCIPAL CONTRACT between CONTRACTOR and Owner or General Contractor, this SUBCONTRACT shall also be terminated, upon written notice of CONTRACTOR to SUBCONTRACTOR, and CONTRACTOR shall only be liable for labor, materials, articles and equipment furnished up to the date of receipt of the written notice of termination and/or materials and equipment ordered for the project, but only to the extent SUBCONTRACTOR is liable.

13. It is understood and agreed that Owner and/or Architect has the right to approve or disapprove the employment of this SUBCONTRACTOR, and in the event that Owner and/or Architect does not approve this SUBCONTRACT, this SUBCONTRACT shall become null and void.

14. In the event that SUBCONTRACTOR shall be unable to proceed expeditiously in the performance of this SUBCONTRACT because of labor problems, then CONTRACTOR shall, in its sole judgment, have the right to terminate this SUBCONTRACT upon five (5) work days' written notice mailed by Certified Mail, or delivered to SUBCONTRACTOR at its last known address. In the event of such termination, CONTRACTOR shall pay SUBCONTRACTOR for the work, labor or material furnished by SUBCONTRACTOR as of the day of such termination.

15. No additions, deductions, or changes shall be made in the Work, nor shall there by any charges for premium time, except upon written Order of CONTRACTOR. Said Order shall specify the amount of additional compensation or credit to be applied to the amount of this SUBCONTRACT.

16. All jurisdictional disputes arising on this project in connection with the performance of this work and/or furnishing of materials shall be subject to adjustment and settlement by the then existing Board of Settlement of Jurisdictional Disputes in the Building and Construction Industry or such other existing agency or body established for settlement of jurisdictional disputes.

17. No discrimination shall be made against any employees or in the employment of any applicant, because of age, race, color, creed, or national origin, and SUBCONTRACTOR agrees to comply with Section 711(a) of Title VII of the Civil Rights act of 1964, and all Executive Orders dealing with Equal Employment Opportunity, as the same may be amended from time to time, the Revised Philadelphia Plan, as extended by Order dated February 13, 1971, as the same may hereafter be modified, and further agrees to comply with all of the provisions of the CONTRACT DOCUMENTS pertaining thereto.

18. All disputes, claims or questions arising hereunder shall be subject to arbitration and shall be submitted to arbitration by a three (3) member Panel in accordance with the rules of Procedure, then obtaining, of the American Arbitration Association. A determination thereunder shall be final and binding upon the parties thereto. Pending determination, there shall be no work stoppage.

19. SUBCONTRACTOR for itself, its subcontractors and all parties acting through or under it hereby covenants and agrees not to file any liens or to make any claims against the premises or any part thereof or against any building or buildings or other improvements erected or made to be erected or made thereon, or against any monies due or to grow due to the CONTRACTOR, in accordance with any statute, State or Federal, for any cause whatsoever, and further covenants to release and hereby does release the premises upon which the Project is located and each and every part thereof and any and all buildings that may now or hereafter be erected thereon, and any monies due or to grow due to the CONTRACTOR from any and every lien, charge or claim of any nature whatsoever that it might otherwise at any time have against the same or any part thereof, for work done or to be done, materials furnished or to be furnished or upon any other ground whatever growing out of or in any way connected with or in relation to the erection construction of any building or buildings upon the same premises.

20. The SUBCONTRACTOR shall be responsible to the CONTRACTOR for compliance with all safety rules and regulations during SUBCONTRACTOR'S performance on and in connection with this project. SUBCONTRACTOR shall indemnify the CONTRACTOR for any and all expenses incurred by CONTRACTOR for fines, penalties, and corrective measures resulting from acts of commission or omission by SUBCONTRACTOR, his agents and employees for failure to comply with such safety rules and regulations.

THIS ADDENDUM IS ATTACHED TO AND FORMS A PART OF YOUR CONTRACT WITH
FIVE STAR, INC.

## INSURANCE AND INDEMINIFICATION PROVISIONS

Subcontractor expressly declares and acknowledges that Subcontractor is an independent contractor and not an employee of Contractor and that Contractor does not direct subcontractor's actions beyond the provisions of this agreement.

1) INDEMNIFICATION. Subcontractor assumes entire responsibility and liability for any and all claims and/or damages of any nature or character whatsoever with respect to the work covered by this Subcontract Agreement (including but not limited to, work performed under this Subcontract Agreement, work performed under change order or any other work incidental thereto, whether performed at or off the project site) and Subcontractor agrees defend, indemnify and hold harmless the Contractor, its affiliates, parents and subsidiaries, the Contractor's surety, if any, the owner, any other Contractor that the Contractor may be obligated to defend and indemnify in the Main Contract, and the architect from and against any and all claims, demands, liabilities,interests, loss, damage, fires, penalties, attorney's fees, cost and expenses of whatever kind or nature, including property damage or for personal injuries (including death) to any and all persons (whether such persons are employees of Contractor or employees of Subcontractor, or employees of Subcontractor's subcontractors, or others) resulting from the work covered by this Subcontract, arising therefrom or occurring in connection therewith and whether any such claims are alleged to have been caused in whole or in part, by a party indemnified hereunder. This indemnification expressly extends to (but is not in any manner limited to) any claims, damages or suits for infringement or violations of patents or patent rights, Subcontractor further agrees that the indemnification contained in this section shall not in any manner be limited by the applicable provisions of any Workers' Compensation Act and, for this purpose, Subcontractor waives its rights to immunity as an employer under any such Workers' Compensation Act in the event of a claim by one or more of its employees against Contractor (or any other party whom Subcontractor is obligated, by this paragraph, to indemnify) and Subcontractor further waives any defense that this Subcontract or any portions thereof was not executed by Subcontractor prior to the date of the occurrence giving rise to Subcontractor's indemnification responsibility hereunder.

In the event that such claims, demands, liabilities, interests, loss, fines, penalties, attorney's fees, costs and expenses are made, asserted or threatened against Contractor or any other party whom Contractor is obligated to indemnify or defend in the Main Contract, Contractor shall have the right to withhold from any payments due, or to become due to the Subcontractor an amount sufficient in Contractor's sole discretion to protect and indemnify it and such other parties against any and all such claims, demands, liabilities, interests, loss, damage, fines, penalties, attorney's fees, cost and expenses, or Contractor, in its sole discretions, may require Subcontractor to furnish a surety bond satisfactory to Contractor guaranteeing such protection furnished by Subcontractor.

2) INSURANCE. Prior to commencement of any work under the Contract and until completion and final payment is made for the work, the Subcontractor and each and every Sub-subcontractor of the Subcontractor shall, at its sole expense, maintain the following insurance on its own behalf, with an insurance company or companies having an A.M. Best Rating of "A-: Class VII" or better, and furnish to the contractor Certificates of Insurance evidencing same.

The term "Subcontractor & Sub-subcontractor" as used in these Insurance Requirements shall mean and include Subcontractors and Sub-subcontractors of every tier.

    A.   Workers' Compensation and Employers Liability: in the State in which the work is to be performed and elsewhere as may be required and shall include, where applicable, U.S. Longshoremen's and Harbor Workers' Coverage.

       a) Workers' Compensation Coverage:  Statutory Requirements

       b) Employers Liability Limits not less than:

| | |
|---|---|
| Bodily Injury by Accident: | $100,000 Each Accident |
| Bodily Injury by Disease: | $100,000 Each Employee |
| Bodily Injury by Disease: | $500,000 Policy limit |

    B.   Commercial General Liability: (including Premises – Operations, Independent Contractors, Products/Completed Operations, Broad Form Property Damage, Contractual Liability

1

(including Liability for Employee Injury assumed under a Contract), and Explosion, Collapse and Underground Coverages).

  a)   Occurrence Form with the following limits:

|   |   |
|---|---|
| 1) General Aggregate: | $2,000,000 |
| 2) Products/Completed Operations Aggregate: | $2,000,000 |
| 3) Each Occurrence: | $1,000,000 |
| 4) Personal and Advertising Injury: | $1,000,000 |
| 5) Fire Damage (any one fire): | $ 50,000 |
| 6) Medical Expense (any one person): | $ 5,000 |

  b)   Products/Completed Operations Coverage must be maintained for a period of at least two (2) years after final payment.

  c)   The General Aggregate Limit must apply on a Per Project basis.

C.   Automobile Liability:

  a)   Coverage to include:

    1)   All owned, Hired and Non-Owned Vehicles

    2)   Contractual Liability Coverage (including Liability for Employee Injury assumed under a Contract).

  b)   Per Accident Combine Single Limit:     $1,000,000

D.   Commercial Umbrella Liability:

  a)   Occurrence Limit:     $1,000,000

  b)   Aggregate Limit (where applicable):   $1,000,000

  b)   Policy to apply excess of the Commercial General Liability (following form Per Project Limit), Commercial Automobile Liability and Employers Liability Coverages.

E.   Deductibles or Self Insured Retentions:
None of the policies of insurance required of the Subcontractor by this agreement shall contain deductibles or self insurance retentions in excess of $10,000.

F.   Financial Rating of Insurance Companies:

  A)   A.M. Best Rating: A- (Excellent) or Higher

  B)   A.M. Best Financial Size Category: Class VII or Higher

G.   Contractor, its affiliates, parents and subsidiaries, the Contractor's surety, if any, the owner, any other Contractor that Contractor may be obligated to defend and indemnify in the Main Contract shall be added as ADDITIONAL INSUREDS on all liability policies. With respect to General Liability, Additional Insured Status shall include coverage for both ongoing operations and completed operations using CG 20 26 11/85 (or its equivalent). Copies of these endorsements shall be included.

H.   Subcontractor's and Sub-subcontractor's insurance is to be endorsed to reflect its *primary and non-contributory* for the Contractor, and all other additional insureds named in these Insurance Requirements.

I.   It is agreed the Subcontractor's and Sub-subcontractor's insurance will not be canceled, materially changed or non-renewed without at least (30) days advance written notice to Contractor, by Certified Mail – Return Receipt Requested.

J.   Waiver of Rights of Recovery and Waiver of Rights of Subrogation:

  a)   The subcontractor and Sub-subcontractors waive all rights of recovery against Contractor, the Prime Contractor, General Contractor, and all the additional insureds for loss or damage covered by any of the insurance maintained by the Subcontractor or Sub-subcontractor pursuant to this subcontract.

  b)   The Subcontractor and Sub-Subcontractors and their respective insurance carriers hereby waived all rights of subrogation against Contractor, the Prime Contractor, General Contractor, and all the additional insureds for loss or damage covered by any of the

insurance maintained by the Subcontractor or Sub-subcontractor pursuant to this subcontract.

    c) If any of the policies of insurance required under this Subcontract require an endorsement to provide for the waiver of subrogations set forth in b, above, then the named insureds of such policies will cause them to be so endorsed.

K.    The amount of insurance provided in the aforementioned insurance coverages, shall not be construed to be a limitation of the liability on the part of the Subcontractor or any their Sub-subcontractors.

L.    Any type of insurance or any increase in limits of liability not described above which the Subcontractor requires for its own protection or on account of statute shall be its own responsibility and at its own expense.

M.    The carrying of insurance described shall in no way be interpreted as relieving the Subcontractor of any responsibility or liability under the contract.

N.    Prior to the commencement of work and /or payment, the Subcontractor and Sub-subcontractor shall file Certificates of Insurance with the Contractor which shall be subject to the Contractor's approval of adequacy of protection and the satisfactory character of the insurer. The Certificates of Insurance should be mailed within five (5) days of the receipt of these insurance requirements to the Contractor, regardless of when your work will start. Project description and Job Number must be shown on the Certificate of Insurance.

    In the event of a failure of a Subcontractor to furnish and maintain said insurance and to furnish satisfactory evidence thereof, Contractor shall have the right (but not the obligation) to take out and maintain the same for all parties on behalf of the Subcontractor who agrees to furnish all necessary information thereof and to pay the cost thereof to the Contractor immediately upon presentation of an invoice. Subcontractor gives Contractor the right to terminate or modify such coverage with or without notice to Subcontractor.

3)   SAFETY. Subcontractor shall be responsible to the Contractor for compliance with all safety laws, rules and regulations during Subcontractor's performance of work in connection with this project including, without limitation, those laws, rules and regulation established under the Federal Occupational Safety and Health Act of 1970. Subcontractor shall indemnify the Contractor from and against all fines, penalties and corrective measures resulting from acts of commission or omission by Subcontractor, its subcontractors, materialmen, agents, employees or assigns, in respect of their failure to comply with such safety laws, rules and regulations. Subcontractor shall establish a safety program implementing safety measures, policies and standards conforming to those required or recommended by governmental and quasi-governmental authorities having jurisdiction and by the Contractor, the Prime Contractor, if applicable, and the Owner, including but not limited to, requirements imposed by the Contract Documents. Subcontractor shall comply with the reasonable recommendations of insurance companies having an interest in the project, and shall stop any part of the WORK as directed by Contractor. Contractor's failure to stop Subcontractor's unsafe practices shall not relieve Subcontractor of the responsibility therefor. Subcontractor shall notify Contractor immediately following any accident and promptly confirm the notice in writing. A detailed written report shall be furnished if requested by the Contractor.

    This agreement applies to any current or future work performed by subcontractor for contractor.

_____ / _____              _____

Subcontractor Signature / Date                  Contractor Signature / Date

                                           Joseph Gaffney

_____                  _____

Subcontractor Name PRINTED                    Contractor name PRINTED

# Five Star, Inc.
## Insurance Requirements
### Subcontractors

A Certificate of Insurance that conforms to the information found below is required before any subcontractor can perform any work at a Five Star, Inc. jobsite. A copy of this certificate and endorsements, either faxed or mailed, must be sent to the Five Star, Inc. at the address found below prior to subcontractor arriving on-site

| CATEGORY | STANDARD MINIMUM REQUIREMENT |
|---|---|
| General Aggregate | $2,000,000 |
| Each Occurrence | $1,000,000 |
| Automobile | $1,000,000 CSL (Combined Single Limit) |
| Workers Compensation | $500,000/$500,000/$500,000 |
| Excess Liability | $1,000,000 |

The Certificate Holder:    Five, Star, Inc.
                           833 Lincoln Avenue
                           Unit 8
                           West Chester, PA 19382

Additional Insured: Five Star, Inc., owner and any others as required by contract.

Description: Project number and jobsite address must be listed.
Five Star, Inc., owner and any others as required by contract must be included as additional insured under Automobile, General Liability and Umbrella on a Primary and Non-Contributory basis including both ongoing and completed operations under General Liability. All policies include Waiver of Subrogation in favor of Five Star, Inc. [All endorsements must be included]

Policies should be endorsed to provide Five Star, Inc. with 30 days notice of cancellation or non-renewal.

Please fax or mail the Certificate of Insurance to:

Five Star, Inc.
833 Lincoln Avenue
Unit 8
West Chester, PA 19382
(610) 719 6415 Phone
610) 719 6416 Fax

*SHEETMETAL*  *McKINLEY SCHOOL*

*Bill Rowen for*  *REVISED*

*Rich Hudson —*  *HAS CHIMNEY LINER*

"It's Simple, It's Service"

*1580 Ducts 16-198*

# CROMEDY CONSTRUCTION

5702 Newtown Avenue ● Philadelphia, PA 19120
Phone: 215-437-7606 ● Fax: 215-437-7655

*RICH HUDSON 215-437-7606*

**REVISED**

*Cromedy Construction is proud to hold the following certificati*

**\*8a** – Federal DBE Certification
**\*DBE** – PA Unified Certification (Philadelphia Airport, Septa, PA DOT, City of Philadelphia)
**\*MBE**- MSDC/OEO City of Philadelphia / State of Pennsylvania
**\*MBE** – Pennsylvania Department of General Services ( DGS )
**\*MBE** – State of New Jersey
**\*MBE** – State of Delaware          **REVISED**      **Base Bid:**   $210,000
**\*LBE** - Philadelphia Local Business Entity (5% Bid Credit)
**\*Certified** Pennsylvania Gaming Vendor

*Contract price as per Rich Hudson*

| Date: | 12/10/2015 | | Drwg Date: | 11/6/2015 |
|---|---|---|---|---|
| Estimator | Bill Rowen | PLEASE NOTE: QUOTE ASSUMES ALL NORMAL WORKING AND DELIVERY HOURS. WE ALSO EXCLUDE ALL WORK NOT SHOWN ON MECHANICALS...NO BID ON ARCHITECTURAL DRAWINGS. | Addenda #1: | 12/4/2015 |

*QUOTE ASSUMES ALL CEILINGS REMOVED BEFORE DUCT INSTALLATION*

| # | | FURNISH & INSTALL | FURNISH ONLY | INSTALL ONLY | EXCLUDE | # | | FURNISH & INSTALL | FURNISH ONLY | INSTALL ONLY | EXCLUDE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | SHEET METAL SHOP DRAWINGS | | X | | | 40 | UNIT FILTERS & REPLACEMENTS | | | | X |
| 2 | COORDINATED DRAWINGS | | X | | | 41 | | | | | |
| 3 | GALVANIZED DUCTWORK | X | | | | 42 | | | | | |
| 4 | WIRE MESH SCREENS | X | | | | 43 | DEMO. - DISCONNECT FROM EQUIP | | X | | |
| 5 | ALL BREECHING & ACCESSORIES | X | | | | 44 | ONLY REMOVAL BY OTHERS | | | | |
| 6 | | | | | | 45 | AIR BALANCE | | | | X |
| 7 | ACOUSTICAL DUCT LINER | X | | | | 46 | LEAK TEST-SMACNA | | | | X |
| 8 | | | | | | 47 | CUTTING & PATCHING | | | | X |
| 9 | SHEET METAL PLENUMS | | | | | 48 | | | | | |
| 10 | | | | | | 49 | | | | | |
| 11 | | | | | | 50 | STRUCTURAL/SUPPL'L STEEL | | | | X |
| 12 | | | | | | 51 | TEMPORARY SERVICES | | | | X |
| 13 | ACCESS DOORS IN DUCTWORK | X | | | | 52 | | | | | |
| 14 | BUILDING ACCESS DOORS | | | | X | 53 | FIELD PAINTING | | | | X |
| 15 | GRILLES, REG., DIFFUSERS | X | | | | 54 | BROOM CLEAN-UP | | | | X |
| 16 | HEAT PUMP UNITS (50/50) | | | X | | 55 | Vacuuming of Duct | | | | X |
| 17 | T-STATS/TUBING/CONTROL WIRING | | | | X | 56 | Ceiling Remove/Replace | | | | X |
| 18 | FANS | X | | | | 57 | | | | | |
| 19 | Belt/Sheaves for Existing | | | | X | 58 | PERMITS | | | | X |
| 20 | STARTERS/VFD'S | | | | X | 59 | Firepacking | | | | X |
| 21 | SEISMIC REQUIREMENTS/FANS | | | | X | 60 | Soundpacking | | | | X |
| 22 | GRAVITY VENTILATORS | X | | | | 61 | OVERTIME PROVISIONS | | | | X |
| 23 | OUTSIDE AIR INTAKES | X | | | | 62 | DRAIN PANS | | | | X |
| 24 | LOUVERS ON MECH'L DWGS | X | | | | 63 | FIN TUBE COVERS/WORK | | | | X |
| 25 | LOUVERS ON ARCH'L DWGS | X | | | | 64 | ASBESTOS RELATED ISSUES | | | | X |
| 26 | LOUVER BLANK-OFF | | | | X | 65 | BOND COST | | | | X |
| 27 | FIRE DAMPERS WHERE SHOWN | | | | X | 66 | SHRINK WRAP DUCT | X | | | |
| 28 | | | | | | 67 | | | | | |
| 29 | F/S DAMPERS WHERE SHOWN | | | | X | 68 | | | | | |
| 30 | AUTOMATIC/CONTROL DAMPERS | | X | | | 69 | DUCT INTERIORS WILL BE | X | | | |
| 31 | | | | | | 70 | PROTECTED FROM FOREIGN | | | | |
| 32 | SMOKE DETECTORS – 4 AHU'S | | X | | | 71 | ELEMENTS AS PER SMACNA | | | | |
| 33 | | | | | | 72 | DUCT CLEANING FOR NEW CONST | | | | X |
| 34 | | | | | | 73 | | | | | |
| 35 | | | | | | 74 | MINORITY BUSINESS PARTICIPATION | | X | | |
| 36 | | | | | | 75 | | | | | |
| 37 | | | | | | 76 | | | | | |
| 38 | | | | | | 77 | | | | | |
| 39 | | | | | | 78 | | | | | |

*R HUDSON . C.P. 215-760-0500*
*OFF - 215-437-7606*
*E. MAIL - RHUDSON @ CromedyConstruction.com*

# EXHIBIT C

**Zavalas, Stacey**

| | |
|---|---|
| **Subject:** | FW: McKinley ES Agreement  - Wintersteen case |
| **Attachments:** | Cromedy Agreement 16-198.pdf |

**From:** Mary Ellen Strubilla <maryellen@fivestarmechanical.com>
**Sent:** Thursday, August 15, 2019 2:31 PM
**To:** Wolf, David S. <DSWolf@MDWCG.com>
**Subject:** FW: McKinley ES Agreement

Dave,
Here is the email with the subcontract agreement.

**From:** Mary Ellen Strubilla
**Sent:** Friday, March 04, 2016 12:43 PM
**To:** Rich Hudson
**Cc:** Joe Gaffney
**Subject:** McKinley ES Agreement

Rich,
Attached is the subcontractor agreement for the sheetmetal at the McKinley Elementary School. Please review, sign and
return for final execution.
Thanks!
Mary Ellen

*Mary Ellen Strubilla*
Five Star Mechanical
833 Lincoln Ave, Unit 8
West Chester, PA 19380

610-719-6415 x20



**From:** Joe Gaffney
**Sent:** Monday, February 29, 2016 3:14 PM
**To:** Mary Ellen Strubilla
**Subject:** FW: McKinley ES

Can you request the cad files for Rich @ Cromedy Construction for the McKinley school

Joe Gaffney

**From:** Rich Hudson [mailto:rhudson@cromedyconstruction.com]
**Sent:** Monday, February 29, 2016 2:36 PM

1

**To:** Joe Gaffney
**Cc:** Mary Ellen Strubilla
**Subject:** RE: McKinley ES

Confirmed…. Do we have access to the cad files.

*Please note that our corporate name has change from Advantage Contracting to **Cromedy Construction Corporation**. Thank you*

Respectfully,

Rich Hudson
Senior Project Manager
Cromedy Construction
Ph: 215-437-7606
Fx: 215-437-7655
Cell: 215-760-0500
www.CromedyConstruction.com

*A SBA 8(a) SDB, MBE/DBE Certified Firm*

*"It's Simple, It's Service"*

*"Everyone Wants Your Business, It's What They Do With It After They Get It That Matters"*





Notice: This communication, including attachments, is PRIVATE AND CONFIDENTIAL and may contain information that is proprietary and legally privileged by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, reproduction of, or reliance on this e-mail, including

2

attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

**From:** Joe Gaffney [mailto:joeg@fivestarmechanical.com]
**Sent:** Monday, February 29, 2016 2:23 PM
**To:** rhudson@cromedyconstruction.com
**Cc:** Mary Ellen Strubilla
**Subject:** FW: McKinley ES

Rich,
Please find the cuts on the AHU'S for McKinley School.

Please note that they are just going in for approval but being that I am going with the basis of design for the project I would imagine that they should be good to start your drawings.

Joe Gaffney
484-614-0486

3

**FIVE STAR, INC.**
833 Lincoln Avenue, Unit 8
West Chester, PA 19380
(610) 719-6415
Fax (610) 719-6416

SUBCONTRACT NO. 16-198

Date:  March 2, 2016

**Above Number must appear on all Invoices**

**SUBCONTRACT**

**(Labor and Materials to be furnished)**

TO:  Cromedy Construction
5702 Newtown Ave
Philadelphia, PA 19120

**Job Number:**  B-090C of 2014/15

**Job Name:**   Mechanical Plant Replacement - William McKinley Elementary School

**Job Location:**  2101 North Orkney Street
Philadelphia, PA 19141

This SUBCONTRACT for the following materials, equipment and/or services to be furnished and performed in accordance with the Contract, General Conditions, Special Conditions, Plans, Specifications, Drawings, Bulletins and Addenda, (hereinafter called CONTRACT DOCUMENTS), prepared by  Princeton Engineering all of which form a part of the Contract between   **FIVE STAR, INC.**    and     Cromedy Construction
, (hereinafter referred to as PRINCIPAL CONTRACT) and hereby becomes a part of this Subcontract as if set forth at length attached hereto.

SCOPE OF WORK:

Labor, materials and supervision necessary for a complete sheetmetal system as identified on the plans, specifications, addenda, all contract documents and Cromedy Construction's proposal dated 12/10/2015.
This is a prevailing wage project.
Contract is contingent upon approval from Owner/Architect.

ATTACHED ADDENDUM AS REPSECTS INSURANCE AND INDEMNIFICATION PROVISIONS FORMS A PART OF YOUR CONTRACT WITH FIVE STAR, INC.  Please note on certificate of insurance, Five Star as additional insured. We are an equal opportunity employer.

In performing the foregoing work the Subcontractor shall furnish all labor, equipment, materials, supplies and everything necessary or incidental thereto or in connection with the performance by it of its work as required and called for under the provisions of the Principal Contract and Contract Documents.

TOTAL FIRM PRICE FOR ALL WORK UNDER THIS SUBCONTRACT IS:  $210,000.00
Two Hundred Ten Thousand Dollars

ACCEPTED SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH ABOVE AND ON THE REVERSE SIDE HEREOF.

ALL OF THE TERMS AND CONDITIONS SET FORTH ABOVE AND ON THE REVERSE SIDE HEREOF ARE PART OF THIS SUBCONTRACT.

ORDER NOT VALID UNTIL ACCEPTED AND RETURNED

**FIVE STAR, INC.**

By: _____
                              Title

By: _____
Joseph Gaffney, Vice President

TERMS AND CONDITIONS FORMING PART OF SUBCONTRACT

1. This Subcontract between  FIVE STAR, INC.  (hereinafter called the CONTRACTOR) and the party to whom this Subcontract is addressed, (hereinafter called the SUBCONTRACTOR) shall, when accepted by SUBCONTRACTOR, become the exclusive contract between the parties, and all prior representations or agreements, whether written or oral, not incorporated herein, are superseded.

2. Work performed by SUBCONTRACTOR shall be in strict accordance with CONTRACT DOCUMENTS applicable to the work to be performed and materials, articles and/or equipment to be furnished hereunder. SUBCONTRACTOR shall be bound by all provisions of these documents and also by applicable provisions of the PRINCIPAL CONTRACT to which the CONTRACTOR is bound, and to the same extent. Where specific work as set forth in the CONTRACT DOCUMENTS is not described in this Subcontract, SUBCONTRACTOR shall perform all work normally contained to come within the scope of his activities, as required of the CONTRACTOR under the PRINCIPAL CONTRACT. All work shall be performed to the complete satisfaction of the CONTRACTOR, the Architect and Owner.

3. Terms of payment, unless otherwise stated on this Subcontract, will be: (a) 90% of the value of the work performed monthly within ten (10) days of receipt of payment therefor from the Owner; and (b) final payment within ten (10) days after the work has been entirely completed, has been accepted by the Owner, and final payment has been received by FIVE STAR, INC.

4. SUBCONTRACTOR assumes entire responsibility and liability and agrees to indemnify and save harmless the CONTRACTOR and/or Owner from any loss, liability, expense, including attorneys' fees, damage or injury caused or occasioned, directly or indirectly, but its failure to comply with any of the following:

(a)    The furnishing and paying for all necessary permits, licenses, inspection fees as called for in the CONTRACT DOCUMENTS as being the responsibility of the SUBCONTRACTOR.

(b)    The payment of all royalty and license fees and the defense of all suits or claims for infringement of any patent rights pertaining to the materials, articles and/or equipment furnished as part of the work by SUBCONTRACTOR.

(c)    The payment of any and all loss or damage, direct or consequential, and claims of any kind or nature whatsoever, for property damage or personal injury, including death, loss of any or all persons, whether employees of CONTRACTOR or others, caused by, resulting from, arising out of or from, or occurring in connection with the performance of the work undertaken by SUBCONTRACTOR hereunder, including, but not limited to claims due to the negligence of CONTRACTOR or Owner, or to any defect in material, equipment, or workmanship whenever the same may develop.

SUBCONTRACTOR shall procure and maintain, at its own expense, the following insurance: Workmen's Compensation, including Occupational Disease within Statutory limits; Comprehensive General Liability, including Contractual, Statutory and Common Law coverage; and such other insurance as the CONTRACTOR or Owner may require in amounts satisfactory to the CONTRACTOR. Before commencing work, or delivering any materials, articles and/or equipment, SUBCONTRACTOR shall furnish a certificate or certificates to the CONTRACTOR establishing that all the insurance coverage required hereunder is in force and that it will not be canceled with less than 10 days' written notice to CONTRACTOR and Owner. Failure of CONTRACTOR to require the production of such certificates of insurance shall not absolve SUBCONTRACTOR of its obligation in respect thereto.

5. SUBCONTRACTOR shall start work at the site within three (3) working days after notice from CONTRACTOR and shall supply sufficient materials, workmen and equipment to maintain progress of the work to the satisfaction of CONTRACTOR and perform the same at such times and places as designated by CONTRACTOR. In the event the SUBCONTRACTOR delays the progress of the work or the furnishing of materials, articles, and/or equipment, or fails in the performance of any of the provisions of this SUBCONTRACT, or if he should make a general assignment for the benefit of his creditors, or if a receiver should be appointed on account of his insolvency or inability to meet his obligations, CONTRACTOR shall have the right to cancel this SUBCONTRACT upon five (5) days' written notice mailed by Certified Mail, or delivered to SUBCONTRACTOR at its last known address. In case of such termination, CONTRACTOR may take possession (and for this purpose SUBCONTRACTOR does hereby assign title thereto) of all of the materials, tools and equipment of SUBCONTRACTOR on said premises and finish the work by whatever method CONTRACTOR may deem expedient, and SUBCONTRACTOR shall not be entitled to receive any further payments under this SUBCONTRACT until the performance of the CONTRACT has been completed by CONTRACTOR or others engaged by CONTRACTOR, at which time, if the unpaid balance due SUBCONTRACTOR exceeds the cost of completion, said amount shall be paid to SUBCONTRACTOR; but if such expense shall exceed such unpaid balance, then SUBCONTRACTOR shall pay the difference to CONTRACTOR. The costs and expenses incurred by CONTRACTOR shall include all damage and costs incurred through the default of the SUBCONTRACTOR as well as consequential damages for delay or otherwise.

6. SUBCONTRACTOR shall clean up and remove from the premises all debris caused by the execution of the work hereunder and shall pay for any breakage or damage caused by SUBCONTRACTOR. Upon failure to remove such debris or to pay for such breakage or other damage, CONTRACTOR shall remove said debris and replace property so damaged, and charge the cost thereof to SUBCONTRACTOR.

7. SUBCONTRACTOR, as a condition precedent to payment hereunder, shall furnish all necessary releases, lien waivers, affidavits, and other documents required by CONTRACTOR to keep Owner's premises free from liens or claims for liens of all materialmen, subcontractors or laborers. Acceptance of final payment by SUBCONTRACTOR shall be a full and complete discharge of CONTRACTOR. No payment, including final payment, shall be construed to be an acceptance of defective work or improper materials.

8. CONTRACTOR may hold, as trust funds, all payments due SUBCONTRACTOR hereunder, which it is authorized to apply in payment of all labor, materials, equipment, services and other charges incurred by SUBCONTRACTOR in connection with the performance of this undertaking and said funds or the balance thereof shall not be payable to SUBCONTRACTOR until all such obligations have been satisfied in full.

9. SUBCONTRACTOR, for the price provided in this SUBCONTRACT, hereby accepts and assumes exclusive liability for, and shall save CONTRACTOR harmless against the payment of all contributions, taxes or premiums which may be payable under the Unemployment Insurance Law of any State or under the Federal Social Security Act, measured upon the payroll of employees, by whomsoever employed, engaged in the performance of the Work included in the SUBCONTRACT and all Sales, Use or other taxes levied or assessed against Owner, CONTRACTOR or SUBCONTRACTOR, arising out of the Work, including, but not limited to, taxes on any kind of materials, articles or equipment. CONTRACTOR may, at its sole discretion, request production of evidence satisfactory to it by SUBCONTRACTOR that all obligations contained in the within paragraph have been paid in full as a condition to making any payment, whether final or otherwise, hereunder.

10. Unless a longer period is provided in the CONTRACT DOCUMENTS, SUBCONTRACTOR hereby guarantees all labor, materials, and work furnished hereunder against all defects which may develop within one year from date of acceptance by Owner, or within the guarantee period set forth in the CONTRACT DOCUMENTS, whichever is longer. Pursuant to such guarantee, SUBCONTRACTOR agrees to repair and/or replace, as CONTRACTOR may require, without charge to CONTRACTOR, any and all defective workmanship, materials, equipment and work; to pay all costs, including labor charges, in connection with such repairs and/or replacements, and, to remedy any defects latent or patent, except those due to ordinary wear and tear or improper use or maintenance. SUBCONTRACTOR shall, in any event, pay for all damage to the property of the Owner resulting from defects in the Work, including consequential damage, and all expenses to remove, replace and/or repair the Work and any other Work which may be damaged in removing or repairing the Work. All guarantees and warranties herein provided shall extend to the Owner or other awarding authority and/or CONTRACTOR.

11. SUBCONTRACTOR agrees: (a) That it will not assign this SUBCONTRACT or any of the monies due it, or to become due hereunder, nor sublet any portion of the Work without first obtaining written consent of the CONTRACTOR and (b) that CONTRACTOR shall have the right to set off against any monies due SUBCONTRACTOR under this SUBCONTRACT, any claim or claims against SUBCONTRACTOR, whether arising under this SUBCONTRACT or any other subcontract or subcontracts between the parties hereto.

12. In the event of the termination of the PRINCIPAL CONTRACT between CONTRACTOR and Owner or General Contractor, this SUBCONTRACT shall also be terminated, upon written notice of CONTRACTOR to SUBCONTRACTOR, and CONTRACTOR shall only be liable for labor, materials, articles and equipment furnished up to the date of receipt of the written notice of termination and/or materials and equipment ordered for the project, but only to the extent SUBCONTRACTOR is liable.

13. It is understood and agreed that Owner and/or Architect has the right to approve or disapprove the employment of this SUBCONTRACTOR, and in the event that Owner and/or Architect does not approve this SUBCONTRACT, this SUBCONTRACT shall become null and void.

14. In the event that SUBCONTRACTOR shall be unable to proceed expeditiously in the performance of this SUBCONTRACT because of labor problems, then CONTRACTOR shall, in its sole judgment, have the right to terminate this SUBCONTRACT upon five (5) work days' written notice mailed by Certified Mail, or delivered to SUBCONTRACTOR at its last known address. In the event of such termination, CONTRACTOR shall pay SUBCONTRACTOR for the work, labor an'd materrial furnished by SUBCONTRACTOR as of the day of such termination.

15. No additions, deductions, or changes shall be made in the Work, nor shall there by any charges for premium time, except upon written Order of CONTRACTOR. Said Order shall specify the amount of additional compensation or credit to be applied to the amount of this SUBCONTRACT.

16. All jurisdictional disputes arising on this project in connection with the performance of this work and/or furnishing of materials shall be subject to adjustment and settlement by the then existing Board of Settlement of Jurisdictional Disputes in the Building and Construction Industry or such other existing agency or body established for settlement of jurisdictional disputes.

17. No discrimination shall be made against any employees or in the employment of any applicant, because of age, race, color, creed, or national origin, and SUBCONTRACTOR agrees to comply with Section 711(a) of Title VII of the Civil Rights act of 1964, and all Executive Orders dealing with Equal Employment Opportunity, as the same may be amended from time to time, the Pennsylvania Fair Employment Practice Act, and the Philadelphia Plan, as extended by Order dated February 13, 1971, as the same may hereafter be modified, and further agrees to comply with all of the provisions of the CONTRACT DOCUMENTS pertaining thereto.

18. All disputes, claims or questions arising hereunder shall be subject to arbitration and shall be submitted to arbitration by a three (3) member Panel in accordance with the rules of Procedure, then obtaining, of the American Arbitration Association. A determination thereunder shall be final and binding upon the parties thereto. Pending determination, there shall be no work stoppage.

19. SUBCONTRACTOR for itself, its subcontractors and all parties acting through or under it hereby covenants and agrees not to file any liens or to make any claims against the premises or any part thereof or against any building or buildings or other improvements erected or made to be erected or made thereon, or against any monies due or to grow due to the CONTRACTOR, in accordance with any statute, State or Federal, for any cause whatsoever, and further covenants to release and hereby does release the premises upon which the Project is located and each and every part thereof and any and all buildings that may now or hereafter be erected thereon, and any monies due or to grow due to the CONTRACTOR from any and every lien, charge or claim of any nature whatsoever that it might otherwise at any time have against the same or any part thereof, for work done or to be done, materials furnished or to be furnished or upon any other ground whatever growing out of or in any way connected with or in relation to the erection construction of any building or buildings upon the same premises.

20. The SUBCONTRACTOR shall be responsible to the CONTRACTOR for compliance with all safety rules and regulations during SUBCONTRACTOR'S performance on and in connection with this project. SUBCONTRACTOR shall indemnify the CONTRACTOR for any and all expenses incurred by CONTRACTOR for fines, penalties, and corrective measures resulting from acts of commission or omission by SUBCONTRACTOR, his agents and employees for failure to comply with such safety rules and regulations.

THIS ADDENDUM IS ATTACHED TO AND FORMS A PART OF YOUR CONTRACT WITH
FIVE STAR, INC.

## INSURANCE AND INDEMINIFICATION PROVISIONS

Subcontractor expressly declares and acknowledges that Subcontractor is an independent contractor and not an employee of Contractor and that Contractor does not direct subcontractor's actions beyond the provisions of this agreement.

1) INDEMNIFICATION. Subcontractor assumes entire responsibility and liability for any and all claims and/or damages of any nature or character whatsoever with respect to the work covered by this Subcontract Agreement (including but not limited to, work performed under this Subcontract Agreement, work performed under change order or any other work incidental thereto, whether performed at or off the project site) and Subcontractor agrees defend, indemnify and hold harmless the Contractor, its affiliates, parents and subsidiaries, the Contractor's surety, if any, the owner, any other Contractor that the Contractor may be obligated to defend and indemnify in the Main Contract, and the architect from and against any and all claims, demands, liabilities, interests, loss, damage, fires, penalties, attorney's fees, cost and expenses of whatever kind or nature, including property damage or for personal injuries (including death) to any and all persons (whether such persons are employees of Contractor or employees of Subcontractor, or employees of Subcontractor's subcontractors, or others) resulting from the work covered by this Subcontract, arising therefrom or occurring in connection therewith and whether any such claims are alleged to have been caused in whole or in part, by a party indemnified hereunder. This indemnification expressly extends to (but is not in any manner limited to) any claims, damages or suits for infringement or violations of patents or patent rights, Subcontractor further agrees that the indemnification contained in this section shall not in any manner be limited by the applicable provisions of any Workers' Compensation Act and, for this purpose, Subcontractor waives its rights to immunity as an employer under any such Workers' Compensation Act in the event of a claim by one or more of its employees against Contractor (or any other party whom Subcontractor is obligated, by this paragraph, to indemnify) and Subcontractor further waives any defense that this Subcontract or any portions thereof was not executed by Subcontractor prior to the date of the occurrence giving rise to Subcontractor's indemnification responsibility hereunder.

In the event that such claims, demands, liabilities, interests, loss, fines, penalties, attorney's fees, costs and expenses are made, asserted or threatened against Contractor or any other party whom Contractor is obligated to indemnify or defend in the Main Contract, Contractor shall have the right to withhold from any payments due, or to become due to the Subcontractor, an amount sufficient in Contractor's sole discretion to protect and indemnify it and such other parties against any and all such claims, demands, liabilities, interests, loss, damage, fines, penalties, attorney's fees, cost and expenses, or Contractor, in its sole discretions, may require Subcontractor to furnish a surety bond satisfactory to Contractor guaranteeing such protection furnished by Subcontractor.

2) INSURANCE. Prior to commencement of any work under the Contract and until completion and final payment is made for the work, the Subcontractor and each and every Sub-subcontractor of the Subcontractor shall, at its sole expense, maintain the following insurance on its own behalf, with an insurance company or companies having an A.M. Best Rating of "A-; Class VII" or better, and furnish to the contractor Certificates of Insurance evidencing same.

The term "Subcontractor & Sub-subcontractor" as used in these Insurance Requirements shall mean and include Subcontractors and Sub-subcontractors of every tier.

A. Workers' Compensation and Employers Liability: in the State in which the work is to be performed and elsewhere as may be required and shall include, where applicable, U.S. Longshoremen's and Harbor Workers' Coverage.
   a) Workers' Compensation Coverage: Statutory Requirements

   b) Employers Liability Limits not less than:
      Bodily Injury by Accident:       $100,000 Each Accident
      Bodily Injury by Disease:        $100,000 Each Employee
      Bodily Injury by Disease:        $500,000 Policy limit

B. Commercial General Liability: (including Premises – Operations, Independent Contractors, Products/Completed Operations, Broad Form Property Damage, Contractual Liability

1

(including Liability for Employee Injury assumed under a Contract), and Explosion, Collapse and Underground Coverages).

a)   Occurrence Form with the following limits:

| | |
|---|---|
| 1) General Aggregate: | $2,000,000 |
| 2) Products/Completed Operations Aggregate: | $2,000,000 |
| 3) Each Occurrence: | $1,000,000 |
| 4) Personal and Advertising Injury: | $1,000,000 |
| 5) Fire Damage (any one fire): | $ 50,000 |
| 6) Medical Expense (any one person): | $ 5,000 |

b)   Products/Completed Operations Coverage must be maintained for a period of at least two (2) years after final payment.

c)   The General Aggregate Limit must apply on a Per Project basis.

C.   Automobile Liability:

a)   Coverage to include:
1) All owned, Hired and Non-Owned Vehicles
2) Contractual Liability Coverage (including Liability for Employee Injury assumed under a Contract).

b)   Per Accident Combine Single Limit:   $1,000,000

D.   Commercial Umbrella Liability:

a)   Occurrence Limit:   $1,000,000

b)   Aggregate Limit (where applicable):   $1,000,000

b)   Policy to apply excess of the Commercial General Liability (following form Per Project Limit), Commercial Automobile Liability and Employers Liability Coverages.

E.   Deductibles or Self Insured Retentions:
None of the policies of insurance required of the Subcontractor by this agreement shall contain deductibles or self insurance retentions in excess of $10,000.

F.   Financial Rating of Insurance Companies:
A)   A.M. Best Rating: A- (Excellent) or Higher
B)   A.M. Best Financial Size Category: Class VII or Higher

G.   Contractor, its affiliates, parents and subsidiaries, the Contractor's surety, if any, the owner, any other Contractor that Contractor may be obligated to defend and indemnify in the Main Contract shall be added as ADDITIONAL INSUREDS on all liability policies. With respect to General Liability, Additional Insured Status shall include coverage for both ongoing operations and completed operations using CG 20 26 11/85 (or its equivalent). Copies of these endorsements shall be included.

H.   Subcontractor's and Sub-subcontractor's insurance is to be endorsed to reflect its *primary and non-contributory* for the Contractor, and all other additional insureds named in these Insurance Requirements.

I.   It is agreed the Subcontractor's and Sub-subcontractor's insurance will not be canceled, materially changed or non-renewed without at least (30) days advance written notice to Contractor, by Certified Mail – Return Receipt Requested.

J.   Waiver of Rights of Recovery and Waiver of Rights of Subrogation:

a)   The subcontractor and Sub-subcontractors waive all rights of recovery against Contractor, the Prime Contractor, General Contractor, and all the additional insureds for loss or damage covered by any of the insurance maintained by the Subcontractor or Sub-subcontractor pursuant to this subcontract.

b)   The Subcontractor and Sub-Subcontractors and their respective insurance carriers hereby waived all rights of subrogation against Contractor, the Prime Contractor, General Contractor, and all the additional insureds for loss or damage covered by any of the

insurance maintained by the Subcontractor or Sub-subcontractor pursuant to this subcontract.

    c) If any of the policies of insurance required under this Subcontract require an endorsement to provide for the waiver of subrogations set forth in b, above, then the named insureds of such policies will cause them to be so endorsed.

K.   The amount of insurance provided in the aforementioned insurance coverages, shall not be construed to be a limitation of the liability on the part of the Subcontractor or any their Sub-subcontractors.

L.   Any type of insurance or any increase in limits of liability not described above which the Subcontractor requires for its own protection or on account of statute shall be its own responsibility and at its own expense.

M.   The carrying of insurance described shall in no way be interpreted as relieving the Subcontractor of any responsibility or liability under the contract.

N.   Prior to the commencement of work and /or payment, the Subcontractor and Sub-subcontractor shall file Certificates of Insurance with the Contractor which shall be subject to the Contractor's approval of adequacy of protection and the satisfactory character of the insurer. The Certificates of Insurance should be mailed within five (5) days of the receipt of these insurance requirements to the Contractor, regardless of when your work will start. Project description and Job Number must be shown on the Certificate of Insurance.

    In the event of a failure of a Subcontractor to furnish and maintain said insurance and to furnish satisfactory evidence thereof, Contractor shall have the right (but not the obligation) to take out and maintain the same for all parties on behalf of the Subcontractor who agrees to furnish all necessary information thereof and to pay the cost thereof to the Contractor immediately upon presentation of an invoice. Subcontractor gives Contractor the right to terminate or modify such coverage with or without notice to Subcontractor.

3)   SAFETY. Subcontractor shall be responsible to the Contractor for compliance with all safety laws, rules and regulations during Subcontractor's performance of work in connection with this project including, without limitation, those laws, rules and regulation established under the Federal Occupational Safety and Health Act of 1970. Subcontractor shall indemnify the Contractor from and against all fines, penalties and corrective measures resulting from acts of commission or omission by Subcontractor, its subcontractors, materialmen, agents, employees or assigns, in respect of their failure to comply with such safety laws, rules and regulations. Subcontractor shall establish a safety program implementing safety measures, policies and standards conforming to those required or recommended by governmental and quasi-governmental authorities having jurisdiction and by the Contractor, the Prime Contractor, if applicable, and the Owner, including but not limited to, requirements imposed by the Contract Documents. Subcontractor shall comply with the reasonable recommendations of insurance companies having an interest in the project, and shall stop any part of the WORK as directed by Contractor. Contractor's failure to stop Subcontractor's unsafe practices shall not relieve Subcontractor of the responsibility therefor. Subcontractor shall notify Contractor immediately following any accident and promptly confirm the notice in writing. A detailed written report shall be furnished if requested by the Contractor.

    This agreement applies to any current or future work performed by subcontractor for contractor.

_____/_____

Subcontractor Signature / Date

_____

Subcontractor Name PRINTED

_____

Contractor Signature / Date

    Joseph Gaffney

_____

Contractor name PRINTED

3

# Five Star, Inc.
## Insurance Requirements
### Subcontractors

A Certificate of Insurance that conforms to the information found below is required before any subcontractor can perform any work at a Five Star, Inc. jobsite. A copy of this certificate and endorsements, either faxed or mailed, must be sent to the Five Star, Inc. at the address found below prior to subcontractor arriving on-site

| CATEGORY | STANDARD MINIMUM REQUIREMENT |
|---|---|
| General Aggregate | $2,000,000 |
| Each Occurrence | $1,000,000 |
| Automobile | $1,000,000 CSL (Combined Single Limit) |
| Workers Compensation | $500,000/$500,000/$500,000 |
| Excess Liability | $1,000,000 |

The Certificate Holder:    Five, Star, Inc.
833 Lincoln Avenue
Unit 8
West Chester, PA 19382

Additional Insured: Five Star, Inc., owner and any others as required by contract.

Description: Project number and jobsite address must be listed.
Five Star, Inc., owner and any others as required by contract must be included as additional insured under Automobile, General Liability and Umbrella on a Primary and Non-Contributory basis including both ongoing and completed operations under General Liability. All policies include Waiver of Subrogation in favor of Five Star, Inc. [All endorsements must be included]

Policies should be endorsed to provide Five Star, Inc. with 30 days notice of cancellation or non-renewal.

Please fax or mail the Certificate of Insurance to:

Five Star, Inc.
833 Lincoln Avenue
Unit 8
West Chester, PA 19382
**(610) 719 6415 Phone**
610) 719 6416 Fax

*SHEETMETAL*   *McKINLEY SCHOOL*

*Bill Rowen - got*
*Puts it to gov*

*Rich Hudson -*

*"It's Simple, It's Service"*

*REVISED*
*HAS CHIMNEY LINER*
*1580 Ducts*
*16-198*
*RICH HUDSON 215-437-7606*

# CROMEDY
## CONSTRUCTION

5702 Newtown Avenue • Philadelphia, PA 19120
Phone: 215-437-7606 • Fax: 215-437-7655

**REVISED**

*Cromedy Construction is proud to hold the following certificati*

**\*8a** – Federal DBE Certification
**\*DBE** – PA Unified Certification (Philadelphia Airport, Septa, PA DOT, City of Philadelphia)
**\*MBE-** MSDC/OEO City of Philadelphia / State of Pennsylvania
**\*MBE** – Pennsylvania Department of General Services ( DGS )
**\*MBE** – State of New Jersey
**\*MBE** – State of Delaware                          **REVISED**   **Base Bid:**   **$210,000**
**\*LBE** - Philadelphia Local Business Entity (5% Bid Credit)       *Contract price*
**\*Certified** Pennsylvania Gaming Vendor                *as per Rich Hudson*

| Date: | 12/10/2015 | | Drwg Date: | 11/6/2015 |
|---|---|---|---|---|
| Estimator | Bill Rowen | | Addenda #1: | 12/4/2015 |

*PLEASE NOTE: QUOTE ASSUMES ALL NORMAL WORKING AND DELIVERY HOURS. WE ALSO EXCLUDE ALL WORK NOT SHOWN ON MECHANICALS...NO BID ON ARCHITECTURAL DRAWINGS.*

*QUOTE ASSUMES ALL CEILINGS REMOVED BEFORE DUCT INSTALLATION*

| | | FURNISH & INSTALL | FURNISH ONLY | INSTALL ONLY | EXCLUDE | | | FURNISH & INSTALL | FURNISH ONLY | INSTALL ONLY | EXCLUDE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | SHEET METAL SHOP DRAWINGS | | X | | | 40 | UNIT FILTERS & REPLACEMENTS | | | | X |
| 2 | COORDINATED DRAWINGS | | X | | | 41 | | | | | |
| 3 | GALVANIZED DUCTWORK | X | | | | 42 | | | | | |
| 4 | WIRE MESH SCREENS | X | | | | 43 | DEMO. - DISCONNECT FROM EQUIP | | X | | |
| 5 | ALL BREECHING & ACCESSORIES | X | | | | 44 | ONLY REMOVAL BY OTHERS | | | | |
| 6 | | | | | | 45 | AIR BALANCE | | | | X |
| 7 | ACOUSTICAL DUCT LINER | X | | | | 46 | LEAK TEST-SMACNA | | | | X |
| 8 | | | | | | 47 | CUTTING & PATCHING | | | | X |
| 9 | SHEET METAL PLENUMS | | | | | 48 | | | | | |
| 10 | | | | | | 49 | | | | | |
| 11 | | | | | | 50 | STRUCTURAL/SUPPL'L STEEL | | | | X |
| 12 | | | | | | 51 | TEMPORARY SERVICES | | | | X |
| 13 | ACCESS DOORS IN DUCTWORK | X | | | | 52 | | | | | |
| 14 | BUILDING ACCESS DOORS | | | | X | 53 | FIELD PAINTING | | | | X |
| 15 | GRILLES, REG., DIFFUSERS | X | | | | 54 | BROOM CLEAN-UP | | | | X |
| 16 | HEAT PUMP UNITS (50/50) | | | X | | 55 | Vacuuming of Duct | | | | X |
| 17 | T-STATS/TUBING/CONTROL WIRING | | | | X | 56 | Ceiling Remove/Replace | | | | X |
| 18 | FANS | X | | | | 57 | | | | | |
| 19 | Belt/Sheaves for Existing | | | | X | 58 | PERMITS | | | | X |
| 20 | STARTERS/VFD'S | | | | X | 59 | Firepacking | | | | X |
| 21 | SEISMIC REQUIREMENTS/FANS | | | | X | 60 | Soundpacking | | | | X |
| 22 | GRAVITY VENTILATORS | X | | | | 61 | OVERTIME PROVISIONS | | | | X |
| 23 | OUTSIDE AIR INTAKES | X | | | | 62 | DRAIN PANS | | | | X |
| 24 | LOUVERS ON MECH'L DWGS | X | | | | 63 | FIN TUBE COVERS/WORK | | | | X |
| 25 | LOUVERS ON ARCH'L DWGS | X | | | | 64 | ASBESTOS RELATED ISSUES | | | | X |
| 26 | LOUVER BLANK-OFF | | | | X | 65 | BOND COST | | | | X |
| 27 | FIRE DAMPERS WHERE SHOWN | | | | X | 66 | SHRINK WRAP DUCT | X | | | |
| 28 | | | | | | 67 | | | | | |
| 29 | F/S DAMPERS WHERE SHOWN | | | | X | 68 | | | | | |
| 30 | AUTOMATIC/CONTROL DAMPERS | | X | | | 69 | DUCT INTERIORS WILL BE | X | | | |
| 31 | | | | | | 70 | PROTECTED FROM FOREIGN | | | | |
| 32 | SMOKE DETECTORS - 4 ANUS | | X | | | 71 | ELEMENTS AS PER SMACNA | | | | |
| 33 | | | | | | 72 | DUCT CLEANING FOR NEW CONST | | | | X |
| 34 | | | | | | 73 | | | | | |
| 36 | | | | | | 74 | MINORITY BUSINESS PARTICIPATION | | X | | |
| 37 | | | | | | 75 | | | | | |
| 38 | | | | | | 76 | | | | | |
| 39 | | | | | | 77 | | | | | |

*R HUDSON - C.P. 215-760-0500*
*OFF - 215-437-7606*
*E. MAIC   R HUDSON @ CROMEDYCONSTRUCTION . COM*

# EXHIBIT D

PAY APP#1

REQUEST FOR PAYMENT

| From: | Cromedy Construction Corporation<br>5702 Newtown Ave.<br>Philadelphia, PA 19120 | To: | Five Star Mechanical<br>833 Lincoln Avenue, Unit 8<br>West Chester, PA 19380 | Invoice: | 1600601 |
| | | | | Invoice date: | 5/15/2016 |
| | | | | Period ending date: | 5/31/2016 |

Contract For:

**Request for payment:**

| | |
| --- | --- |
| Original contract amount | $210,000.00 |
| Approved changes | $0.00 |
| Revised contract amount | $210,000.00 |

Project: 16006
McKinley School

| Contract completed to date | | Contract date: 5/1/2016 |
| --- | --- | --- |
| | $9,500.00 | |
| Add-ons to date | $0.00 | |
| Taxes to date | $0.00 | Architect: |
| Less retainage | $0.00 | |
| Total completed less retainage | $9,500.00 | Scope: |
| Less previous requests | $0.00 | |
| Current request for payment | $9,500.00 | |

| Current billing | | |
| --- | --- | --- |
| | $9,500.00 | |
| Current additional charges | $0.00 | |
| Current tax | $0.00 | |
| Less current retainage | $0.00 | |
| Current amount due | $9,500.00 | |
| Remaining contract to bill | $200,500.00 | |

INVOICE RECEIVED MAY 23 2016
VERIFIED
STATEMENT RECEIVED
APPROVED FOR PAYMENT

8/1/16

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
| --- | --- | --- |
| Changes approved in previous<br>months by Owner | | |
| Total approved this Month | | |
| TOTALS | | |
| NET CHANGES by Change Order | | |

I hereby certify that the work performed and the materials supplied to date, as shown on the above represent the actual value of the accomplishment under the terms of the Contract (and all authorized changes thereof) between the undersigned and the Five Star Mechanical relating to the above referenced project. I also certify that the contractor has paid all amounts previously billed and paid by the owner.

State Of Pennsylvania        County Of Philadelphia

CONTRACTOR:  Cromedy Construction Corporation

By: _____

Date: 5-15-16

Subscribed and sworn to before me this 15th day of May 2016

Notary Public Sharon Warren

My commission expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SHARON WARREN, Notary Public
City of Philadelphia, Phila. County
My Commission Expires April 21, 2020

# EXHIBIT E



Erie Insurance®

Member Company
Erie Insurance Exchange

Erie Indemnity Company, Attorney-in-Fact • Home Office • 100 Erie Insurance Place • Erie, Pennsylvania 16530
814.870.2000 • Toll free 1.800.458.0811 • Fax 814.870.3126 • erieinsurance.com

April 2, 2018

Mark J. Spross, Esq.
McCormick & Priore
1600 JFK Boulevard, Suite 800
Philadelphia, PA 19103

Via email: mspross@mccormickpriore.com

|     | Re: | ERIE Claim | #A00000741342 |
|-----|-----|-----|-----|
|     |     | ERIE Policy | #Q37 0158532 |
|     |     | ERIE Insured: | Cromedy Construction & Endt #1 |
|     |     | Date of Loss: | 11/16/2016 |
|     |     | Your Client: | Erie Insurance Exchange |

Dear Attorney Spross:

I am Lucia M. Knouse, Property & Casualty Records Coordinator for the Erie Insurance Group. I hereby certify that on November 16, 2016 the enclosed Declarations, policy form and endorsements were in effect under ERIE Policy Number Q37 0158532. These are true likenesses of the documents issued to Cromedy Construction Corporation, Advantage Contracting, Cromedy Advantage Contracting, Inc. d/b/a.

Sincerely,

Lucia M. Knouse, AIC, AIS, AINS
*Certificate Holder in Essentials of RIM*
P & C Records Coordinator
Litigation/Claims Examination Dept.
(814) 870-4638

/lmk

Enclosures

Sworn to and subscribed before me

this 2ND day of April, 2018.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Ellen Lipiec, Notary Public
City of Erie, Erie County
My Commission Expires Jan. 22, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

DECLARATIONS

**ERIE INSURANCE EXCHANGE**
**ULTRAFLEX POLICY**

ERIE
Insurance
Group
100 Erie Ins. Pl
Erie, PA 16530

AMENDED DECLARATIONS     * * EFFECTIVE 02/01/16
ATTACH THIS TO YOUR POLICY.

REASON FOR AMENDMENT MULTIPLE CHANGES

| AGENT | ITEM 2. POLICY PERIOD | POLICY NUMBER |
|---|---|---|
| AA3746   THE IOWA GROUP INC | 01/01/16 TO 01/01/17 | Q32 0158532 A |

ITEM 1. NAMED INSURED AND ADDRESS                ITEM 3. OTHER INTEREST

CROMEDY CONSTRUCTION CORP
& ENDT #1
5702 NEWTON AVE
PHILADELPHIA PA  19120-1619

POLICY PERIOD BEGINS AND ENDS AT 12.01 A.M. STANDARD TIME AT THE STATED
ADDRESS OF THE NAMED INSURED.
    THE INSURANCE APPLIES TO THOSE PREMISES DESCRIBED AS PER THE ATTACHED
SUPPLEMENTAL DECLARATIONS. THIS IS SUBJECT TO ALL APPLICABLE TERMS OF THE
POLICY AND ATTACHED FORMS AND ENDORSEMENTS

DEDUCTIBLE (PROPERTY PROTECTION ONLY)- $  1,000.
COVERAGES:                                                              DEPOSIT
PROPERTY PROTECTION - AS PER THE ATTACHED SUPPLEMENTAL DECLARATIONS     PREMIUM
    1.  BUILDINGS                                                    $    INCL
    2.  BUSINESS PERSONAL PROPERTY AND PERSONAL PROPERTY OF OTHERS   $    INCL
    3.  ADDITIONAL INCOME PROTECTION                                 $    INCL
    4.  GLASS AND LETTERING                                          $
    5.  SIGNS, LIGHTS AND CLOCKS                                     $

                    LIMITS OF INSURANCE                              $    INCL
PREMIUM BASIS - COSTS, PAYROLL
    EACH OCCURRENCE LIMIT            $ 1,000,000
        DAMAGE TO PREMISES
        RENTED TO YOU LIMIT         $ 1,000,000 ANY ONE PREMISES
        MEDICAL EXPENSE LIMIT       $    10,000 ANY ONE PERSON
    PERSONAL & ADVERTISING INJURY LIMIT $ 1,000,000 ANY ONE PERSON OR ORGANIZATION
    GENERAL AGGREGATE LIMIT                 $ 2,000,000
    PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT  $ 2,000,000

OPTIONAL COVERAGES                                      SEE NEXT PAGE

***FORMERLY - ADVANTAGE CONTRACTING
***AMENDED NAMED INSURED/ENDT#1 & ADDED LOSS PAYEE

                    TOTAL DEPOSIT PREMIUM - - - - -     $

        NO DIFFERENCE IN PREMIUM DUE TO THE CHANGE - - - - - -     $         0.

APPLICABLE FORMS - SEE SCHEDULE OF FORMS

HMB     02/05/16

OPTIONAL COVERAGES

| | | |
|---|---|---|
| MECHANICAL & ELECTRICAL BREAKDOWN | $ | INCL |
| CONTRACTORS EQUIPMENT COVERAGE | $ | INCL |
| EMPLOYEE BENEFIT LIABILITY - $1000 DEDUCTIBLE | $ | INCL |
|   $ 1,000,000 EACH EMPLOYEE | | |
|   $ 2,000,000 AGGREGATE | | |
| RETROACTIVE DATE 01/01/2016 | | |
|   ENHANCEMENT ENDORSEMENT - CONTRACTORS ENDORSEMENT | $ | INCL |
| EMPLOYMENT PRACTICES LIABILITY INSURANCE COVERAGE-CLAIMS MADE | $ | INCL |
|   $   250,000 AGGREGATE LIMIT (INCLUDES DEFENSE COSTS) | | |
|   $     5,000 DEDUCTIBLE PER LOSS AMOUNT (INCLUDES DEFENSE COSTS) | | |
|   ORIGINAL INCEPTION DATE 01/01/2016 | | |
| THIRD PARTY EMPLOYMENT PRACTICES LIABILITY INSURANCE COVERAGE-CLAIMS MADE | $ | INCL |
| INSTALLATION COVERAGE | $ | INCL |
| DATA BREACH RESPONSE EXPENSES COVERAGE | $ | INCL |
|   $50,000 DATA BREACH RESPONSE EXPENSES COVERAGE LIMIT | | |
|   $ 5,000 LEGAL SERVICES & FORENSIC INFORMATION TECHNOLOGY SERVICES SUB LIMIT | | |
| DATA BREACH LIABILITY COVERAGE | $ | INCL |
|   $100,000 DATA BREACH LIABILITY COVERAGE LIMIT | | |
| IDENTITY RECOVERY COVERAGE - OWNERS | $ | INCL |
|   $25,000 EXPENSE REIMBURSEMENT COVERAGE LIMIT | | |

32                CONTINUED ON NEXT PAGE

ERIE INSURANCE EXCHANGE
ULTRAFLEX POLICY

AMENDED DECLARATIONS    * * EFFECTIVE 02/01/16
ATTACH THIS TO YOUR POLICY.

REASON FOR AMENDMENT MULTIPLE CHANGES

AA3746    THE LOWA GROUP INC        01/01/16 TO 01/01/17   Q37 0158532 A

CROMEDY CONSTRUCTION CORP
& ENDT #1
5702 NEWTON AVE
PHILADELPHIA PA  19120-1619

SUPPLEMENTAL DECLARATIONS
LOCATION  1, BUILDING  1
LOCATION OF PREMISES                  OCCUPANCY/OPERATIONS
--------------------                  --------------------
 5702 NEWTON AVE, PHILADELPHIA,        HVAC CONTRACTOR
 PHILADELPHIA CO, PA  19120

INTEREST OF NAMED INSURED IN SUCH PREMISES - OWNER

                        PROPERTY PROTECTION
            COVERAGES                      CO-INS %    AMOUNT OF INSURANCE
1. BUILDINGS                                  80        $    800,000
2. BUSINESS PERSONAL PROPERTY AND             80        $    100,000
   PERSONAL PROPERTY OF OTHERS
3. ADDITIONAL INCOME PROTECTION       OCCURRENCE        $    125,000

OPTIONAL COVERAGES - PROPERTY PROTECTION
MECHANICAL & ELECTRICAL BREAKDOWN                       $       INCL
CONTRACTORS EQUIPMENT COVERAGE
    BL LEASED   $   100,000  COMPREHENSIVE PERILS  $ 1000 DEDUCTIBLE
    MISC EQUIP  $   259,600  COMPREHENSIVE PERILS  $ 1000 DEDUCTIBLE

CONTRACTORS EQUIPMENT SCHEDULE - REPLACEMENT COST
MISCELLANEOUS EQUIPMENT
- $225,000 - 2009 BETECH SPIRALER FABRICATOR
- $   5,000 - 19FT SKY JACK LIFT
- $   5,000 - 19 FT JLB LIFT
- $ 15,000 - DIESEL POWERED ENGINE
- $   9,600 - FORMING HEADS FOR SPIRAL MACHINE
BLANKET LEASED EQUIPMENT
- $100,000 - BLANKET, LEASED OR RENTED EQUIPMENT


         LOSS PAYEE
TRISUPPLY & EQUIPMENT
RE: LEASED EQUIPMENT
1685 RIVER RD
NEW CASTLE DE   19720-5194


                                        HMB     02/05/16

ENDORSEMENT 1

IT IS AGREED THAT THE NAMED INSURED SHALL READ AS FOLLOWS:

CROMEDY CONSTRUCTION CORPORATION,
ADVANTAGE CONTRACTING,
CROMEDY ADVANTAGE CONTRACTING INC D/B/A


INLAND MARINE SCHEDULE
- - - - - - - - - - - - - - - - - - - - - -
INSTALLATION COVERAGE - COMPREHENSIVE PERILS   $ 1000 DEDUCTIBLE
$   240,000 INSTALLATION


INSTALLATION COVERAGE SCHEDULE
  INCLUDING BREAKAGE
  $240,000 PER JOBSITE, TEMPORARY STORAGE LOCATION,
          IN TRANSIT
  $240,000 CATASTROPHE LIMIT

32                    CONTINUED ON NEXT PAGE

ERIE INSURANCE EXCHANGE
ULTRAFLEX POLICY

AMENDED DECLARATIONS     * * EFFECTIVE 02/01/16
ATTACH THIS TO YOUR POLICY.

REASON FOR AMENDMENT MULTIPLE CHANGES

AA3746    THE LOWA GROUP INC         01/01/16 TO 01/01/17   Q37 0158532 A

CROMEDY CONSTRUCTION CORP
& ENDT #1
5702 NEWTON AVE
PHILADELPHIA PA  19120-1619

SCHEDULE OF FORMS

FORM NUMBER    EDITION DATE                DESCRIPTION

ULF            03/01        ULTRAFLEX PACKAGE POLICY

| UFB796 | 05/15 | IMPORTANT NOTICE TO POLICYHOLDERS - ULTRAFLEX PACKAGE PROGRAM |
| UFB901 | 10/15 | IMPORTANT NOTICE TO POLICYHOLDERS - UNMANNED AIRCRAFT EXCLUSION |
| IL0910 | 07/02 | PENNSYLVANIA NOTICE |
| IL0246 | 09/07 | PENNSYLVANIA CHANGES - CANCELLATION AND NONRENEWAL |
| GU44 | 03/01 | PENNSYLVANIA AMENDATORY ENDORSEMENT |
| IL985G* | 01/15 | DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT |
| UF8705* | 06/96 | IMPORTANT NOTICE - NO FLOOD COVERAGE |
| UF4810* | 03/08 | IMPORTANT NOTICE - POLICY SERVICE FEES |
| UF6330* | 08/09 | IMPORTANT NOTICE: DO YOU USE SUBCONTRACTORS? |
| FORM SA | 11/12 | SUBSCRIBERS AGREEMENT |
| CG2109 | 06/15 | EXCLUSION - UNMANNED AIRCRAFT |
| ENDT1 | | LONG NAMED INSURED ENDORSEMENT |
| FX0001 | 06/13 | ULTRAFLEX COMMERCIAL PROPERTY COVERAGE PART |
| GU51 | 03/01 | PENNSYLVANIA AMENDATORY ENDORSEMENT |
| IL0952 | 01/15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| ULNH | 05/06 | MECHANICAL AND ELECTRICAL BREAKDOWN COVERAGE |

HMB    02/05/1

SCHEDULE OF FORMS (CONTINUED)

| FORM NUMBER | EDITION DATE | DESCRIPTION |
|---|---|---|
| ULOA | 06/14 | PRODUCTION OR PROCESS MACHINERY - DEDUCTIBLE |
| C100 | 02/02 | INLAND MARINE GENERAL CONDITIONS |
| IMAH | 08/03 | EXCLUSION - FUNGUS, WET ROT AND BACTERIA |
| IMCEQRE | 05/09 | RENTED/LEASED MOBILE EQUIPMENT - BLANKET COVERAGE-COMPREHENSIVE PERILS |

| IMCEQCP | 04/14 | CONTRACTORS EQUIPMENT COVERAGE - COMPREHENSIVE PERILS |
| ULTEPA | 02/10 | EMPLOYMENT PRACTICES LIABILITY INSURANCE COVERAGE ENDORSEMENT - PENNSYLVANIA |
| UF0168 | 02/11 | EPLI POLICYHOLDER LETTER |
| UF0169 | 08/11 | LEGAL ADVICE LINE |
| CG0435 | 12/07 | EMPLOYEE BENEFITS LIABILITY COVERAGE |
| ULKS | 05/15 | CONTRACTORS ERIEPLACEABLE ENHANCEMENTS ENDORSEMENT |
| IMIFCP | 04/14 | INSTALLATION COVERAGE - COMPREHENSIVE PERILS |
| ULOY | 06/14 | COVERAGE FOR PUNITIVE DAMAGES |
| CG0001 | 04/13 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| ULED | 09/05 | EXCLUSION - ASBESTOS |
| FX0003 | 06/14 | ULTRAFLEX EXTRA LIABILITY COVERAGES |
| ULQN | 06/14 | EXCLUSION - PROFESSIONAL LIABILITY |
| CG0099 | 11/85 | CHANGES IN GENERAL LIABILITY FORMS FOR COMMERCIAL PACKAGE POLICIES |

32            CONTINUED ON NEXT PAGE

ERIE INSURANCE EXCHANG
ULTRAFLEX POLICY
AMENDED DECLARATIONS   * * EFFECTIVE 02/01/16
ATTACH THIS TO YOUR POLICY.

REASON FOR AMENDMENT MULTIPLE CHANGES

AA3746    THE LOWA GROUP INC        01/01/16 TO 01/01/17    Q37 0158532 A

CROMEDY CONSTRUCTION CORP
& ENDT #1
5702 NEWTON AVE
PHILADELPHIA PA  19120-1619

SCHEDULE OF FORMS (CONTINUED)

| FORM NUMBER | EDITION DATE | DESCRIPTION |
|---|---|---|
| CG2147 | 12/07 | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| IL0021 | 09/08 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT |
| GU30 | 03/01 | AMENDMENT OF POLICY - TWO OR MORE COVERAGE PARTS |
| GU32 | 03/01 | EXCLUSION - LEAD LIABILITY |
| IL0017 | 11/98 | COMMON POLICY CONDITIONS |
| CG2167 | 12/04 | FUNGI OR BACTERIA EXCLUSION |
| CG2170 | 01/15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| UF8385 | 03/95 | IMPORTANT NOTICE |
| CG2196 | 03/05 | SILICA OR SILICA-RELATED DUST EXCLUSION |
| GU136 | 03/09 | AMENDMENT OF MOBILE EQUIPMENT DEFINITION |
| ULTD | 12/09 | AMENDMENT OF OCCURRENCE DEFINITION FOR SUBCONTRACTED WORK |
| CG2106 | 05/14 | EXCLUSION-ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY-WITH LIMITED BODILY INJURY EXCEPTION |
| CG2186 | 12/04 | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS |
| ULUN | 09/13 | DATA BREACH RESPONSE EXPENSES COVERAGE |
| UFB702 | 09/13 | IMPORTANT NOTICE - DATA BREACH RESPONSE EXPENSES COVERAGE |
| ULUP | 06/14 | DATA BREACH LIABILITY COVERAGE |
| ULUQ | 06/14 | IDENTITY RECOVERY COVERAGE - OWNERS |

SCHEDULE OF FORMS (CONTINUED)

| FORM NUMBER | EDITION DATE | DESCRIPTION |
| --- | --- | --- |
| IMRCCE | 04/10 | REPLACEMENT COST COVERAGE – CONTRACTORS EQUIPMENT AND MOBILE EQUIPMENT |

32



# Ultraflex℠
# Package Policy



Erie
Insurance

Member Companies
Erie Insurance Exchange · Erie Insurance Property & Casualty Company

ERIE INSURANCE GROUP is proud to present this ULTRAFLEX PACKAGE POLICY. This important contract between YOU and The ERIE consists of this policy with coverage agreements, limitations, exclusions and conditions, a Declarations, plus any endorsements. We urge YOU to read it.

The protection given by this policy is in keeping with the single purpose of our Founders: "To provide YOU with as near PERFECT PROTECTION, as near PERFECT SERVICE, as is humanly possible, and to do so at the LOWEST POSSIBLE COST."

# AGREEMENT

## ERIE INSURANCE EXCHANGE

In return for your timely premium payment, your compliance with all of the provisions of this policy, and your signing of a "Subscriber's Agreement" with Erie Indemnity Company and other Subscribers, we agree to provide the coverages you have purchased. Your coverages and limits of protection are shown in the Declarations, which are part of this policy.

Your signing the "Subscriber's Agreement", which includes a limited power-of-attorney, permits Erie Indemnity Company, as Attorney-in-Fact, to make reciprocal insurance contracts between you and other Subscribers and otherwise manage the business of the Erie Insurance Exchange. This power-of-attorney applies only to your insurance business at the Exchange and is limited to the purposes described in the "Subscriber's Agreement".

Your responsibility as a "Subscriber" is determined by this policy and the "Subscriber's Agreement". You are liable for just the policy premiums charged and are not subject to any other premium liability under the policy.

This agreement is made in reliance on the information you have given us and is subject to all of the terms of this policy.

This policy, all endorsements to it, and the "Subscriber's Agreement" constitute the entire agreement between you and us.

## ERIE INSURANCE PROPERTY AND CASUALTY COMPANY

In return for your timely premium payment and your compliance with all of the provisions of this policy, we agree to provide the coverages you have purchased. Your coverages and limits of protection are shown in the Declarations, which are part of this policy.

This agreement is made in reliance on the information you have given us, and is subject to all of the terms of this policy.

This policy and all endorsements to it constitute the entire agreement between you and us.

# DEFINITIONS

## ADDITIONAL ERIE INSURANCE EXCHANGE DEFINITIONS

The following words have this special meaning in policies issued by *Erie Insurance Exchange* when they appear in quotes.

- "Subscriber" means the person who signed, or the partnership, firm or corporation that authorized the signing of, the application for this policy.

- "Subscriber's Agreement" means the agreement, including a limited power-of-attorney among the Subscribers and the Erie Indemnity Company, as Attorney-in-Fact.

# GENERAL POLICY CONDITIONS

## 1. AUTOMATIC RENEWAL POLICY

Your policy will be automatically renewed at the end of the policy period, unless terminated by you or us in accordance with the steps explained in the Cancellation Condition.

Each year, we will send you a Renewal Certificate which shows the premium due for the next policy period.

This is a service that we provide for you so that your insurance protection does not stop.

If you do not want the renewal policy, you must mail our Agent or us written notice in advance of the new policy period. If you do not notify us, your policy remains in effect. You must pay us the earned premium due us for this time.

2

## 2. CANCELLATION

### Your Right to Cancel or Refuse Renewal

You may cancel this policy or any coverage by mailing or delivering to our Agent or us written notice stating at what future date you want the cancellation to take effect. We may waive these requirements by confirming the date of cancellation to you in writing.

### Our Right to Cancel or Refuse to Renew

We may cancel or refuse to renew by mailing you written notice stating the effective date of our action. Our action will comply with the laws of the state in which your principal office is located. The cancellation will not take effect until at least 30 days (Maryland - 45 days, except for nonpayment of premium - 30 days) after we send it. For states that require a different number of days for notification of cancellation or non-renewal, or specify the reasons for cancellation or non-renewal, an Amendatory Endorsement is attached.

We reserve the right to cancel for your non-compliance with our premium payment plans. We do not waive our right to cancel, even if we have accepted prior late payments.

### Method of Giving Notice

Mailing notice to the address shown on the Declarations will be sufficient proof of notice. The policy period will end on the date and time stated in the notice.

### Return of Premium

If your policy is cancelled by you or us, we will return the pro rata unused share of your premium. Cancellation will be effective even if we have not given or offered the return premium.

## 3. CONCEALMENT, FRAUD OR MISREPRESENTATION

This entire policy is void if before or after a loss any insured has intentionally concealed or misrepresented any material fact or circumstance concerning this insurance.

In the event of a fraudulent claim, we will not make payment for the loss.

## 4. COOPERATION

You agree to cooperate with us by:

    a.  truthfully completing and promptly returning questionnaires and audit forms about this insurance;

    b.  permitting and helping with inspections and audits; and

    c.  complying with specific recommendations to improve your risk.

## 5. HOW YOUR POLICY MAY BE CHANGED

This policy conforms to the laws of the state in which your principal office is located. If the laws of the state change, this policy will comply with these changes.

Your policy may be changed by asking us. Your request must contain enough information to identify you. Asking our Agent is the same as asking us. If we agree with your request, we will then issue an Amended Declarations.

We will give you the benefit of any change in coverage made by us, if it does not require additional premium. This change will be effective as of the date we implement the change for you in your state.

## 6. INCREASE IN HAZARD

Unless we agree beforehand, coverage is suspended if the hazard is substantially increased by any means within the control of the insured.

## 7. INSPECTION AND AUDIT

We have the right but are not obligated to:

    a.  make inspections and surveys at any time;

    b.  give you reports on the conditions we find; and

    c.  recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to provide for the health or safety of workers or the public. We do not warrant that your property or operations are safe, healthful or in compliance with any law, regulation, code or standard. Inspections, surveys, reports or recommendations are for our benefit only.

This condition also applies to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

We may examine and audit your books and records at any time during or within three years after the policy period, as they relate to this insurance. No appeals or disputes regarding your premium will be permitted three years after your audit is completed.

## 8. OUR RIGHT TO RECOVER FROM OTHERS

After we make a payment under this policy, we will have the right to recover from anyone else held responsible. This right will not apply under Property Protection if you have waived it in writing prior to loss. Any insured is required to transfer this right to us, and do nothing to harm this right. Anyone receiving payment from us and from someone else for the same loss will reimburse us up to our payment.

## 9. POLICY ACCEPTANCE

By accepting this policy, you agree that the statements on the Declarations are accurate and complete and are based on the facts you have given us. This policy is issued in reliance on these facts.

## 10. PREMIUMS

The first Named Insured shown in the Declarations:

    a.   is responsible for the payment of all premiums; and

    b.   will be the payee for any return premiums we pay.

## 11. PRIORITY

At our option, this insurance will first protect you, and then others we protect.

## 12. TIME OF INCEPTION

If this policy replaces another policy ending at noon on the date of this policy, we will protect you as of that time.

## 13. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

## ADDITIONAL ERIE INSURANCE EXCHANGE CONDITION

The following condition applies *only* to policies issued by *Erie Insurance Exchange.*

### 1. ACCOUNTING

Erie Indemnity Company may keep up to 25% of the premium written or assumed by Erie Insurance Exchange as compensation for:

    a.   becoming and acting as Attorney-in-Fact;

    b.   managing the business and affairs of Erie Insurance Exchange, its affiliates and subsidiaries; and

    c.   paying general administrative expenses, including sales commissions, salaries, and other employment costs, the cost of supplies, and other administrative costs.

The rest of the premium will be placed on the books of the *Erie Insurance Exchange.* We will deposit or invest this amount as permitted by law. This amount will be used to pay losses, adjustment expenses, legal expenses, court costs, taxes, assessments, licenses, fees, and other governmental fines and charges, establishment of reserves and surplus, and reinsurance, and may be used for dividends and other purposes Erie Indemnity Company decides are to the advantage of the Subscribers.

This policy has been signed on our behalf at Erie, Pennsylvania by our President and Secretary. If required by law, it has been countersigned on the Declarations by our authorized Agent.



James J. Tanous
Secretary

Terrence V Cavanagh
President

Erie Insurance®

Home Office • 100 Erie Insurance Place • Erie, PA 16530 • 814.870.2000
Visit our website at www.erieinsurance.com

ULF (Ed. 3/01) UF-8126

ERIE INSURANCE
ULTRAFLEX PACKAGE
UF-B796 (Ed. 5/15)

# IMPORTANT NOTICE TO POLICYHOLDERS – ULTRAFLEX PACKAGE PROGRAM

### DIRECTORS AND OFFICERS LIABILITY COVERAGE

**This Notice applies to renewal policies only. If your policy is new, this Notice is not applicable.**

This Notice is a basic description of the significant changes in terms, coverages, and exclusions that will be effective upon renewal of your Ultraflex Policy. Some of the changes described below will result in the reduction of coverage or the addition of an exclusion of coverage in your policy. Other changes may broaden, clarify, or have no impact on coverage. This notice does not reference every editorial change made in your policy.

This Notice provides a listing of form and endorsement changes that have been made to the Ultraflex Package Program. These program changes apply to new and renewal policies. If a form or endorsement described below is applicable to your policy it will appear on the Declarations under the Schedule of Forms.

This Notice is not an insurance policy or contract. All coverages are subject to the specific terms, conditions, limits, and exclusions contained in your renewal policy and all applicable endorsements. PLEASE READ YOUR RENEWAL POLICY AND ENDORSEMENTS CAREFULLY for details regarding coverage including the limitation of coverage. In the case of any conflict between this Notice and the policy including endorsements, the policy language is controlling. Your payment of the renewal premium for this policy acknowledges your understanding and acceptance of the changes outlined in this Notice. If you have any questions concerning this Notice or your renewal policy and endorsements, please contact your ERIE Agent.

**Directors and Officers Liability Coverage – Condominiums (UL-BK; UL-BKIL; UL-BKNC; UL-BKNY)**

**Directors and Officers Liability Coverage – Homeowners (UL-KZ; UL-KZIL; UL-KZNC; UL-KZNY)**

**Directors and Officers Liability Coverage – Churches (UL-JO; UL-JOIL; UL-JONC; UL-JONY)**

**Reduction in Coverage:**

- **Issuance or Sale of Securities**
  - These endorsements were revised to exclude any equity or debt offering, solicitation, sale, distribution, or issuance of securities of the Homeowners Association, Condominium Association, or Church.

**Clarification in Coverage:**

- **Securities Exclusion**
  - These endorsements were revised to clarify the Securities Exclusion applies to the actual or alleged violation in the purchasing or sales of any securities.
- **Violation of Laws Exclusion**
  - These endorsements were revised to clarify the Violation of Laws exclusion only applies to the violation of employment laws.
- **Definition of Wrongful Act**
  - These endorsements were revised to clarify coverage for a "wrongful act" applies to any "insured" and not just a "director and officer".

**Broadening in Coverage:**

- **Who Is An Insured**
  - These endorsements were revised to include Employees, Volunteer Workers, and Committee Members as an insured.

1

ERIE INSURANCE
COMMERCIAL GENERAL LIABILITY
UF-B901 (Ed. 10/15)

# IMPORTANT NOTICE TO POLICYHOLDERS –UNMANNED AIRCRAFT EXCLUSION

**This Notice summarizes changes that apply to renewal policies. If your policy is new, the provisions described in this Notice are part of your policy.**

This Notice is a basic description of significant changes in terms, coverages, and exclusions that will be effective upon renewal of your Commercial General Liability Policy. Some of the changes described below will result in a reduction of coverage or the addition of an exclusion of coverage in your policy. Other changes may clarify or have no impact on coverage. This Notice does not reference every editorial change made in your policy.

This Notice provides a summary of form and endorsement changes that have been made to the Commercial General Liability Program. These program changes apply to new and renewal policies. Endorsements that are applicable to your policy will appear on the Declarations under the Schedule of Forms. PLEASE NOTE that the Exclusion –Unmanned Aircraft, Endorsement CG 21 09, is attached to all new and renewal policies.

This Notice is not an insurance policy or contract. All coverages are subject to the specific terms, conditions, limits, and exclusions contained in your new or renewal policy and all applicable endorsements. PLEASE READ YOUR POLICY AND ENDORSEMENTS CAREFULLY for details regarding coverage including the limitation of coverage. In the case of any conflict between this Notice and the policy including endorsements, the policy language is controlling.

**CG 21 09 (Ed. 6/15) Exclusion – Unmanned Aircraft –** Modifies insurance provided under the Commercial General Liability Coverage Form in your policy. *This endorsement is added to all policies and will be listed on your Declarations under the Schedule of Forms.*

**Reduction and Clarification in Coverage**

Under Section I – Coverage A – Bodily Injury and Property Damage Liability, the Aircraft, Auto Or Watercraft Exclusion, Exclusion 2.g., is replaced with a two-part Aircraft, Auto Or Watercraft Exclusion that specifically excludes Unmanned Aircraft without exception under new paragraph g.1) and retains the prior exclusionary provisions for Aircraft (Other than Unmanned Aircraft), Auto Or Watercraft under paragraph g.2). New paragraph g.1) provides that insurance does not apply to bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an unmanned aircraft. The exclusion applies even if the claims against any insured allege negligence or wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured.

Under Section I – Coverage B - Personal and Advertising Injury, a specific exclusion is added for Unmanned Aircraft under Paragraph 2. Exclusions. Coverage is excluded for personal and advertising injury arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an unmanned aircraft. The exclusion applies even if the claims against any insured allege negligence or wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured.

Unmanned aircraft is defined in the Endorsement as aircraft that is not designed, manufactured, or modified after manufacture, to be controlled directly by a person from within or on the aircraft.

*Your payment of the renewal premium for this policy acknowledges your understanding and acceptance of the changes outlined in this Notice. If you have any questions concerning this Notice or your policy and endorsements, please contact your ERIE Agent.*

INTERLINE
IL 09 10 (Ed. 7/02) UF-3007


ERIE INSURANCE GROUP

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. Surveys;

2. Consultation or advice; or

3. Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;

2. To consultation services required to be performed under a written service contract not related to a policy of insurance; or

3. If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

---

**Instruction to Policy Writers**
Attach the Pennsylvania Notice to all new and renewal certificates insuring risks located in Pennsylvania.

---

Copyright ISO Properties, Inc., 2001

INTERLINE
IL 02 46 (Ed. 9/07) UF-3030

**ERIE INSURANCE GROUP**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PENNSYLVANIA CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

2. **Cancellation Of Policies In Effect For Less Than 60 Days**

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

3. **Cancellation Of Policies In Effect For 60 Days Or More**

   If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

   a. You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

   b. You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

   c. A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

   d. Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

   e. Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

f. Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

4. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

5. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6. If the policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

7. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

**B.** The following are added and supersede any provisions to the contrary:

1. **Nonrenewal**

   If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

2. **Increase Of Premium**

   If we increase your renewal premium, we will mail or deliver to the first Named Insured written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to the first Named Insured's last known address. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

Copyright, Iso Properties, Inc., 2006



**ERIE** INSURANCE GROUP

COMMERCIAL INLAND MARINE
COMMERCIAL GENERAL LIABILITY
FIVESTAR CONTRACTORS
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
ULTRASURE FOR PROPERTY OWNERS
GU-44 (Ed. 3/01) UF-6770

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE POLICY

COMMERCIAL GENERAL LIABILITY POLICY

FIVESTAR CONTRACTORS' POLICY

ULTRAFLEX PACKAGE POLICY

ULTRAPACK BUSINESS POLICY

ULTRASURE FOR PROPERTY OWNERS POLICY

**A. Concealment, Fraud or Misrepresentation** of the **General Policy Conditions** is replaced by the following:

**Concealment, Fraud, or Misrepresentation**

This policy may be canceled, if before or after a loss, the insured has intentionally concealed or misrepresented any material fact or circumstance which affects the insurability of the risk.

In the event of a fraudulent claim, we will not make payments for the loss.

**B. Transfer Of Your Rights And Duties Under This Policy** of the **General Policy Conditions** is replaced by the following:

**Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

If you die, this Coverage Part will remain in effect as provided in **1.** or **2** below, whichever is later:

1. For 180 days after your death regardless of the policy period shown in the Declarations, unless the insured property is sold prior to that date; or

2. Until the end of the policy period shown in the Declarations, unless the insured property is sold prior to that date.

Coverage during the period of time after your death is subject to all provisions of this policy including payment of any premium due for the policy period shown in the Declarations and any extension of that period.

ERIE INSURANCE
ULTRAFLEX PACKAGE
IL 9 85G (Ed. 1/15) UF-B478

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

## SCHEDULE

Terrorism Premium (Certified Acts) $ 4

This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Forms(s) and/or Policy(s):

Ultraflex Package

Additional Information, if any, concerning the terrorism premium:

**SCHEDULE – PART II (Refer to Paragraph B. in this endorsement)**

Federal share of Terrorism Losses 85% Year: 2015
Federal share of Terrorism Losses 84% Year: 2016
Federal share of Terrorism Losses 83% Year: 2017
Federal share of Terrorism Losses 82% Year: 2018
Federal share of Terrorism Losses 81% Year: 2019
Federal share of Terrorism Losses 80% Year: 2020
(Applicable if policy is in force)

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.   Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B.   Disclosure of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses at-tributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C.   Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 bil-lion in a calendar year, and we have met our insurer deducti-ble under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion,

and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures estab-lished by the Secretary of the Treasury.

Copyright, ISO Properties, Inc., 2007

ERIE INSURANCE
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
ULTRASURE FOR PROPERTY OWNERS
ULTRASURE FOR LANDLORDS
FIVESTAR CONTRACTORS'
COMMERCIAL PROPERTY
HOME PROTECTOR
DWELLING PROPERTY
UF-8705 (Ed. 6/96)

# IMPORTANT NOTICE - NO FLOOD COVERAGE

Your basic policy covers losses from many perils. However, it **DOES NOT** provide coverage for flood loss.

Insurance covering flood loss is generally available through the National Flood Insurance Program.

In an effort to serve you, information about flood insurance and the National Flood Insurance Program can be provided by your ERIE Agent.

ERIE INSURANCE
BOAT PROTECTOR
BUSINESS CATASTROPHE LIABILITY
COMMERCIAL FIRE
COMMERCIAL CRIME
COMMERCIAL GENERAL LIABILITY
COMMERCIAL INLAND MARINE
DWELLING PROPERTY/PERSONAL LIABILITY
FIVESTAR CONTRACTORS'
HOMEPROTECTOR
MOBILE HOMEPROTECTOR
PERSONAL CATASTROPHE LIABILITY
PERSONAL INLAND MARINE
SURETY
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
ULTRASURE FOR LANDLORDS
ULTRASURE FOR PROPERTY OWNERS
WORKERS' COMPENSATION
UF-4810 (Ed. 3/08)

# IMPORTANT NOTICE - POLICY SERVICE FEES

Dear Policyholder:

**SERVICE FEES** - For policies effective on and after March 1, 2008, the following service fees will be applicable to all payment plans.

- **Returned Payment Fee** - A $25.00 charge will be applied to your account if your check or other payment is returned unpaid by your financial institution.

- **Late Fee** - A $10.00 charge will be applied to your account when a cancellation notice is issued on your policy because of non-payment of premium.

- **Reinstatement Fee** - A $25.00 charge will be applied to your account when your policy is reinstated with a lapse in coverage following cancellation of your policy because of non-payment of premium.

If you have any questions concerning this Important Notice, please contact your ERIE Agent.



ERIE INSURANCE GROUP
**ERIE.**

FIVESTAR CONTRACTORS
ULTRAFLEX PACKAGE
COMMERCIAL GENERAL LIABILITY
(Ed. 8/09) UF-6330

# IMPORTANT NOTICE: DO YOU USE SUBCONTRACTORS?

If you use subcontractors in your business, please read the following notice.

It is important to have and maintain Certificates of Insurance for all subcontractors. This will verify that each subcontractor is adequately insured and may protect your business from costly losses. If you do not have and maintain certificates from subcontractors, their costs will be added to the audited payroll of this policy according to the applicable general liability manual rules for uninsured subcontractors. These rules apply in all states where you operate. Uninsured subcontractors represent a significant increase to your general liability loss exposures and could impact your future insurability with ERIE.

When this liability policy was issued, the premium was based on estimated rating information for your operations. Payrolls were not estimated for subcontractors that you hired during the policy period. Therefore, you will be charged an additional premium for subcontractors who do not provide you with certificates of liability insurance, or those that do not have adequate general liability insurance limits. For a subcontractor, ERIE considers general liability insurance limits of at least $1,000,000 to be adequate.

When your policy term expires, ERIE may audit your operations and review the subcontractors used during the policy term. The audit will ensure that you pay the appropriate premium for your exposure. As part of the audit process, we will ask you for copies of the Certificates of Insurance for each subcontractor that cover the time period the subcontractor performed work for you. Therefore, you may be required to submit more than one Certificate of Insurance for the same subcontractor. If you do not have the certificates, or cannot produce the certificates at the time of the audit, the subcontractor will be considered uninsured and a premium charge will be made.

If you have any questions regarding this notice, please contact your ERIE agent. Thank you for your business.

ERIE INSURANCE EXCHANGE
Form SA (Ed. 11/12) UF-B213

**- THIS IS AN ENDORSEMENT TO YOUR POLICY. PLEASE READ IT CAREFULLY.**

# SUBSCRIBER'S AGREEMENT

*The following is the language of the Subscriber's Agreement that applies to policies issued by ERIE INSURANCE EXCHANGE. Definitions included in this Agreement apply only to the Subscriber's Agreement.*

The Subscriber ("you" or "your") agrees with the other Subscribers at ERIE INSURANCE EXCHANGE ("ERIE"), a Reciprocal/Inter-Insurance Exchange, and with their Attorney-in-Fact, the Erie Indemnity Company ("we" or "us"), a Pennsylvania corporation with its Home Office in Erie, Pennsylvania, to the following:

1. You agree to pay your policy premiums and to exchange with other ERIE Subscribers policies providing insurance for any insured loss as stated in those policies.

2. You appoint us as Attorney-in-Fact with the power to: a) exchange policies with other ERIE Subscribers; b) take any action necessary for the exchange of such policies; c) issue, change, nonrenew or cancel policies; d) obtain reinsurance; e) collect premiums; f) invest and reinvest funds; g) receive notices and proofs of loss; h) appear for, compromise, prosecute, defend, adjust and settle losses and claims under your policies; i) accept service of process on behalf of ERIE as insurer; and j) manage and conduct the business and affairs of ERIE, its affiliates and subsidiaries. This power of attorney is limited to the purposes described in this Agreement.

3. You agree that as compensation for us: a) becoming and acting as Attorney-in-Fact; b) managing the business and affairs of ERIE; and c) paying general administrative expenses, including sales commissions, salaries and employee benefits, taxes, rent, depreciation, supplies and data processing, we may retain up to 25% of all premiums written or assumed by ERIE. The rest of the premiums will be used for losses, loss adjustment expenses, investment expenses, damages, legal expenses, court costs, taxes, assessments, licenses, fees, and any other governmental fines and charges, establishment of reserves and surplus, and reinsurance, and may be used for dividends and other purposes we decide are to the advantage of Subscribers.

4. You agree that this Agreement, including the power of attorney, shall have application to all insurance policies for which you apply at ERIE, including changes in any of your coverages.

5. You agree to sign and deliver to us all papers required to carry out this Agreement.

6. This Agreement, including the power of attorney, shall not be affected by your subsequent disability or incapacity.

7. This Agreement is and shall be binding upon you, us, and all executors, administrators, successors and assigns.

*(Subscriber's Agreement language updated 1996.)*

Form SA

ERIE INSURANCE
COMMERCIAL GENERAL LIABILITY
CG 21 09 (Ed. 6/15) UF-B898

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.g. Aircraft, Auto Or Watercraft** under **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

2. **Exclusions**

This insurance does not apply to:

g. **Aircraft, Auto Or Watercraft**

1) **Unmanned Aircraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and "loading or unloading".

This Paragraph **g.1)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

2) **Aircraft (Other Than Unmanned Aircraft), Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft"), "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This Paragraph **g.(2)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft"), "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This Paragraph **g.2)** does not apply to:

a) A watercraft while ashore on premises you own or rent;

b) A watercraft you do not own that is:

i) Less than 26 feet long; and

ii) Not being used to carry persons or property for a charge;

c) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

d) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

e) "Bodily injury" or "property damage" arising out of:

i) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

ii) The operation of any of the machinery or equipment listed in Paragraph **f.2)** or **f.3)** of the definition of "mobile equipment".

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Coverage B – Personal And Advertising Injury Liability:**

2. **Exclusions**

This insurance does not apply to:

**Unmanned Aircraft**

"Personal and advertising injury" arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the offense which caused the "personal and advertising injury" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

This exclusion does not apply to:

a. The use of another's advertising idea in your "advertisement"; or

b. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

C. The following definition is added to the **Definitions** section:

"Unmanned aircraft" means an aircraft that is not:

1. Designed;

2. Manufactured; or

3. Modified after manufacture;

to be controlled directly by a person from within or on the aircraft.

© Insurance Services Office, Inc., 2014

2

ERIE INSURANCE
ULTRAFLEX PACKAGE
FX-00-01 (Ed. 6/13) UF-3553

# ULTRAFLEX COMMERCIAL PROPERTY COVERAGE PART

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the "Declarations". The words "we", "us", and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **Section XI - Definitions**.

## SECTION I - COVERAGES

## INSURING AGREEMENT

We will pay for direct physical "loss" of or damage to covered property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

## BUILDING(S) - COVERAGE 1

### A. Covered Property

Building(s) means buildings described in the "Declarations" and anything permanently attached. It also includes:

1. Building equipment and fixtures servicing the premises;

2. Personal property you have for the service and maintenance of the buildings and premises including, but not limited to the following:

   a. Fire extinguishing equipment;

   b. Outdoor furniture;

   c. Floor coverings;

   d. Appliances used for refrigerating, ventilating, cooking, dishwashing, or laundering; and

   e. Flag poles and outdoor lights;

3. Vegetated roofs, including lawns, trees, shrubs, and plants which are part of a vegetated roof;

4. Glass which you own. The glass must be part of the building or in the building described in the "Declarations", including glass in wall cases.

   Our payment for "loss" to glass will also include:

   a. Replacement of building glass with safety glazing materials when made necessary by an ordinance or building code;

   b. Replacement of lettering, ornamentation, or burglar alarm foil;

   c. Repair or replacement of frames;

   d. Installation of temporary coverings; and

   e. Removal of obstructions;

5. Exterior signs, lights, and clocks which you own. Exterior signs, lights, and clocks must be permanently attached to the building(s) on the premises described in the "Declarations".

### B. Property Not Covered

Building(s) does not apply to:

1. Fences, walks, and unattached outbuildings not described in the "Declarations", except as provided in Extensions of Coverage - **A.3.**;

2. Outdoor swimming pools and equipment pertaining thereto not described in the "Declarations";

3. Bulkheads, pilings, piers, wharves, or docks not described in the "Declarations";

4. Bridges, roadways, patios, or other paved surfaces;

5. Retaining walls that are not part of a building, or not described in the "Declarations";

6. The cost of excavation, grading, backfilling, or filling;

7. Trees, shrubs, lawns, and plants (other than trees, shrubs, lawns, and plants which are part of a vegetated roof), except as provided in Extensions of Coverage - **A.9.**;

8. Unattached outdoor signs, lights, and clocks except as provided in Extensions of Coverage - **A.2.**;

9. Underground pipes, flues, or drains;

10. Land (including land on which covered property is located) or water; and

11. Property specifically insured in whole or in part by this or any other insurance.

### C. Amount of Insurance

The most we will pay for "loss" or damage to any building described in the "Declarations" in any one occurrence is the applicable amount of insurance shown in the "Declarations" for that building subject to the applicable Automatic Adjustment of Coverage Amounts.

### D. Automatic Adjustment of Coverage Amounts

This policy provides you with a guard against the effect of inflation on construction costs for Building(s) - Coverage 1.

We will keep track of costs and at the next policy period we will adjust the amount of your building coverage if necessary. Your premium will be adjusted at each policy period to reflect any change in the amount of insurance.

During the policy period, if there is an increase in construction costs and a "loss" occurs, we will reflect the increase in the amount of insurance for Building(s) - Coverage 1 before making payment. The amount of increase in the amount of insurance will be:

1. The amount of insurance that applied to your covered building(s) on the most recent of: the policy inception date, the policy anniversary date, or any other policy change amending the amount of insurance, times

2. The percentage of annual increase shown in the "Declarations", expressed as a decimal (example: 8% is .08), times

3. The number of days since the beginning of the current policy period or the effective date of the most recent policy change amending the amount of insurance to your covered building(s), divided by 365.

There will be no charge for this additional coverage.

If the amount of insurance shown in the "Declarations" for Building(s) - Coverage 1 is inadequate, these adjustments may not be sufficient to provide full recovery should a "loss" occur.

## BUSINESS PERSONAL PROPERTY AND PERSONAL PROPERTY OF OTHERS - COVERAGE 2

### A. Covered Property

Business Personal Property and Personal Property of Others means:

1. Personal property pertaining to your business, professional or institutional activities, including leased property you are contractually responsible to insure;

2. Personal property of others that is in your care, custody, or control;

3. Labor, materials, or services furnished or arranged by you on personal property of others;

4. Your use interest as a tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations, or additions:

   a. Made a part of the building or structure you occupy but do not own; and

   b. You acquired or made at your expense but cannot legally remove;

5. Attached exterior signs which you own or which are in your care, custody, or control and for which you are contractually responsible. The attached exterior signs must be permanently attached to the building on the premises described in the "Declarations"; and

6. Glass which is in your care, custody, or control and for which you are contractually responsible. The glass must be part of the building described in the "Declarations", including glass in wall cases.

Our payment for "loss" to glass will also include:

   a. Replacement of building glass with safety glazing materials when made necessary by an ordinance or building code;

   b. Replacement of lettering, ornamentation, or burglar alarm foil;

   c. Repair or replacement of frames;

   d. Installation of temporary coverings; and

   e. Removal of obstructions.

while in or on the described buildings, or in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

Our payment for "loss" of or damage to personal property of others will only be made to the owner of the property.

### B. Property Not Covered

Business Personal Property and Personal Property of Others does not apply to:

1. "Automobiles" held for sale;

2. Vehicles or self-propelled machines (including "aircraft" or watercraft) that:

   a. Can be licensed for use on public roads, except vehicles that are solely used to service the premises described in the "Declarations"; or

   b. Are operated principally away from the premises described in the "Declarations".

   This paragraph does not apply to:

   a. Vehicles or self-propelled machines or "automobiles" you manufacture, process, or warehouse;

   b. Vehicles or self-propelled machines, other than "automobiles", you hold for sale or repair;

   c. Rowboats or canoes out of water at the premises described in the "Declarations"; or

   d. Trailers, but only to the extent provided for in the Extensions of Coverage - B.22.;

3. Unattached exterior signs, lights, and clocks, except as provided in Extensions of Coverage - A.2.;

4. "Money" and "securities", except as provided in Extensions of Coverage - B.4., B.6., B.9., B.19., and B.20.;

5. Your property sold on installment or deferred payment plans after delivery to customers;

6. Household and personal articles of the insured, the insured's partners, members or managers of a limited liability company, the insured's officers, or the insured's employees, except as provided in Extensions of Coverage - B.23.;

7. Trees, shrubs, lawns, and plants, except as provided in Extensions of Coverage - A.9.;

2

8.  Crops and growing crops while outside of the building(s);

9.  Contraband, or property in the course of illegal transportation or trade;

10. "Electronic data" including the cost to research, replace, or restore the information on "electronic data" or magnetic media, except as provided in **Section IV - Additional Coverages – C. 2.**

    We will cover "electronic data" which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning, or security systems;

11. The cost to research, replace, or restore the information on valuable papers and records, except as provided in Extensions of Coverage - **B.30.** Valuable papers and records include proprietary information; written, printed, or inscribed documents and records; including books, maps, films, abstracts, drawings, deeds, mortgages, card index systems, and manuscripts;

12. Fine arts, except as provided in Extensions of Coverage - **B.12.** Fine arts include paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; porcelains; and similar property of rarity, historic value, or artistic merit;

13. Animals, unless owned by others and boarded by you or if owned by you as stock while inside the building(s) described in the "Declarations";

14. "Mobile equipment":

    a.  While being used or stored away from the premises described in the "Declarations"; or

    b.  While at or being transported to or from job sites away from the premises described in the "Declarations"; and

15. Property specifically insured in whole or in part by this or any other insurance.

### C.  Amount of Insurance

The most we will pay for "loss" or damage to Business Personal Property and Personal Property of Others on the premises described in the "Declarations" in any one occurrence is the applicable amount of insurance shown in the "Declarations" for Business Personal Property and Personal Property of Others on that premises.

## ADDITIONAL INCOME PROTECTION - COVERAGE 3

### A.  Additional Income Protection Coverage

Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against. "Loss" or damage also includes property in the

open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

If you are a tenant, your premises are the portion of the building described in the "Declarations" which:

1.  You rent, lease, or occupy;

2.  All routes within the building that service or are used to gain access to the described premises; and

3.  The area within 1,500 feet of the premises described in the "Declarations" (with respect to "loss" or damage to covered property in the open or in a vehicle).

You are required to resume normal business operations as promptly as possible and shall use all available means to eliminate any unnecessary delay.

### B.  Extra Expense Coverage

Extra expense coverage is provided at the premises described in the "Declarations" only if the "Declarations" show that Additional Income Protection Coverage applies to that premises.

"Extra expense" means necessary expenses you incur due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against. "Loss" or damage also includes property in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

We will pay necessary actual and necessary "extra expenses" (other than the expense to repair or replace property) sustained by you to:

1.  Avoid or minimize the "interruption of business" and to continue your business operations:

    a.  At the premises described in the "Declarations"; or

    b.  At replacement premises or at temporary locations, including:

        1)  Relocation expenses; and

        2)  Costs to equip and operate the replacement premises or temporary locations.

2.  Minimize the "interruption of business" if you cannot continue your business operations to the extent it reduces the amount of loss that would have been payable under loss of "income" and/or "rental income".

We will not pay any "loss" or damage to your buildings or business personal property and personal property of others. We also will not pay the cost of research or any other expense to replace or restore your valuable papers and records or "electronic data". We will pay the extra cost to repair or replace your covered property and the amount to research, replace, or restore the lost information on damaged valuable papers and records or "electronic data" to the extent it reduces the amount of loss that would have been payable under loss of "income" and/or "rental income".

## C.  Additional Coverages

### 1.  Civil Authority

When a peril insured against causes damage to property other than property at the premises described in the "Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" provided that both of the following apply:

a.  Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" are within that area but are not more than one mile from the damaged property; and

b.  The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for "income" and/or "rental income" will begin 72 hours after the time of the first action of civil authority that prohibits access to the premises described in the "Declarations" and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority coverage for "extra expense" will begin immediately after the time of the first action of civil authority that prohibits access to the premises described in the "Declarations" and will end:

a.  Four consecutive weeks after the date of that action; or

b.  When your Civil Authority coverage for "income" and/or "rental income" ends;

whichever is later.

### 2.  Full Resumption of Operations

We will also pay your actual loss of "income" and/or "rental income" for an additional 60 days if your "income" and/or "rental income" after operations are resumed is less than your "income" and/or "rental income" before the loss. The additional amount we will pay will start after the later of the following times:

a.  The date on which the liability for Additional Income Protection - Coverage 3 would terminate if this clause had not been included; or

b.  The date on which repair, replacement, or rebuilding of such part of the damaged or destroyed property described in the "Declarations" is actually completed.

## D.  Amount of Insurance

We will pay the actual loss of "income" and/or "rental income" sustained by you up to the Occurrence Limit shown in the "Declarations".

The "income" and/or "rental income" loss sustained by you shall not exceed:

1.  The actual reduction of "income" and/or "rental income", during the "interruption of business"; and

2.  The reduction in rents received less charges and expenses which do not necessarily continue during the "interruption of business", or during the period when the tenant cannot inhabit the premises.

We will pay up to $100 a day, for seven (7) days, after your business is suspended to cover loss of "income" and/or "rental income" sustained by you while you are determining your actual income protection loss. The amount paid will be subtracted from your actual loss of "income" and/or "rental income".

Payment of loss of "income" and/or "rental income" is not limited by the end of the policy period.

Payments under the following coverages will not increase the applicable Occurrence Limit for Additional Income Protection – Coverage 3:

1.  Extra Expense Coverage;

2.  Civil Authority; or

3.  Full Resumption of Operations.

## GLASS AND LETTERING - COVERAGE 4

### Covered Property

Glass and Lettering means for the premium shown in the "Declarations", the deductible does not apply to glass covered under Building(s) - Coverage 1 or Business Personal Property and Personal Property of Others – Coverage 2.

## SIGNS, LIGHTS, AND CLOCKS - COVERAGE 5

### Covered Property

The $5,000 amount of insurance provided in Extensions of Coverage - Exterior Signs, Lights, and Clocks - **A.2.** is increased by the amount shown in the "Declarations" for those items that are separately scheduled and are subject to the exclusions listed in Section III - Exclusions and Section VIII - Extensions of Coverage.

The maximum amount of insurance we will pay for any one covered "loss" is the:

1.  $5,000 amount of insurance shown in the Extensions of Coverage - Exterior Signs, Lights, and Clocks - **A.2.**; and

2.  The amount of insurance shown in the "Declarations".

If a deductible amount for Signs, Lights, or Clocks - Coverage 5 is shown in the "Declarations", this deductible amount replaces the $100 deductible amount shown in Paragraph **A.2.** of Exterior Signs, Lights, and Clocks of Section VIII - Extensions of Coverage.

## SECTION II - PERILS INSURED AGAINST

## BUILDING(S) - COVERAGE 1

## BUSINESS PERSONAL PROPERTY AND PERSONAL PROPERTY OF OTHERS - COVERAGE 2

## ADDITIONAL INCOME PROTECTION - COVERAGE 3

### Covered Cause of Loss

This policy insures against direct physical "loss", except "loss" as excluded or limited in this policy.

## GLASS AND LETTERING - COVERAGE 4

### Covered Cause of Loss

For Glass and Lettering this policy insures against direct physical "loss" to glass, except fire and scratching, and as excluded or limited in this policy.

## SECTION III - EXCLUSIONS

### A. Coverages 1, 2, 3, 4, and 5

We do not cover under Building(s) - Coverage 1; Business Personal Property and Personal Property of Others - Coverage 2; Additional Income Protection - Coverage 3; Glass and Lettering - Coverage 4; and Signs, Lights, and Clocks - Coverage 5 "loss" or damage caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":

1. Deterioration or depreciation.

2. Intentional loss, meaning any "loss" arising from an act committed by or at the direction of the insured with the intent to cause a "loss".

3. "Loss" or damage caused by or resulting from any of the following:

   a. By weather conditions, but only if weather conditions contribute in any way with a peril excluded in Part A. of Section III - Exclusions to produce the "loss";

   b. By acts or decisions, including the failure to act or decide, of anyone;

   c. By faulty, inadequate, or defective:

      1) Planning, zoning, development, surveying;

      2) Design, specifications, workmanship, repair, construction, renovating, remodeling, grading, or compaction;

      3) Materials used in repair, construction, renovation, or remodeling; or

      4) Maintenance;

   of property whether on or off the insured premises by anyone, but if "loss" by a peril insured against results, we will pay for the ensuing "loss".

4. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of "loss".

5. Earth Movement

   a. Earthquake, including tremors and aftershocks, and any earth sinking, rising, or shifting related to such event;

   b. Landslide, including any earth sinking, rising, or shifting related to such event;

   c. Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased; or

   d. Earth sinking (other than sinkhole collapse), rising, or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations, or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil, and the action of water under the ground surface.

   This exclusion applies regardless of whether any of the above, in Paragraphs 5.a. through 5.d., is caused by an act of nature or is otherwise caused.

   But if Earth Movement, as described in 5.a. through 5.d. above, results in fire, explosion, sprinkler leakage, volcanic action, or building glass breakage, we will pay for the "loss" or damage caused by such perils.

   Volcanic action means direct "loss" or damage resulting from the eruption of a volcano when the "loss" or damage is caused by:

   a. Airborne volcanic blast or airborne shock waves;

   b. Ash, dust, or particulate matter; or

   c. Lava flow.

   All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   This does not include the cost to remove ash, dust, or particulate matter that does not cause direct "loss" to the covered property.

   This exclusion does not apply to property being transported.

6. Water

   a. Flood, surface water, waves, (including tidal water and tsunami), tides, tidal wave, overflow of any body of water or spray from any of these, all whether driven by wind or not (including storm surge);

   b. Mudslide or mudflow;

   c. By water or sewage which backs up through sewers or drains, or which enters into and overflows or is otherwise discharged from a sewer, drain, sump pump, sump pump well, or any other

system designed to remove subsurface water which is drained from the foundation area;

d. Water under the ground surface pressing on, or flowing or seeping through:

   1) Foundations, walls, floors, or paved surfaces;

   2) Sidewalks or driveways;

   3) Basements, whether paved or not; or

   4) Doors, windows, or other openings.

e. Water from a broken water main. However, this exclusion does not apply to water flowing or seeping from a broken water main where the break occurs on the premises described in the "Declarations".

f. Waterborne material carried or otherwise moved by any of the water referred to in Paragraphs **6.a.**, **6.c.**, **6.d.**, or **6.e.** or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **6.a.** through **6.f.**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall, or other boundary or containment system fails in whole or in part, for any reason, to contain the "loss".

But if Water, as described in Paragraphs **6.a.** through **6.f.** results in fire, explosion, sprinkler leakage, volcanic action, or building glass breakage, we will pay for the "loss" or damage caused by such perils.

This exclusion does not apply to property being transported.

7. War

   a. War including undeclared or civil war;

   b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or

   c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

With respect to any action that comes within the terms of this exclusion and involves nuclear reaction or radiation, or radioactive contamination, this War exclusion supersedes Paragraph A. 9. of Section III - Exclusions, the nuclear hazard exclusion.

8. Seizure or destruction of covered property by order of governmental authority, except as provided in Extensions of Coverage - **B.3.** and **B.15.**

We will also cover "loss" caused by acts of destruction ordered by governmental authority to prevent the spread of a fire.

9. Nuclear reaction or radiation, or radioactive contamination unless fire ensues, and then only for ensuing "loss".

10. By the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair of any property, or requiring the tearing down of any property, including the cost of removing its debris, except as provided in Extensions of Coverage - **B.3.**, **B.7.**, and **B.8.**

11. The failure of power, communication, water, or other utility service supplied to the insured premises, however caused, if the failure:

   a. Originates away from the premises described in the "Declarations"; or

   b. Originates at the premises described in the "Declarations" but only if such failure involves equipment used to supply the utility service to the premises described in the "Declarations" from a source away from the premises described in the "Declarations";

except as provided in Extensions of Coverage - **A.6.** and **A.8.**, unless a covered "loss" ensues, and then only for ensuing "loss".

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

"Loss" or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular, or satellite network.

Exclusions A.5. through A.11. apply whether or not the loss event results in widespread damage or affects a substantial area.

**B. Coverages 1, 2, and 3**

We do not cover under Building(s) - Coverage 1, Business Personal Property and Personal Property of Others - Coverage 2, and Additional Income Protection - Coverage 3 "loss" caused:

1. By:

   a. Wear and tear, rust, or corrosion;

   b. Change in flavor, color, texture, or finish;

   c. Damp or dry air;

   d. Inherent vice;

   e. Smog;

   f. Latent or hidden defect;

   g. Marring or scratching;

   h. Smoke, vapor, or gases from agricultural or industrial operations;

i. Settling, cracking, shrinking, bulging or expansion of pavements, foundations, walls, floors, roofs, or ceilings;

j. Termites, vermin, insects, rodents, birds, skunks, raccoons, spiders, or reptiles;

k. Or to machines and machinery by rupture, bursting, or disintegration of their rotating or moving parts resulting from centrifugal or reciprocating force; or

l. Mechanical breakdown;

unless a covered "loss" ensues, and then only for ensuing "loss".

2. By discharge, dispersal, seepage, migration, release, or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release, or escape is itself caused by a peril insured against. But if "loss" or damage by a peril insured against results from the discharge, dispersal, seepage, migration, release, or escape of "pollutants", we will pay for the resulting damage caused by the peril insured against.

3. By mysterious disappearance, unexplained loss, or inventory shortage. We will accept inventory records as a means of proving the amount of a covered "loss".

4. By the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot, or bacteria.

But if "fungus", wet or dry rot, or bacteria results in a covered loss from a peril insured against, we will pay for the loss or damage caused by that peril insured against.

This exclusion does not apply:

a. When "fungus", wet or dry rot, or bacteria results from fire or lightning; or

b. To the extent that coverage is provided in **Section IV – Additional Coverages - Limited Coverage For "Fungus", Wet Rot, Dry Rot, And Bacteria** with respect to loss or damage caused by a peril insured against other than fire or lightning.

5. By continuous or repeated seepage or leakage of water or the presence or condensation of humidity, moisture, or vapor, that occurs over a period of 14 days or more.

6. By freezing due to temperature reduction to plumbing, heating, air conditioning, or other equipment or appliances (except fire protective systems) or by water, other liquids, powder or molten material that leaks or flows from such items while the described building is vacant for more than 60 consecutive days, unless you have exercised reasonable care to:

a. Maintain heat in the building; or

b. Shut off the water supply and drain the system or appliance of water.

7. By collapse, including any of the following conditions of property or any part of the property:

a. An abrupt falling down or caving in;

b. Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

c. Any cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion as such condition relates to a. or b. above.

But if collapse results in a peril insured against at the premises described in the "Declarations", we will pay for the "loss" or damage caused by the peril insured against.

**Exclusion B.7.** does not apply:

a. To the extent that coverage is provided in Section IV - Additional Coverages, A. Collapse; or

b. To collapse caused by one or more of the following:

1) Fire; lightning; windstorm; hail; explosion; smoke; "aircraft"; vehicles; riot; civil commotion; vandalism or malicious mischief; breakage of building glass; falling objects; weight of snow, ice, or sleet; sinkhole collapse; or volcanic action.

Sinkhole collapse means "loss" caused by sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.

This peril does not include:

a) The cost of filling sinkholes; or

b) "Loss" or damage to property caused by or resulting from the sinking or collapse of land into man-made underground cavities;

2) Water damage resulting from the accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of plumbing, heating, air conditioning, or other equipment or appliances, but does not include damage from a sump pump, sump pump well, or any other system designed to remove subsurface water which is drained from the foundation areas;

3) Breakage of building glass;

4) Weight of rain that collects on a roof; or

5) Weight of people or personal property.

8. By explosion of, including resulting damage to, steam boilers, steam pipes, steam turbines, or steam engines if owned by, leased by, or operated under your control. We also do not cover damage to these caused by any condition or occurrence within the boilers, pipes, turbines, or engines. We will pay for "loss" from the explosion of gases or fuel within the combustion chamber, flues, or passages of any fired

7

vessel. We will also pay for "loss" by ensuing fire or explosion not included in this paragraph.

9.  To hot water boilers or other water heating equipment, caused by a condition or occurrence within the boilers or equipment, other than an explosion.

10.  By electricity including electric arching other than lightning, unless fire or explosion ensues, and then only for ensuing "loss", except as provided in Extensions of Coverage - A.1.

11.  To the interior of the building or the contents by rain, snow, sand, or dust, whether driven by wind or not, unless the exterior of the building first sustains damage to its roof or walls by a peril insured against. We will pay for "loss" caused by or resulting from the thawing of snow, sleet, or ice on the building.

12.  To outdoor radio or television antennas (including satellite dishes) and its lead-in wiring, masts, or towers by windstorm or hail.

13.  By dishonest or criminal acts (including theft) committed by you, or any of your members of a limited liability company, or any of your employees (including temporary or leased employees), directors, officers, trustees, or authorized representatives:

    a.  Acting alone or in collusion with other persons; or

    b.  While performing services for you or otherwise.

    We will cover acts of destruction by your employees (including temporary or leased employees) but only for ensuring "loss", but there is no coverage for "loss" or damage:

    a.  By theft by your employees (including temporary or leased employees) or any person to whom you entrust property for any purpose, whether acting alone or in collusion with any other party; or

    b.  Caused by or resulting from manipulation, including the introduction or enaction of any virus, harmful code, or similar instruction, of a computer system (including "electronic data") by your employees.

14.  To any merchandise, goods, or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production, or use of the product, including planning, testing, processing, packaging, installation, maintenance, or repair. This exclusion applies to any effect that compromises the form, substance, or quality of the product. But if such error or omission results in a "loss" by a peril insured against, we will pay for the "loss" or damage caused by that peril insured against.

15.  By or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness, or disease.

## C.  Coverage 1

We do not cover under Building(s) - Coverage 1 "loss" caused:

1.  To fences, pavements, outdoor swimming pools and related equipment, retaining walls, bulkheads, piers, wharves, or docks, when covered under the policy, by freezing or thawing, impact of watercraft, or by the pressure or weight of ice or water whether driven by wind or not.

2.  To building materials and supplies not attached as part of the building, unless held for sale by you, caused by or resulting from theft. We will cover "loss" to building materials and supplies located in the building described on the premises in the "Declarations" caused by a peril insured against including theft. We will pay up to 10% of the Building(s) − Coverage 1 limit but not to exceed $100,000 for any one "loss".

3.  To vegetated roofs for "loss" caused by or resulting from:

    a.  Dampness or dryness of atmosphere or of soil supporting the vegetation;
    b.  Changes in or extremes of temperature;
    c.  Disease;
    d.  Frost or hail; or
    e.  Rain, snow, ice, or sleet.

## D.  Coverage 2

We do not cover under Business Personal Property and Personal Property of Others - Coverage 2 "loss" or damage caused:

1.  From your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title or possession of any property.

2.  By breakage of glassware, statuary, marble, bric-a-brac, porcelains, and other articles of a fragile or brittle nature. We will cover such "loss" caused by fire; lightning; "aircraft"; explosion; sonic boom; riot; civil commotion; smoke; vehicles; windstorm; hail; vandalism or malicious mischief; falling objects (the exterior of the building must first sustain damage to roof or walls by falling objects); sinkhole collapse; volcanic action; weight of ice, snow, or sleet; sprinkler leakage; or water damage.

3.  By rain, snow, or sleet to property in the open.

4.  By any legal proceeding.

5.  By actual work upon property being altered, repaired, installed, serviced, or faulty materials or workmanship, unless fire ensues, and then only for "loss" through ensuing fire.

8

6. By delay, loss of use, or loss of market.

7. To property that has been transferred to a person or to a place outside the premises described in the "Declarations" on the basis of unauthorized instructions.

8. By theft of furs and fur garments. We will pay for "loss" of furs and fur garments by "burglary" up to $10,000 for any one "loss".

9. By theft of gold and other precious metals and alloys. We will pay for theft of any one article of jewelry up to $500, but our payment will not exceed $10,000 for any one "loss". Jewelry means jewelry, necklaces, bracelets, gems, precious and semi-precious stones, articles containing one or more gems, and articles made of gold or other precious metals.

### E.  Coverage 3

We do not cover under Additional Income Protection - Coverage 3:

1. Increase of loss resulting from ordinance or law regulating construction or repair of buildings.

2. Consequential damages resulting from the breach of contractual obligations.

3. Increase of loss caused by or from delay in rebuilding, repairing, or replacing the property or resuming operations, due to interference at the location of the rebuilding, repair, or replacement by strikers or other persons.

4. Loss due to delay or loss of market.

5. Increase of loss caused by or resulting from the suspension, lapse, or cancellation of any license, lease, or contract. We will pay for loss of "income" and/or "rental income" during the "interruption of business" and during the period of Full Resumption of Operations if the suspension, lapse, or cancellation is caused by the suspension of your business.

6. "Extra expense" caused by the suspension, lapse, or cancellation of any license, lease, or contract beyond the "interruption of business".

7. Increase of loss resulting from ordinance or law regulating the prevention, control, repair, clean-up, or restoration of environmental damage.

8. Income protection specifically insured in whole or in part by this or any other insurance.

## SECTION IV - ADDITIONAL COVERAGES

### A.  Collapse

The coverage provided under this **Additional Coverage - Collapse** applies only to an abrupt collapse as described and limited in **A.1.** through **A.7.**:

1. For the purpose of this **Additional Coverage - Collapse**, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;

2. We will pay for direct physical "loss" or damage to covered property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Part or that contains Covered Property insured under this Coverage Part, if such collapse is caused by one or more of the following:

a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

c. Use of defective material or methods in construction, remodeling, or renovation if the abrupt collapse occurs during the course of construction, remodeling, or renovation; or

d. Use of defective material or methods in construction, remodeling, or renovation if the abrupt collapse occurs after the course of the construction, remodeling, or renovation is complete, but only if the collapse is caused in part by:

1) A cause of loss listed in **2.a.** and **2.b.**;

2) Fire; lightning; windstorm; hail; explosion; smoke; "aircraft"; vehicles; riot; civil commotion; vandalism or malicious mischief; breakage of building glass; falling objects; weight of snow, ice, or sleet; sinkhole collapse; or volcanic action.

   Sinkhole collapse means "loss" caused by sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.

   This peril does not include:

   a) The cost of filling sinkholes; or

   b) "Loss" or damage to property caused by or resulting from the sinking or collapse of land into man-made underground cavities;

3) Water damage resulting from the accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of plumbing, heating, air conditioning, or other equipment or appliances, but does not include damage from a sump pump, sump pump well, or any other system designed to remove subsurface water which is drained from the foundation areas;

4) Breakage of building glass;

5) Weight of people or personal property; or

6) Weight of rain that collects on a roof.

3. This **Additional Coverage - Collapse** does not apply to:

a. A building or any part of a building that is in danger of falling down or caving in;

b. A part of a building that is standing, even if it has separated from another part of the building; or

c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

4. With respect to the following property:

    a. Outdoor radio or television antennas (including satellite dishes) and its lead-in wiring, masts, or towers;

    b. Awnings, gutters, and downspouts;

    c. Yard fixtures;

    d. Outdoor swimming pools;

    e. Fences;

    f. Piers, wharves, and docks;

    g. Beach or diving platforms or appurtenances;

    h. Retaining walls; and

    i. Walks, roadways, and other paved surfaces;

if an abrupt collapse is caused by a cause of "loss" listed in **2.a.** through **2.d.**, we will pay for "loss" or damage to that property listed in **4.a.** through **4.i.** only if:

    a. Such "loss" or damage is a direct result of the abrupt collapse of a building insured under this Coverage Part; and

    b. The property is Covered Property under this Coverage Part.

5. If business personal property and personal property of others falls down or caves in and such collapse is **not** the result of an abrupt collapse of a building, we will pay for "loss" or damage to insured property caused by such collapse of business personal property and personal property of others only if:

    a. The collapse of business personal property and personal property of others was caused by a cause of loss listed in **2.a.** through **2.d.**;

    b. The business personal property and personal property of others which collapses is inside a building; and

    c. The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be business personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to business personal property and personal property of others if marring and/or scratching are the only damage to that business personal property and personal property of others caused by the collapse.

6. This **Additional Coverage - Collapse** does not apply to business personal property and personal property of others that has not abruptly fallen down or caved in, even if the business personal property and personal property of others shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

7. This **Additional Coverage - Collapse** will not increase the Limits of Insurance provided in this Coverage Part.

8. The term peril insured against includes the **Additional Coverage - Collapse** as described and limited in **A.1.** through **A.7.**

B. **Limited Coverage for "Fungus", Wet Rot, Dry Rot, And Bacteria**

1. The coverage described in Paragraphs **2.** and **6.** below only applies when the "fungus", wet or dry rot, or bacteria is the result of a peril insured against, other than fire and lightning, that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

2. We will pay for loss or damage by "fungus", wet or dry rot, or bacteria. As used in this Limited Coverage, the term loss or damage means:

    a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot, or bacteria, including the cost of removal of the "fungus", wet or dry rot, or bacteria;

    b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot, or bacteria; and

    c. The cost of testing performed before, during, or after removal, repair, replacement, or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot, or bacteria are present.

3. The coverage described in Paragraph **2.** above of this Limited Coverage is limited to $25,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences caused by a peril insured against, other than fire and lightning, which takes place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot, or bacteria, we will not pay more than a total of $25,000 even if the "fungus", wet or dry rot, or bacteria continues to be present, active, or recurs, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limits of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot, or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limits of Insurance on the affected Covered Property.

If there is a covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot, or bacteria, our loss payment will not be limited by the terms of this Limited Coverage, except to the extent that

"fungus", wet or dry rot, or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Exclusions **B. 4.**, Coverages 1, 2, and 3 in Section III - Exclusions or under Section IV - Additional Coverages - A. Collapse.

6. The following Paragraphs **6. a.** or **6. b.** applies only if the "interruption of business" satisfies all terms and conditions of Additional Income Protection - Coverage 3 and Extension of Coverage - Income Protection Coverage.

    a. If the covered loss which resulted in "fungus", wet or dry rot, or bacteria does not itself necessitate an "interruption of business", but such "interruption of business" is necessary due to loss or damage to covered property caused by "fungus", wet or dry rot, or bacteria, then we will pay the actual loss of "income" and/or "rental income" sustained by you in a period of not more than 30 days. The days need not be consecutive.

    b. If the "interruption of business" was caused by loss or damage other than "fungus", wet or dry rot, or bacteria but remediation of "fungus", wet or dry rot, or bacteria prolongs the "interruption of business", we will pay the actual loss of "income" and/or "rental income" sustained by you during the delay (regardless of when such a delay occurs during the "interruption of business") in a period of not more than 30 days. The days need not be consecutive.

7. The coverage described under Paragraph **6.** of this Limited Coverage is limited to $25,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss of "income" and/or "rental income" arising out of your "interruption of business" in a 12-month period (starting with the beginning of the present annual policy period). With respects to a particular occurrence of loss which results in "fungus", wet or dry rot, or bacteria, we will not pay more than a total of $25,000 for loss of "income" and/or "rental income" even if the "fungus", wet or dry rot, or bacteria continues to be present or active, or recurs in a later policy period resulting in an "interruption of business".

8. This coverage does not apply to lawns, trees, shrubs, or plants which are part of a vegetated roof.

**C. Electronic Data Processing Equipment and Electronic Data Coverage**

    Payments under this Electronic Data Processing Equipment, Electronic Data Coverage, and Income Protection are an Additional Amount of Insurance and will increase the total amount of insurance available for the coverage involve.

1. **Electronic Data Processing Equipment - Computer Virus**

    We will cover "loss" or damage to "electronic data processing equipment" caused by mechanical breakdown, malfunction, short circuit, blow-out, electrical injury, magnetic injury or disturbance, or computer virus. We will pay up to $10,000 for any one "loss" to "electronic data processing equipment".

    The cause of the electrical damage must occur in the described building on the premises described in the "Declarations" or within 1,500 feet of it. We will not cover "loss" caused by any change in electrical power supply, such as interruption, power surge, or brownout that originates more than 1,500 feet away from the building containing your "electronic data processing equipment" unless caused by lightning.

    We do not cover:

    a. "Electronic data processing equipment" which the insured rents or leases to others while it is away from the premises described in the "Declarations".

    b. "Loss" caused by processing operations or "loss" that occurred while the insured property is being worked on unless fire or explosion ensues, and then only for "loss", damage, or expense caused by the ensuing fire or explosion.

    "Electronic data processing equipment" means computers, terminals, teleprinters, readers, telephone systems, computerized cash registers, word processing equipment, and equipment and parts related to the processing unit.

    "Electronic data processing equipment" does not include computer operated or controlled production or processing machinery or equipment or a separate computer or computerized control panels used to operate the production or processing machinery or equipment.

    We will pay for "loss" to "electronic data processing equipment" which is in excess of the deductible amount shown in the "Declarations".

2. **Electronic Data – Expenses for Reproduction or Replacement**

    We will cover the expenses incurred to reproduce or replace your "electronic data" when destruction or corruption is caused by a peril insured against including loss by theft. This includes your "electronic data" that is destroyed or corrupted by mechanical breakdown, malfunction, short circuit, blow-out, electrical injury, magnetic injury or disturbance, or by a virus, harmful code, or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation.

Coverage is limited to "electronic data" which is owned by you, or licensed or leased to you, originates and resides in your computers and is used in the e-commerce activity of your business.

This Additional Amount of Insurance does not apply to "electronic data" which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning, or security systems.

The business of e-commerce and e-commerce activity means commerce conducted by the Internet or other computer based interactive communication network. This includes business-to-business conducted in that manner.

"Loss" or damage to "electronic data" will be valued at the cost of reproduction or replacement including the cost of data entry, re-programming, and computer consultation services. But we will not pay the cost to duplicate research that led to the development of your "electronic data".

To the extent that "electronic data" is not reproduced or replaced, the "loss" will be valued at the cost of replacement of the "media" on which "electronic data" was stored, with blank "media" of substantially identical type.

The most we will pay for the expenses incurred in the reproduction or replacement of your "electronic data" is $25,000.

"Media" means materials on which "electronic data" are recorded, such as magnetic tapes, disc packs, paper tapes, and cards.

We will pay for the expenses incurred in the reproduction or replacement of your "electronic data" which is in excess of the deductible amount shown in the "Declarations".

3. **Income Protection – Computer Operations**

a. Additional Income Protection – Coverage 3 is extended to cover your loss of "income" you sustain due to partial or total "interruption of business" resulting directly from an interruption in your computer operations due to your "electronic data" being destroyed or corrupted caused by a peril insured against including loss by theft. This includes your loss of "income" resulting from your "electronic data" that is destroyed or corrupted by mechanical breakdown, malfunction, short circuit, blow-out, electrical injury, magnetic injury or disturbance, or by a virus, harmful code, or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation.

b. The most we will pay for your loss of "income" due to "interruption of business" resulting from an interruption to your computer operations in any one policy year, regardless of the number of interruptions or the number of premises, locations, or computer systems involved is $25,000. If the loss payment relating to the first interruption does not exhaust this amount of insurance, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions during that policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

c. This Income Protection coverage does not apply to loss sustained or expense incurred after the end of the period of restoration even if the $25,000 amount of insurance has not been exhausted.

d. Coverage for Income Protection does not apply when "interruption of business" is due to damage or corruption of "electronic data", or any "loss" to "electronic data", except as provided under Paragraphs a. through c. of this Income Protection - Computer Operations.

No deductible applies to Income Protection – Computer Operations.

4. **Exclusions – Electronic Data – Expenses for Reproduction or Replacement and Income Protection – Computer Operations**

We do not cover under Electronic Data – Expenses for Reproduction or Replacement and Income Protection – Computer Operations:

a. "Media" and "electronic data" which cannot be replaced with the same kind or quality.

b. Program support documentation such as flow charts, record formats, or narrative descriptions unless they are converted to "electronic data" form and then only in that form.

c. "Loss" caused by errors or omissions or deficiency in design, specifications, materials, or workmanship, unless fire or explosion ensues, and then only for "loss", damage, or expense caused by the ensuing fire or explosion.

d. "Loss" caused by errors or omissions in programming or processing operations or "loss" that occurred while the insured property is being worked on unless fire or explosion ensues, and then only for "loss", damage, or expense caused by the ensuing fire or explosion.

e. "Loss" or damage caused by or resulting from manipulation, including the introduction or enaction of any virus, harmful code, or similar instruction of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity re-

tained by you, or for you, to inspect, design, install, modify, maintain, repair, or replace that system.

## SECTION V - DEDUCTIBLES

1. Building(s) - Coverage 1, Business Personal Property and Personal Property of Others - Coverage 2 and Extensions of Coverage - We will pay the amount of "loss" to property in any one occurrence which is in excess of the deductible amount shown in the "Declarations", unless otherwise stated in the Extensions of Coverage.

2. Theft - We will pay the amount of "loss" to property caused by theft in any one occurrence which is in excess of the deductible amount applying to Building(s) - Coverage 1 and Business Personal Property and Personal Property of Others - Coverage 2 shown in the "Declarations", unless a separate deductible for theft is shown in the "Declarations".

3. When the occurrence involves "loss" to more than one building (or building and business personal property) and separate limits of insurance apply or blanket limits of insurance apply, the losses will not be combined in determining the application of the deductible. The deductible will be applied only once per occurrence.

4. Additional Income Protection - Coverage 3 and Glass and Lettering - Coverage 4 - No deductible applies.

## SECTION VI - SPECIAL LOSS PAYMENTS - COVERAGE 1

Improvements and Betterments Made by Others is subject to special treatment when damaged by a peril insured against:

1. If you pay for repair or replacement, we will pay you the expenses involved not exceeding the replacement cost of damaged property.

2. If repaired or replaced at the expense of others, there is no loss payable to you.

3. If the damaged property is not repaired or replaced by you or at the expense of others, there is no loss payable to you.

## SECTION VII - SPECIAL LOSS PAYMENTS - COVERAGE 2

The following property is subject to special treatment when damaged by a peril insured against:

1. Accounting Books, Records, Tapes, and Recording Media. We will pay you the cost of blank items (books, film, tape, or other written documents). Extensions of Coverage - **B.30.** - Valuable Papers and Records provides for reproduction of these items.

2. Improvements and Betterments:

    a. If you pay for repair or replacement, we will pay you the expenses involved not exceeding the replacement cost of damaged property.

b. If not repaired or replaced, we will pay you a proportion of your original cost. We will determine the proportionate value as follows:

    1) Multiply the original cost by the number of days from the "loss" or damage to the expiration of the lease; and

    2) Divide the amount determined in **1)** above by the number of days from the installation of improvements to the expiration of the lease.

    If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

c. If repaired or replaced at the expense of others, there is no loss payable to you.

3. Sold Property. If you have sold property but not delivered it, we will pay you the net selling price.

## SECTION VIII - EXTENSIONS OF COVERAGE

### A. Extensions of Coverage

We will pay the following "losses" at your option. Payments under these Extensions are not an additional amount of insurance and will not increase the total amount of insurance available for the coverage involved.

1. **Electrical Service Panels.** We will pay for damage to your electrical service panels caused by electricity.

    This extension of coverage applies to each building described in the "Declarations".

2. **Exterior Signs, Lights, and Clocks.** We will pay up to $5,000 for "loss" caused by a peril insured against to lights, clocks, and unattached exterior signs which you own, or for which the lease holds you contractually responsible. We will cover all lights, clocks, and unattached exterior signs on the premises described in the "Declarations".

    We will not pay for "loss" caused by:

    a. Wear and tear, gradual deterioration, faulty manufacture or installation, inherent vice, extremes of temperature, dampness of atmosphere, or mechanical breakdown;

    b. Damage to electrical apparatus which is part of covered property caused by electricity other than lightning, except for ensuing fire damage; or

    c. Breakage during installation, repairing or dismantling, or breakage during transportation, unless caused by fire, lightning, collision, derailment or overturn of vehicle.

    This extension of coverage applies to each building described in the "Declarations".

    The deductible for this extension is $100.

13

3. **Fences, Walks, and Unattached Outbuildings - Coverage 1**. We will pay up to $5,000 for any one "loss" caused by a peril insured against to fences, walks, and unattached outbuildings on the premises described in the "Declarations".

Unattached outbuildings include garages, storage areas and tool sheds, but do not include those buildings used for dwelling purposes.

If specific insurance is carried on any item covered by this extension, then this extension does not apply to that item.

This extension of coverage applies to each building described in the "Declarations".

4. **Merchandise in Shipment**. Business Personal Property and Personal Property of Others - Coverage 2 includes protection for "loss" by a peril insured against to merchandise which you have sold but for which you have not received payment, while in the custody of a common carrier. This extension of coverage only applies when the "loss" is not recoverable from the purchaser, transporter, or any other insurance.

5. **Moving Clause – Business Personal Property and Personal Property of Others - Coverage 2**. When you move, coverage for "loss" to business personal property and personal property of others will apply for 60 days while in transit and at each location. The amount of insurance applying at each location will be the proportion that the value in each such location bears to the total value of Business Personal Property and Personal Property of Others - Coverage 2 covered at the original location. After the completion of your move, the coverage will apply at the new location only.

6. **Refrigerated Products**. Business Personal Property and Personal Property of Others - Coverage 2 covers "loss" to the contents of refrigeration equipment on the insured premises from either power or mechanical failure.

This extension of coverage applies to each building described in the "Declarations".

7. **Replacement Cost Coverage**. After a covered "loss" to your Building(s) – Coverage 1 or Business Personal Property or Personal Property of Others – Coverage 2, you have the option of choosing a replacement cost settlement instead of an actual cash value settlement, thereby eliminating any deduction for depreciation. When you select replacement cost, the Coinsurance Clause (Condition 3.) shall apply as a percentage of the replacement cost rather than the actual cash value of the property.

When adjustment is on a replacement cost basis, we will pay the smallest of the following:

a. The amount of insurance applicable to the damaged or destroyed property;

b. The cost of replacement on the same premises with material of like kind and quality and intended for the same use; or

c. The amount actually spent in repairing or replacing the property.

We will not pay on a replacement cost basis for any "loss" or damage:

a. Until the lost or damaged property is actually repaired or replaced; or

b. Unless the repairs or replacement are made as soon as reasonably possible after the "loss" or damage.

We will not pay for "loss" under this Replacement Cost Coverage extension:

a. Due to any ordinance or law regulating the construction or repair of buildings;

b. Unless and until the damaged or destroyed property is repaired or replaced as soon as practicable;

c. To stock (raw, in process, or finished) or merchandise including materials and supplies in connection therewith;

d. To household furniture or apartment and dwelling contents;

e. To manuscripts;

f. To paintings, etchings, pictures, tapestries, statuary, marbles, bronzes, antique furniture, rare books, antique silver, porcelains, rare glassware, bric-a-brac, or other articles of art, rarity, or antiquity; or

g. To obsolete property.

If the cost of repair or replacement is less than $2,500 for any one "loss" to covered property, we will waive the coinsurance requirement and pay the replacement cost for the "loss" or damaged property. We will not pay for replacement cost for the "loss" or damage to property listed in Paragraphs a. through g. shown above under this Extension of Coverage - Replacement Cost Coverage.

If you choose an actual cash value settlement, you can still select a replacement cost settlement if the property is repaired or replaced within 6 months of loss. If you choose a replacement cost settlement, the coinsurance requirement applies on a replacement cost basis.

8. **Temperature Change**. Business Personal Property and Personal Property of Others - Coverage 2 covers "loss" resulting from temperature or humidity change. There must first be damage from a peril insured against to the premises described in the "Declarations". "Loss" resulting from riot and civil commotion is not covered.

14

This extension of coverage applies to each building described in the "Declarations".

9. **Trees, Shrubs, Lawns, and Plants – Coverages 1 & 2.** We will cover "loss" to trees, shrubs, lawns, and plants (except vegetated roofs) on the premises described in the "Declarations" caused by fire; lightning; explosion; riot or civil commotion; vehicles; "aircraft"; smoke; falling objects; sonic boom; sinkhole collapse; volcanic action; or collapse caused by any of the perils specified in this paragraph.

If trees, shrubs, and plants are inside buildings, on the premises described in the "Declarations" we will also cover "loss" caused by windstorm; hail; weight of snow, ice, or sleet; vandalism or malicious mischief; or temperature change. There must first be damage from a peril insured against to the premises described in the "Declarations".

We will not be liable for more than $1,000 for any one tree, shrub, or plant, including expenses for removing debris, or $10,000 for any one "loss", unless trees, shrubs, or plants are held for sale inside buildings, or trees, shrubs, or plants are used for decorative purpose inside the building, in which case the Business Personal Property and Personal Property of Others – Coverage 2 limit applies. We will not be liable for more than $2,500 for any one "loss" to lawns.

This extension includes expenses for the removal of debris of trees, shrubs, and plants from the premises described in the "Declarations" caused by a peril insured against which are the property of others. If you are a tenant, we will not cover the removal of debris of trees, shrubs, and plants owned by the landlord at the premises described in the "Declarations".

There is no coverage under this policy for trees, shrubs, lawns, and plants grown outside of buildings held for sale.

This extension of coverage applies to each building described in the "Declarations".

10. **Water Damage.** If "loss" or damage caused by or resulting from covered water or other liquid, powder, or molten material damage "loss" occurs, we will pay the cost to tear out and replace any part of the building described in the "Declarations" to repair damage to the system or appliance from which the covered water or other liquids, powder, or molten material escapes.

We will not pay for the cost to repair or replace any defect in the system or appliance that caused the "loss" or damage.

This extension of coverage applies to each building described in the "Declarations".

**B. Extensions of Coverage**

Payments under these Extensions of Coverage are an ADDITIONAL AMOUNT of insurance and will increase the total amount of insurance available for the coverage involved.

1. **Accounts Receivable.** This policy covers damage to records of accounts receivable up to $25,000 for any one "loss" caused by a peril insured against at the premises described in the "Declarations", while being conveyed outside the premises or while temporarily within other premises for any purpose except storage. It covers:

   a. All sums due the insured from customers, provided the insured is unable to collect such sums as the direct result of "loss" to records of accounts receivable;

   b. Interest charges on any loan to offset impaired collections, pending repayments of such sums made uncollectible by such "loss";

   c. Collection expense in excess of normal collection cost which is made necessary because of such "loss"; and

   d. Other expenses, when reasonably incurred by the insured in re-establishing records of accounts receivable following such "loss".

   Coverage will also apply while the records of accounts receivable are being moved to and while at a place of safety because of imminent danger of "loss", and while being returned from such place.

   This extension of coverage applies to each building described in the "Declarations".

   The deductible does not apply to this extension.

2. **Arson Reward.** We will pay up to $10,000 as a reward to any individual or group for information which results in the arrest and conviction of any person committing an act of arson resulting in damage to covered property.

   The deductible does not apply to this extension.

3. **Building Ordinance or Law Coverage.**

   **A. Application of Coverage**

   The building ordinance or law coverage applies to **B. Coverage for the Value of the Undamaged Part of the Building** and **C. Coverage for the Increased Cost of Construction** for any building covered by this policy at the premises described in the "Declarations" only if Paragraphs **A.1.** and **A.2.** below are satisfied and an amount of insurance is shown on the "Declarations" for buildings:

15

a. The ordinance or law:

1) Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the premises described in the "Declarations"; and

2) Is in force at the time of "loss";

but coverage applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered.

b. The building sustains:

1) Direct physical damage caused by a peril insured against under this policy and such damage results in enforcement of or compliance with the ordinance or law; or

2) Both direct physical damage that is covered under this policy and direct physical damage that is not caused by a peril insured against under this policy, and the building damage in its entirety results in enforcement of or compliance with the ordinance or law;

but if the building sustains direct physical damage that is not caused by a peril insured against under this policy and such damage is the subject of the ordinance or law, then there is no coverage even if the building has also sustained direct physical damage caused by a peril insured against.

This extension of coverage applies to each building described in the "Declarations".

B. **Coverage for the Value of the Undamaged Part of the Building**

1. **Coverage Agreement**

If the building sustains direct damage caused by a peril insured against, we will pay for the value of the undamaged part of the building caused by enforcement of or compliance with any ordinance or law regulating the construction or repair of building(s) that:

a. Requires the demolition of the undamaged parts of the building;

b. Regulates the construction or repair of the building, or establishes zoning or land use requirements at the premises described in the "Declarations"; and

c. Is in force at the time of "loss" or damage.

Coverage for the Value of the Undamaged Part of the Building is not an additional amount of insurance. Payment is included within the amount of insurance for the covered building described in the "Declarations".

2. **Loss Payment - Value of the Undamaged Part of the Building**

We will pay for the value of the undamaged portion of the building as a result of any ordinance or law regulating the construction, use, or repair of building(s) as follows:

a. We will pay the smallest of the following if the covered building is not repaired or rebuilt:

1) The actual cash value of the undamaged part of the building;

2) The amount of insurance shown in the "Declarations" for the building described in the "Declarations"; or

3) The difference between the amount of insurance on the insured building at the time of "loss" or damage and the amount paid for "loss" to the damaged or destroyed portion of the insured building.

b. We will pay the smallest of the following if the covered building is being repaired or replaced on the same premises or another premises:

1) The actual cash value for the undamaged part of the building, if the insured building is covered on an actual cash value basis;

2) The replacement cost for the undamaged part of the building if the insured building is covered on a replacement cost basis;

3) The amount of insurance shown in the "Declarations" for the building described in the "Declarations"; or

4) The difference between the amount of insurance on the insured building at the time of "loss" or damage and the amount paid for "loss" to the damaged or destroyed portion of the insured building.

C. **Coverage for Increased Cost of Construction**

1. **Coverage Agreement**

If the building sustains direct physical damage caused by a peril insured against, we will pay up to $25,000 for the increased cost to:

a. Repair, replace, or construct the damaged portions of the building; or

b. Reconstruct or remodel undamaged portions of the building whether or not demolition is required;

caused by enforcement of or compliance with any ordinance or law regulating the construction, use, or repair of buildings. If the building is repaired or replaced, it must be intended for the

same use as the current building, unless otherwise required by an ordinance or law. We will not pay for the increased cost of construction if the building is not repaired, replaced, or remodeled.

When a building described in the "Declarations" is damaged or destroyed and increased cost of construction applies to that building in accordance with C.1.a. above, coverage for the increased cost of construction also applies to repairs or reconstruction of the following, subject to the same conditions stated in C.1. a.:

a. The cost of excavation, grading, backfilling, and filling;

b. Foundation of the building;

c. Pilings; and

d. Underground pipes, flues, and drains.

**2. Loss Payment - Increased Cost of Construction**

The most we will pay is $25,000 for the increased cost of construction that results from any building ordinance or law. Payment for the increased cost of construction is an additional amount of insurance.

**D. Building Ordinance or Law - No Coverage**

We will not pay for "loss" due to any ordinance or law:

1. You were required to comply with before the "loss", even if the building was undamaged; and

2. You failed to comply with the ordinance or law.

We will not pay any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot, or bacteria.

Also, we will not pay any costs associated with the enforcement of or compliance with an ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling, or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread, or any activity of "fungus", wet or dry rot, or bacteria.

**4. Check, Credit, Debit, or Charge Card Forgery or Alteration.** We will pay up to $5,000 for any one "loss" resulting directly from:

a. Forgery or alteration of credit, debit, or charge cards; and

b. Forgery or alteration of any checks, drafts, promissory notes, or similar written promises, orders, or directions to pay a certain sum in money that are:

1) Made or drawn by or drawn upon you;

2) Made or drawn by one acting as your Agent;

or that are purported to have been so made or drawn.

We will not pay for "loss" caused by dishonest or criminal acts committed by you, any of your members of a limited liability company, or any of your employees, directors, trustees, or authorized representatives:

a. Acting alone or in collusion with other persons; or

b. While performing services for you or otherwise.

We will not pay for any "loss" arising from forgery or alteration of a credit, debit, or charge card if you have not complied fully with the provisions, conditions, or other terms under which the card was issued.

All "losses" committed by any person, whether acting alone or in collusion with others, are considered one occurrence which is subject to the $5,000 limit.

If you are sued for refusing to pay any covered instrument on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will also pay for any reasonable legal expense that you incur and pay in that defense. The amount we will pay is in addition to the amount of insurance applicable to this extension. The deductible does not apply to legal expenses.

You must include with your proof of "loss" any instrument involved in that "loss", or, if that is not possible, an affidavit setting forth the amount and cause of "loss".

Electrical and Mechanical Signatures. We will treat signatures that are produced or reproduced electronically, mechanically, or by other means same as handwritten signatures.

"Covered instruments" includes checks, drafts, promissory notes, or similar written promises.

"Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own named signed with or without authority, in any capacity, for any purpose.

"Occurrence" means for this coverage only, all loss caused by any person or in which that person is in-

17

volved, whether the loss involves one or more instruments.

This extension applies anywhere in the world.

A $200 deductible applies to this extension.

5. **Contingent Business Interruption.** We will pay up to $25,000 for your contingent income meaning loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to building(s) or business personal property of "dependent properties" from a peril insured against.

However, coverage for contingent income does not apply when the only loss to "dependent properties" is "loss" or damage to "electronic data", including destruction or corruption of "electronic data". If the "dependent property" sustains "loss" or damage to "electronic data" and other property, this coverage will not continue once the other property is repaired, rebuilt, or replaced.

We will reduce the amount of your "income" and/or "rental income" loss, other than "extra expense", to the extent you can resume normal operations by using an available:

    a.  Source of materials; or
    b.  Outlet for your products.

"Dependent property" means premises operated by others whom you depend on in any way for continuation of your normal business operations. The "dependent properties" are:

    a.  Contributing Locations which mean those premises you depend on as a source of materials or services that you need for your operations. Services do not include water, communication, power supply, or waste water removal services;
    b.  Recipient Locations which mean those premises you depend on as a customer for your products or services;
    c.  Manufacturing Locations which mean those premises you depend on to manufacture products for your customers under contract or sale; or
    d.  Leader Locations which mean those premises you depend on to attract customers to your business.

"Dependent properties" do not include roads, bridges, tunnels, waterways, airfields, pipelines, or any other similar areas or structures.

"Interruption of business" for contingent business interruption means the period of time that your business is suspended and it:

    a.  Begins with the date of direct "loss" or damage to the "dependent property" caused by a peril insured against; and
    b.  Ends on the date when the "dependent property" should be repaired, rebuilt, or replaced with reasonable speed and similar quality.

"Interruption of business" for contingent business interruption does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

    a.  Regulates the construction, use, or repair, or requires the tearing down, of any property; or
    b.  Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

The deductible does not apply to this extension.

6. **Counterfeit Money.** We will pay up to $1,000 per workday for loss from the acceptance in good faith of counterfeit money. "Workday" means a day on which your operations are usually performed.

The deductible for this extension is $50.

7. **Debris Removal.** We will pay the cost of removal of debris to covered property on the premises described in the "Declarations" caused by a peril insured against. This does not apply to any increase of "loss" resulting from ordinances or laws regulating construction or repair of buildings. We will pay up to 5% of the total limits for Coverages 1 and 2 plus $25,000 for debris removal expense.

This extension does not cover the costs to:

    a.  Remove debris of your property that is not insured under this policy, or property in your care, custody, or control that is not covered property under Building(s) – Coverage 1 or Business Personal Property and Personal Property of Others – Coverage 2;
    b.  Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you are contractually responsible to insure such property and it is insured under this policy;
    c.  Remove any property that is property not covered under Building(s) – Coverage 1 or Business Personal Property and Personal Property of Others – Coverage 2;
    d.  Remove property of others of a type that would not be covered property under Building(s) – Coverage 1 or Business Personal Property and Personal Property of Others – Coverage 2; or
    e.  Extract "pollutants" from land or water, or to remove, restore, or replace polluted land or water.

This extension of coverage applies to each building described in the "Declarations".

8. **Demolition Cost.** This policy covers the cost, not to exceed $25,000, of demolishing and removing any undamaged portion of the building after a covered "loss". The demolition must be required by enforcement of or compliance with any ordinance or law regulating the construction, use of, or repair of buildings.

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

9. **Employee Dishonesty.** We will pay for loss of "money", "securities", and Business Personal Property and Personal Property of Others - Coverage 2 up to $10,000 per occurrence resulting from dishonest acts committed by any of your "employees", whether identified or not, acting alone or in collusion with other persons (except you or your partner(s)) with the intent to:

a. Cause you to sustain loss; and
b. Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment) for:

1) Any "employee"; or
2) Any other person or organization.

This extension is subject to the following:

a. For any loss, our payment shall not exceed the replacement cost of business personal property and personal property of others at the time of loss, except the cost of "securities" may be determined by the market value at the time of settlement;

b. All loss caused by, or involving, one or more "employees", whether the result of a single act or a series of acts, is considered one occurrence;

c. We will only pay for loss you sustain through acts committed or events occurring during the policy period and if loss is discovered during the policy period or is discovered within one year from the end of the policy period;

d. Our payment is not increased regardless of the number of people we protect;

e. Regardless of the number of years our policy is in force, the amount of insurance shall not be cumulative from year to year;

f. If you sustained a loss during the period of any prior insurance that you could have recovered under your prior insurance, except that the time to discover the loss had expired, we will pay the loss under this Extension of Coverage, provided:

1) This policy became effective at the time of cancellation or termination of your prior insurance; and

2) The loss would have been covered by this insurance had it been in effect when the act or events causing the loss were committed or occurred.

We will pay up to $10,000 or the amount of insurance under your prior insurance, whichever is less.

The loss under this part **f.** is not an additional amount of insurance and will not increase the total amount of insurance for Employee Dishonesty.

We do not cover:

a. Loss caused by any dishonest or criminal act committed by you, or any of your members of a limited liability company, or any of your partners, whether acting alone or in collusion with other persons.

b. Loss or that part of any loss, the proof of which as to its existence or amount is dependent upon:

1) An inventory computation; or

2) A profit and loss computation.

c. Loss that is an indirect result of any act or occurrence covered by this policy including, but not limited to, loss caused by:

1) Your inability to realize income that you would have realized had there been no loss of, or loss from damage to covered property;

2) Payment of damages of any type for which you are legally liable. We will pay compensatory damages arising directly from a loss covered by this policy;

3) Payment of costs, fees, or other expenses you incur in establishing either the existence or the amount of loss under this policy; or

4) Payment of expenses related to any legal action.

d. Any "employee" immediately upon discovery by:

1) You; or

2) Any of your partners, officers, directors, or members of a limited liability company not in collusion with the "employee";

of any dishonest act committed by that "employee" before or after being hired by you.

e. Loss caused by any "employee" for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation.

f. Loss resulting directly or indirectly from trading whether in your name or in a genuine or fictitious account.

g. Loss resulting from fraudulent or dishonest signing, issuing, cancelling, or failing to cancel, a warehouse receipt or any papers connected with it.

"Employee" means for this coverage only:

a.  Any natural person:

1)  While in your service (and for 30 days after termination of service);

2)  Whom you compensate directly by salary, wages, or commissions; and

3)  Whom you have the right to direct and control while performing services for you.

b.  Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while having care, custody, and control of property outside the premises described in the "Declarations".

c.  Any natural person who is leased to you under a written agreement between you and a labor leasing firm to perform duties related to the conduct of your business.

d.  Any natural person who is a former "employee", director, partner, member of a limited liability company, representative, or trustee retained as a consultant while performing services for you.

e.  Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care, custody, or control of covered property outside the premises described in the "Declarations".

"Employee" does not mean any:

a.  Agent, broker, factor, commission merchant, consignee, independent contractor, or representative of the same general character; or

b.  Manager of a limited liability company, director, or trustee except while performing acts coming within the scope of the usual duties of an "employee".

The deductible for this extension is $200.

10. **Expenses for Loss Adjustment.** We will pay up to $5,000 for expenses involved in the preparation of loss data, inventories, and appraisals. This does not include expenses incurred in using a public adjuster.

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

11. **Expenses for Security.** We will pay up to $2,500 for expenses incurred for security after a covered "loss" to protect the covered property from further damage.

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

12. **Fine Arts.** We will pay up to $25,000 for a "loss" caused by a peril insured against to your fine arts on the premises described in the "Declarations". Fine arts mean property that is rare or has historical value, such as paintings, etchings, drawings, rare books, tapestries, or stained glass.

We will not cover fine arts that are on display at fairgrounds or at a national or international exposition.

We do not cover "loss" caused by a process to repair, retouch, restore, adjust, service, or maintain your fine arts. If a fire or explosion results, we do cover the "loss" caused by the fire or explosion.

This extension of coverage applies to each building described in the "Declarations".

13. **Fire Department Service Charges.** We will pay reasonable charges made by a fire department for services rendered as a result of an insured "loss".

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

14. **Fire Extinguisher Recharge.** We will pay expenses incurred to recharge portable fire extinguishers after they are used to fight a fire.

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

15. **Income Protection Coverage**

- **Income Protection Coverage**

   This extension provides for loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against. "Loss" or damage also includes property in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

   If you are a tenant, your premises are the portion of the building described in the "Declarations" which:

   a.  You rent, lease, or occupy;

   b.  All routes within the building that service or are used to gain access to the described premises; and

   c.  The area within 1,500 feet of the premises described in the "Declarations" (with respect to "loss" or damage to covered property in the open or in a vehicle).

   You are required to resume normal business operations as promptly as possible and shall use all available means to eliminate any unnecessary delay.

20

This extension of coverage applies to each building described in the "Declarations".

- **Extra Expense**

  "Extra expense" coverage is provided at the premises described in the "Declarations".

  "Extra expense" means necessary expenses you incur due to partial or total "interruption of business" resulting directly from "loss" to property described in the "Declarations" from a peril insured against. "Loss" or damage to property also includes property in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

  We will pay actual and necessary "extra expenses" (other than the expenses to repair or replace property) sustained by you to:

  a.  Avoid or minimize the "interruption of business" and to continue your business operations:

      1)  At the premises described in the "Declarations"; or

      2)  At replacement premises or at temporary locations, including:

          a)  Relocation expenses; and

          b)  Costs to equip and operate the replacement premises or temporary locations.

  b.  Minimize the "interruption of business" if you cannot continue your business operations to the extent it reduces the amount of loss that would have been payable under loss of "income" and/or "rental income".

  We will not pay any "loss" or damage to your buildings or business personal property and personal property of others. We also will not pay the cost of research or any other expense to replace or restore your valuable papers and records or "electronic data". We will pay the extra cost to repair or replace your covered property and the amount to research, replace, or restore the lost information on damaged valuable papers and records or "electronic data" to the extent it reduces the amount of loss that would have been payable under loss of "income" and/or "rental income".

- **Additional Coverages**

  a.  **Civil Authority**

      When a peril insured against causes damage to property other than property at the premises described in the "Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil au-

thority that prohibits access to the premises described in the "Declarations" provided that both of the following apply:

      1)  Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" are within that area but are not more than one mile from the damaged property; and

      2)  The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

      Civil Authority coverage for "income" and/or "rental income" will begin 72 hours after the time of the first action of civil authority that prohibits access to the premises described in the "Declarations" and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

      Civil Authority coverage for "extra expense" will begin immediately after the time of the first action of civil authority that prohibits access to the premises described in the "Declarations" and will end:

      1)  Four consecutive weeks after the date of that action; or

      2)  When your Civil Authority coverage for "income" and/or "rental income" ends;

      whichever is later.

  b.  **Full Resumption of Operations**

      We will also pay your actual loss of "income" and/or "rental income" for an additional 60 days if your "income" and/or "rental income" after operations are resumed is less than your "income" and/or "rental income" before the loss. The additional amount we will pay will start after the later of the following times:

      1)  The date on which the liability for Income Protection Coverage would terminate if this clause had not been included; or

      2)  The date on which repair, replacement, or rebuilding of such part of the damaged or destroyed property described in the "Declarations" is actually completed.

- **Amount of Insurance**

  If the "loss" to property on the premises described in the "Declarations" results in partial or total suspension of your business, we will pay your actual loss sustained up to $250 for each workday not to exceed $25,000 for any one loss.

  Payment of loss of "income" and/or "rental income" is not limited by the end of the policy period.

  Payments under the following coverages are also subject to the amounts of insurance of $250 for each workday up to $25,000 for any one loss and the following coverages will not increase these amounts of insurance under this Extension of Coverage - Income Protection:

  a. Extra Expense Coverage;

  b. Civil Authority; or

  a. Full Resumption of Operations.

- **Exclusions**

  We will not cover any loss under this Extension of Coverage caused by the exclusions shown under **Section III - Exclusions.**

- **Deductible**

  The deductible does not apply to this extension.

16. **Income Protection - Off-Premises Utility Properties Failure.** We will pay up to $25,000 for your loss of "income", "rental income", and "extra expense" you sustain due to partial or total "interruption of business" resulting from the interruption of service to the premises described in the "Declarations".

    The "interruption of business" must result directly from "loss" to the following property, not on the premises described in the "Declarations" from a peril insured against:

    a. Communication Supply Property, meaning property supplying communication services, including telephone, radio, microwave, or television services, to the premises described in the "Declarations", such as:

       1. Communication transmission lines (including fiber optic transmission lines);
       2. Coaxial cables; and
       3. Microwave radio relay except satellites.

    b. Power Supply Property, meaning the following types of property supplying electricity, steam, or gas to the premises described in the "Declarations":

       1. Utility generating plants;
       2. Switching stations;
       3. Substations;
       4. Transformers; and
       5. Transmission lines.

    c. Water Supply Property, meaning the following types of property supplying water to the premises described in the "Declarations":

       1. Pumping stations; and
       2. Water mains.

    d. Wastewater Removal Property, meaning a utility system for removing wastewater and sewage from the premises described in the "Declarations", other than a system designed primarily for draining storm water. The wastewater removal property includes sewer mains, pumping stations, and similar equipment for moving the effluent to a holding treatment or disposal facility, and includes such facilities.

       Coverage under this policy does not apply to interruption in service caused by or resulting from a discharge of water or sewage due to heavy rainfall or flooding.

    We will only pay for loss of "income", "rental income", and "extra expense" sustained by you after the first 24 hours following "loss" to off-premises communication supply property, power supply property, water supply property, or waste water removal property.

    Transmission lines include all lines which serve to transmit communication service or power, including lines which may be identified as distribution lines.

    This extension of coverage applies to each building described in the "Declarations".

    The deductible does not apply to this extension.

17. **Key Replacement.** If keys to your building(s) are stolen during a theft loss, we will pay, at your request, up to $5,000 to replace the keys and locks to the doors of your premises.

    This extension of coverage applies to each building described in the "Declarations".

18. **Leasehold Interest.** We will pay for leasehold interest you sustain due to the cancellation of your lease resulting directly from "loss" or damage to buildings or business personal property at the premises described in the "Declarations" from a peril insured against.

    We will not pay any "loss" you sustain caused by your cancelling the lease.

    This extension of coverage applies to each building described in the "Declarations".

    Leasehold interest means the following:

    a. Tenant's Lease Interest, meaning the difference between the:

       1) Rent you pay at the premises described in the "Declarations"; and

2) Rental value of the premises described in the "Declarations".

a. Bonus payments, meaning the unamortized portion of the cash bonus that will not be refunded to you. A cash bonus is money you paid to acquire your lease. It does not include:

1) Rent, whether or not prepaid; or

2) Security.

b. Improvements and Betterments, meaning the unamortized portion of payments made by you for improvements and betterments. It does not include the value of improvements and betterments recoverable under any other insurance, but only to the extent of such other insurance is valid.

Improvements and betterments are fixtures, alterations, installations, or additions:

1) Made a part of the building or structure you occupy but do not own; and

2) You acquire or made at your expense but cannot legally remove.

c. Prepaid Rent, meaning the unamortized portion of any amount of advance rent you paid that will not be refunded to you. This does not include the customary rent due at:

1. The beginning of each month; or

2) Any other rental period.

**Amount of Insurance**

We will pay your "net leasehold interest" at the time of loss up to $15,000 for loss you sustain because of the cancellation of any one lease. This applies to:

a. Tenant's Lease Interest

1) But, if your lease is cancelled and your landlord lets you continue to use your premises under a new lease or other arrangement, the most we will pay for loss because of the cancellation of any one lease is the lesser of:

a) The difference between the rent you now pay and the rent you will pay under the new lease or new arrangement; or

b) Your "net leasehold interest" at the time of loss.

2) Your "net leasehold interest" decreases automatically each month. The amount of "net leasehold interest" at any time is your "gross leasehold interest" times the leasehold interest factor for the remaining months of your lease. A proportionate share applies for any one period of time less than a month.

b. Bonus Payments, Improvements and Betterments, and Prepaid Rent

1) If your lease is cancelled and your landlord lets you continue to use your premises under a new lease or other arrangement, the most we will pay for loss because of the cancellation of any one lease is the lesser of:

a) The loss sustained by you; or

b) Your "net leasehold interest" at the time of loss.

2) Your "net leasehold interest" decreases automatically each month. The amount of each decrease is your "monthly leasehold interest". A proportionate share applies for any period of time less than a month.

**Definitions**

"Gross leasehold interest" means the difference between the:

a. Monthly rental value of the premises you lease; and

b. Actual monthly rent you pay including taxes, insurance, janitorial, or other services that you pay for as part of the rent.

This amount is not changed:

a. Whether you occupy all or part of the premises; or

b. If you sublet the premises.

"Monthly leasehold interest" means the monthly portion of covered Bonus Payments, Improvements and Betterments, and Prepaid Rent. To find your "monthly leasehold interest", divide your original costs of Bonus Payments, Improvements and Betterments, and Prepaid Rent by the number of months left in your lease at the time of the expenditure.

"Net Leasehold Interest":

a. Applicable to Tenant's Lease Interest

"Net leasehold interest" means the present value of your "gross leasehold interest" for each remaining month of the term of the lease at the rate of interest.

The "net leasehold interest" is the amount that, equivalent to your receiving the "gross leasehold interest" for each separate month of the unexpired term of the lease.

b. Applicable to Bonus Payments, Improvements and Betterments, or Prepaid Rent.

"Net leasehold interest" means your "monthly leasehold interest" times the number of months left in your lease.

23

19. **Money and Securities.** We will pay up to $10,000 for any one "loss" caused by a peril insured against to "money" or "securities" while in or on the premises described in the "Declarations" or within a bank or savings institution.

We will pay for "money" and "securities" while being conveyed by the insured or by an authorized employee, up to $10,000 for any one "loss" caused by a peril insured against.

We will pay up to $10,000 for "loss" if the "loss" occurs inside the home of the insured or an authorized employee.

This does not include loss caused by unexplained or mysterious disappearance or abstraction.

The deductible for this extension is $200.

20. **Money and Securities Destruction.** We will pay for "money" and "securities" destruction up to $10,000 for any one "loss" caused by a peril insured against. "Money" and "securities" destruction means "loss" by destruction of "money" and "securities" within the premises described in the "Declarations".

This does not include loss caused by unexplained or mysterious disappearance or abstraction.

This extension of coverage applies to each building described in the "Declarations".

21. **Newly Acquired or Constructed Property**

a. If this policy covers building(s), you may extend that insurance to apply to 50% of the limit for Buildings(s) - Coverage 1 or $500,000, whichever is less, on:

1) Newly acquired buildings at other than the location(s) described in the "Declarations";

2) New additions, new buildings, and new structures when constructed on the insured premises, including materials, equipment, and supplies on or within 1,500 feet of the insured premises;

provided there is no other insurance applicable.

b. If this policy covers your business personal property and personal property of others, you may extend that insurance to apply to 25% of the limit for Business Personal Property and Personal Property of Others - Coverage 2 or $250,000, whichever is less, on newly acquired business personal property and personal property of others in a newly acquired or leased building other than the location(s) described in the "Declarations";

provided there is no other insurance applicable.

c. In addition to the amount of insurance provided in Extensions of Coverage B.15. - Income Protection Coverage, if this policy covers Income Protection, you may extend that insurance to apply up to 25% of the limit for Additional Income Protection - Coverage 3 or $250,000, whichever is less, for loss of "income" and/or "rental income" on:

1) Newly acquired buildings or business personal property and personal property of others in a newly leased building at other than the location(s) described in the "Declarations"; or

2) New additions, new buildings, and new structures when constructed on the described premises, including materials, equipment, and supplies on or within 1,500 feet of the described premises, if "loss" to the new additions, new buildings, and new structures delays the start of your business. The "interruption of business" will start on the day your business would have started if the "loss" had not occurred;

provided there is no other insurance applicable.

This extension shall apply for 90 days after the acquisition or start of construction, provided the policy remains in force or is renewed.

You shall report values involved and pay any additional premium.

This extension does not apply to property while in transit.

22. **Non-Owned Detached Trailers.** Business Personal Property and Personal Property of Others - Coverage 2 is extended to cover non-owned detached trailers that you do not own, provided that:

a. The trailer is used in your business;

b. The trailer is in your care, custody, or control at the insured premises described in the "Declarations"; and

c. You have a contractual responsibility to pay for "loss" or damage to the trailer.

We will not pay for any "loss" or damage that occurs:

a. While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion; or

b. During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

We will pay up to $5,000 for any one "loss" caused by a peril insured against to non-owned detached trailers.

This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

This extension of coverage applies to each building described in the "Declarations".

24

23. **Personal Articles.** Business Personal Property and Personal Property of Others - Coverage 2 is extended to cover household and personal articles of the insured, the insured's partners, members or managers of a limited liability company, the insured's officers, or the insured's employees for loss caused by a peril insured against. We will pay up to $10,000 for any one "loss" at the premises described in the "Declarations".

This extension of coverage applies to each building described in the "Declarations".

24. **Pollutants Clean Up and Removal.** We will cover the cost to extract "pollutants" from land or water on the premises described in the "Declarations" if the release, discharge, or dispersal of "pollutants" is caused by a peril insured against during the policy period. We will pay up to $25,000 for all "losses" throughout the year. The "loss" must be reported to us within 180 days after the "loss" or the end of the policy period, whichever is the later date.

25. **Private Structures and Rental Value - Dwellings.** You may apply an amount of insurance equal to 10% of the coverage on any insured dwelling to each of the following:

    a. Private structures pertaining to the dwelling; and

    b. Rental value of the dwelling or its private structures. The amount available in any one month cannot exceed 25% of this additional amount of insurance. Damaged property must be repaired as soon as practicable.

Dwelling means a residence for not more than four families. It may contain not more than five roomers or boarders in addition to the four families and it may also contain an incidental commercial occupancy. It may not be used only for commercial or farming purposes.

Incidental commercial occupancy means:

    a. Offices used for business or professional purposes;

    b. Private schools or studios used for music, dance, photography, and other instructional purposes; or

    c. Small service occupancies used for service rather than for sales. Examples are barber or beauty shops, tailors or dressmakers, telephone exchanges, and shoe repair shops using hand work only.

This extension of coverage applies to each building described in the "Declarations".

26. **Property in Danger.** This policy covers up to 45 days for any "loss" to covered property removed from the premises described in the "Declarations" or at a temporary location because of danger of damage by a peril insured against or to repair damage to the covered property.

This extension of coverage applies to each building described in the "Declarations".

27. **Temporarily Off-Premises - Business Personal Property and Personal Property of Others - Coverage 2.** This extension includes coverage for business personal property and personal property of others up to $25,000 and coverage for salesmen's samples up to $2,500 for "loss" caused by a peril insured against except while in transit. This extension applies only to business personal property and personal property of others at a location you do not own, lease, or operate and for not more than 60 days.

We will cover business personal property and personal property of others and salesmen's samples at exhibitions or trade shows for not more than 60 days.

This extension shall not apply to property rented to others and property sold on installment or deferred payment plans after delivery to customers.

28. **Transportation - Airborne Property.** We will pay up to $25,000 for "loss" to Business Personal Property and Personal Property of Others - Coverage 2 in or on an "aircraft" owned, leased, or operated by or for you or in or on an "aircraft" of a common or contract carrier. The "loss" must be caused by fire; lightning; flood; earthquake; landslide; windstorm; theft; robbery; or crashing of the "aircraft".

This extension applies anywhere in the world.

29. **Transportation.** We will pay up to $25,000 for "loss" to Business Personal Property and Personal Property of Others - Coverage 2 in or on a vehicle owned, leased, or operated by or for you; in or on a vehicle of a common or contract carrier; or on a dock, pier, bulkhead, platform, or station while in the custody of a common or contract carrier. The "loss" must be caused by fire; lightning; flood; earthquake; landslide; windstorm; collapse of bridge, dock, or culvert; theft; "robbery"; or collision (excluding roadbed collision), upset, or overturn of transporting vehicle.

This extension includes $1,000 of coverage for tools and equipment.

This extension applies away from the premises described in the "Declarations" but only while in the United States of America, its territories or possessions, Puerto Rico, or Canada.

30. **Valuable Papers and Records.** Business Personal Property and Personal Property of Others - Coverage 2 is extended to cover the "extra expense" incurred in the reproduction of your valuable papers and records and your interest in the valuable papers of others when destroyed by a peril insured against at the premises described in the "Declarations", while being conveyed outside the premises, or temporarily within other premises for any purpose except storage.

Coverage will also apply while your valuable papers and records and your interest in the valuable papers of others are being moved to and while at a place of safety because of imminent danger of "loss" and while being returned from such place.

"Loss" or damage to valuable papers and records will be valued at the cost of restoration or replacement of the lost or damaged information. To the extent that the contents of the valuable papers and records are not restored, the valuable papers and records will be valued at the cost of replacement with blank materials or substantially identical type.

Valuable papers and records means inscribed, printed, or written:

a. Documents;
b. Manuscripts; or
c. Records;

including abstracts, books, deeds, drawings, films, maps, or mortgages. But valuable papers and records does not mean "money" or "securities".

This extension is limited to $25,000 for any one "loss".

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

31. **Heating and Air Conditioning Equipment.** Business Personal Property and Personal Property of Others – Coverage 2 is extended to cover heating or air conditioning equipment which is in your care, custody, or control and for which you are contractually responsible. The heating and air conditioning equipment must be permanently attached to the building on the premises described in the "Declarations".

We will pay up to $20,000 for any one "loss" caused by a peril insured against to heating and air conditioning equipment.

This extension of coverage applies to each building described in the "Declarations".

32. **Laptop Computers Off-Premises.** We will pay up to $10,000 for laptops, notebooks, and other handheld computers for "loss" caused by a peril insured against while in transit, temporarily at your home, or at a premise you do not own, lease, or occupy. We will only cover laptops, notebooks, and handheld computers while in the United States of America, its territories or possessions, Puerto Rico, or Canada.

# SECTION IX - WHEN AND WHERE THIS POLICY APPLIES

## When

This policy applies to losses that occur during the policy period. Unless otherwise specified in the "Declarations", "Renewal Certificate", "Amended Declarations", "Revised Declara-

tions", or endorsement, the policy period begins and ends 12:01 AM Standard Time at the stated address of the Named Insured. An "Amended Declarations" or endorsement tells you that the policy has been changed. A "Renewal Certificate" tells you that the policy is being renewed for another policy period.

## Where

Property Protection - This policy applies to "loss" of property designated in the specific coverage.

# SECTION X - COMMERCIAL PROPERTY CONDITIONS

1. **ABANDONMENT OF PROPERTY**

   We will not accept abandoned property.

2. **APPRAISAL**

   If you and we fail to agree on the amount of "loss", either party may make written demand for an appraisal. Each party will select an appraiser and notify the other of the appraiser's identity within 20 days after the demand is received. The appraisers will select a competent and impartial umpire. If the appraisers are unable to agree upon an umpire within 15 days after both appraisers have been identified, you or we can ask a judge of a court of record in the state where your principal office is located to select an umpire.

   The appraisers shall then set the amount of "loss". If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of "loss". If they cannot agree, they will submit their differences to the umpire. A written award by two will determine the amount of "loss".

   Each party will pay the appraiser it chooses, and equally bear expenses of the appraisal. However, if the written demand for appraisal is made by us, we will pay for the reasonable cost of your appraiser and your share of the cost of the umpire.

   We will not be held to have waived any rights by any act relating to appraisal.

3. **COINSURANCE CLAUSE - COVERAGES 1 & 2**

   The coinsurance clause applies to each insured item for which a specific amount is shown in the "Declarations". (See percentage shown in the "Declarations").

   We will pay that proportion of any "loss" that the amount of insurance bears to the amount produced by multiplying the coinsurance percentage by the actual cash value (ACV) of such property at the time of "loss". We will pay the amount of insurance or the amount determined by coinsurance, whichever is less.

   Our Payment = $\dfrac{\text{amount of insurance}}{\text{amount required}}$ X loss

   "Amount required" means the coinsurance percentage multiplied by the actual cash value.

If "loss" or damage to your covered property is on a replacement cost basis, "amount required" means the coinsurance percentage multiplied by the replacement cost.

When applying the coinsurance clause, the cost of excavations and earthmoving, the value of parts of structures underground and the Extensions of Coverage are not to be considered.

### 4. DIVISIBLE CONTRACT

The breach of a policy condition in one building or location will have no effect on the coverage on another where no breach exists.

### 5. LIMITATION - ELECTRONIC MEDIA AND RECORDS

We will not pay for any loss of "income" and/or "rental income" caused by direct physical damage to electronic media and records after the longer of:

a. Sixty (60) consecutive days after the date of physical "loss" or damage; or

b. The period beginning with the date of direct physical "loss" or damage to repair, rebuild, or replace, with reasonable speed and similar quality, other property at the insured premises due to "loss" caused by the same occurrence.

Electronic media and records mean:

a. Electronic data processing, recording, or storage media such as films, tapes, discs, drums, or cells;

b. Data stored on such media; or

c. Programming records used for electronic data processing or electronically controlled equipment.

This limitation does not apply to "extra expense".

### 6. LOSS PAYMENT

We will adjust all "losses" with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. We will not pay you more than your financial interest in the covered property.

"Loss" will be payable 30 days after we receive your proof of "loss" if you have complied with all the terms of this coverage part and one of the following has been done:

a. We have reached an agreement with you;

b. There is an entry of final judgment; or

c. There is a filing of an appraisal award on your behalf.

We have the option to:

a. Pay the value of that part of the damaged property;

b. Pay the cost to repair or replace that part of the damaged property, but this does not include the increased cost of construction due to enforcement of or compliance with any ordinance or law regulating the construction or repair of the damaged building;

c. Take all or part of the damaged property at an agreed or appraised value; or

d. Repair or replace that part of the damaged property with material of like kind and quality, but this does not include the increased cost of construction due to any ordinance or law regulating the construction or repair of the damaged building.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this coverage form or any applicable provision which amends or supersedes the Valuation Condition.

We will not pay more than the amount of insurance shown in the "Declarations" applicable to the damaged or destroyed property.

**Pennsylvania Only:**

We must give the insured notice of our intent to repair or replace within 15 working days after we receive your sworn proof of loss.

### 7. MORTGAGEE

"Loss" shall be payable to mortgagees named in the "Declarations", to the extent of their interest and in the order of precedence.

**Our Duties**

We will:

a. Protect the mortgagee's interest in an insured building. This protection will not be invalidated by any act or neglect of the insured, any breach of warranty, increase in hazard, change of ownership, or foreclosure if the mortgagee has no knowledge of these conditions.

b. Give the mortgagee 30 days' notice before cancellation or refusal to renew this policy.

**Mortgagee's Duties**

The mortgagee will:

a. Furnish proof of "loss" within 60 days if you fail to do so;

b. Pay upon demand any premium due if you fail to do so;

c. Notify us of any change in ownership or occupancy, or any increase in hazard of which the mortgagee has knowledge;

d. Give us his or her right of recovery against any party liable for "loss". This shall not impair the right of the mortgagee to recover the full amount of the mortgage debt; and

e. After a "loss", permit us to satisfy the mortgage requirements, and receive full transfer of the mortgage and all "securities" held as collateral to the mortgage debt.

Policy conditions relating to **APPRAISAL, LOSS PAYMENT** and **SUITS AGAINST US** apply to the mortgagee.

This mortgagee interest provision shall apply to any trustee or loss payee named in the "Declarations".

## 8. NO BENEFIT TO BAILEE

No bailee shall benefit, directly or indirectly, from this insurance.

## 9. OTHER INSURANCE

You may have other insurance subject to the same plan, terms, conditions, and provisions as insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limits of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covered on the same basis.

If there is other insurance covering the same loss or damage, other than that described in the paragraph above, we will pay only for the amount of covered loss or damage in excess of the amount due from the other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limits of Insurance.

## 10. PROPERTY OF OTHERS

If we are called upon to pay a "loss" for property of others, we reserve the right to adjust the "loss" with the owner. If we pay the owner, such payments will satisfy your claims against us for the owner's property.

In case of disagreement with the property owner, we will conduct the defense on your behalf at our expense.

## 11. PROTECTIVE SAFEGUARDS

You must maintain, as far as is within your control, any protective safeguards shown in the "Declarations". Failure to do so will suspend the coverage of this policy at the affected location. Coverage will not be suspended if you notify us immediately when the system is not in operation because of repairs or maintenance, and you comply with our requests and directions at that time.

## 12. RECORDS

You must keep proper records so that we can accurately determine the amount of "loss".

## 13. RECOVERIES

If either you or we recover any property after settlement, that party must notify the other. Expenses of recovery will be deducted from the value of the property. The balance of the proceeds will be divided according to your and our interests.

At your option, the recovered property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay the expenses of the recovery and the expenses to repair the recovered property, up to the Limits of Insurance.

## 14. RESUMPTION OF YOUR BUSINESS

We will reduce the amount of your:

a. Income protection loss, other than "extra expense", to the extent that you can resume your business, in whole or in part, by using damaged or undamaged property (including business personal property) at the premises described in the "Declarations" or elsewhere.

b. "Extra expense" loss to the extent you can return your business to normal and discontinue such "extra expense".

## 15. SUITS AGAINST US

We may not be sued unless there is full compliance with all the terms of this policy. Suit must be brought within 2 years (Maryland and North Carolina - 3 years) after the "loss" occurs.

## 16. VACANCY AND UNOCCUPANCY

Property may be unoccupied without limit of time. If the building at which the "loss" occurs is vacant for more than 60 consecutive days before the "loss", then we will:

a. Not pay for any "loss" caused by:

   1) Vandalism or malicious mischief, water damage, glass breakage, or theft; or

   2) Sprinkler leakage unless you have exercised reasonable care to protect the system against freezing;

b. Pay for other covered "losses", but we will reduce the amount of payment by 15%.

For a tenant operated business, the building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

For the owner of the building, the building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

a. Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

b. Used by the building owner to conduct customary operations.

Buildings under construction are not considered vacant or unoccupied.

## 17. VALUATION

We will determine the value of covered property in the event of "loss" as follows:

a. At actual cash value at the time of the "loss", except as provided elsewhere in this policy;

b. Stock you have sold but not delivered will be valued at the selling price less any discounts and expenses you otherwise would have had.

## 18. YOUR DUTIES AFTER A LOSS

In case of a covered "loss", you must perform the following duties:

a. Give us or our Agent immediate notice. If a crime "loss", also notify the police (except Virginia);

b. Protect the property from further damage. If necessary for property protection, make reasonable repairs and keep a record of all repair costs;

c. Furnish a complete inventory of damaged property stating its original cost. At our request, furnish a complete inventory of undamaged property stating its original cost. If a "loss" is both less than $10,000 and less than 5% of the amount of insurance, no special inventory and appraisal of the undamaged property shall be required;

d. Produce for examination, with permission to copy, all books of accounts, bills, invoices, receipts, and other vouchers as we may reasonably require;

e. Show us or our representative the damaged property, as often as may be reasonably required;

f. Cooperate with us in our investigation of a "loss" and any suits;

g. Separately submit to examinations under oath and sign a transcript of the same;

h. Send us, within 90 days after the "loss", your signed and sworn proof of loss statement which includes:

1) Time and cause of "loss";

2) Your interest in the property and the interest of all others involved;

3) Any encumbrances on the property;

4) Other policies which may cover the "loss";

5) Any changes in title, use, occupancy, or possession of the property which occurred during the policy term;

6) When required by us any plans, specifications, and estimates for the repair of the damaged building; and

7) The inventory of damaged property as prepared in c. above;

i. In addition to the other conditions under Additional Income Protection - Coverage 3, make necessary replacements or repairs and use all available means to eliminate any unnecessary delay in order to resume operations as soon as possible;

j. Agree to help us enforce any right of recovery against any party liable for "loss" under this policy. This will not apply if you have waived recovery rights in writing prior to a "loss".

## SECTION XI - DEFINITIONS

- "Aircraft" means any machine or device capable of atmospheric flight except model airplanes.

- "Automobile" means a land motor vehicle, trailer, or semi-trailer designed for travel on public roads (including any attached machinery or equipment), but does not include "mobile equipment".

- "Burglary" means the taking of Business Personal Property and Personal Property of Others - Coverage 2 from inside the premises by a person unlawfully entering or exiting the premises as evidenced by visible marks of forcible entry or exit. It includes "loss" to the building and its equipment resulting from "burglary" or attempted "burglary".

- "Declarations", "Amended Declarations", "Revised Declarations", and "Renewal Certificate" mean the form which shows your coverages, limits of protection, premium charges, and other information. This form is part of your policy.

- "Electronic data" means information, facts, or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-Roms, DVD's, tapes, drives, cells, data processing devices, or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of "electronic data", means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve, or send data. This paragraph does not apply to your stock of prepackaged software.

- "Extra expense" means the necessary expenses incurred by you during the "interruption of business" that would not have been incurred if there had been no direct "loss" to covered property caused by a peril insured against.

- "Fungus" means any type or form of "fungus", including mold or mildew and any mycotoxins, spores, scents, or by-products produced or released by "fungi".

- "Income" means the sum of net income (net profit or loss before income taxes) that would have been earned or incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes, interests, and rents. For manufacturing risks, "income" includes the net sales value of production.

- "Interruption of business" means the period of time that your business is partially or totally suspended and it:

  1. Begins with the date of direct "loss" to covered property caused by a peril insured against; and

  2. Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality.

- "Loss" means direct and accidental loss of or damage to covered property.

- "Mobile equipment" means any of the following types of land vehicles (including any attached machinery or equipment):

  1. Bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;

  2. Vehicles maintained for use solely on or next to premises you own or rent;

  3. Vehicles that travel on crawler treads;

  4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

     a. Power cranes, shovels, loaders, diggers, or drills; or

     b. Road construction or resurfacing equipment such as graders, scrapers, or rollers;

  5. Vehicles not described in 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

     a. Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well servicing equipment; or

     b. Cherry pickers and similar devices used to raise or lower workers;

  6. Vehicles not described in 1., 2., 3., or 4. above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but are considered "automobiles".

     a. Equipment designed primarily for:

        1) Snow removal;

        2) Road maintenance, but not construction or resurfacing;

        3) Street cleaning;

     b. Cherry pickers and similar devices mounted on an "automobile" or truck chassis and used to raise or lower workers; and

     c. Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well servicing equipment.

- "Money" means:

  1. Currency, coins, and bank notes in current use and having a face value; and

  2. Travelers checks, register checks, credit card slips, and money orders held for sale.

- "Pollutants" mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.

- "Rental income" means:

  1. The rents from the tenant occupancy of the premises described in the "Declarations";

  2. Continuing operating expenses incurred by the business such as:

     a. Payroll; and

     b. All expenses for which the tenant is legally responsible and for which you would otherwise be responsible.

  3. Rental value of the property described in the "Declarations" and occupied by you;

  4. Incidental income received from coin-operated laundries, hall rentals, or other facilities on the premises described in the "Declarations".

- "Robbery" means the taking of Business Personal Property and Personal Property of Others - Coverage 2 from the care, custody, and control of a person by one who has:

  1. Caused or threatened to cause that person bodily harm; or

  2. Committed an obviously unlawful act witnessed by that person.

- "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

1. Tokens, tickets including lottery tickets, food stamps, revenue, and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

2. Evidences of debt issued in connection with credit or charge cards not issued by you;

"Securities" does not include "money".



ERIE INSURANCE GROUP

FIVESTAR CONTRACTORS
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
ULTRASURE FOR PROPERTY OWNERS
GU-51 (Ed. 3/01) UF-8075

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PENNSYLVANIA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

The following is added to **Loss Payment** of **Section X - Commercial Property Conditions:**

We must give the insured notice of our intent to repair or replace within 15 working days after we receive your sworn proof of loss.

ERIE INSURANCE
INTERLINE
IL 09 52 (Ed. 1/15) UF-4076

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

COMMERCIAL INLAND MARINE COVERAGE PART(S)

FIVESTAR CONTRACTORS' COMMERCIAL PROPERTY COVERAGE PART

ULTRAFLEX COMMERCIAL PROPERTY COVERAGE PART

ULTRAPACK COMMERCIAL PROPERTY COVERAGE PART

ULTRASURE FOR PROPERTY OWNERS' COMMERCIAL PROPERTY COVERAGE PART

ULTRASURE FOR LANDLORDS POLICY

**A.  Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.  Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Reaction or Radiation Exclusion or the War Exclusion.

Copyright ISO Properties, Inc., 2007

ULTRAFLEX PACKAGE
UL-NH (Ed. 5/06) UF-8989



**ERIE INSURANCE GROUP**

ERIE®

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# MECHANICAL AND ELECTRICAL BREAKDOWN COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** The following is added to **Section II - Perils Insured Against - Building(s) - Coverage 1, Business Personal Property and Personal Property of Others - Coverage 2, and Additional Income Protection - Coverage 3:**

We will cover direct physical damage to covered property for "loss" caused by "mechanical, electrical or pressure systems breakdown" on the premises described in the "Declarations".

**B.** The following Paragraphs **B.1.k., B.1.l., B.8., B.9.,** and **B.10.** in **Section III - Exclusions** are deleted.

**C.** Paragraph **A.11.** in **Section III - Exclusions** is replaced by the following:

We do not cover "loss" by the failure of power or other utility service supplied to the insured premises, however caused, if the failure occurs away from the insured premises, except as provided in Extensions of Coverage - A.6. and A.8., unless a covered "loss" ensues, and then only for ensuing "loss". However, we will pay for "loss" resulting from "mechanical, electrical, or pressure systems breakdown" to any transformer, electrical apparatus, or any "covered equipment" that is:

1. Located on or within 1,500 feet of the insured premises;

2. Owned by the building owner at your premises, or owned by a public utility company; and

3. Used to supply telephone, electricity, air conditioning, heating, gas, water or steam to the insured premises.

With respect to this coverage, we will not pay for a "mechanical, electrical or pressure system breakdown" caused by or resulting from fire; lightning; windstorm or hail; explosion (except as specifically provided in item 3. of the "mechanical, electrical or pressure systems breakdown" definition); smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

**D.** The following is added to **Section III - Exclusions:**

We will not pay for "loss", damage or expense caused by or resulting from:

1. Any defect, programming error, programming limitation, computer virus, malicious code, loss of "electronic data", loss of access, loss of use, loss of functionality or other condition within or involving "electronic data" or "media" of any kind. But if a "mechanical, electrical or pressure systems breakdown" results, we will pay for the resulting "loss", damage or expense;

2. Any of the following tests:

   a. A hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment.

**E.** The following are added to Paragraph **A.** in **Section VIII - Extensions of Coverage:**

**Expediting Expenses**

With respect to your damaged covered property resulting from "mechanical, electrical or pressure systems breakdown", we will pay up to $25,000 for the reasonable extra cost to:

1. Make temporary repairs; and

2. Expedite permanent repairs or permanent replacement.

**Hazardous Substances**

We will pay for the additional cost to repair or replace covered property because of contamination by a "hazardous substance" resulting from "mechanical, electrical or pressure systems breakdown". This includes the additional expenses to clean up or dispose of such property.

As used in this coverage, additional costs mean those beyond what would have been payable under this Mechanical and Electrical Equipment Breakdown Coverage had no "hazardous substance" been involved.

We will pay up to $25,000 for "loss", damage or expense under this coverage, including actual loss of "income" you sustain and necessary extra expense you incur.

**F.** The following is added to Paragraph **B.** in **Section VIII - Extensions of Coverage:**

**Ammonia Contamination**

If covered property is contaminated by ammonia as a result of "mechanical, electrical or pressure systems breakdown", we will pay up to $25,000 including salvage expense for any one "loss".

**G.** The following are added to **Section X - Commercial Property Conditions:**

**Suspension**

Whenever "covered equipment" is found to be in or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against "loss" from a "mechanical, electrical, or pressure systems breakdown" to that "covered equipment". Coverage can be suspended by delivering or mailing a written notice of suspension to:

1. Your last known address,

2. The address where the object is located.

If we suspend your insurance, you will get a pro rata refund of premium. But the suspension will be effective even if we have not yet made or offered a refund.

**Jurisdictional Inspection**

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

**Environmental, Safety and Efficiency Improvements**

If "covered equipment" requires replacement due to a "mechanical, electrical, or pressure systems breakdown", we will pay your additional cost to replace with equipment that is better for the environment, safer or more efficient than the equipment being replaced.

However, we will not pay more than 125% of what the cost would have been to repair or replace with like kind or quality. This condition does not increase any of the applicable limits. This condition does not apply to any property to which Actual Cash Value applies.

**H.** The following are added to **Section XI - Definitions:**

"Covered equipment" means covered property:

1. That generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

2. Which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

None of the following is "covered equipment":

1. Insulating or refractory material;

2. Buried vessel or piping;

3. Sewer piping, piping forming a part of a fire protection system or water piping other than:

   a. Feed water piping between any boiler and its feed pump or injector;

   b. Boiler condensate return piping;

   c. Water piping forming a part of refrigerating and air conditioning systems; or

   d. Vessels and piping used for cooling, humidifying or space heating purposes.

4. Structure, foundation, cabinet, compartment containing the object or air supported structure or building;

5. Dragline, excavation, or construction equipment;

6. "Vehicle" or any equipment mounted on a "vehicle". "Vehicle" means, as respects this endorsement only, any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor, or harvester.

   However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle", or

7. Equipment manufactured by you for sale.

"Hazardous substance" means any substance other than ammonia that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

"Mechanical, electrical or pressure systems breakdown" means a fortuitous event that causes direct physical damage to "covered equipment". The event must be one of the following:

1. Mechanical breakdown, including rupture or bursting caused by centrifugal force;

2. Artificially generated electrical current, including electrical arcing, that disturbs electrical devices, appliance or wires;

3. Explosion of steam boiler, steam piping, steam engines or steam turbines owned or leased by you or operated under your control;

4. "Loss" or damage to steam boiler, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

5. "Loss" or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

If covered electrical equipment requires drying out as a result of flood, we will pay for the direct expenses of such drying out.

ERIE INSURANCE
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
UL-OA (Ed. 6/14) UF-9338

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRODUCTION OR PROCESS MACHINERY - DEDUCTIBLE

This endorsement modifies insurance provided under the following:

ULTRAFLEX COMMERCIAL PROPERTY COVERAGE PART

**A.** The following is added to **Section V - Deductibles:**

We will pay the amount of "loss" to "production or process machinery" caused by "mechanical, electrical, or pressure systems breakdown" in any one occurrence which is in excess of:

1. $1,000;

2. The deductible amount shown in the "Declarations"; or

3. The deductible amount applying to Building(s) — Coverage 1 and Business Personal Property and Personal Property of Others — Coverage 2;

whichever amount is greater.

For Additional Income Protection Coverage — Coverage 3, if the loss to "production or process machinery" is caused by "mechanical, electrical, or pressure systems breakdown", we will pay the amount of "income" and/or "rental income" loss which is in excess of one day multiplied by the "average daily value".

Should the policy deductible apply to the same "loss", only the deductibles for "production or process machinery" plus income protection or the policy deductible, whichever is the greater amount, shall be used.

**B.** The following definitions are added to **Section XI - Definitions:**

"Average daily value" means the loss of "income" and/or "rental income" for that location that you would have earned had no "mechanical, electrical, or pressure systems breakdown" occurred during the "interruption of business" divided by the number of days in that period.

We will make no reduction for loss of "income" and/or "rental income" not being earned, or the number of working days, because the "mechanical, electrical, or pressure systems breakdown" occurred, or any other scheduled or unscheduled shutdowns during the "interruption of business". If the Business Income and Extra Expense dollar deductible is expressed as a number times the "average daily value", that amount will be calculated as follows:

The "average daily value" will be the "income" and/or "rental income" for the entire location that would have been earned had no "mechanical, electrical, or pressure systems breakdown" occurred during the period of "interruption of business" divided by the number of working days in that period. No reduction shall be made for the "income" and/or "rental income" not being earned or in the number of working days, because of the "mechanical, electrical, or pressure systems breakdown" or any other scheduled or unscheduled shutdowns during the period of interruption. The "average daily value" applies to all locations included in the valuation of the loss.

The number indicated in the "Declarations" will be multiplied by the "average daily value" as determined above. The result will be used for the Business Income and Extra Expense dollar deductible.

**Example**

Business is interrupted partially or completely for 10 days. If there had been no "mechanical, electrical, or pressure systems breakdown", the total location income for those 10 days would have been $5,000. The Income Protection Deductible is 3 times the "average daily value".

$5,000 divided by 10 = $500 "average daily value".

3 times $500 = $1,500 Loss of Income Protection Deductible.

"Production or process machinery" means any machine or apparatus that processes or produces a product intended for eventual sale. This includes all component parts of such machine or apparatus and any other equipment used exclusively with such machine or apparatus.

COMMERCIAL INLAND MARINE
C-100 (Ed. 2/02) UF-3638

**ERIE INSURANCE GROUP**

# INLAND MARINE GENERAL CONDITIONS

Unless stated otherwise in any Inland Marine Coverage Parts, Declarations, or endorsements, the following General Conditions apply to all Inland Marine Coverage Parts forming part of this policy.

## GENERAL CONDITIONS

### 1. ABANDONMENT OF PROPERTY

We will not accept abandoned property.

### 2. APPRAISAL

If you and we fail to agree on the amount of loss, on the written demand of either, each party will choose a competent appraiser and notify the other of the appraiser's identity within 20 days after the demand is received. The appraisers will select a competent and impartial umpire. If the appraisers are unable to agree upon an umpire within 15 days after both appraisers have been identified, you or we can ask a judge of a court of record in the state where the policy is issued to select an umpire.

The appraisers shall then set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of loss. If they cannot agree, they will submit their differences to the umpire. A written award by two will determine the amount of loss.

Each party will pay the appraiser it chooses, and equally bear expenses for the umpire and all other expenses of the appraisal. However, if the written demand for appraisal is made by us, we will pay for the reasonable cost of your appraiser and your share of the cost of the umpire.

We will not be held to have waived any rights by any act relating to the appraisal.

### 3. ASSIGNMENT

Interest in your policy may be transferred only with our written consent. If you die, the policy will cover:

1. Your legal representative, but only while performing duties as your representative; and

2. Anyone having proper custody of insured property until a representative is appointed.

### 4. INSURANCE UNDER MORE THAN ONE COVERAGE

If more than one coverage applies to the same loss, we will pay no more than the actual amount of the loss.

### 5. LOSS PAYABLE CLAUSE

Loss shall be payable to loss payees named in the Declarations, to the extent of their interest.

### Our Duties

We will:

1. Protect the loss payee's interest in the insured property. This protection will not be invalidated by any act of neglect of the Insured, any breach of warranty, increase in hazard, change in ownership, or subsequent legal encumbrance if the loss payee has no knowledge of these conditions.

2. Give the loss payee 30 days notice before cancellation or refusal to renew this policy.

### Loss Payee's Duties

The loss payee will:

1. Furnish proof of loss within 60 days if you fail to do so.

2. Pay upon demand any premium due if you fail to do so.

3. Notify us of any change of ownership or occupancy, or any increase in hazard of which the loss payee has knowledge.

4. Give us his or her right of recovery against any party liable for loss.

5. After a loss, permit us to satisfy the debt requirements and receive full transfer of the debt.

### 6. LOSS PAYMENT

We will settle any claim for loss with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. We will pay within 30 days after we receive your proof of loss and the amount of loss is finally determined by one of the following:

1. We have reached an agreement with you; or

2. There is an entry of final judgment; or

3. There is a filing of an appraisal award on your behalf.

### 7. LOSS SETTLEMENT

Unless otherwise stated, the amount of insurance shown in this policy is not the agreed value of the insured property. Claims are settled on the basis of actual cash value at the time of loss. We will pay the lesser of the following amounts:

1. The actual cash value of the property at the time of loss, based on a reduction for depreciation; or

2. The cost to repair the property to its condition immediately prior to the loss; or

3. The cost to replace the property with property of like kind and quality that is substantially similar and intended for the same use; or

4. The applicable amount of insurance.

We have the option to:

1. Pay the loss in money; or

2. Repair, replace or rebuild the property with like kind and quality or property that is substantially similar. We must give the Insured notice of our intent to repair, replace or rebuild within 30 days after we receive your sworn proof of loss.

Upon payment of the loss, we have the right to take all or part of the property at its agreed or appraised value. Any property we take becomes our property.

Payment of a claim does not reduce the amount of insurance unless we pay a total loss on the scheduled property. After the loss, you have the option, to accept a refund of the unearned premium for the property, or you may apply the refund to the premium due for insurance on the replacement property.

We are not liable for any loss if the Insured does anything after the loss occurs to impair our right to recover.

## 8. LOSS TO A PAIR OR SET

If there is a loss to a pair or set, we may:

1. Repair or replace any part of the pair or set to restore it to its value before the loss; or

2. Pay the difference between actual cash value of the property before and after the loss.

## 9. LOSS TO PARTS

If there is a loss to a part of an item that consists of several parts, we will pay only for the loss to that part. A loss to a part is not considered to be a loss to the whole item.

## 10. LOSSES PAID BY OTHERS

We will not pay for that part of a loss that has been paid by someone else.

## 11. NO BENEFIT TO BAILEE

No bailee shall benefit, directly or indirectly, from this insurance.

## 12. OTHER INSURANCE

If you have other insurance covering the same loss as the insurance under this policy, we will pay only the excess over what you should have received from the other insurance. We will pay the excess whether you can collect on the other insurance or not.

## 13. PROPERTY OF OTHERS

If we are called upon to pay a loss for property of others, we reserve the right to adjust the loss with the owner. If we pay the owner, such payments will satisfy your claims against us for the owner's property.

At our option, without cost to you, we may choose to defend you in suits which result from a covered loss to the property of others.

## 14. RECOVERIES

The Insured must notify us, or we must notify the Insured promptly if either receives a recovery for a loss which we have paid. The costs that are incurred by either party in making the recovery are to be reimbursed first. We are entitled to the surplus up to the amount that we have paid for the loss. The Insured may then keep any excess.

## 15. REPORTING TERMS ONLY

This policy may be subject to reporting terms. If the policy is cancelled, you must report the required amount as of the cancellation date.

## 16. SUITS AGAINST US

We may not be sued unless there is full compliance with all terms of this policy. Suit must be brought within one year (Maryland and North Carolina - 3 years and Virginia - 2 years) after the loss occurs.

## 17. YOUR DUTIES AFTER A LOSS

In case of a covered loss, you must perform the following duties:

1. Give us or our Agent immediate notice. If a crime loss, also notify the police (except Virginia);

2. Protect the property from further damage. If it is necessary to property protection, make reasonable repairs and keep a record of all repair costs;

3. Furnish a complete inventory of the damaged property stating its original cost. At our request, furnish a complete inventory of undamaged property stating its original cost. If a loss is both less than $10,000 and less than 5% of the amount of insurance, no special inventory and appraisal of the undamaged property shall be required;

4. Produce for examination, with permission to copy, all books of accounts, bills, invoices, receipts, other vouchers as we may reasonably require;

5. Show us or our representative the damaged property, as often as may be reasonably required;

6. Submit to examinations under oath and sign a transcript of the same;

7. Send us within 90 days after the loss, your signed and sworn proof of loss statement which includes:

    a. Time and cause of loss;

    b. Your interest in the property and the interest of all others involved;

    c. Any encumbrances on the property;

    d. Other policies which may cover the loss;

e. Any changes in title, use, occupancy, or possession of the property which occurred during the policy term;

f. When required by us any plans, specifications and estimates for the repair of the damaged building;

g. The inventory of damaged property as prepared in 3. in this form;

8. Agree to help us enforce any right of recovery against any party liable for loss under this policy. This will not apply if we have waived recovery rights in writing prior to a loss.

COMMERCIAL INLAND MARINE
IM-AH (Ed. 8/03) UF-4197



ERIE INSURANCE GROUP

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# EXCLUSION - FUNGUS, WET ROT, DRY ROT, AND BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART(S)

**A.** The following exclusion is added to Paragraph A. in Section III - Exclusions:

**"Fungus", Wet Rot, Dry Rot, and Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a covered "loss" from a peril insured against, we will pay for the "loss" or damage caused by that peril insured against.

This exclusion does not apply:

1. When "fungus", wet or dry rot or bacteria results from fire or lightning; or

2. To the extent that coverage is provided in the Additional Coverage - Limited Coverage For "Fungus", Wet Rot, Dry Rot, And Bacteria with respect to "loss" or damage caused by a peril insured against other than fire or lightning.

**B.** The following exclusion is added to Paragraph B. in Section III - Exclusions:

Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**C.** Paragraph B. 2. b. Deterioration or Contamination Exclusion in Section III - Exclusions is replaced by the following. With respect to any Coverage Part to which the Deterioration or or Contamination Exclusion does not apply, this exclusion will not apply.

b. Wear and tear, rust or corrosion;

**D.** The following is added as an **Additional Coverage:**

**Additional Coverage - Limited Coverage For "Fungus", Wet Rot, Dry Rot, And Bacteria**

1. The coverage described in Paragraph 2. below only applies when the "fungus", wet or dry rot or bacteria is the result of a peril insured against, other than fire

and lightning, that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

c. The cost of testing performed before, during, or after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under Paragraph 2. above of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences caused by a peril insured against, other than fire and lightning, which takes place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, our loss payment will not be limited by the terms of this Limited Coverage, except to the extent

that "fungus', wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**E.** The following definition is added to **Section IX - Definitions:**

"Fungus" means any type or form of "fungus", including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by "fungi".

Copyright ISO Properties, Inc., 2001

ERIE INSURANCE
COMMERCIAL INLAND MARINE
IM-CEQ-RE (Ed. 5/09) UF-3559

# RENTED/LEASED MOBILE EQUIPMENT - BLANKET COVERAGE

## COMPREHENSIVE COVERAGE

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the "Declarations". The words "we", "us", and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **Section IX - Definitions.**

### SECTION I - COVERAGES

### INSURING AGREEMENT

We will pay for direct physical "loss" of or damage to covered property caused by any of the covered causes of loss listed under **Section II - Perils Insured Against.**

#### A.  Covered Property

We will cover "mobile equipment" and "non-mobile equipment" you rent or lease from others for a time period of 120 consecutive days or less as described in the "Declarations".

#### B.  Property Not Covered

We do not cover:

1. Aircraft or Watercraft;
2. "Automobiles", motor trucks, tractors, trailers, and similar conveyances designed for highway use and used for over the road transportation of people or cargo. However, this does not include:
   a. Self-propelled vehicles designed, maintained and used primarily to provide mobility to permanently attached equipment; or
   b. Vehicles designed for highway use that are not licensed and operated on public roads.
3. Contraband, or property in the course of illegal transportation or trade;
4. Property while airborne;
5. Property that is waterborne, except by fire;
6. Property that you loan, lease, or rent to others;
7. Property while it is stored or operated underground in connection with any mining operations.

### SECTION II - PERILS INSURED AGAINST

#### Covered Cause of Loss

This coverage insures against risk of "loss" to covered property unless the "loss" is excluded in **Section III - Exclusions.**

### SECTION III - EXCLUSIONS

A.  We will not pay for loss or damage to covered property caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any other cause or event that contributes concurrently or in any other sequence to the "loss".

1.  **Civil Authority**

    Seizure or destruction of covered property by order of governmental authority.

    However, we will cover "loss" caused by acts of destruction ordered by governmental authority to prevent the spread of a fire.

2.  **Intentional Acts**

    Intentional "loss", meaning any loss arising from an act committed by, or at the direction of the insured with the intent to cause a "loss".

3.  **Neglect**

    Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

4.  **Nuclear Hazard**

    Nuclear reaction or radiation, or radioactive contamination unless fire ensues, and then only for ensuing "loss".

5.  **War**

    War, whether declared or undeclared, discharge of a nuclear weapon (even if accidental), hostile or warlike action in time of peace or war, insurrection, rebellion, revolution, civil war, usurped power, including action taken by governmental authority in defending against such an occurrence.

6.  **Weather Conditions**

    Weather conditions, but only if weather conditions contribute in any way with a peril excluded to produce the "loss".

B.  We do not cover "loss" or damage resulting from:

1.  **Criminal, Fraudulent or Dishonest Acts**

    Dishonest or criminal acts committed by you or any of your members of a limited liability company, or any of your employees, directors, officers, trustees or authorized representatives:

    a.  Acting alone or in collusion with other persons; or

    b.  While performing services for you or otherwise.

1

We will cover acts of destruction by your employees but only for ensuing "loss", but theft by your employees (including leased employees) is not covered.

2. **Deterioration or Contamination**

   a. Deterioration or contamination;

   b. Wear and tear, rust or corrosion, mold or rotting;

   c. Change in color, texture, or finish;

   d. Decay, fungus, mildew, or mold;

   e. Inherent vice;

   f. Any quality, fault, or weakness in the covered property that causes it to damage or destroy itself;

   g. Marring or scratching; or

   h. Termites, vermin, insects, rodents, birds, skunks, raccoons, pavements, foundations, walls, floors, roofs, or ceilings; spiders, or reptiles.

3. **Electricity**

   Electricity other than lightning, unless fire or explosion ensues, and then only for ensuing "loss".

4. **Humidity/Temperature**

   Humidity, freezing or overheating, dampness, dryness, or changes in or extremes of temperature.

5. **Loss of Use**

   Loss caused by or resulting from loss of use, business interruption, delay or loss of market.

6. **Mechanical Breakdown**

   We do not pay for "loss" caused by mechanical breakdown including centrifugal force.

   However, this exclusion does not apply to "loss" resulting from testing.

7. **Missing Property**

   Missing property where the only proof of loss is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property.

   This exclusion does not apply to covered property in the custody of a carrier for hire.

8. **Pollutants**

   Discharge, dispersal, seepage, migration, release, or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release, or escape is itself caused by a peril insured against. But if "loss" or damage by a peril insured against results from the discharge, dispersal, seepage, migration, release, or escape of "pollutants", we will pay for the resulting damage caused by the peril insured against.

9. **Puncture, Blowout and Road Damage**

   Loss to tires caused by road damage, such as blowout or puncture, unless it results from another "loss" covered by this endorsement.

10. **Weight of Load**

    Weight of load, which under the operation conditions at the time of a "loss" exceeds the registered lifting capacity or load rating chart of any equipment or machine.

11. **Load Shifting**

    Shifting of a load, poor loading, or rough handling.

12. **Explosion**

    Due to explosion of any steam boiler, steam piping, or pressure vessel owned, used, or operated by the insured.

## SECTION IV - AMOUNTS OF INSURANCE

Our payment for "loss" or damage to covered property will not exceed the amount shown in the "Declarations".

Our Occurrence Limit for all "loss" or damage resulting from any one occurrence will not exceed the amount shown in the "Declarations" or on a separate schedule regardless of the number of items of covered property involved, either in the case of partial or total "loss" or salvage charges or any other charges or all combined.

## SECTION V - DEDUCTIBLE

We will pay the amount of "loss" to covered property in any one occurrence that is in excess of the deductible amount shown in the "Declarations".

## SECTION VI - EXTENSIONS OF COVERAGE

We will pay the following "losses" at your option. Some of the Extensions of Coverage provide an additional amount of insurance and increase the total amount of insurance available for the coverage involved. Other Extensions of Coverage do not provide an additional amount of insurance and do not increase the total amount of insurance available for the coverage involved. Each Extension of Coverage indicates whether payment under the extension is or is not an additional amount of insurance.

1. **Debris Removal**

   We will pay the cost to remove debris of covered property that is caused by a peril insured against in this coverage.

   We will pay up to 25% of the amount we pay for the direct "loss". We will not pay more for "loss" to property and debris removal combined than the amount of insurance listed in the "Declarations" applicable to the covered property.

2

Coverage provided under this Extension of Coverage is not an additional limit and does not increase the total amount of insurance available.

2. **Pollutant Cleanup and Removal**

We will pay your expense to extract "pollutants" from land or water if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by a peril insured against that occurs during the policy period. The expenses are paid only if they are reported to us in writing within 180 days from the date the peril insured against occurs.

We do not pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants". However, we pay the cost of testing which is necessary for the extraction of "pollutants" from land or water.

The most we pay for each site or location is $10,000 for the sum of all such expenses arising out of a peril insured against occurring during each separate 12 month period of this policy.

Coverage provided under this Extension is an additional limit.

## SECTION VII - WHEN AND WHERE

**WHEN**

This policy applies to "losses" that occur during the policy period. The policy period is shown in the "Declarations", "Renewal Certificate", "Amended Declarations", "Revised Declarations" or endorsement. An "Amended Declarations" or endorsement tells you that the policy has been changed. A "Renewal Certificate" tells you that the policy is being renewed for another policy period.

**WHERE**

Coverage applies only while the covered property is in the United States, its territories or possessions, Puerto Rico or Canada.

## SECTION VIII - ADDITIONAL CONDITIONS

1. **COINSURANCE**

All covered property must be insured for at least 100% of its' Actual Cash Value.

We will pay only the proportion of any "loss" that the amount of insurance shown in the "Declarations" for the lost or damaged item(s) bears to the 100% of the Actual Cash Value at the time of "loss".

This procedure applies to the total of all covered property to which the amount of insurance applies.

2. **LOSS PAYMENT**

We will adjust all "losses" with you. We will pay you

unless some other person is named in the policy or is legally entitled to receive payment. We will not pay you more than your financial interest in the covered property.

"Loss" will be payable 30 days after we receive your proof of "loss" if you have complied with all the terms of this coverage part and one of the following has been done:

a. We have reached an agreement with you; or

b. There is an entry of final judgment; or

c. There is a filing of an appraisal award on your behalf.

We have the option to:

a. Pay the value of the damaged property;

b. Pay the cost to repair or replace the damaged property;

c. Take all or part of the damaged property at an agreed or appraised value; or

d. Repair or replace the damaged property with material of like kind or quality.

We will determine the value of lost of damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this coverage form or any applicable provision which amends or supersedes the Valuation Condition.

3. **VALUATION**

The value of covered property will be based on the Actual Cash Value (with a deduction for depreciation) at the time of the "loss".

## SECTION IX - DEFINITIONS

"Automobile" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any attached machinery or equipment), but does not include "mobile equipment".

"Declarations", "Amended Declarations", "Revised Declarations" and "Renewal Certificate" means the form which shows your coverages, limits of protection, premium charges and other information. This form is part of your policy.

"Loss" means direct and accidental loss of or damage to covered property.

"Mobile equipment" means any of the following types of land vehicles (including any attached machinery or equipment):

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to

3

premises you own or rent;

3. Vehicles that travel on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   a. Power cranes, shovels, loaders, diggers or drills; or

   b. Road construction or resurfacing equipment such as graders, scrapers, or rollers;

5. Vehicles not described in 1., 2., 3. or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   a. Air compressors, pumps and generators, including spraying, welding, building 3 cleaning, geophysical exploration, lighting and well servicing equipment; or

   b. Cherry pickers and similar devices used to raise or lower workers;

6. Vehicles not described in 1., 2., 3. or 4. above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but are considered "automobiles".

   a. Equipment designed primarily for:

      1) Snow removal;

      2) Road maintenance, but not construction or resurfacing;

      3) Street cleaning;

   b. Cherry pickers and similar devices mounted on an "automobile" or truck chassis and used to raise or lower workers; and

   c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

"Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, or reclaimed..

ERIE INSURANCE
INLAND MARINE
IM-CEQ-CP (Ed. 4/14) UF-3562

# CONTRACTORS' EQUIPMENT COVERAGE - COMPREHENSIVE PERILS

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the "Declarations". The words "we", "us", and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **Section IX - Definitions.**

## SECTION I - COVERAGES

## INSURING AGREEMENT

We will pay for direct physical "loss" of or damage to covered property caused by or resulting from a peril insured against.

**A. Covered Property**

We will cover:

1. Your "mobile equipment"; and

2. "Mobile equipment" of others in your care, custody or control; and

3. Your "contractors' non-mobile equipment".

described in the "Declarations" or schedule of "mobile equipment" and "contractors' non-mobile equipment".

**B. Property Not Covered**

We do not cover:

1. Aircraft or Watercraft;

2. "Automobiles", motor trucks, tractors, trailers, and similar conveyances designed for highway use and used for over the road transportation of people or cargo. However, this does not include:

   a. Self-propelled vehicles designed, maintained and used primarily to provide mobility to permanently attached equipment; or

   b. Vehicles designed for highway use that are not licensed and operated on public roads;

3. Contraband, or property in the course of illegal transportation or trade;

4. Property while airborne;

5. Property that is waterborne, except by fire;

6. Property that you loan, lease, or rent to others;

7. Property while it is stored or operated underground in connection with any mining operations;

8. Plans, designs, blueprints, specifications, mechanical drawings or similar property.

## SECTION II - PERILS INSURED AGAINST

**Covered Cause of Loss**

This policy insures against direct physical "loss", except "loss" as excluded or limited in this policy.

## SECTION III - EXCLUSIONS

A. We will not pay for "loss" of or damage to covered property caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss".

   1. **Civil Authority**

      Seizure or destruction of covered property by order of governmental authority.

      However, we will cover "loss" caused by acts of destruction ordered by governmental authority to prevent the spread of a fire.

   2. **Intentional Acts**

      Intentional loss, meaning any "loss" arising from an act committed by, or at the direction of the insured with the intent to cause a "loss".

   3. **Neglect**

      Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of "loss".

   4. **Nuclear Hazard**

      Nuclear reaction or radiation, or radioactive contamination unless fire ensues, and then only for ensuing "loss".

   5. **War**

      a. War including undeclared or civil war;

      b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

c.  Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

With respect to any action that comes within the terms of this exclusion and involves nuclear reaction or radiation or radioactive contamination, this War exclusion supersedes Paragraph **A.4. of Section III – Exclusions,** the nuclear hazard exclusion.

6.  **Weather Conditions**

Weather conditions, but only if weather conditions contribute in any way with a peril excluded to produce the "loss".

**B.** We do not cover "loss" or damage resulting from:

1.  **Criminal, Fraudulent or Dishonest Acts**

Dishonest or criminal acts (including theft) committed by you or any of your members of a limited liability company, or any of your employees (including temporary or leased employees), directors, officers, trustees or authorized representatives:

a.  Acting alone or in collusion with other persons; or

b.  While performing services for you or otherwise.

We will cover acts of destruction by your employees (including temporary or leased employees) but only for ensuing "loss", but there is no coverage for "loss" or damage by theft by your employees (including temporary or leased employees) or any person to whom you entrust property for any purpose, whether acting alone or in collusion with any other party.

We will cover "loss" caused by dishonest acts by carriers or other bailees for hire.

2.  **Deterioration or Contamination**

a.  Deterioration or contamination;

b.  Wear and tear, rust or corrosion, mold or rotting;

c.  Change in color, texture, or finish;

d.  Decay, fungus, mildew, or mold;

e.  Inherent vice;

f.  Any quality, fault, or weakness in the covered property that causes it to damage or destroy itself;

g.  Marring or scratching;

h.  Settling, cracking, shrinking, bulging or expansion of pavements, foundations, walls, sidewalks, driveways, patios, floors, roofs, or ceilings;

i.  Termites, vermin, insects, rodents, birds, skunks, raccoons, spiders, or reptiles.

3.  **Electricity**

Electricity other than lightning unless fire or explosion ensues, and then only for ensuing "loss".

4.  **Humidity/Temperature**

Humidity, freezing or overheating, dampness, dryness, or changes in or extremes of temperature.

5.  **Loss of Use**

Loss of use, business interruption, delay or loss of market.

6.  **Mechanical Breakdown**

We do not pay for "loss" caused by mechanical breakdown including centrifugal force.

However, this exclusion does not apply to "loss" resulting from testing.

7.  **Missing Property**

Missing property where the only proof of "loss" is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property. This exclusion does apply to covered property in the custody of a carrier for hire.

8.  **Pollutants**

Discharge, dispersal, seepage, migration, release, or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release, or escape is itself caused by a peril insured against. But if "loss" or damage by a peril insured against results from the discharge, dispersal, seepage, migration, release, or escape of "pollutants", we will pay for the resulting damage caused by the peril insured against.

9.  **Puncture, Blowout and Road Damage**

Loss to tires or tubes caused by road damage, such as blowout or puncture, unless it results from another "loss" covered by this endorsement.

10. **Weight of Load**

Weight of Load, which under the operating conditions at the time of a "loss" exceeds the registered lifting capacity or load rating chart of any equipment or machine.

11. **Load Shifting**

Shifting of a load, poor loading or rough handling.

12. **Explosion**

Due to explosion of any steam boiler, steam piping or pressure vessel owned, used or operated by the insured.

## SECTION IV - AMOUNTS OF INSURANCE

Our payment for "loss" of or damage to covered property shall not exceed the amount shown in the "Declarations" or on a separate schedule for the covered property.

Our Occurrence Limit for all "loss" or damage resulting from any one occurrence will not exceed the amount shown in the "Declarations" or on a separate schedule regardless of the number of items of covered property involved, either in the case of partial or total "loss" or salvage charges or any other charges or all combined.

## SECTION V - DEDUCTIBLE

We will pay the amount of "loss" to covered property in any one occurrence that is in excess of the deductible amount shown in the "Declarations".

## SECTION VI - EXTENSIONS OF COVERAGE

We will pay the following "losses" at your option. Some of the Extensions of Coverage provide an additional amount of insurance and increase the total amount of insurance available for the coverage involved. Other Extensions of Coverage do not provide an additional amount of insurance and do not increase the total amount of insurance for the coverage involved. Each Extension of Coverage indicates whether payment under the extension is or is not an additional amount of insurance.

1. **Newly Purchased Equipment**

   If during the policy period, you purchase additional "mobile equipment" or "contractors' non-mobile equipment" similar to the covered property, we extend coverage to the additional purchased equipment for up to 60 days.

   The most we will pay for any one "loss" under this additional coverage is the lesser of:

   a. The actual cash value of the covered property; or

   b. Up to 25% of the total amount of insurance on the covered property.

   This additional coverage will end when any of the following first occur:

   a. This policy is terminated or not renewed;

   b. 60 days after you purchase the additional equipment; or

   c. You report the additional purchased equipment to us.

   The additional premium is due from the date of purchase.

   Coverage provided under this Extension of Coverage is not an additional limit and does not increase the total amount of insurance available.

2. **Debris Removal**

   We will pay the cost of removal of debris to covered property on the premises described in the "Declarations" caused by a peril insured against. We will pay up to 25% of the amount we pay for the direct "loss". We will not pay more for "loss" to property and debris removal combined than the amount of insurance listed in the "Declarations" applicable to the covered property.

   Debris Removal does not cover the costs to:

   a. Remove debris of your property that is not insured under this policy, or property in your care, custody, or control that is not covered property under this endorsement;

   b. Remove any property that is property not covered under this endorsement;

   c. Remove property of others of a type that would not be covered property under this endorsement; or

   d. Extract "pollutants" from land or water, or to remove, restore, or replace polluted land or water.

3. **Pollutant Cleanup and Removal**

   We will pay your expense to extract "pollutants" from land or water if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by a peril insured against that occurs during the policy period. The expenses are paid only if they are reported to us in writing within 180 days from the date the peril insured against occurs.

   We do not pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants". However, we pay the cost of testing which is necessary for the extraction of "pollutants" from land or water.

   The most we pay for each site or location is $10,000 for the sum of all such expenses arising out of a peril insured against during each separate 12 month period of this policy.

   Coverage provided under this Extension is an additional limit.

4. **Rental Reimbursement**

   In the event of a "loss" by a covered peril to your "contractors' equipment", we reimburse you for your expense to rent similar equipment while your equipment is inoperable.

   The most we reimburse you for rental expenses is $5,000.

   We will continue to reimburse you for the rental of equipment after the expiration date of this coverage,

provided the "loss" occurred before the expiration date.

We will not reimburse you:

a. For the rental of equipment until after the waiting period indicated in the "Declarations" has passed since your "contractors' equipment" was rendered inoperable. If no waiting period is indicated then a 72 hour waiting period applies.

 After the waiting period has passed we will only reimburse you for the rental expenses that you actually incur.

b. If you can continue or resume your operations with similar equipment that is available to you at no additional expense to you.

c. For the rental expense of any equipment unless you make every reasonable effort to repair, replace, or rebuild the inoperable equipment after the "loss" by a peril insured against.

The deductible amount indicated in the "Declarations" does not apply to this Extension of Coverage.

Coverage provided under this Extension of Coverage is not an additional limit and does not increase the total amount of insurance available.

5. **Spare Parts and Fuel**

 We pay for direct physical "loss" caused by a peril insured against to spare parts and accessories for "contractors' equipment" and fluids for vehicles and "contractors' equipment". Fluids include gasoline, oil, hydraulic fluid, and diesel fuel.

 The most we pay for "loss" to spare parts and accessories is $5,000.

 Coverage provided under this Extension of Coverage is not an additional limit and does not increase the total amount of insurance available.

## SECTION VII - WHEN AND WHERE

### WHEN

This policy applies to "losses" that occur during the policy period. Unless otherwise specified in the "Declarations", "Renewal Certificate", "Amended Declarations", "Revised Declarations" or endorsement the policy period begins and ends 12:01 AM Standard Time at the stated address of the Named Insured. An "Amended Declarations" or endorsement tells you that the policy has been changed. A "Renewal Certificate" tells you that the policy is being renewed for another policy period.

### WHERE

Coverage applies only while the property is in the United States, its territories or possessions, Puerto Rico or Canada. This includes property that is in transit within the continental United States.

## SECTION VIII - ADDITIONAL CONDITIONS

1. **COINSURANCE**

 All covered property must be insured for at least 100% of its' Actual Cash Value.

 We will pay only the proportion of any "loss" that the amount of insurance shown in the "Declarations" or in the schedule for the lost or damaged item(s) bears to the 100% Actual Cash Value at the time of "loss".

 If there is more than one amount of insurance indicated in the "Declarations" for this coverage, this procedure applies separately to each amount of insurance.

 If there is only one amount of insurance indicated in the "Declarations" for this coverage, this procedure applies to the total of all covered property to which the amount of insurance applies.

2. **VALUATION**

 The value of covered property will be based on the Actual Cash Value at the time of the "loss" (with a deduction for depreciation).

3. **OUR RIGHT TO RECOVER FROM OTHERS**

 After we make a payment under this policy, we will have the right to recover from anyone else held responsible. This right will not apply if you waived it in writing prior to "loss". Any insured is required to transfer this right to us, and do nothing to harm this right. Anyone receiving payment from us and from someone else for the same "loss" will reimburse us up to our payment.

## SECTION IX - DEFINITIONS

"Automobile" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any attached machinery or equipment), but does not include mobile equipment.

"Contractors' non-mobile equipment" means machinery and equipment of a portable nature that you use in your contracting operations. "Contractors' non-mobile equipment" also means powered and non-powered equipment such as portable welders, portable heaters, ladders, scaffolding, mortar mixers, pumps, table/radial saws and generators. "Contractors' non-mobile equipment" does not include portable powered and non-powered hand tools.

"Mobile equipment" means any of the following types of land vehicles (including any attached machinery or equipment):

4

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to premises you own or rent;

3. Vehicles that travel on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   a. Power cranes, shovels, loaders, diggers, or drills; or

   b. Road construction or resurfacing equipment such as graders, scrapers, or rollers;

5. Vehicles not described in 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   a. Air compressors, pumps and generators, including spraying, welding, building cleaning, geographical exploration, lighting and well servicing equipment; or

   b. Cherry pickers and similar devices used to raise or lower workers;

6. Vehicles not described in 1., 2., 3., or 4. above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but are considered "automobiles".

   a. Equipment designed primarily for:

      1) Snow Removal;

      2) Road maintenance, but not construction or resurfacing;

      3) Street Cleaning;

   b. Cherry pickers and similar devices mounted on an "automobile" or truck chassis and used to raise or lower workers; and

   c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geographical exploration, lighting and well servicing equipment.

"Declarations", "Amended Declarations", "Revised Declarations" and "Renewal Certificate" means the form which shows your coverages, limits of protection, premium charges and other information. This form is part of your policy.

"Loss" means direct and accidental loss of or damage to covered property.

"Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

ULTRAFLEX PACKAGE
UL-TEPA (Ed. 2/10) UF-2987



ERIE INSURANCE GROUP

# THIS IS A CLAIMS-MADE AND REPORTED COVERAGE ENDORSEMENT.

# EMPLOYMENT PRACTICES LIABILITY INSURANCE COVERAGE ENDORSEMENT - PENNSYLVANIA

Throughout this Coverage Endorsement (hereinafter referred to as "EPL Coverage Endorsement"), the words "you" and "your" refer to the "named insured(s)" shown in the Declarations and any other person(s) or organization(s) qualifying as a "named insured" under this EPL Coverage Endorsement. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under SECTION III. WHO IS AN INSURED.

Other words and phrases that appear in "quotations" have special meaning. Refer to SECTION VII. DEFINITIONS.

## SECTION I - WHAT IS COVERED

### A. Insuring Agreement

1. "We" shall pay those "losses" arising out of an "insured's" "wrongful employment act" against "your" "employees", "recognized volunteers" and applicants for employment to which this insurance applies.

2. If coverage for "third party violations" is shown in the Declarations, then "we" shall pay those "losses" arising out of an "insured's" "third party violation" against "your" customers, vendors and clients.

3. For coverage to apply under this EPL Coverage Endorsement, a "claim" or "suit" for a "wrongful employment act" must be first made against "you" during the "EPL coverage period" or any Extended Reporting Period (if applicable) and reported to "us" pursuant to the terms of this EPL Coverage Endorsement.

4. A "claim" or "suit" by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

   a. When written notice of such "claim" or "suit" is received and recorded by any "insured" or by "us", whichever comes first; or

   b. When "we" make any settlement in accordance with the terms of this EPL Coverage Endorsement.

### B. Defense

1. "We" have the right and duty to defend and appoint an attorney to defend any "claim" or "suit" brought against any "insured" for a "wrongful employment act" to which this insurance applies, even if the "claim" or "suit" is groundless or fraudulent.

2. "We" have the right to investigate and settle any "claim" or "suit" that "we" believe is proper. "You" shall be entitled to effectively associate in the defense of any "claim".

3. "We" shall pay all reasonable costs "we" ask the "insured" to incur while helping "us" investigate or defend a "claim" or "suit". "We", however, will not pay more than $100 per day for earnings lost by the "insured" because of time taken off from work.

4. "We" shall pay premiums for appeal bonds, or bonds to release property being used to secure a legal obligation, for a covered "suit". "We" shall only pay, however, for bonds valued up to "our" Aggregate EPL Limit of Liability. "We" shall have no obligation to appeal or to obtain these bonds.

5. Payments for "defense costs" are included within the Aggregate EPL Limit of Liability. They are not in addition to the Aggregate EPL Limit of Liability. "Our" duty to defend or to make payment of any "claim" or "suit" pursuant to paragraphs 1-4 above, ends after the Aggregate EPL Limit of Liability has been exhausted by payment of "loss", including "defense costs".

6. "We" shall pay all interest on that amount of any judgement within the Aggregate EPL Limit of Liability:

   a. which accrues after entry of judgment; and

   b. before "we" pay, offer to pay, or deposit in court that part of the judgment within the Aggregate EPL Limit of Liability.

These interest payments are included within "our" Aggregate EPL Limit of Liability.

## C. Transfer of Control

1. "You" may take over control of any outstanding "claim" or "suit" previously reported to "us", but only if "we", in "our" sole discretion, decide that you should, or if a court orders "you" to do so.

2. Notwithstanding subsection 1. of this Clause C, in all events, if the Aggregate EPL Limit of Liability is exhausted, "we" will notify "you" of all outstanding "claims" or "suits" and "you" will take over control of the defense. "We" will help transfer control of the "claims" and "suits" to "you".

3. "We" shall take whatever steps are necessary to continue the defense of any outstanding "claim" or "suit" and avoid a default judgment during the transfer of control to "you". If "we" do so, "we" shall not waive or give up any of "our" rights. "You" shall pay all reasonable expenses "we" incur for taking such steps after the Aggregate EPL Limit of Liability is exhausted.

## SECTION II. EXCLUSIONS - WHAT IS NOT COVERED

This insurance does not apply to:

### A. Profit or Advantage

Any liability arising out of the gaining of any profit or advantage to which an "insured" was not legally entitled. However, to the extent that a "claim" or "suit" is otherwise covered under this EPL Coverage Endorsement, "we" will defend a "claim" or "suit" asserting that an "insured" gained a profit or advantage to which the "insured" was not legally entitled, until such time as the "insured" is determined to have gained a profit or advantage to which the "insured" was not legally entitled.

### B. Criminal Acts

Any liability arising out of any dishonest, fraudulent, criminal, or malicious act by or at the direction of any "insured". However, to the extent that a "claim" or "suit" is otherwise covered under this EPL Coverage Endorsement "we" will defend a "claim" or "suit" asserting a dishonest, fraudulent, criminal or malicious act until such time as the "insured" is determined to have committed such dishonest, fraudulent, criminal or malicious act.

The "wrongful employment act(s)" of an "insured" shall not be imputed to any other "insured" for the purpose of determining the applicability of the foregoing exclusions A. and B.

### C. "Property Damage"

Any liability arising out of "property damage".

### D. "Bodily Injury"

Any liability arising out of "bodily injury".

### E. Worker's Compensation, Social Security and Unemployment, Disability and Retirement Benefits

Any liability arising out of any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or simllar law.

This exclusion, however, shall not apply to "loss" arising from a "claim" or "suit" for "retaliation".

### F. Contractual Liability

Any liability arising out of any actual or alleged contractual liability of any "insured" under any express contract or agreement. This exclusion, however, shall not apply to the extent any liability does not arise under such express contract or agreement.

### G. ERISA, FLSA, NLRA, WARN, COBRA, and OSHA

Any liability for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law.

It is acknowledged that "claims" and "suits" for violation(s) of any of the responsibilities, obligations or duties imposed by "similar federal, state, local or foreign statutory law or common law," as such quoted language is used in the immediately-preceding paragraph, include, without limitation, any and all "claims" and "suits" which in whole or in part allege, arise out of, are based upon, are attributable to, or are in any way related to any of the circumstances described in any of the following:

1. the refusal, failure or inability of any "insured(s)" to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered or time spent in connection with work related activities (as opposed to tort-based back pay or front pay damages for torts other than conversion);

2. improper deductions from pay taken by any "insured(s)" from any "employee(s)" or purported "employee(s)"; or

3. failure to provide or enforce legally required meal or rest break periods.

Notwithstanding the foregoing, this exclusion G. shall not apply to the extent that a "claim" or "suit" is for "retaliation".

### H. Prior Knowledge

Any liability arising out of incidents, circumstances or "wrongful employment acts", which an "insured", prior to the "original inception date" as shown in the Declarations, had knowledge or which an "insured" could have reasonably foreseen might result in a "claim" or "suit".

### I. Prior Notice

Any liability arising out of the facts alleged, or to the same or "related wrongful employment acts" alleged or contained in any "claim" or "suit" which has been reported, or in any circumstances of which notice has been given, under any policy of which this EPL Coverage Endorsement is a renewal or replacement or which it may succeed in time.

### J. Prior Litigation

Any liability arising out of, as of the "original inception date", any prior (i) litigation; or (ii) administrative or regulatory proceeding or investigation of which an "insured" had notice, or alleging the same or "related wrongful employment acts" alleged or contained in such pending or prior litigation or administrative or regulatory proceeding or investigation.

### K. Securities Holder

Any "claim" or "suit" brought by a securities holder of the "insured" in their capacity as such, whether directly, derivatively on behalf of the "insured", or by class action.

### L. Outside Boards

Any liability arising out of any actual or alleged act or omission of an "insured" serving in any capacity, other than as a director, officer or "employee" of the "insured" entity.

## SECTION III. WHO IS AN INSURED

### A. Individual

If "you" are shown in the Declarations as an individual, "you" and "your" spouse are "insureds", only for the conduct of a business of which "you" are the sole owner.

### B. Corporation

If "you" are shown in the Declarations as a corporation or organization other than a partnership, joint venture, or limited liability company, "you" and "your" "subsidiaries" are "insureds".

### C. Partnership or Joint Venture

If "you" are shown in the Declarations as a partnership or joint venture, "you" are an "insured". "Your" members, partners or co-venturers and their spouses are also "insureds", but only for the conduct of "your" business.

### D. Limited Liability Company

If "you" are shown in the Declarations as a limited liability company, "you" are an "insured". "Your" members are also "insureds", but only with respect to the conduct of "your" business. "Your" managers are "insureds", but only with respect to their duties as "your" managers.

### E. Trusts

If "you" are shown in the Declarations as a trust, "you" are an "insured". "Your" trustees are also "insureds", but only with respect to their duties as trustees.

### F. "Employees"

"Your" "employees", executive officers and directors are "insureds", only for the conduct of "your" business within the scope of their employment or their duties as executive officers or directors.

### G. Extensions

1. Subject otherwise to the terms hereof, this EPL Coverage Endorsement shall cover "loss" arising from any "claims" or "suits" made against the estates, heirs, or legal representative of deceased individual "insureds", and the legal representatives of individual "insureds", in the event of incompetency, who were individual "insureds" at the time the "wrongful employment acts", upon which such "claims" or "suits" are based, were committed.

2. Subject otherwise to the terms hereof, this EPL Coverage Endorsement shall cover "loss" arising from all "claims" and "suits" made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an individual "insured", including a "claim" or "suit" that seeks damages recoverable from marital community property, property jointly held by the individual "insured" and the spouse, or property transferred from the individual "insured" to the spouse; provided, however, that this extension shall not afford coverage for a "claim" or "suit" arising out of any "wrongful employment act" of the spouse, but shall apply only to "claims" or "suits" arising out of any "wrongful employment acts" of an individual "insured", subject to this EPL Coverage Endorsement's terms, conditions and exclusions.

## SECTION IV. LIMIT OF LIABILITY
(Including "Defense Costs")

**A.** The Aggregate EPL Limit of Liability shown in the Declarations and the information contained in this section limits the most "we" shall pay for all "loss" arising out of "claims" and "suits" first made against "insureds" during the "EPL coverage period" or Extended Reporting Period (if applicable), regardless of:

1. the number of persons or organizations covered by this EPL Coverage Endorsement; or

2. the number of "claims" made or "suits" brought; or

3. the length of the "EPL coverage period".

**B.** The Aggregate EPL Limit of Liability is the most "we" shall pay for all "losses" covered under this EPL Coverage Endorsement, including amounts incurred for "defense costs".

**C.** The Aggregate EPL Limit of Liability for the Extended Reporting Period shall be part of, and not in addition to the Aggregate EPL Limit of Liability for the "EPL coverage period".

**D.** All "claims" and "suits" arising from the same or "related wrongful employment acts" shall be treated as arising out of a single "wrongful employment act".

**E.** All "claims" or "suits" arising out of one "wrongful employment act" shall be deemed to be made on the date that the first such "claim" is made or "suit" is brought. All "claims" asserted in a "class action suit" will be treated as arising out of a single "wrongful employment act".

**F.** Any "claim" or "suit" which is made subsequent to the "EPL coverage period" or Extended Reporting Period (if applicable) which, pursuant to Section VI, Clause D.3. and 4. is considered made during the "EPL

coverage period" or Extended Reporting Period shall also be subject to the one Aggregate EPL Limit of Liability stated in the Declarations.

## SECTION V. DEDUCTIBLE

"You" shall be responsible for the deductible amount shown in the Declarations with respect to each "claim" and "suit" and "you" may not insure against it. A single deductible amount shall apply to "loss" arising from all "claims" and "suits" alleging the same "wrongful employment act" or "related wrongful employment acts". Expenses "we" incur in investigating, defending and settling "claims" and "suits" are included in the deductible. The deductible is not included within the Aggregate EPL Limit of Liability.

## SECTION VI. CONDITIONS

"We" have no duty to provide coverage under this EPL Coverage Endorsement, unless there has been full compliance with all Conditions contained in this EPL Coverage Endorsement.

### A. Assignment

The interest of any "insured" is not assignable. "You" cannot assign or transfer "your" interest in the EPL Coverage Endorsement without "our" written consent attached to the EPL Coverage Endorsement.

### B. Bankruptcy or Insolvency

"Your" bankruptcy, insolvency or inability to pay, will not relieve "us" from the payment of any "claim" or "suit" covered by this EPL Coverage Endorsement.

Under no circumstances will "your" bankruptcy, insolvency, or inability to pay require "us" to drop down, in any way replace, or assume any of "your" obligations with respect to the Deductible provisions of this EPL Coverage Endorsement.

### C. "Coverage Territory"

"We" cover "wrongful employment acts" anywhere in the world, but only if the "claim" is made and the "suit" is brought for such "wrongful employment act" in the United States of America, its territories and possessions, Puerto Rico, or Canada.

### D. Duties in the Event of an Incident, "Claim" or "Suit"

1. If, during the "EPL coverage period", incidents or events occur which "you" reasonably believe may give rise to a "claim" or "suit" for which coverage may be provided hereunder, such belief being based upon either written notice from the potential claimant or the potential claimant's representative; or notice of a complaint filed with EEOC, DOL or OFCCP (or similar federal, state or local agency); or upon a contemporaneously made memorandum of an oral "claim", allegation or threat, "you" shall give written notice to "us" as soon as practicable and either:

   a. anytime during the "EPL coverage period" or the Extended Reporting Period (if applicable); or

   b. within thirty (30) days after the end of the "EPL coverage period" or Extended Reporting Period (if applicable), as long as such "claim" or "suit" is reported no later than thirty (30) days after the date such "claim" or "suit" was first made against an "insured".

2. If a "claim" is made or a "suit" is brought against any "insured", "you" must:

   a. Immediately record the specifics of the "claim" or "suit" and the date received; and

   b. Provide "us" with written notice, as described in subsection 3. below, as soon as practicable.

3. Such written notice of "claim" or "suit" shall contain:

   a. The identity of the person(s) alleging a "wrongful employment act";

   b. The identity of the "insured(s)" who allegedly were involved in the incidents or events;

   c. The date the alleged incidents or events took place; and

   d. The written notice or contemporaneously prepared memorandum referred to above.

   If written notice is given to "us" during the "EPL coverage period" or Extended Reporting Period (if applicable), pursuant to the above requirements, then any "claim" or "suit" which is subsequently made against any "insureds" and reported to "us" alleging, arising out of, based upon or attributable to such circumstances or alleging any "related wrongful employment act" to such circumstances, shall be considered made at the time such notice of such circumstances was first given.

4. If "you" submit written notice of a "claim" or "suit", pursuant to this Clause D., then any "claim" or "suit" that may subsequently be made against an "insured" and reported to "us" alleging the same or a "related wrongful employment act" to the "claim" or "suit" for which such notice has been given shall be deemed, for the purpose of this insurance, to have been first made during the "EPL coverage period" in effect at the time such written notice was first submitted to "us".

5. "You" and any other "insured" must:

   a. Immediately send "us" copies of any demands, notices, summonses or legal papers received in connection with any "claim" or "suit";

   b. Authorize "us" to obtain records and other information;

   c. Cooperate with "us" in the investigation, settlement or defense of the "claim" or "suit";

   d. Assist "us", upon "our" request, in the enforcement of any right against any person or organization which may be liable to the "insured" because of injury or damage to which this insurance may also apply;

   e. Take no action, or fail to take any required action, that prejudices the rights of the "insureds" or "us" with respect to such "claim" or "suit".

6. No "insureds" will, except at their own cost, voluntarily make a payment, assume any obligation, or

incur any expense without "our" prior written consent.

### E. Transfer of Rights of Recovery Against Others to "Us"

"You" may be able to recover all or part of a "loss" from someone other than "us". "You", therefore, shall do all that is possible after a "loss" to preserve any such right of recovery. If "we" make a payment under this EPL Coverage Endorsement, that right of recovery shall belong to "us". "You" shall do whatever is necessary, including signing documents, to help "us" obtain that recovery.

### F. Extended Reporting Period

1. Solely with respect to this EPL Coverage Endorsement and except as indicated below, if "you" or "we" shall cancel or refuse to renew this EPL Coverage Endorsement, "you" shall have the right, upon payment of an additional premium of 100% of the full annual premium applicable to this EPL Coverage Endorsement, to buy an Extended Reporting Period Endorsement, providing an Extended Reporting Period of one (1) year following the effective date of the cancellation or nonrenewal, in which to give "us" written notice of "claims" first made or "suits" first brought against the "insureds" during said Extended Reporting Period for any "wrongful employment acts" occurring before the end of the "EPL coverage period" and are otherwise covered by this EPL Coverage Endorsement.

   To obtain an Extended Reporting Period Endorsement, "you" must request it in writing and pay the additional premium due, within sixty (60) days of the effective date of cancellation or nonrenewal.

2. The Extended Reporting Period Endorsement cannot be canceled by either party, except for non-payment of premium. The additional premium for the Extended Reporting Period shall be fully earned at the inception of the Extended Reporting Period and this EPL Coverage Endorsement cannot be cancelled after such additional premium is paid. If "we" do not receive the written request as required, "you" may not exercise this right at a later date.

3. This insurance, provided during the Extended Reporting Period, is excess over any other valid and collectible insurance that begins or continues in effect after the Extended Reporting Period Endorsement becomes effective, whether the other insurance applies on a primary, excess, contingent, or any other basis.

4. In the event of cancellation by "us" for the nonpayment of premium, any monies received by "us" as payment for the Extended Reporting Period shall be first applied to such premium owing for the policy. The Extended Reporting Period will not take effect until the premium owing for the policy is paid in full and the premium owing for the Extended Reporting Period is paid promptly when due.

5. In the event of a "Transaction", as defined in Clause G. below, the "named insured" shall have the right, within sixty (60) days before the end of the "EPL coverage period", to request an offer from "us" of an Extended Reporting Period (with respect to "wrongful employment acts" which occur prior to the effective time of the "Transaction"). We shall

offer such Extended Reporting Period pursuant to such terms, conditions, and premium as we may reasonably decide. In the event of a "Transaction", the right to an Extended Reporting Period shall not otherwise exist except as indicated in this paragraph.

### G. Change in Control of "Named Insured"

If during the "EPL coverage period":

1. the "named insured" shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

2. any person or entity or group of persons or entities acting in concert shall acquire an amount of the outstanding securities representing more than fifty (50%) percent of the voting power for the election of directors or General Partners of the "named insured" (in the event the "named insured" is a Partnership), or acquires the voting rights of such an amount of such securities; or

3. a General Partner of the "named insured" (in the event the "named insured" is a partnership) withdraws, resigns or is terminated;

*(any of the above events herein referred to as the "Transaction")*

then this EPL Coverage Endorsement shall continue in full force and effect as to "wrongful employment acts" occurring prior to the effective time of the "Transaction", but there shall be no coverage afforded by any provision of this EPL Coverage Endorsement for any actual or alleged "wrongful employment acts" occurring after the effective time of the "Transaction". This EPL Coverage Endorsement may not be canceled after the effective time of the "Transaction" and the entire premium for this EPL Coverage Endorsement shall be deemed earned as of such time. "You" shall also have the right to an offer by "us" of an Extended Reporting Period described in Clause F. of this EPL Coverage Endorsement.

"You" shall give "us" written notice of the "Transaction" as soon as practicable, but not later than thirty (30) days after the effective date of the "Transaction".

### H. Legal Action Against "Us"

No person or organization has the right to join "us" as a party or otherwise bring "us" into a "suit" asking for damages from an "insured".

### I. Other Insurance

Unless expressly written to be excess over other applicable insurance, it is intended that the insurance provided by this EPL Coverage Endorsement shall be primary.

### J. EPL Coverage Endorsement Changes

This EPL Coverage Endorsement contains all the agreements between "you" and "us" concerning this insurance. The first "named insured" in the Declarations is authorized to request changes in this EPL Coverage Endorsement. This EPL Coverage Endorsement can only be changed by a written endorsement "we" issue and make part of this EPL Coverage Endorsement.

**K. Representations**

Any and all relevant provisions of this EPL Coverage Endorsement may be voidable by "us" in any case of fraud, intentional concealment, or misrepresentation of material fact by any "insured".

**L. Special Rights and Duties of the "Named Insured"**

"You" agree that when there is more than one person and/or entity covered under this EPL Coverage Endorsement, the first "named insured" in the Declarations shall act on behalf of all "insureds" as to:

1. Giving of notice of a "claim" or "suit";

2. Giving and receiving notice of cancellation or nonrenewal;

3. Payment of premiums and receipt of return premiums;

4. Acceptance of any endorsements issued to form a part of this EPL Coverage Endorsement; or

5. Purchasing or deciding not to purchase the Extended Reporting Period Endorsement.

**M. Headings**

The descriptions in the headings of this EPL Coverage Endorsement are solely for convenience, and form no part of the terms and conditions of coverage.

## SECTION VII - DEFINITIONS

**A.** "Bodily injury" means physical injury, sickness, or disease, including death resulting therefrom.

**B.** "Claim" means a written demand for monetary and non-monetary relief (including any request to toll or waive any statute of limitations). The term "claim" shall also mean an Equal Employment Opportunity Commission (EEOC), Department of Labor (DOL) or Office of Federal Contract Compliance Program (OFCCP) (or similar federal, state or local agency) proceeding or investigation commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to "you". However, in no event, shall the term "claim" include any labor or grievance proceeding, which is subject to a collective bargaining agreement.

**C.** "Class Action Suit" means any suit seeking certification or certified as a class action by a federal or state court.

**D.** "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by "us" resulting solely from the investigation, adjustment, defense and appeal of a "claim" or "suit" against "you".

**E.** "Employee" means an individual whose labor or service is engaged by and directed by "you" for remuneration, whether such individual is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal, and temporary "employees". An individual who is leased to "you" shall also be an "employee", but only if "you" provide indemnification to such leased individual in the same manner as is provided to "your" "employees". Any other individual who is contracted to perform work for "you",

or who is an independent contractor for "you", shall also be an "employee", but only if "you" provide indemnification to such individual in the same manner as that provided to "your" "employees".

**F.** "EPL coverage period" means the period commencing on the effective date shown in the Declarations. This period ends on the earlier of the expiration date or the effective date of cancellation of the EPL Coverage Endorsement. If "you" became an "insured" under this EPL Coverage Endorsement after the effective date, the "EPL coverage period" begins on the date "you" became an "insured".

**G.** "Loss(es)" means damages (including front pay and back pay), judgments, settlements, pre- and post-judgment interest on that part of any judgment paid by "us", statutory attorney fees, and "defense costs"; however, "loss" shall not include: (1) civil or criminal fines or penalties imposed by law; (2) the multiplied portion of multiplied damages; (3) taxes; (4) any amount for which the "insureds" are not financially liable or which are without legal recourse to the "insureds"; (5) employment related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (6) any liability or costs incurred by any "insured" to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar; or (7) matters which may be deemed uninsurable under the law pursuant to which this EPL Coverage Endorsement shall be construed.

Where permitted by law (not applicable in Ohio), "loss" shall include punitive or exemplary damages imposed upon any "insured" (subject to the policy's other terms, conditions and exclusions).

**H.** "Named Insured" means the person or organization designated in the Declarations.

**I.** "Original inception date" refers to the date specified in the Declarations for this EPL Coverage Endorsement.

**J.** "Property Damage" means physical injury to, or destruction of, tangible property including the loss of use thereof, or loss of use of tangible property, which has not been physically injured or destroyed.

**K.** "Recognized volunteers" means an uncompensated individual who volunteers labor or services to "you", but only when performing such labor or services at the request of and under the direction of "you".

**L.** "Related Wrongful Employment Act(s)" means "wrongful employment acts" which are the same, related or continuous, or "wrongful employment acts" which arise from a common nucleus of facts. "Claims" or "suits" can allege "related wrongful employment acts", regardless of whether such "claims" or "suits" involve the same or different claimants, "insureds" or legal causes of actions.

**M.** "Retaliation" means a "wrongful employment act" of an "insured" alleged to be in response to, the actual or attempted exercise by an "employee" of any right that

such "employee" has under the law. Provided, however, "retaliation" shall not include the "wrongful employment act" of an "insured" alleged in response to the threat of or the actual filing of any "claim" or "suit" under the Federal False Claims Act or any other federal, state, local or foreign "whistleblower law".

**N.** "Subsidiary" means:

1. Any for-profit organization which, on or before the inception of the "EPL coverage period", is more than 50% owned by the "named insured", either directly or indirectly through one or more of its "subsidiaries"; or

2. A for-profit organization which becomes a "subsidiary" during the "EPL coverage period", but only upon the condition that within 90 days of its becoming a "subsidiary", the "named insured" shall have provided "us" with full particulars of the new "subsidiary" and agreed to any additional premium or amendment of the provisions of this EPL Coverage Endorsement required by "us" relating to such new "subsidiary". Further, coverage as shall be afforded to the new "subsidiary" is conditioned upon the "named insured" paying when due any additional premium required by "us" relating to such new "subsidiary".

   An organization becomes a "subsidiary" when the "named insured" owns more than fifty (50%) percent ownership interest in such "subsidiary", either directly, or indirectly through one or more of its "subsidiaries". An organization ceases to be a "subsidiary" when the "named insured" ceases to own more than fifty (50%) percent ownership in such "subsidiary", either directly, or indirectly through one or more of its "subsidiaries".

   In all events, coverage as is afforded under this EPL Coverage Endorsement with respect to a "claim" made or "suit" brought against any "subsidiary" or an "insured" of any "subsidiary", shall only apply to "wrongful employment act(s)" commenced or allegedly commenced after the effective time that such "subsidiary" became a "subsidiary", and prior to the time that such "subsidiary" ceased to be a "subsidiary".

**O.** "Suit" means a civil proceeding or an administrative proceeding seeking money damages, and includes an arbitration, mediation or any other alternative dispute resolution procedure seeking such damages, to which the "insured" must submit or may submit with "our" consent. "Suit" shall not include any civil proceeding or administrative proceeding arising from any labor or grievance dispute which is subject to a collective bargaining agreement.

**P.** "Third party violation" means any actual or alleged discrimination, sexual harassment or violation of an indi-

vidual's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

**Q.** "Whistleblower law" means a statute, rule or regulation, which protects an "employee" against discrimination from his or her employer, if the "employee" discloses or threatens to disclose to a superior or any governmental agency; or who gives testimony relating to, any action with respect to the employer's operations, which may be a violation of public policy as reflected in legislation, administrative rules, regulations or decisions, judicial decisions, and professional codes of ethics.

**R.** "Wrongful Employment Act(s)" means any actual or alleged:

1. wrongful dismissal, discharge or termination (either actual or constructive), including breach of an implied contract;

2. harassment (including sexual harassment, whether quid pro quo, hostile work environment or otherwise);

3. discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

4. "retaliation" (including lockouts);

5. employment-related misrepresentation(s) to "your" "employee" or applicant for employment with "you";

6. employment-related libel, slander, humiliation, mental anguish, infliction of emotional distress, defamation, or invasion of privacy;

7. wrongful failure to employ or promote;

8. wrongful deprivation of career opportunity, wrongful demotion or negligent "employee" evaluation, including the giving of negative or defamatory statements in connection with an "employee" reference;

9. wrongful discipline;

10. failure to grant tenure;

11. failure to provide or enforce adequate or consistent corporate policies and procedures relating to any "wrongful employment act";

12. negligent supervision or hiring by an "insured", relating to any of the above;

13. violation of an individual's civil rights relating to any of the above;

14. "third party violations", but only if coverage for "third party violations" is shown in the Declarations, and only with respect to "claims" or "suits" made by "your" customers, vendors or clients.


## Erie Insurance®

Home Office • 100 Erie Insurance Place • Erie, Pennsylvania 16530 • (814) 870.2000
Toll Free 1.800.458.0811 • Fax (814) 870•3126 • www.erieinsurance.com

Policyholder Name:                                           **Date:**
Policyholder Address:

Dear ERIE EPL Policyholder:

Thank you for purchasing Employment Practices Liability (EPL) coverage from ERIE. We appreciate the trust you have placed in us and will do everything in our power to continue to earn your business.

Hartford Steam Boiler (HSB) is ERIE's partner in offering EPL coverage, including access to a loss prevention Web site and a 1-877 legal helpline. As an ERIE EPL customer, you will have access to these loss prevention resources.

**Loss Prevention Web site**
The Web site provides current, comprehensive content, including a model employee handbook, employment practices checklist, model forms and policies, and a library of employment-related modules and web-based training. The general information and materials provided on the Web site do not represent legal advice and are not meant to be a substitute for seeking competent legal advice.

To gain access to the Web site, visit *www.Erie.EmployerProtection.net.*
- *Click Register Here* and then *Register a New Organization.*
- Complete the online registration process by creating a username and password.
- The next screen will show your unique organization code. Please retain this number.
- Employees may register using your organization code by entering the code in the box labeled *Register in an Existing Organization* on the login screen.

**1-877 Legal Helpline**
The 1-877 helpline is a free helpline for EPL-related questions. It is managed by Jackson Lewis, a leading employment defense law firm. As an ERIE Policyholder, you may call this helpline to receive best practice guidance about general employment law issues and "best practices."

To contact the helpline, call 1-877-LAW-4EPL. The helpline is available from 9 a.m. until 6 p.m. EST Monday through Friday. Calls are answered by a customer service representative. An attorney from Jackson Lewis will return the call within one business day.

Thank you again for becoming an EPL Policyholder. We hope you find these loss prevention resources helpful in getting the help and protection that you and your business need.

Sincerely,

*Marc Cipriani*

Marc Cipriani
Division Officer, Commercial Lines

UF-0168-02/11                          The ERIE is Above All in SERVICE.

# Legal Help Line

## General Advice From Employment Attorneys Is A Toll-Free Call Away

Wondering how new employment laws may affect you? Call 1-877-529-4375 (1-877-LAW-4EPL).

Hartford Steam Boiler (HSB) is ERIE's partner in offering EPL coverage, including access to a legal help line and a loss prevention Web site.

The Legal Help Line is a complimentary service exclusively for Policyholders with our Employment Practices Liability (EPL) insurance program. Through this service, an experienced attorney – well-versed in federal and state employment laws – can give you general counsel on a range of employment issues, including:

- Whether an employee may have a claim against you
- Legal implications of actions you are considering
- New employment laws and how they affect you
- Other employment law-related questions

### Prevention is the Best Medicine

Specialized employment defense lawyers can help you prevent employment-related claims and charges with general advice on questions such as:

- Hiring—essentials for every job applicant
- Firing—what to do/not do
- Discrimination—issues of age, race, gender or other forms of discrimination
- Sexual or other harassment—creating a harassment-free workplace
- Family and Medical Leave Act—who FMLA applies to
- Performance reviews—what to cover

**Call 1-877-529-4375 for Employment Legal Advice.**

The Legal Help Line staff will take note of your inquiry and refer it to an experienced employment attorney who will respond within the next business day. All communications are strictly confidential and subject to attorney-client privileges. There is no cost or obligation.

### More Help is Online

Your EPL insurance program also provides you with complimentary access to *Erie.EmployerProtection.net*, an online employment-related Web site which features many resources to help you prevent employee charges and lawsuits.

### Your Protection Against Conflict and Claims

Today, you can't afford not to protect yourself from employee accusations and claims. The risks and stakes are too high. And, for you, the solution is simple.

Use the materials at *Erie.EmployerProtection.net*. Give employees clear rules and procedures. Give your managers tools and training to treat employees fairly and consistently. And give yourself the proof of compliance and good faith efforts you'll need if an employee makes a claim.

If you're like most small business owners, you're already worried about employee lawsuits. Go to *Erie.EmployerProtection.net*. Get help. And get a better night's sleep.



The Legal Help Line service is for general advice and guidelines on employment matters but advice will not be provided as to whether or not a personnel action should be taken regarding a particular person. This service is not meant to substitute for seeking legal advice from an attorney licensed in your state regarding specific employment actions and matters. The Web site resources provided to EPL Policyholders are not meant to convey a legal opinion. Seek advice regarding employment-related matters from attorneys licensed in state(s) where you conduct business.

UF0169  08/11  (CUW99  8/11)

COMMERCIAL GENERAL LIABILITY
CG 04 35 (Ed. 12/07) UF-3289



**ERIE INSURANCE GROUP**

POLICY NUMBER:

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# EMPLOYEE BENEFITS LIABILITY COVERAGE

### THIS ENDORSEMENT PROVIDES CLAIMS - MADE COVERAGE.
### PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Limit Of Insurance | Each Employee Deductible | Premium |
|---|---|---|---|
| Employee Benefits Programs | $          each employee | $ | $ |
| | aggregate | | |
| Retroactive Date: | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | |

**A.** The following is added to **Section I - Coverages:**

**COVERAGE - EMPLOYEE BENEFITS LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

1) The amount we will pay for damages is limited as described in Paragraph **D.** (Section **III - Limits Of Insurance**); and

2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

b. This insurance applies to damages only if:

1) The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

2) The act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

3) A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or an Extended Reporting Period we provide under Paragraph **G.** of this endorsement.

c. A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

1) When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

2) When we make settlement in accordance with Paragraph **a.** above.

A "claim" received and recorded by the insured within 60 days after the end of the policy period will be considered to have been received within the policy period, if no subsequent policy is available to cover the claim.

d. All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have

been made at the time the first of those "claims" is made against any insured.

2. **Exclusions**

This insurance does not apply to:

a. **Dishonest, Fraudulent, Criminal Or Malicious Act**

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

b. **Bodily Injury, Property Damage, Or Personal And Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

c. **Failure To Perform A Contract**

Damages arising out of failure of performance of contract by any insurer.

d. **Insufficiency Of Funds**

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

e. **Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation**

Any "claim" based upon:

1) Failure of any investment to perform;

2) Errors in providing information on past performance of investment vehicles; or

3) Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

f. **Workers' Compensation And Similar Laws**

Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

g. **ERISA**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

h. **Available Benefits**

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

i. **Taxes, Fines Or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

j. **Employment-Related Practices**

Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

**B.** For the purposes of the coverage provided by this endorsement:

1. All references to Supplementary Payments - Coverages **A** and **B** are replaced by Supplementary Payments - Coverages **A**, **B** and **Employee Benefits Liability**

2. Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

**C.** For the purposes of the coverage provided by this endorsement, Paragraphs **2.** and **3.** of Section II - Who Is An Insured are replaced by the following:

2. Each of the following is also an insured:

a. Each of your "employees" who is or was authorized to administer your "employee benefit program".

b. Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

c. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

b. Coverage under this provision does not apply to any act, error or omission that was committed before you acquired or formed the organization.

**D.** For the purposes of the coverage provided by this endorsement, **Section III - Limits Of Insurance** is replaced by the following:

1. **Limits Of Insurance**

a. The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

1) Insureds;

2) "Claims" made or "suits" brought;

3) Persons or organizations making "claims" or bringing "suits";

4) Acts, errors or omissions; or

5) Benefits included in your "employee benefit program".

b. The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions

2

negligently committed in the "administration" of your "employee benefit program".

c. Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

1) An act, error or omission; or

2) A series of related acts, errors or omissions

negligently committed in the "administration" of your "employee benefit program".

However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits Of Insurance.

2. **Deductible**

a. Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Schedule as applicable to Each Employee. The limits of insurance shall not be reduced by the amount of this deductible.

b. The deductible amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

c. The terms of this insurance, including those with respect to:

1) Our right and duty to defend any "suits" seeking those damages; and

2) Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim"

apply irrespective of the application of the deductible amount.

d. We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

E. For the purposes of the coverage provided by this endorsement, Conditions 2. and 4. of Section IV – Commercial General Liability Conditions are replaced by the following:

**2. Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

a. You must see to it that we are notified as soon as practicable of an act, error omission which

may result in a "claim". To the extent possible, notice should include:

1) What the act, error or omission was and when it occurred; and

2) The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

b. If a "claim" is made or "suit" is brought against any insured, you must:

1) Immediately record the specifics of the "claim" or "suit" and the date received; and

2) Notify us as soon as practicable.

You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

c. You and any other involved insured must:

1) Immediately send up copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

2) Authorize us to obtain records and other information;

3) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

4. **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

b. **Excess Insurance**

1) This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an act, error or omission on other than a claims-made basis, if:

a) No Retroactive Date is shown in the Schedule of this Insurance; or

b) The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

2) When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not brought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

c. **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

F. For the purposes of the coverage provided by this endorsement, the following Extended Reporting Period provisions are added, or, if this endorsement is attached to a claims-made Coverage Part, replaces any similar Section in that Coverage Part:

**EXTENDED REPORTING PERIOD**

1. You will have the right to purchase an Extended Reporting Period, as described below, if:

   a. This endorsement is canceled or not renewed; or

   b. We renew or replace this endorsement with insurance that:

      1) Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

      2) Does not apply to an act, error or omission on a claims-made basis.

2. The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to "claims" for acts, errors or omissions that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be canceled.

3. An Extended Reporting Period of unlimited duration is available, but only by an endorsement and for an extra charge.

You must give us a written request for the endorsement within 60 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

   a. The "employee benefit programs" insured;

   b. Previous types and amounts of insurance;

   c. Limits of insurance available under this endorsement for future payment of damages; and

   d. Other related factors.

The additional premium will not exceed 200% of the annual premium for this endorsement.

The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

4. If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for claims first received and recorded during the Extended Reporting Period.

The extended reporting period aggregate limit of insurance will be equal to the dollar amount shown in the Schedule of this endorsement under Limits of Insurance.

Paragraph **D.1.b.** of this endorsement will be amended accordingly. The Each Employee Limit shown in the Schedule will then continue to apply as set forth in Paragraph **D.1.c.**.

G. For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions** Section:

1. "Administration" means:

   a. Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

   b. Handling records in connection with the "employee benefit program"; or

   c. Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

   However, "administration" does not include handling payroll deductions.

2. "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

3. "Claim" means any demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for damages as a result of an act, error or omission.

4. "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

   a. Group life insurance; group accident or health insurance; dental, vision and hearing plans; an flexible spending accounts; provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

   b. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

   c. Unemployment insurance, social security benefits, workers' compensation and disability benefits;

   d. Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

   e. Any other similar benefits designated in the Schedule or added thereto by endorsement.

**H.** For the purposes of the coverage provided by this endorsement, Definitions **5.** and **18.** in the **Definitions** Section are replaced by the following:

**5.** "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**18.** "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

© ISO Properties, Inc., 2006

ERIE INSURANCE
ULTRAFLEX PACKAGE
UL-KS (Ed. 5/15) UF-8208

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTRACTORS' ERIEPLACEABLE ENHANCEMENTS ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

ULTRAFLEX COMMERCIAL PROPERTY COVERAGE PART

## ULTRAFLEX COMMERCIAL PROPERTY COVERAGE PART

A. The following is added to Paragraph **A. Covered Property of Section I  Business Personal Property and Personal Property of Others – Coverage 2** of the Ultraflex Commercial Property Coverage Part:

Business Personal Property and Personal Property of Others -- Coverage 2 covers:

Your and your employees' tools and equipment while in or on the described buildings, in the open, in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof. For tools and equipment off premises, coverage is provided under Paragraph **G. 2. Coverage - Contractors' Tools Off Premises – Coverage.**

B. The amount of insurance under **Check, Credit, Debit, or Charge Card Forgery or Alteration** of Section VIII - **Extensions of Coverage** is increased from $5,000 to $15,000 for any one "loss".

C. The amount of insurance under **Counterfeit Money** of **Section VIII - Extensions of Coverage** is increased from $1,000 to $11,000 for any one "loss".

D. The amount of insurance under **Employee Dishonesty** of **Section VIII - Extensions of Coverage** is increased from $10,000 to $25,000 for any one "loss".

E. The amount of insurance under **Income Protection -- Off Premises Utility Properties Failure** of **Section VIII - Extensions of Coverage** is increased from $25,000 to $50,000 for any one loss.

F. We will pay up to $250,000 as a Blanket Coverage Amount of Insurance which applies to the following coverages:

1. Accounts Receivable;

2. Business Personal Property and Personal Property of Others - Temporarily Off Premises;

3. Debris Removal;

4. Electronic Data Processing Equipment – Computer Virus;

5. Electronic Data – Expenses for Reproduction or Replacement;

6. Fine Arts;

7. Transportation; and

8. Valuable Papers and Records.

This blanket amount of insurance may be applied to any one coverage or combination of coverages shown above. However, the most we will pay for "loss" or damage resulting from any one occurrence at any premises described in the "Declarations" is $250,000. The blanket amount of insurance applies separately to each premises described in the "Declarations".

The blanket amount of insurance is in addition to the amount of insurance provided for these coverages in Section IV – **Additional Coverages** and Section VIII - **Extensions of Coverage.**

G. The following are added to Section I - Coverages of the Ultraflex Commercial Property Coverage Part:

1. **Installation Coverage**

   a. **Insuring Agreement**

   We will pay up to $10,000 for direct physical "loss" of or damage to covered property caused by any of the covered causes of "loss" listed under **Section II - Perils Insured Against** of this coverage.

   b. **Covered Property**

   We cover:

   1) Materials;

   2) Supplies;

   3) Equipment;

   4) Machinery;

   5) Fixtures; and

   6) Trees, Shrubs, and Plants;

   that are to be installed by you or at your direction. Coverage includes the cost of labor. You

1

must own the property or be legally liable for it. This property is covered while it is:

1) In transit to a job site or temporary storage location;

2) At a job site or temporary storage location; or

3) Being installed or erected.

Coverage for this property will end at the earliest of the following times:

1) When the installation or erection is complete and has been accepted by the owner;

2) When the described project is abandoned with no intention to complete it;

3) Sixty days after the installation or erection is completed;

4) When your interest in the property ends;

5) The date the policy is terminated or nonrenewed; or

6) The covered property has been put to its intended use.

c.   **Property Not Covered**

We do not cover:

1) An existing building, structure, or land to which an addition, alteration, improvement, or repair is being made;

2) Property that belongs to you while it is stored at a permanent warehouse or storage yard for more than sixty days;

3) "Money", notes, or "securities";

4) Accounts, bills, deeds, or evidence of debt;

5) Plans, blueprints, designs, or specifications;

6) Automobiles, trucks, tractors, trailers, and similar conveyances designed for highway use or used for over the road transportation of people or cargo;

7) "Aircraft";

8) Watercraft;

9) Property while airborne;

10) Property that is waterborne, except by fire;

11) Machinery, tools, equipment, supplies, or similar property which will not become a permanent part of your project, installation, or construction; or

12) Contraband or property in the course of illegal transportation or trade.

d.   **Section II - Perils Insured Against** of the Ultraflex Commercial Property Coverage Part is replaced by the following but only for this coverage:

**Covered Cause of Loss**

This coverage insures against direct physical "loss", except "loss" as excluded or limited in **Section III - Exclusions** of this coverage.

e.   **Section III - Exclusions** of the Ultraflex Commercial Property Coverage Part is replaced by the following but only for this coverage:

We will not pay for "loss" or damage to covered property caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss".

1) **Civil Authority**

Seizure or destruction of covered property by order of governmental authority.

However, we will cover "loss" caused by acts of destruction ordered by governmental authority to prevent the spread of a fire.

2) **Intentional Acts**

Intentional loss, meaning any "loss" arising from an act committed by, or at the direction of the insured with the intent to cause a "loss".

3) **Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of "loss".

4) **Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination unless fire ensues, and then only for ensuing "loss".

5) **War**

War, whether declared or undeclared, discharge of a nuclear weapon (even if accidental), hostile or warlike action in time of peace or war, insurrection, rebellion, revolution, civil war, usurped power, including action taken by governmental authority in defending against such an occurrence.

6) **Weather Conditions**

Weather conditions, but only if weather conditions contribute in any way with a peril excluded in this section to produce the "loss".

7) **Defects, Errors, and Omissions**

Loss caused by an act, defect, error, or omission (negligent or not) relating to:

a) Design or specifications;

b) Workmanship or construction;

c) Repair, renovation, remodeling, grading, or compaction;

d) Maintenance; or

e) Planning, zoning, development, or surveying.

8) **Seepage or Leakage**

Continuous or repeated seepage or leakage of water or the presence or condensation of humidity, moisture, or vapor, that occurs over a period of 14 days or more.

We do not cover "loss" or damage resulting from:

1) **Criminal, Fraudulent, or Dishonest Acts**

Criminal, fraudulent, or dishonest acts committed by you or any of your members of a limited liability company, or any of your employees, directors, officers, trustees, or authorized representatives:

a) Acting alone or in collusion with other persons; or

b) While performing services for you or otherwise.

We will cover acts of destruction by your employees but only for ensuing "loss"; but theft by your employees (including leased employees) is not covered.

2) **Deterioration or Contamination**

a) Deterioration or contamination;

b) Wear and tear, rust or corrosion, or rotting;

c) Change in color, texture, or finish;

d) Inherent vice;

e) Any quality, fault, or weakness in the covered property that causes it to damage or destroy itself;

f) Marring or scratching;

g) Settling, cracking, shrinking, bulging, or expansion of pavements, foundations, walls, sidewalks, driveways, patios, floors, roofs, or ceilings; or

h) Termites, vermin, insects, rodents, birds, skunks, raccoons, spiders, or reptiles.

3) **Electricity**

Arcing or by electrical currents other than lightning. However, this exclusion does not apply to "loss" resulting from testing.

4) **Humidity/Temperature**

Humidity, freezing or overheating, dampness, dryness, or changes in or extremes of temperature.

5) **Loss of Use**

Loss of use, business interruption, delay, or loss of market.

6) **Mechanical Breakdown**

We do not pay for "loss" caused by mechanical breakdown including centrifugal force.

However, this exclusion does not apply to "loss" resulting from testing.

7) **Missing Property**

Missing property where the only proof of "loss" is unexplained or mysterious disappearance of covered property, shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property. This exclusion does apply to covered property in the custody of a carrier for hire.

8) **Pollutants**

Discharge, dispersal, seepage, migration, release, or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release, or escape is itself caused by a peril insured against. But if "loss" or damage by a peril insured against results from the discharge, dispersal, seepage, migration, release, or escape of "pollutants", we will pay for the resulting damage caused by the peril insured against.

9) **Property in the Open**

Damage to property in the open resulting from rain, snow, or sleet.

10) **Transferred Property**

Property that has been transferred to a person or to a place outside the premises described in the "Declarations" on the basis of unauthorized instructions.

11) **Load Shifting**

3

Shifting of a load, poor loading, or rough handling.

12) **Unlawful Occupation**

Possession arising out of unlawful occupation of the installation premises or site, but this does not exclude your liability for damage to or removal of insured property during such occupation.

f.   **Section V – Deductibles** of the Ultraflex Commercial Property Coverage Part is replaced by the following but only for this coverage:

We will pay the amount of "loss" to covered property in any one occurrence which is in excess of $200 if the "loss" is only covered by this endorsement.

When the occurrence involves "loss" to covered property under the Installation Coverage of the Ultraflex Erieplaceable Enhancements Endorsement and under another Installation Coverage Part, the highest deductible will be applied to the "loss".

g.   The following is added to Paragraph **B. Where in Section IX – When and Where This Policy Applies:**

Coverage applies only while the covered property is in the United States, its territories or possessions, Puerto Rico or Canada. This includes property that is in transit within the continental United States.

h.   The following are added to **Section X – Commercial Property Conditions:**

1) **Collection From Others**

We will not pay any "loss" if the insured has collected the same from others.

2) **Insurance Under More Than One Coverage**

If more than one coverage applies to the same "loss", we will pay no more than the actual amount of the "loss".

3) **Loss Payable Clause**

"Loss" shall be payable to loss payees named on the "Declarations" to the extent of their interest and in the order of precedence.

**Our Duties**

We will:

a)   Protect the loss payee's interest in the insured property. This protection will not be invalidated by any act of neglect of the insured, any breach of warranty,

increase in hazard, change of ownership, or subsequent legal encumbrance if the loss payee has no knowledge of these conditions; and

b)   Give the loss payee 30 days notice before cancellation or refusal to renew this policy.

**Loss Payee's Duties**

The loss payee will:

a)   Furnish proof of "loss" within 60 days if you fail to do so;

b)   Pay upon demand any premium due if you fail to do so;

c)   Notify us of any change of ownership or occupancy, or any increase in hazard of which the loss payee has knowledge;

d)   Give us his or her right of recovery against any party liable for "loss"; and

e)   After a "loss", permit us to satisfy the debit requirements and receive full transfer of debt.

4) **Valuation**

In the event of "loss" or damage to covered property, we agree to repair, rebuild, or replace the property with other property of like kind and quality subject to the following terms and conditions:

a)   We will not pay more for "loss" or damage on a replacement cost basis than the least of:

i)   The amount of insurance applicable to the lost or damaged property;

ii)   The cost to replace the lost or damaged property with other property:

1)   Of comparable material and quality; and

2)   Used for the same purpose.

iii)   The amount you actually spend that is necessary to repair or replace the lost or damaged property.

b)   We will not pay on a replacement cost basis for any "loss":

i)   Until the lost or damaged property is actually repaired or replaced; and

ii)   Unless the repairs or replacement are made as soon as reasonably possible after the "loss" or damage. If the property is not repaired with-

4

in such reasonable time, it will be valued at its actual cash value as of the time of "loss".

c)  You may make a claim for "loss" covered by this insurance on an actual cash value basis instead of a replacement cost basis. In the event you elect this option, you may still make a claim for the additional coverage under this provision, if you notify us, in writing, within 180 days after the "loss" or damage.

2.  **Contractors' Tools - Coverage**

a.  **Insuring Agreement**

We will pay up to $10,000 for direct physical "loss" of or damage to covered property caused by any of the covered cause of loss listed under **Section II - Perils Insured Against** of this coverage.

b.  **Covered Property**

We will cover:

1)  Your portable powered and non-powered hand tools;

2)  Your employees' portable powered and non-powered hand tools;

3)  Portable powered and non-powered hand tools in your care, custody, or control;

4)  Your "contractors' non-mobile equipment";

5)  Your employees' "contractors' non-mobile equipment"; and

6)  "Contractors' non-mobile equipment" in your care, custody, or control.

We will also cover all portable powered, non-powered hand tools, and non-mobile equipment that you lease, rent, or borrow from anyone else up to $2,500 for any one "loss". This $2,500 is part of and not in addition to the $10,000 amount of insurance for contractor's tools shown above.

c.  **Property Not Covered**

We do not cover:

1)  "Aircraft" or watercraft;

2)  "Automobiles", trucks, tractors, trailers, and similar conveyances designed for highway use or used for over the road transportation of people or cargo;

3)  Contraband or property in the course of illegal transportation or trade;

4)  Property while airborne;

5)  Property that is waterborne, except by fire;

6)  Property that you loan, lease, or rent to others;

7)  Property while it is stored or operated underground in connection with any mining operations;

8)  "Mobile equipment"; or

9)  Plans, blueprints, designs, or specifications.

d.  **Section II - Perils Insured Against** of the Ultraflex Commercial Property Coverage Part is replaced by the following:

**Covered Cause of Loss**

This coverage insures against direct physical "loss", except "loss" as excluded or limited in **Section III - Exclusions** of this coverage.

e.  **Section III - Exclusions** of the Ultraflex Commercial Property Coverage Part is replaced by the following but only for this coverage:

We will not pay for "loss" or damage to covered property caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss".

1)  **Civil Authority**

Seizure or destruction of covered property by order of governmental authority.

However, we will cover "loss" caused by acts of destruction ordered by governmental authority to prevent the spread of a fire.

2)  **Intentional Acts**

Intentional loss, meaning any "loss" arising from an act committed by, or at the direction of the insured with the intent to cause a "loss".

3)  **Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of "loss".

4)  **Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination unless fire ensues; and then only for ensuing "loss".

5)  **War**

War, whether declared or undeclared, discharge of a nuclear weapon (even if accidental), hostile or warlike action in time of peace or war, insurrection, rebellion, revolution, civil war, usurped power, including ac-

5

tion taken by governmental authority in defending against such an occurrence.

6) **Weather Conditions**

Weather conditions, but only if weather conditions contribute in any way with a peril excluded in this section to produce the "loss".

7) **Seepage or Leakage**

Continuous or repeated seepage or leakage of water or the presence or condensation of humidity, moisture, or vapor, that occurs over a period of 14 days or more.

We do not cover "loss" or damage resulting from:

1) **Criminal, Fraudulent, or Dishonest Acts**

Criminal, fraudulent, or dishonest acts committed by you or any of your members of a limited liability company, or any of your employees, directors, officers, trustees, or authorized representatives:

a) Acting alone or in collusion with other persons; or

b) While performing services for you or otherwise.

We will cover acts of destruction by your employees but only for ensuing "loss"; but theft by your employees (including leased employees) is not covered.

2) **Deterioration or Contamination**

a) Deterioration or contamination;

b) Wear and tear, rust or corrosion, or rotting;

c) Change in color, texture, or finish;

d) Inherent vice;

e) Any quality, fault, or weakness in the covered property that causes it to damage or destroy itself;

f) Marring or scratching;

g) Settling, cracking, shrinking, bulging, or expansion of pavements, foundations, walls, sidewalks, driveways, patios, floors, roofs, or ceilings; or

h) Termites, vermin, insects, rodents, birds, skunks, raccoons, spiders, or reptiles.

3) **Electricity**

Electricity, other than lightning, unless fire or explosion ensues, and then only for ensuing "loss".

4) **Humidity/Temperature**

Humidity, freezing or overheating, dampness, dryness, or changes in or extremes of temperature.

5) **Loss of Use**

Loss of use, business interruption, delay, or loss of market.

6) **Mechanical Breakdown**

We do not pay for "loss" caused by mechanical breakdown including centrifugal force.

However, this exclusion does not apply to "loss" resulting from testing.

7) **Missing Property**

Missing property where the only proof of "loss" is unexplained or mysterious disappearance of covered property, shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property. This exclusion does apply to covered property in the custody of a carrier for hire.

8) **Pollutants**

Discharge, dispersal, seepage, migration, release, or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release, or escape is itself caused by a peril insured against. But if "loss" or damage by a peril insured against results from the discharge, dispersal, seepage, migration, release, or escape of "pollutants", we will pay for the resulting damage caused by the peril insured against.

f. **Section V - Deductibles** of the Ultraflex Commercial Property Coverage Part is replaced by the following but only for this coverage:

We will pay the amount of "loss" to covered property in any one occurrence that is in excess of $500 if the "loss" is only covered by this endorsement.

When the occurrence involves "loss" to covered property under the Contractors' Tools Off Premises Coverage of the Ultraflex Erieplaceable Enhancements Endorsement and under another Tools Coverage Part, the highest deductible will be applied to the "loss".

g.  The following is added to Paragraph **B. Where in Section IX - When and Where This Policy Applies:**

Coverage applies only while the covered property is in the United States, its territories or possessions, Puerto Rico, or Canada. This includes property that is in transit within the continental United States.

h.  The following is added to **Section X - Commercial Property Conditions:**

**VALUATION**

The value of covered property will be based on the actual cash value at the time of "loss" (with a deduction for depreciation).

i.  The following are added to **Section IX - Definitions:**

"Contractors' non-mobile equipment" means machinery and equipment of a portable nature that you use in your contracting operations. "Contractors' non-mobile equipment" also means powered and non-powered equipment such as portable welders, portable heaters, ladders, scaffolding, mortar mixers, pumps, table/radial saws, and generators.

"Contractors' non-mobile equipment" does not include portable powered and non-powered hand tools.

3.  **Contract Penalty - Coverage**

We will pay up to $5,000 for contractual penalties that you are required to pay your customers. These contractual penalties must be a result of any clause in your contracts for failure to timely deliver your products according to the contract terms. These contractual penalties must result from "loss" or damage to your covered property by a peril insured against.

4.  **Extra Expense - Coverage**

The following is added to **Extra Expense of Income Protection of Section VIII - Extensions of Coverage:**

The $25,000 amount of insurance for which we will pay under **Extensions of Coverage - Income Protection** is increased by $10,000 for Extra Expense only.

The maximum amount of insurance for which we will pay for any one loss for extra expense is $35,000.

5.  **Merchandise – Deferred Payment**

Business Personal Property and Personal Property of Others - Coverage 2 includes protection for "loss" by a peril insured against to merchandise which you have sold under a conditional sale or trust agreement or any installment or deferred payment plan after delivery to buyers.

We will pay up to $5,000 for "loss" or damage to merchandise which you have sold under a conditional sale or trust agreement or any installment or deferred payment plan after deliver to buyers.

When a total "loss" to covered property occurs, deferred payments are valued at the amount shown in your books as due from the buyer.

When partial "loss" to covered property occurs and the buyer refuses to continue payment, forcing you to repossess, deferred payments are valued as follows:

a.  If the realized value of the repossessed property is greater than or equal to the amount shown in your books, as due from the buyer, we will make no payment; but

b.  If the realized value of the repossessed property is less than the amount shown in your books as due from the buyer, we will pay the difference.

When a total or partial "loss" occurs and the buyer continues to pay you, we will make no loss payment.

6.  **Outdoor Radio and Television Antennas and Satellite Dishes**

We will pay up to $2,500 for "loss" or damage to outdoor radio and television antennas, satellite dishes, and its lead-in wiring, masts, or towers caused by windstorm or hail at the premises described in the "Declarations".

7.  **Peak Season - Business Personal Property and Personal Property of Others – Coverage 2**

The amount of insurance for Business Personal Property and Personal Property of Others - Coverage 2 is increased by 25% of the limit for Business Personal Property and Personal Property of Others - Coverage 2 to cover "loss" to business personal property and personal property of others during a peak season.

8.  **Sewer And Drain Back-Up - Coverage**

We will pay up to $5,000 for any one "loss" to covered property caused by water or sewage that backs up through sewers and drains, or which enters into and overflows or is otherwise discharged from a sewer, drain, sump pump, sump pump well, or any other system designed to remove subsurface water which is drained from the foundation area.

7

Paragraph **A.6.c.** of Section III - Exclusions is deleted.

**Deductible** - We will pay the amount of "loss" to your covered property in any one occurrence which is in excess of $500 for this coverage.

9. **Utility Services - Direct Damage - Coverage**

We will pay up to $25,000 for "loss" or damage to covered property on the premises described in the "Declarations" that you sustain due to an interruption in utility service to the premises described in the "Declarations".

The interruption in utility services must result directly from "loss" to the following property, not on the premises described in the "Declarations", from a peril insured against:

a. Communication Supply Property, meaning property supplying communication services, including telephone, radio, microwave, or television services, to the premises described in the "Declarations", such as:

   1) Communication transmission lines (including fiber optic transmission lines);

   2) Coaxial cables; and

   3) Microwave radio relay except satellites.

b. Power Supply Property, meaning the following types of property supplying electricity, steam, or gas to the premises described in the "Declarations":

   1) Utility generating plants;

   2) Switching stations;

   3) Substations;

   4) Transformers; and

   5) Transmission lines.

c. Water Supply Property, meaning the following types of property supplying water to the premises described in the "Declarations":

   1) Pumping stations; and

   2) Water mains.

d. Wastewater Removal Property, meaning a utility system for removing wastewater and sewage from the premises described in the "Declarations" other than a system designed primarily for draining storm water. The wastewater removal property includes sewer mains, pumping stations, and similar equipment for moving the effluent to a holding treatment or disposal facility, and includes such facilities.

Transmission lines include all lines which serve to transmit communication service or power, including lines which may be identified as distribution lines.

We will not pay for "loss" or damage to "electronic data" including destruction or corruption of "electronic data".

## COMMERCIAL GENERAL LIABILITY COVERAGE FORM

A. The following is added to Paragraph **1. Insuring Agreement** of Section I - Coverage A - Bodily Injury And Property Damage Liability of the Commercial General Liability Coverage Part:

### VOLUNTARY PROPERTY DAMAGE

1. **Insuring Agreement**

   We will pay those sums that the insured becomes legally obligated to pay as damages because of unintentional damage to property of others:

   a. Caused by the insured or while the property is in the possession of the insured; and

   b. Arising out of your operations described in the Declarations and covered by this policy.

   This insurance applies to "property damage" only if:

   a. The "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

   b. The "property damage" occurs during the policy period.

   Damage does not include disappearance, abstraction, or loss of use.

2. Paragraphs **2.j.3)**, **2.j.4)**, and **2.j.5)**, **Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** of the Commercial General Liability Coverage Part are deleted.

3. **Section III - Limits Of Insurance** of the Commercial General Liability Coverage Part is replaced by the following:

   a. The Limits of Insurance shown in the Declarations for this coverage and the rules below fix the most we will pay regardless of the number of:

      1) Insureds;

      2) Claims made or "suits" brought, or

      3) Persons or organizations making claims or bringing "suits".

   b. The $10,000 Occurrence Limit for this coverage is the most we will pay for the sum of all damages arising out of damage to proper-

ty of one or more persons or organizations as a result of any one "occurrence".

    c.   The $25,000 Aggregate Limit for this coverage is the most we will pay for all damages as a result of all "occurrences" which take place during a policy period.

    d.   The deductible amount of $500 applies to all "property damages" sustained by any one person or organization as the result of any one "occurrence".

       We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken; you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

4.   The following condition is added to **Section IV - Commercial General Liability Conditions** of the Commercial General Liability Coverage Part:

       If damage occurs, you shall, if requested by us, replace the property or furnish the labor and materials necessary for repairs, at actual cost to you, excluding prospective profit or overhead charges of any nature.

**B.**   The following is added to **Section III - Limits of Insurance** of the Commercial General Liability Coverage Form:

**Limits Of Insurance**

The General Policy Aggregate limit shown in the Declarations will apply separately to each of your projects away from premises owned by or rented by you.

**C.**   Paragraph **7.** under **Section III — Limits of Insurance** of the **Commercial General Liability Coverage Form** is replaced by the following:

    7.   Subject to **5.** above, the Medical Expense Limit is increased from $5,000 to $10,000. This limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

**D.**   The following is added to Paragraph **4. Other Insurance** of **Section IV — Commercial General Liability Conditions:**

**Primary and Noncontributory Insurance**

This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:

1.   The additional insured is a Named Insured under such other insurance; and

2.   You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

ERIE INSURANCE
INLAND MARINE
IM-IF-CP (Ed. 4/14) UF-3563

# INSTALLATION COVERAGE - COMPREHENSIVE PERILS

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the "Declarations". The words "we", "us", and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **Section IX - Definitions**.

## SECTION I - COVERAGES

### INSURING AGREEMENT

We will pay for direct physical "loss" of or damage to covered property caused by or resulting from a peril insured against.

### A. Covered Property

We cover:

1. Materials;

2. Supplies;

3. Equipment;

4. Machinery; and

5. Fixtures

6. Appliances, whether permanent or not, that will be located in the finished structure.

that are to be installed by you or at your direction. Coverage includes the cost of labor. You must own the property or be legally liable for it. This property is covered while it is:

1. In transit to a "jobsite" or "temporary storage location";

2. At a "jobsite" or "temporary storage location";

3. Being installed or erected.

Coverage for this property will end at the earliest of the following times:

1. When the installation or erection is complete and has been accepted by the owner;

2. When the described project is abandoned with no intention to complete it;

3. 60 days after the installation or erection is completed;

4. When your interest in the property ends; or

5. The date the policy is terminated or nonrenewed.

6. The covered property has been put to its intended use.

### B. Property Not Covered

We do not cover:

1. An existing building, structure or land to which an addition, alteration, improvement, or repair is being made.

2. Property that belongs to you while it is stored at a permanent warehouse or storage yard for more than 60 days.

3. Money, notes or securities.

4. Accounts, bills, deeds or evidence of debt.

5. Plans, blueprints, designs or specifications.

6. Automobiles, trucks, tractors, trailers, and similar conveyances designed for highway use or used for over the road transportation of people or cargo.

7. Aircraft.

8. Watercraft.

9. Trees, shrubs, lawns and plants.

10. Property while airborne.

11. Property that is waterborne, except by fire.

12. Machinery, tools, equipment, supplies or similar property, which will not become a permanent part of your project, installation or construction.

13. Contraband or property in the course of illegal transportation or trade.

## SECTION II - PERILS INSURED AGAINST

### Covered Cause of Loss

This policy insures against direct physical "loss", except "loss" as excluded or limited in this policy.

## SECTION III - EXCLUSIONS

### A. We will not pay for "loss" of or damage to covered property caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss".

1. **Civil Authority**

   Seizure or destruction of covered property by order of governmental authority.

However, we will cover "loss" caused by acts of destruction ordered by governmental authority to prevent the spread of a fire.

2. **Intentional Acts**

Intentional loss, meaning any "loss" arising from an act committed by, or at the direction of the insured with the intent to cause a "loss".

3. **Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of "loss".

4. **Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination unless fire ensues, and then only for ensuing "loss".

5. **War**

a. War including undeclared or civil war;

b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

c. Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

With respect to any action that comes within the terms of this exclusion and involves nuclear reaction or radiation or radioactive contamination, this War exclusion supersedes Paragraph **A.4.** of **Section III – Exclusions**, the nuclear hazard exclusion.

6. **Weather Conditions**

Weather conditions, but only if weather conditions contribute in any way with a peril excluded in this section to produce the "loss".

7. **Defects, Errors, and Omissions**

Loss caused by an act, defect, error, or omission (negligent or not) relating to:

a. Design or specifications;

b. Workmanship or construction;

c. Repair, renovation, remodeling, grading, or compaction;

d. Maintenance; or

e. Planning, zoning, development, or surveying.

but, if "loss" by a peril insured against results, we will pay for the ensuing "loss".

**B.** We do not cover "loss" or damage resulting from:

1. **Criminal, Fraudulent or Dishonest Acts**

Dishonest or criminal acts (including theft) committed by you or any of your members of a limited liability company, or any of your employees (including temporary or leased employees), directors, officers, trustees or authorized representatives:

a. Acting alone or in collusion with other persons; or

b. While performing services for you or otherwise.

We will cover acts of destruction by your employees (including temporary or leased employees) but only for ensuing "loss", but there is no coverage for "loss" or damage by theft by your employees (including temporary or leased employees) or any person to whom you entrust property for any purpose, whether acting alone or in collusion with any other party.

We will cover "loss" caused by dishonest acts by carriers or other bailees for hire.

2. **Deterioration or Contamination**

a. Deterioration or contamination;

b. Wear and tear, rust or corrosion, mold or rotting;

c. Change in color, texture, or finish;

d. Decay, fungus, mildew, or mold;

e. Inherent vice;

f. Any quality, fault, or weakness in the covered property that causes it to damage or destroy itself;

g. Marring or scratching;

h. Settling, cracking, shrinking, bulging or expansion of pavements, foundations, walls, sidewalks, driveways, patios, floors, roofs or ceilings;

i. Termites, vermin, insects, rodents, birds, skunks, raccoons, spiders, or reptiles.

3. **Electricity**

Arcing or by electrical currents other than lightning. However, this exclusion does not apply to "loss" resulting from testing.

4. **Humidity/Temperature**

Humidity, freezing or overheating, dampness, dryness, or changes in or extremes of temperature.

5. **Loss of Use**

Loss of use, business interruption, delay or loss of market.

6. **Mechanical Breakdown**

We do not pay for "loss" caused by mechanical breakdown including centrifugal force.

However, this exclusion does not apply to "loss" resulting from testing.

7. **Missing Property**

Missing property where the only proof of "loss" is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property. This exclusion does apply to covered property in the custody of a carrier for hire.

8. **Pollutants**

Discharge, dispersal, seepage, migration, release, or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release, or escape is itself caused by a peril insured against. But if "loss" or damage by a peril insured against results from the discharge, dispersal, seepage, migration, release, or escape of "pollutants", we will pay for the resulting damage caused by the peril insured against.

9. **Property in the Open**

Damage to property in the open resulting from rain, snow or sleet.

10. **Transferred Property**

Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

11. **Load Shifting**

Shifting of a load, poor loading or rough handling.

12. **Unlawful Occupation**

Possession arising out of unlawful occupation of the installation premises or site, but this does not exclude your liability for damage to or removal of insured property during such occupation.

## SECTION IV - AMOUNTS OF INSURANCE

Our payment for "loss" of or damage will not exceed the amount of insurance shown in the "Declarations" or on a separate schedule applicable to the covered property.

Our Catastrophe Limit for all "loss" or damage resulting from any one occurrence will not exceed the amount shown in the "Declarations" or on a separate schedule regardless of the number of items of covered property involved, either in the case of partial or total "loss" or salvage charges or any other charges or all combined.

## SECTION V - DEDUCTIBLE

We will pay the amount of "loss" to covered property in any one occurrence that is in excess of the deductible amount shown in the "Declarations".

## SECTION VI - EXTENSIONS OF COVERAGE

We will pay the following "losses" at your option. Payment under these Extensions are not an additional amount of insurance and will not increase the total amount of insurance, unless indicated.

1. **Debris Removal**

We will pay the cost of removal of debris to covered property on the premises described in the "Declarations" caused by a peril insured against. We will pay up to 25% of the amount we pay for the direct "loss". We will not pay more for "loss" to property and debris removal combined than the amount of insurance listed in the "Declarations" applicable to the covered property.

Debris Removal does not cover the costs to:

a. Remove debris of your property that is not insured under this policy, or property in your care, custody, or control that is not covered property under this endorsement;

b. Remove any property that is property not covered under this endorsement;

c. Remove property of others of a type that would not be covered property under this endorsement; or

d. Extract "pollutants" from land or water, or to remove, restore, or replace polluted land or water.

2. **Pollutant Cleanup and Removal**

We will pay your expense to extract "pollutants" from land or water if the discharge, dispersal, seepage, migration or escape of the "pollutants" is caused by a peril insured against that occurs during the policy period. The expenses are paid only if they are reported to us in writing within 180 days from the date the peril insured against occurs.

We do not pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants". However, we pay the cost of testing which is necessary for the extraction of "pollutants" from land or water.

The most we pay for each site or location is $10,000 for the sum of all such expenses arising out of a peril insured against occurring during each separate 12 month period of this policy.

This is an additional limit.

3

3. **Emergency Removal**

We will pay for direct physical "loss" or damage to covered property while it is being moved or being stored to prevent a "loss" caused by a peril insured against. This coverage applies for up to ten days after the property is first moved, but does not extend past the date on which this policy expires.

## SECTION VII - WHEN AND WHERE

**WHEN**

This policy applies to "losses" that occur during the policy period. Unless otherwise specified in the "Declarations", "Renewal Certificate", "Amended Declarations", "Revised Declarations" or endorsement the policy period begins and ends 1:01 AM Standard Time at the stated address of the Named Insured. An "Amended Declarations" or endorsement tells you that the policy has been changed. A "Renewal Certificate" tells you that the policy is being renewed for another policy period.

**WHERE**

Coverage applies only while the property is in the United States, its territories or possessions, Puerto Rico or Canada. This includes property that is in transit within the continental United States.

## SECTION VIII - ADDITIONAL CONDITIONS

1. **COINSURANCE**

All covered property must be insured for at least 100% of its replacement cost.

We will pay only the proportion of any "loss" that the amount of insurance shown in the "Declarations" or in the schedule for the lost or damaged item(s) bears to the 100% replacement cost at the time of "loss".

If there is more than one amount of insurance indicated in the "Declarations" for this coverage, this procedure applies separately to each amount of insurance.

If there is only one amount of insurance indicated in the "Declarations" for this coverage, this procedure applies to the total of all covered property to which the amount of insurance applies.

2. **MORTGAGEE**

"Loss" shall be payable to mortgagees named in the "Declarations", to the extent of their interest and in the order of precedence.

**Our Duties**

We will:

a. Protect the mortgagee's interest in an insured building. This protection will not be invalidated by any act or neglect of the insured, any breach of warranty, increase in hazard, change in ownership, or foreclosure if the mortgagee has no knowledge of these conditions.

b. Give the mortgagee 30 days notice before cancellation or refusal to renew this policy.

**Mortgagee's Duties**

The mortgagee will:

a. Furnish proof of "loss" within 60 days if you fail to do so.

b. Pay upon demand any premium due if you fail to do so.

c. Notify us of any change in ownership or occupancy, or any increase in hazard of which the mortgagee has knowledge.

d. Give us his or her right of recovery against any party liable for "loss". This shall not impair the right of the mortgagee to recover the full amount of the mortgage debt.

e. After a "loss", permit us to satisfy the mortgage requirements, and receive full transfer of the mortgage and all "securities" held as collateral to the mortgage debt.

Policy conditions relating to APPRAISAL, LOSS PAYMENT and SUITS AGAINST US apply to the mortgagee.

This mortagee interest provision shall apply to any trustee or loss payee named in the "Declarations".

2. **VALUATION**

In the event of "loss" or damage to covered property, we agree to repair, rebuild or replace the property with other property of like kind and quality subject to the following terms and conditions:

a. We will not pay more for "loss" or damage on a replacement cost basis than the least of:

1) The amount of insurance applicable to the lost or damaged property;

2) The cost to replace the lost or damaged property with other property:

a) Of comparable material and quality; and

b) Used for the same purpose.

3) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

b. We will not pay on a replacement cost basis for any "loss":

1) Until the lost or damaged property is actually repaired or replaced; and

4

2) Unless the repairs or replacement are made as soon as reasonably possible after the "loss" or damage. If the property is not repaired within such reasonable time, it will be valued at its actual cash value as of the time of "loss".

c. You may make a claim for "loss" covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect this option, you may still make a claim for the additional coverage under this provision, if you notify us, in writing, within 180 days after the "loss" or damage.

## SECTION IX - DEFINITIONS

"Declarations", "Amended Declarations", "Revised Declarations" and "Renewal Certificate" means the form which shows your coverages, limits of protection, premium charges and other information. This form is part of your policy.

"Jobsite" means any location, project, or work site where you are involved in an installation or construction project.

"Loss" means direct and accidental "loss" of or damage to covered property.

"Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

"Temporary storage location" means a location(s) where property that is to become a permanent part of a completed project is stored while awaiting delivery to a "jobsite" where work is in progress, or where work is to begin within thirty (30) days.

ERIE INSURANCE
COMMERCIAL GENERAL LIABILITY
FIVESTAR CONTRACTORS
ULTRAFLEX PACKAGE
UL-OY (Ed. 6/14) UF-9457

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COVERAGE FOR PUNITIVE DAMAGES

## IN, PA

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.** Paragraph **1. Insuring Agreement** of Section **I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages, including vicarious liability for punitive or exemplary damages to the extent allowed by law, because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      1) The amount we will pay for damages is limited as described in Section III - Limits of Insurance; and

      2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      2) The "bodily injury" or "property damage" occurs during the policy period.

      3) Prior to the policy period, no insured listed under Paragraph 1. of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      1) Reports all, or any part of the "bodily injury" or "property damage" to us or any other insurer;

      2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

1

**B.** Paragraph **1. Insuring Agreement** of Section I - Coverage **B - Personal And Advertising Injury Liability** is replaced by the following:

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages, including vicarious liability for punitive or exemplary damages to the extent allowed by law, because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

      1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

      2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

   b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2

ERIE INSURANCE
COMMERCIAL GENERAL LIABILITY
CG 00 01 (Ed. 4/13) UF-9708

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V –Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      2) The "bodily injury" or "property damage" occurs during the policy period; and

   3) Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

   This insurance does not apply to:

   a. **Expected Or Intended Injury**

      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

1) That the insured would have in the absence of the contract or agreement; or

2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

   a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

   b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

1) Causing or contributing to the intoxication of any person;

2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

   a) The supervision, hiring, employment, training or monitoring of others by that insured; or

   b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **1), 2)** or **3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

1) An "employee" of the insured arising out of and in the course of:

   a) Employment by the insured; or

   b) Performing duties related to the conduct of the insured's business; or

2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

f. **Pollution**

1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

   a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

      i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

i) Any insured; or

ii) Any person or organization for whom you may be legally responsible; or

d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

2) Any loss, cost or expense arising out of any:

a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

1) A watercraft while ashore on premises you own or rent;

2) A watercraft you do not own that is:

   a) Less than 26 feet long; and

   b) Not being used to carry persons or property for a charge;

3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

5) "Bodily injury" or "property damage" arising out of:

   a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

   b) The operation of any of the machinery or equipment listed in Paragraph **f.2)** or **f.3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

1) War, including undeclared or civil war;

2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

3) Property loaned to you;

4) Personal property in the care, custody or control of the insured;

5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **1)**, **3)** and **4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph **2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **3)**, **4)**, **5)** and **6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

4

m. **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

1) "Your product";

2) "Your work"; or

3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o. **Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

p. **Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

q. **Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

1. **Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

5

2. **Exclusions**

This insurance does not apply to:

a. **Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b. **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

c. **Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e. **Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. **Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

g. **Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

h. **Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j. **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

1) Advertising, broadcasting, publishing or telecasting;

2) Designing or determining content of web sites for others; or

3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k. **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l. **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m. **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n. **Pollution-related**

Any loss, cost or expense arising out of any:

1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

6

o. **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

1) War, including undeclared or civil war;

2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

p. **Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**COVERAGE C – MEDICAL PAYMENTS**

1. **Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

1) On premises you own or rent;

2) On ways next to premises you own or rent; or

3) Because of your operations;

provided that:

a) The accident takes place in the "coverage territory" and during the policy period;

b) The expenses are incurred and reported to us within one year of the date of the accident; and

c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

1) First aid administered at the time of an accident;

2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

We will not pay expenses for "bodily injury":

a. **Any Insured**

To any insured, except "volunteer workers".

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

f. **Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

g. **Coverage A Exclusions**

Excluded under Coverage A.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

1) Agrees in writing to:

a) Cooperate with us in the investigation, settlement or defense of the "suit";

b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

c) Notify any other insurer whose coverage is available to the indemnitee; and

d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

2) Provides us with written authorization to:

a) Obtain records and other information related to the "suit"; and

b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2.   Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      1) "Bodily injury" or "personal and advertising injury":

         a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

         b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph 1)a) above;

         c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph 1)a) or b) above; or

         d) Arising out of his or her providing or failing to provide professional health care services.

      2) "Property damage" to property:

         a) Owned, occupied or used by;

         b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      1) With respect to liability arising out of the maintenance or use of that property; and

      2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage **C**;

   b. Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage **B**.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   1) How, when and where the "occurrence" or offense took place;

   2) The names and addresses of any injured persons and witnesses; and

   3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

   1) Immediately record the specifics of the claim or "suit" and the date received; and

   2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

   1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   2) Authorize us to obtain records and other information;

3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance**

   If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

   a. **Primary Insurance**

      This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

   b. **Excess Insurance**

      1) This insurance is excess over:

         a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

            i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

            ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

            iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

2) When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

b) The total of all deductible and self-insured amounts under all that other insurance.

4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      1) Goods or products made or sold by you in the territory described in Paragraph a. above;

      2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

      3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

      1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in 2) above and supervisory, inspection, architectural or engineering activities.

12



ERIE INSURANCE GROUP

COMMERCIAL GENERAL LIABILITY
FIVESTAR CONTRACTORS'
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
ULTRASURE FOR PROPERTY OWNERS
UL-TD (Ed. 12/09) UF-2973

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT OF OCCURRENCE DEFINITION FOR SUBCONTRACTED WORK

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The definition of "occurrence" in **Section V - Definitions** is deleted and replaced by the following:

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. "Property damage" to "your work" will constitute an "occurrence" if all of the following conditions are met:

1. The "property damage" to "your work" is included in the "products-completed operations hazard";

2. The damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor; and

3. The "property damage" is not expected or intended by you or anyone for whom you are legally responsible.

The following is added to "property damage" in **Section V - Definitions:**

c. "Property damage" does not include any loss, cost or expense to correct any defective, faulty or incorrect work performed by you or by any contractors or subcontractors working directly or indirectly on your behalf.

ALL OTHER PROVISIONS OF THE POLICY APPLY.

Includes copyright material of Insurance Services Office, Inc. with its permission

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

1) Power cranes, shovels, loaders, diggers or drills; or

2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

1) Equipment designed primarily for:

a) Snow removal;

b) Road maintenance, but not construction or resurfacing; or

c) Street cleaning;

2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

1) Products that are still in your physical possession; or

2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

   a) When all of the work called for in your contract has been completed.

   b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

   c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   a) You;

   b) Others trading under your name; or

   c) A person or organization whose business or assets you have acquired; and

2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

1) Work or operations performed by you or on your behalf; and

2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

2) The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012



ERIE INSURANCE GROUP

COMMERCIAL GENERAL LIABILITY
FIVESTAR CONTRACTORS
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
UL-ED (Ed. 9/05) UF-5563

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - ASBESTOS

This endorsement modifies the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** and to Paragraph **2., Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**Asbestos**

This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" arising out of:

1. The inhaling, ingesting, or physical exposure to asbestos, or goods or products containing asbestos;

2. The manufacture, distribution, sale, resale, rebranding, transportation, storage, or disposal of asbestos or products containing asbestos;

3. The installation, repair, removal, encapsulation, abatement, replacement, handling of or exposure to, asbestos or products containing asbestos; or

4. The use of asbestos in constructing or manufacturing any goods, products, or structures.

We will not pay for the investigation or defense of any claim or "suit" or for any fine, cost, or expense of any claim or "suit" resulting from asbestos.

ERIE INSURANCE
ULTRAFLEX PACKAGE
FX-00-03 (Ed. 6/14) UF-3555

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ULTRAFLEX EXTRA LIABILITY COVERAGES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A. Damage to Premises Rented to You - Fire Legal Liability:**

1. The following is added to Paragraph **1., Insuring Agreement** of Section I - Coverage A - Bodily Injury And Property Damage Liability:

   **Insuring Agreement**

   We will pay those sums that the insured becomes legally obligated to pay as damages because of "property damage" to buildings rented to you or occupied by you.

   The damage must be caused by fire; lightning; windstorm; hail; explosion; riot, civil commotion; vehicles; aircraft; smoke; vandalism; malicious mischief; water damage; or elevator collision.

2. Exclusions **2.c.** through **2.n.** of **Section I - Bodily Injury And Property Damage Liability** do not apply to this coverage. A separate limit of insurance applies to this coverage as described in **Section III - Limits of Insurance.**

   We do not cover liability assumed by the insured except in an "insured contract".

3. Paragraph **9.a.** of "insured contract" of **Section V - Definitions** is replaced by the following:

   9.a. A contract for lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire; lightning; windstorm; hail; explosion; riot; civil commotion; vehicles; aircraft; smoke; vandalism; malicious mischief; water damage; or elevator collision to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract".

**B. Host Liquor Liability Coverage**

The following is added to Paragraph **2.c. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

This exclusion does not apply to liability of the insured or the indemnitee of the insured arising out of the giving or serving of alcoholic beverages at functions incidental to your business, provided you are not engaged in the business of manufacturing, distributing, selling, or serving of alcoholic beverages.

**C. Non-Owned Watercraft**

Paragraph **2.g.2)a) Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

This exclusion does not apply to a watercraft that you do not own that is less than 51 feet long.

**D. Incidental Medical Malpractice**

1. The following is added to Paragraph **1., Insuring Agreement** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" arising from "incidental medical malpractice injury".

2. The following is added to Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage:**

   This insurance does not apply to:

   a. Expenses incurred by the insured for first aid to others at the time of an accident.

   b. "Bodily injury" arising from any insured if the insured is engaged in the business or occupation of providing the following services:

      1) Diagnostic, medical, surgical, dental, x-ray, or nursing service or treatment or the furnishing of food or beverages in connection with the service or treatment;

      2) Ambulance, paramedical, rescue squad, or other service or treatment conducive to health;

      3) The furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances; or

      4) Health or therapeutic service, treatment, advice, or instruction.

c.   "Bodily injury" arising from any indemnitee if the indemnitee is engaged in the business or occupation of providing the following services:

1)   Diagnostic, medical, surgical, dental, x-ray, or nursing service or treatment or the furnishing of food or beverages in connection with the service or treatment;

2)   Ambulance, paramedical, rescue squad, or other service or treatment conducive to health;

3)   The furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances; or

4)   Health or therapeutic service, treatment, advice, or instruction.

3.   The following is added to **Section V - Definitions:**

"Incidental medical malpractice injury" means injury arising out of the rendering of or failure to render, during the policy period, the following services:

a.   Diagnostic, medical, surgical, dental, x-ray, or nursing service or treatment, or the furnishing of food or beverages in connection with the service or treatment; or

b.   The furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances.

**E.   Volunteer Workers - Medical Payments**

The following is added to Paragraph 1. **Insuring Agreement** of **Section I - Coverage C - Medical Payments:**

We will pay medical expenses for "bodily injury" sustained by your volunteer workers caused by an accident while engaged in any of your insured activities.

**F.   Attorney's Fees**

The following is added to **Section I - Supplementary Payments - Coverages A and B:**

All reasonable attorneys' fees up to $100 which the insured incurs because of arrest resulting from an accident involving "mobile equipment" covered by this policy.

**G.   Municipal Supervisors**

The following is added to **Section II – Who Is An Insured:**

Supervisors, if you are a municipality.

**H.**   The following is added to the definition of "products-completed operations hazard" of **Section V - Definitions:**

Includes all "bodily injury" and "property damage" arising out of "your product" if your business includes the handling or distribution of "your product" for consumption on premises you own or rent.

**I.   Waiver of Subrogation**

**Transfer of Right of Recovery Against Others to Us - Section IV – Commercial General Liability Conditions** is replaced by the following:

We waive any right of recovery we may have against the additional insured because of payments we have made under this Coverage Part. However, our rights may only be waived prior to the "bodily injury" or "property damage" caused by the "occurrence" which we have made payments under this Coverage Part.

The insured must do nothing after a loss to impair our rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce these rights.

**J.   Primary and Non-Contributory Insurance**

**Other Insurance – Section IV – Commercial General Liability Condition** is replaced by the following:

Where required by a written contract or agreement, this insurance is primary and non-contributory as respects any other insurance policy issued to the additional insured, and such other insurance policy shall be excess or non-contributing, whichever applies, with this insurance.

ERIE INSURANCE
COMMERCIAL GENERAL LIABILITY
FIVESTAR CONTRACTORS
ULTRAFLEX PACKAGE
UL-QN (Ed. 6/14) UF-3163

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.** The following is added to Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions of Section I - Coverage B - Personal and Advertising Injury Liability:**

**Professional Liability**

This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" due to:

1. The rendering of or failure to render:

   a. Diagnostic, medical, surgical, dental, x-ray, or nursing service or treatment, or the furnishing of food or beverages with them;

   b. Health or therapeutic service, treatment, advice, or instruction; or

   c. Ambulance, paramedical, rescue squad, or other service or treatment conducive to health;

2. The furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances;

3. The handling of or performing of autopsies;

4. The rendering of or failure to render cosmetic, ear piercing, tonsorial, massage, physiotherapy, chiropody, hearing aid, optical or optometrical services, or treatments;

5. The selling, licensing, franchising, or furnishing of your computer software, including electronic data processing programs, designs, specifications, manuals, and instructions;

6. Any act, error, or omission with respect to data processing services or operations;

7. Any act, error, or omission with respect to any real estate agent or broker services;

8. The rendering of or failure to render any "professional services" by you or on your behalf, but only with respect to either or both of the following operations:

   a. Providing engineering, architectural, or surveying services to others in your capacity as an engineer, architect, or surveyor; and

   b. Providing or hiring independent professionals to provide engineering, architectural, or surveying services in connection with construction work you perform; or

9. Any other service of a professional nature, including but not limited to accounting, printers, or attorneys.

These exclusions apply even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or on your behalf with respect to the operations described above.

**B.** The following definition is added to **Section V - Definitions:**

"Professional services" includes:

1. The preparing, approving, or failing to prepare or approve maps, plans, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

2. Supervision or inspection activities performed as part of any related architectural or engineering activities.

"Professional services" do not include services within construction means, methods, techniques, sequences, and procedures employed by you in connection with your operations in your capacity as a construction contractor.

**C.** This Exclusion - Professional Liability does not apply to liability for damages because of "bodily injury", "property damage", or "personal and advertising injury" if a premium for professional liability coverage is shown in the Declarations.

1

ERIE INSURANCE
COMMERCIAL GENERAL LIABILITY
CG 00 99 (Ed. 11/85) UF-9889

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES IN GENERAL LIABILITY FORMS FOR COMMERCIAL PACKAGE POLICIES

This endorsement modifies insurances provided under the following:

COMPLETED OPERATIONS AND PRODUCTS LIABILITY INSURANCE
COMPREHENSIVE GENERAL LIABILITY INSURANCE
CONTRACTUAL LIABILITY INSURANCE
DRUGGISTS LIABILITY INSURANCE
ELEVATOR COLLISION INSURANCE
MANUFACTURERS AND CONTRACTORS LIABILITY INSURANCE
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY INSURANCE
OWNERS, LANDLORDS AND TENANTS LIABILITY INSURANCE
PREMISES MEDICAL PAYMENTS INSURANCE
SPECIAL MULTI-PERIL POLICY LIABILITY INSURANCE
STOREKEEPERS INSURANCE

A. Whenever the term "policy" is used in any form listed above or in the declarations or any related endorsement, it is changed to "coverage part."

B. The Common Policy Declarations (other than any references to premiums) and the Common Policy Conditions do not apply).

C. With respect to the Special Multi-Peril Policy Conditions and Definitions Form attached to this policy:

1. The General Conditions, Conditions Applicable to Section II and Definitions Applicable to Section II apply only to the Commercial General Liability Coverage Part;

2. The Conditions Applicable to Section I do not apply to any part of this policy; and

3. The Cancellation condition is replaced by the following:

Cancellation. This policy may be cancelled by the "named insured" by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the company by mailing to the "named insured" at the address shown in this policy, written notice stating when not less than thirty days thereafter such cancellation shall be effective; provided that in the event of nonpayment of premium, such notice shall state when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the "named insured" or by the company shall be equivalent to mailing.

If the "named insured" cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

Copyright, Insurance Services Office, Inc., 1985

COMMERCIAL GENERAL LIABILITY
CG 21 47 (Ed. 12/07) UF-9680



ERIE INSURANCE GROUP

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury and Property damage Liability:

This insurance does not apply to;

"Bodily injury" to:

1. A person arising out of any:

   a. Refusal to employ that person;

   b. Termination of that person's employment; or

   c. Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

2. The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs 1., 2. or 3. above is directed.

This exclusion applies:

1. Whether the injury-causing event described in Paragraphs a., b., or c. above occurs before employment, during employment or after employment of that person;

2. Whether the insured may be liable as an employer or in any other capacity; and

3. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to paragraph 2., Exclusions of Section I - Coverage B - Personal Injury and Advertising Injury Liability:

This insurance does not apply to:

"Personal and advertising injury" to:

1. A person arising out of any:

   a. Refusal to employ that person;

   b. Termination of that person's employment; or

   c. Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination or malicious prosecution directed at that person; or

2. The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs 1., 2. or 3. above is directed.

This exclusion applies:

1. Whether the injury-causing event described in Paragraphs a., b., or c. above occurs before employment, during employment or after employment of that person;

2. Whether the insured may be liable as an employer or in any other capacity; and

3. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

© ISO Properties Inc., 2006



ERIE INSURANCE GROUP

INTERLINE
IL 00 21 (Ed. 9/08) UF-3005

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY.

1. The insurance does not apply:

   **A.** Under any Liability Coverage, to "bodily injury" or "property damage":

   1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limits of liability; or

   2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   **B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   **C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

   1) The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

   2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

   3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(a)** applies only to "property damage" to such "nuclear facility" and any property threat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

    a) Any "nuclear reactor";

    b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

    c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

Copyright, ISO Properties, Inc., 2001

2



**ERIE INSURANCE GROUP**

BUSINESS CATASTROPHE LIABILITY
COMMERCIAL GENERAL LIABILITY
FIVESTAR CONTRACTORS
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
ULTRASURE FOR PROPERTY OWNERS
GU-30 (Ed. 3/01) UF-5919

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# AMENDMENT OF POLICY - TWO OR MORE COVERAGE PARTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following Condition is added to **Section IV - Commercial General Liability Conditions:**

**TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY US**

Notwithstanding the OTHER INSURANCE Condition in your policy, if this policy and any other coverage part or policy issued to you by us apply to the same occurrence, offense or accident, the maximum Limits of Insurance under all coverage parts or policies will not exceed the highest applicable Limits of Insurance under any one coverage part or policy.

In no event will coverage be provided during the policy period after

1. the applicable Aggregate Limit of Protection under any one coverage part or policy has been exhausted; or

2. the applicable Aggregate Limits of Insurance under any one coverage part or policy would have been exhausted had all covered claims been submitted under that one coverage part or policy rather than under two or more coverage parts or policies.

This condition does not apply to any coverage part or policy issued by us specifically to apply as excess insurance over this policy.



**ERIE INSURANCE GROUP**

BUSINESS CATASTROPHE LIABILITY
COMMERCIAL GENERAL LIABILITY
FIVESTAR CONTRACTORS
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
ULTRASURE FOR PROPERTY OWNERS
GU-32 (Ed. 3/01) UF-6189

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# EXCLUSION - LEAD LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following is added to Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

**Lead Liability**

This insurance does not apply to:

1. Actual or alleged "bodily injury" arising out of the ingestion, inhalation, or absorption of lead or lead compounds in any form.

2. Actual or alleged "bodily injury" or "property damage" arising out of any form of lead or lead compounds.

3. Any legal obligation of the insured for indemnification or contribution due to damages arising out of "bodily injury" or "property damage" caused by lead, resulting from paint containing lead or contributed to by any other substance or material containing lead;

4. "Bodily injury" or "property damage" arising out of the actual or alleged:

    a. exposure to or existence of lead, paint containing lead, or any other material or substance containing lead, or

    b. Manufacture, distribution, sale, resale, rebranding, installation, repair, removal, encapsulation, abatement, replacement or handling of lead, paint containing lead, or any other material or substance containing lead.

    whether or not the lead is now or was at any time airborne as a particle, contained as a product, ingested, inhaled, transmitted in any fashion, or found in any form whatsoever.

5. Any loss, cost or expense arising out of any:

    a. Request, demand or order that the insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, lead or lead compounds.

    b. Claim or "suit" by or on behalf of any governmental authority for damages resulting from testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, lead or lead compounds in any form.

INTERLINE
IL 00 17 (Ed. 11/98) UF-9850



**ERIE INSURANCE GROUP**

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

### A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

### C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be changed. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

### E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

### F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties and only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

COMMERCIAL GENERAL LIABILITY
CG 21 67 (Ed. 12/04) UF-3888



ERIE INSURANCE GROUP

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**
# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of Section I - Coverage A - Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

a. "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b. Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section I - Coverage B - Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

a. "Personal and advertising injury" which would not have taken place in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to **Section V - Definitions:**

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by "fungi".

© ISO Properties, Inc., 2003

ERIE INSURANCE
COMMERCIAL GENERAL LIABILITY
CG 21 70 (Ed. 1/15) UF-4077

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART
    UNDERGROUND STORAGE TANK POLICY

A. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year, and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© ISO Properties, Inc., 2007


ERIE INSURANCE GROUP

COMMERCIAL GENERAL LIABILITY
FIVESTAR CONTRACTORS'
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
ULTRASURE FOR LANDLORDS
ULTRASURE FOR PROPERTY OWNERS
(Ed. 3/95) UF-8385

# IMPORTANT NOTICE

Your policy contains Lead Liability Exclusion Endorsement GU-32, an exclusion involving lead contamination.

Any claims of **bodily injury, personal injury** or **property damage** from lead contamination occurring during this policy period and future policy periods will not be covered. Your liability insurance does not cover any loss, cost or expense arising from any requests or claims made by a governmental authority that you test for, remove or in any way respond to the effects of lead.

It has become increasingly apparent in recent years that lead poisoning poses a serious threat to children. Studies have shown that even small doses of lead can cause severe poisoning, slowed development, altered behavior, and loss of intelligence. The lead hazard can be reduced by removing the lead from the premises using approved abatement methods.

Again, this policy contains a complete exclusion for liability resulting from lead. Therefore, we recommend you take action to identify and remove any lead hazards that may exist on your premises to protect yourself.

COMMERCIAL GENERAL LIABILITY
CG 21 96 (Ed. 3/05) UF-4906



ERIE INSURANCE GROUP

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.,** Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**Silica or Silica-Related Dust**

a. "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

b. Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

c. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by an insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2.,** Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**Silica or Silica-Related Dust**

a. "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

b. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

1. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

2. "Silica-related dust" means a mixture or combination of "silica" and other dust or particles.

© ISO Properties, Inc., 2004



ERIE INSURANCE GROUP

**ERIE.**

COMMERCIAL GENERAL LIABILITY
FIVESTAR CONTRACTORS
ULTRAFLEX PACKAGE
ULTRAPACK BUSINESS
ULTRASURE FOR PROPERTY OWNERS
GU-136  (Ed. 3/09)  UF-2769

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# AMENDMENT OF MOBILE EQUIPMENT DEFINITION

This endorsement modifies insurance provided under the following:
   COMMERCIAL GENERAL LIABILITY COVERAGE FORM

A. Exclusion **g.** under **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

1) A watercraft while ashore on premises you own or rent;

2) A watercraft you do not own that is:

   a) Less than 26 feet long; and

   b) Not being used to carry persons or property for a charge;

3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

5) "Bodily injury" or "property damage" arising out of the operation of any equipment listed in Paragraph **f.2)** or **f.3)** of the definition of "mobile equipment"; or

6) "Bodily injury" or "property damage" arising out of the operation of machinery or equipment that is attached to or part of a land motor vehicle that would qualify under the definition of "mobile equipment" if it were not described on the declarations of a motor vehicle liability policy for liability coverage.

B. Paragraph **12.** of **Section V - Definitions** is replaced by the following:

"Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   1) Power cranes, shovels, loaders, diggers or drills; or

   2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   1) Equipment designed primarily for:

a) Snow removal;

b) Road maintenance, but not construction or resurfacing; or

c) Street cleaning;

2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicle that is described on the declarations of a motor vehicle liability policy for liability coverage. "Mobile equipment" that is described on the declarations of a motor vehicle liability policy for liability coverage is considered an "auto".

ERIE INSURANCE
COMMERCIAL GENERAL LIABILITY
CG 21 06 (Ed. 5/14) UF–B756

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of Section **I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

1) Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

2) The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **1)** or **2)** above.

However, unless Paragraph **1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

© Insurance Services Office, Inc., 2013

COMMERCIAL GENERAL LIABILITY
CG 21 86 (Ed. 12/04) UF-4905



ERIE INSURANCE GROUP

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

1. The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

2. "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

1. A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

2. The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

3. A reinforced or unreinforced base coat;

4. A finish coat providing surface texture to which color may be added; and

5. Any flashing, caulking or sealant used with the system for any purpose.

© ISO Properties, Inc., 2003

ERIE INSURANCE
ULTRAFLEX PACKAGE
UL-UN (Ed. 9/13) UF-B448

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DATA BREACH RESPONSE EXPENSES COVERAGE

Various provisions in this coverage form restrict coverage. Read the entire coverage form carefully to determine rights, duties, and what is and is not covered.

Throughout this coverage form the words "you" and "your" refer to the "Named Insured" shown in the Declarations. The words "we", "us", and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I - INSURING AGREEMENT

"We" will pay for Data Breach Response Expenses Coverage if "you" have a "personal data breach" that is:

1. First discovered by "you" during the policy period shown in the Declarations for which this Data Breach Response Expenses Coverage is applicable;

2. Reported to "us" within 60 days from the date it is first discovered by "you"; and

3. The "personal data breach" takes place in the "coverage territory".

### What is Covered

1. Legal and Forensic Information Technology Services

   "We" will pay "your" necessary and reasonable costs for the following outside professional services:

   a. Legal Services

      Professional legal counsel review of the "personal data breach" and how "you" should best respond to it.

   b. Forensic Information Technology Services

      Professional information technologies review, if needed, to determine what is possible and reasonable, the nature and extent of the "personal data breach", and the number and identities of the "affected individuals".

2. Notification to Affected Individuals

   "We" will pay "your" necessary and reasonable costs to provide notification of the "personal data breach" to "affected individuals".

3. Services to Affected Individuals

   "We" will pay "your" necessary and reasonable costs to provide the following services to "affected individuals":

   a. Informational Materials

A packet of loss prevention and customer support information.

b. Help Line

   A toll-free telephone line for "affected individuals" with questions about the "personal data breach" or wanting to request additional services as listed in paragraphs **c.** and **d.** below.

c. Monitoring Services

   An electronic service automatically monitoring for activities affecting an individual's credit files, public records, and/or criminal records. Monitoring Services are subject to the type of data released and to the "affected individuals" enrolled for this service with the designated service provider.

d. Identity Restoration Case Management

   This covers the services of an identity restoration professional. This professional will help the "affected individual" to recover control over their personal identity. This includes, with the permission and co-operation of the "affected individual", contacting authorities, credit bureaus, creditors, and businesses for the process of correcting credit, other records, and accounts, within the constraints of what is possible and reasonable, to restore control over their personal identity.

## SECTION II – EXCLUSIONS

"We" do not cover any costs for a "personal data breach" arising from the following:

1. "Your" intentional or willful complicity in a "personal data breach".

2. Any criminal; fraudulent; dishonest act, error, or omission; or any intentional or knowing violation of the law by "you".

3. Any "personal data breach" occurring prior to the first inception date of this Data Breach Response Expenses Coverage regardless of when the first "personal data breach" was discovered by "you".

4. Any third party liability or defense costs.

5. Costs to research any deficiency, except as specifically provided under Section I – Insuring Agreement, What is Covered **1.b.** Forensic Information Technology Services. This includes, but is not limited to, any deficiency in "your" systems, procedures, or physical security that may have contributed to a "personal data breach".

6. Costs to correct any deficiency in "your" systems, procedures, or physical security that may have contributed to a "personal data breach".

7. Any fines or penalties including, but not limited to, fees or surcharges from affected financial institutions.

8. Any costs arising out of criminal investigations or proceedings.

9. Any threat, extortion, or blackmail including, but not limited to, ransom payments and private security assistance.

10. Any virus or other "malicious code" that is or becomes named and recognized by the CERT Coordination Center, McAfee, Secunia, Symantec, or other comparable third party monitors of malicious code activity.

11. "Your" reckless disregard for the security of "personally identifying information" in "your" care, custody, or control.

12. "Your" purposeful off-shoring of the processing, storage, or other use of data containing "personally indentifying information" to a jurisdiction outside of the "coverage territory".

13. Seizure or destruction by order of governmental authority.

14. War:

    a. War including undeclared or civil war;

    b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or

    c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

15. Nuclear reaction or radiation, or radioactive contamination.

## SECTION III – LIMITS OF INSURANCE

The Data Breach Response Expenses Coverage Limit of Insurance shown in the Declarations is the most "we" will pay for the sum of all costs under Section I – Insuring Agreement, What is Covered because of all "personal data breaches" occurring during the policy period.

We will pay up to $5,000 for the sum of all costs covered under Legal Services and Forensic Information Technology Services because of all "personal data breaches" occurring during the policy period. This sublimit is part of, and not in addition to, the Data Breach Response Expenses Coverage Limit of Insurance.

These limits apply regardless of the number of "personal data breaches" occurring during the policy period.

A "personal data breach" may be first discovered by "you" in one policy period but cause covered costs in one or more sub-

sequent policy periods. If so, all covered costs arising from such "personal data breach" will be subject to the Data Breach Response Expenses Coverage Limit of Insurance and the Legal and Forensic Information Technology Limit of Insurance applicable to the policy that was in force when the "personal data breach" was first discovered by "you".

Coverage for Services to Affected Individuals is limited to costs to provide such services for a period of up to one year from the date of the notification to the "affected individuals". Notwithstanding, coverage for Identity Restoration Case Management Services initiated within such one year period may continue for a period of up to one year from the date such Identity Restoration Case Management Services are initiated.

## SECTION IV – CONDITIONS

1. **BANKRUPTCY OR INSOLVENCY**

   Bankruptcy or insolvency of "you" or "your" estate will not relieve "us" of "our" obligations under this Data Breach Response Expenses Coverage.

2. **DUE DILIGENCE**

   "You" agree to use due diligence to prevent and mitigate costs covered under this Data Breach Response Expenses Coverage. This includes, but is not limited to, complying with reasonable and industry-accepted protocols for the following:

   a. Providing and maintaining appropriate physical security for "your" premises, computer systems, and hard copy files, electronic media, handheld devices, and storage devices;

   b. Providing and maintaining appropriate computer, network, and Internet security;

   c. Maintaining and updating at appropriate intervals back-ups of computer data;

   d. Protecting transactions, such as using encryption when processing credit card, debit card, and check payments;

   e. Appropriate disposal of files containing "personally identifying information", including shredding hard copy files and destroying physical media used to store electronic data; and

   f. Providing appropriate security awareness training on "your" physical, electronic, and procedural security measures.

3. **LEGAL ADVICE**

   The services provided under this Data Breach Response Expenses Coverage are not legal recommendations for action. "Our" determination of what is or is not covered under this coverage does not represent legal advice or counsel from "us" about what action "you" should or should not do.

4.  **NO BENEFIT TO BAILEE**

No bailee, having custody of "personally identifiable information" shall benefit, directly or indirectly, from this insurance.

5.  **OTHER INSURANCE**

"You" may have other insurance subject to the same plan, terms, conditions, and provisions as insurance under this Data Breach Response Expenses Coverage. If "you" do, "we" will pay "our" share of the "personal data breach". "Our" share is the proportion that the applicable limits of insurance under this coverage bears to the limits of insurance of all insurance covered on the same basis.

If there is other insurance covering the same "personal data breach", other than that described in the paragraph above, " we" will pay only the amount in excess of the amount due from the other insurance, whether "you" can collect on it or not. But "we" will not pay more than the applicable limits of insurance.

6.  **PRE-NOTIFICATION CONSULTATION**

"You" agree to consult with "us" prior to issuing any notification to "affected individuals". "We" assume no responsibility under this Data Breach Response Expenses Coverage for any services promised to "affected individuals" without "our" prior agreement. If possible, this pre-notification consultation will also include the designated service provider(s) as agreed to under the Service Providers Condition. "You" must provide the following at our pre-notification consultation with "you":

a.  Information about the "personal data breach" that may appropriately be communicated with "affected individuals"; and

b.  The scope of services that "you" desire for the "affected individuals". For example, coverage may be structured to provide fewer services in order to make those services available to more "affected individuals" without exceeding the available Data Breach Response Expenses Coverage Limit.

7.  **RECORDS**

"You" must keep proper records so that "we" can accurately determine the "affected individuals" of a "personal data breach".

8.  **SERVICE PROVIDERS**

a.  "We" will only pay under this Data Breach Response Expenses Coverage for services that are provided by service providers approved by "us". Approval of an alternate vendor must be obtained prior to the consultation process. "We" will only pay reasonable and customary charges associated with services covered under this Data Breach Response Expenses Coverage provided by an alternate vendor.

b.  Prior to the pre-notification consultation described in the Pre-Notification Consultation Condition, "you" must come to an agreement with "us" regarding the service provider(s) to be used for the Notification to Affected Individuals and Services to Affected Individuals. "We" will suggest a service provider. If "you" prefer to use an alternate service provider, "our" coverage is subject to the following limitations:

1)  Such alternate service provider(s) must be approved by "us" prior to the consultation process;

2)  "Our" payment for services provided by any alternate service provider will not exceed the amount that "we" would have paid using the service provider "we" had suggested; and

3)  Such alternate service provider must provide services that are reasonably equivalent or superior in both kind and quality to the services that would have been provided by the service provider "we" had suggested.

c.  "We" will only pay for Legal Expense Coverage from a licensed legal counsel.

9.  **SERVICES**

The following conditions apply regarding any services provided to "you" or any "affected individual" by "us", our designees, or any service firm paid for in whole or in part under this Data Breach Response Expenses Coverage:

a.  The effectiveness of such services depends on "your" cooperation and assistance;

b.  All services may not be available or applicable to all "affected individuals". For example, "affected individuals" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions;

c.  "We" cannot guarantee, after "our" vendor has provided the applicable services, that the problems associated with the covered "personal data breach" will be eliminated; and

d.  "You" will have a direct relationship with the professional service firms paid for in whole or in part under this coverage. Those firms work for "you".

10. **TIME LIMITS**

a.  "You" must report a "personal data breach" to "us" within 60 days of "your" discovery of the "personal data breach".

b.  "You" have up to one year from the date of reporting a "personal data breach" to initiate the services provided for "you".

3

c.   An "affected individual" has up to one year from the date the notification is received of a "personal data breach" to initiate the credit report monitoring services provided.

Once initiated the credit monitoring services will continue to be provided to that person for one year.

d.   Credit Report Monitoring and Identity Restoration Case Management Services will be provided by "our" Designated Service Provider for a period of 12 consecutive months from the inception of the Credit Report Monitoring and Identity Restoration Case Management Services.

11.  **YOUR DUTIES AFTER A PERSONAL DATA BREACH**

In case of a covered "personal data breach", "you" must perform the following duties:

a.   Give "us" prompt notice of the "personal data breach". As stated in the Time Limits condition, "you" must report the "personal data breach" to "us" within 60 days of "your" discovery.

b.   Take all reasonable steps to protect "personally identifying information" remaining in "your" care, custody, or control.

c.   Preserve all evidence of the "personal data breach".

d.   Permit "us" to inspect the property and records proving the "personal data breach".

e.   Produce for examination, with permission to copy, all books of accounts, bills, invoices, receipts, and other vouchers as "we" may reasonably require.

f.   Send "us", within 30 days after the "personal data breach", "your" signed and sworn proof of loss statement which includes:

1)   Time and cause of the "personal data breach";

2)   Other policies which may cover the "personal data breach";

3)   The method of the "personal data breach";

4)   The approximate number of "affected individuals" as a result of the "personal data breach";

5)   A detailed description of the type and nature of the information that was compromised;

6)   Whether or not the information was encrypted and if so, the level of encryption;

7)   Whether or not law enforcement has been notified;

8)   If available, the states in which the "affected individuals" are domiciled; and

9)   If available who received the "personally identifying information" as a result of the "personal data breach".

g.   Cooperate with "us" in "our" investigation of a "personal data breach".

h.   Separately submit to examinations under oath and sign a transcript of the same.

i.   Agree to help "us" enforce any right of recovery against any party liable for the "personal data breach" under this policy. This will not apply if "you" have waived recovery rights in writing prior to a "personal data breach".

**SECTION V DEFINITIONS**

•   "Affected Individual" means any person who is "your" current, former, or prospective customer, client, member, director, or employee and whose "personally identifying information" is lost, stolen, accidentally released, or accidentally published by a "personal data breach" covered under this endorsement. This definition is subject to the following provisions:

1.   "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual".

2.   An "affected individual" must have a direct relationship with "your" interests as an insured under this policy. The following are examples of individuals who would not meet this requirement:

a.   If "you" aggregate or sell information about individuals as part of "your" business, the individuals about whom "you" keep such information do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of "yours".

b.   If "you" store, process, transmit, or transport records, the individual whose "personally identifying information" "you" are storing, processing, transmitting, or transporting for another entity do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of "yours".

c.   "You" may have operations, interests, or properties that are not insured under this policy. Individuals who have a relationship with "you" through such other operations, interests, or properties do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of "yours".

3. An "affected individual" may reside anywhere in the world but must be a citizen or legal alien of the United States (its territories and possessions), Puerto Rico, or Canada with a valid Social Security Number (SSN) or Social Insurance Number (SIN).

- "Coverage territory" means the United States (including its territories and possessions), Puerto Rico, and Canada.

- "Electronic data" means information, facts, or computer programs stored as or on, created or used on, or transmitted to or from software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices, or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve, or send data.

- "Identity theft" means the fraudulent use of "personally identifying information". This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts, or commit crimes.

  "Identity theft" does not include the fraudulent use of a business name, d/b/a, or any other method of identifying a business activity.

- "Malicious code" means any loss of data that results from a worm, virus, Trojan, BOT, or other piece of computer code, software, spyware, or malware that is used to collect, destroy, alter, retrieve, or affect computer software and/or data on a computer system, network, storage device, Smartphone, or other peripheral device; and on the date the "personal data breach" occurred is named and recognized by the CERT Coordination Center or any other industry acceptable third party antivirus, antimalware, or other solution that monitors malicious code activity.

- "Personal data breach" means the loss, theft, accidental release, or accidental publication of "personally identifying information" regarding one or more "affected individual(s)", if such loss, theft, accidental release, or accidental publication has or could reasonably result in the fraudulent use of such information. This definition is subject to the following provisions:

  1. At the time of the loss, theft, accidental release, or accidental publication, the "personally identifying information" must be in "your" direct care, custody, or control.

2. "Personal data breach" includes disposal or abandonment of "personally identifying information" without appropriate safeguards such as shredding or destruction, subject to the following provisions:

   a. "Your" failure to use appropriate safeguards must be accidental and not reckless or deliberate; and

   b. Such disposal or abandonment must take place during the time period for which this Data Breach Response Expenses Coverage is effective.

3. "Personal data breach" includes situations where there is a reasonable cause to suspect that such "personally identifying information" has been lost, stolen, accidentally released, or accidentally published, even if there is no firm proof.

4. "Personal data breach" does not include the loss, theft, release, or publication of information that is in the care, custody, or control of a third party to which "you" have directly or indirectly turned over such information for any reason. This includes but is not limited to, storage, processing, transmission, or transportation of such information.

All "personal data breach" that are discovered at the same time or arise from the same cause will be considered one "personal data breach".

- "Personally identifying information" means information that could be used to commit fraud or other illegal activity involving the credit or identity of an "affected individual". This includes but is not limited to, social security numbers, drivers license numbers, credit card numbers, bank account information, or any other account numbers correlated with names and addresses.

  "Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses with no correlated social security numbers or account numbers.

5

ERIE INSURANCE
ULTRAFLEX PACKAGE
(Ed. 9/13) UF-B702

# IMPORTANT NOTICE – DATA BREACH RESPONSE EXPENSES COVERAGE

Dear ERIE Data Breach Customer:

Thank you for purchasing *Data Breach Response Expenses Coverage.*  We appreciate the trust you have placed in us.

ERIE Insurance has partnered with IDentity Theft 911, a leading provider of data risk management solutions, to support us in providing business owners like you  with Data Breach coverages.*  As an educational resource, a data security website is available to you.  This website provides tips and best practices that will help you protect sensitive information.  It also includes information regarding notification laws and regulations, an Incidence Response Plan template, and other resources.

To access the website, visit **www.erie.breachresponse.com**.
- *Click Sign in now*
- User Name:  **Erie1** and Password:  **Erie1**
  (*Note:* The User Name and Password are case sensitive).
- Complete the online registration process by creating your own Username & Password

If ever you suspect a loss, theft, accidental release or publication of non-public personal information regarding individuals that have a direct relationship with your business, such as customers, clients or employees, call the ERIE Claims Office nearest you. See the reverse side of this notice for a listing of all ERIE Claims Offices and their phone numbers.  We're your first line of response when you discover a data breach involving non-public personal information of others.

Thank you again for becoming a Data Breach Customer.  We hope you find our services valuable in helping to protect you and your business.

Sincerely,

*Marc Cipriani*

Marc Cipriani
Senior Vice President, Commercial Lines

* Coverage is subject to the terms and limitations of the endorsements you purchased.

# Toll-Free Numbers for Field/Claims Offices

Contact an Erie Insurance office in your area:

| State | Field Office | Call Toll Free |
|---|---|---|
| Illinois | Peoria | (888) 335-3743 |
| Indiana | Fort Wayne | (800) 892-5655 |
| | Indianapolis | (800) 624-1620 |
| District of Columbia / Maryland | District of Columbia | (800) 492-2709 |
| | Silver Spring | (800) 492-2709 |
| | Hagerstown | (800) 533-5602 |
| North Carolina | Charlotte | (800) 473-3882 |
| | Raleigh | (800) 533-3982 |
| New York | Rochester | (800) 333-0823 |
| Ohio | Canton | (800) 362-6541 |
| | Columbus | (800) 282-1702 |
| Pennsylvania | Allentown/Bethlehem | (800) 322-9026 |
| | Erie | (877) 771-3743 |
| | Harrisburg | (800) 382-1304 |
| | Johnstown | (800) 241-4209 |
| | Murrysville | (800) 553-3367 |
| | Philadelphia | (800) 821-2902 |
| | Pittsburgh | (800) 922-1824 |
| Tennessee | Knoxville | (888) 922-3743 |
| Virginia | Richmond | (800) 322-3743 |
| | Roanoke | (800) 533-3743 |
| | Waynesboro | (800) 542-2250 |
| Wisconsin | Waukesha | (877) 740-3743 |
| West Virginia | Parkersburg | (800) 642-1948 |

**Note:** When contacting Erie Insurance to report a claim, please be advised that the company cannot provide advice or counsel Policyholders on whether or not to file a claim. Erie Insurance is obligated to file the claim when contacted by a Policyholder. Discussions about how the claim will impact your policy or questions about whether or not to file a claim should be directed to your Erie Insurance Agent.

ERIE INSURANCE
ULTRAFLEX PACKAGE
UL-UP (Ed. 6/14) UF-B449

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DATA BREACH LIABILITY COVERAGE

Various provisions in this coverage form restrict coverage. Read the entire coverage form carefully to determine rights, duties, and what is and is not covered.

Throughout this coverage form the words "you" and "your" refer to the "Named Insured" shown in the Declarations. The words "we", "us", and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section VII– Definitions.

## SECTION I - INSURING AGREEMENT

1.  "We" will pay those sums that the insured becomes legally obligated to pay as damages because of a "personal data breach" to which this insurance applies. "We" will have the right and duty to defend the insured against any "personal data breach suit" seeking those damages. However, "we" will have no duty to defend the insured against any "personal data breach suit" seeking damages for a "personal data breach" to which this insurance does not apply. "We" may, at "our" discretion, investigate any "personal data breach" and settle any claim or "personal data breach suit" that may result, but:

    a.  The amount "we" will pay for damages is limited as described in Section V – Limits of Insurance; and

    b.  "Our" right and duty to defend ends when "we" have used up the applicable limit of insurance in the payment of judgments or settlements under this Data Breach Liability Coverage.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for in this Data Breach Liability Coverage.

2.  This insurance applies to "personal data breach suits" only if:

    a.  The "personal data breach" takes place in the "coverage territory";

    b.  "You" report the "personal data breach suit" to "us" as soon as practicable after notice is received by "you"; and

    c.  The "personal data breach suit" arose out of a "personal data breach" covered under "our" Data Breach Expenses Coverage where Notification to Affected Individuals and Services to Affected Individuals were paid for by "us" and provided by service providers approved by "us".

3.  A "personal data breach" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section IV – Who Is An Insured receives notice of a "personal data breach" or "personal data breach suit":

    a.  Reports all, or any part, of the "personal data breach" to "us" or any other insurer;

    b.  Receives a written or verbal demand or claim for damages because of a "personal data breach";

    c.  Becomes aware by any other means that a "personal data breach" has occurred or begun to occur; or

    d.  All "personal data breach suits" arising out of one "personal data breach" shall be deemed to be made on the date that the first "personal data breach suit" is brought. All "personal data breach suits" asserted in a class action suit will be treated as arising out of a single "personal data breach".

## SECTION II – EXCLUSIONS

This insurance does not apply to:

1.  "Your" intentional or willful complicity in a "personal data breach".

2.  Any criminal; fraudulent; dishonest act, error, or omission; or any intentional or knowing violation of the law by "you".

3.  Any "personal data breach" occurring prior to the first inception date of this Data Breach Liability Coverage regardless of when the first "personal data breach" was discovered by "you".

4.  Costs to correct any deficiency in "your" systems, procedures, or physical security that may have contributed to a "personal data breach".

5.  Any fines or penalties including, but not limited to, fees or surcharges from affected financial institutions.

6.  Any costs arising out of criminal investigations or proceedings.

7.  Any threat, extortion, or blackmail including, but not limited to, ransom payments and private security assistance.

8.  Any virus or other "malicious code" that is or becomes named and recognized by the CERT Coordination Center, McAfee, Secunia, Symantec, or other comparable third party monitors of malicious code activity.

9. "Your" reckless disregard for the security of "personally identifying information" in "your" care, custody, or control.

10. "Your" purposeful off-shoring of the processing, storage, or other use of data containing "personally indentifying information" to a jurisdiction outside of the "coverage territory".

11. Seizure or destruction by order of governmental authority.

12. War:

   a. War including undeclared or civil war;

   b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or

   c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

13. Nuclear reaction or radiation, or radioactive contamination.

14. Any "personal data breach suit" made against "you" by a subsidiary or entity owned whole or in part by "you".

15. Any rendering of or failure to render any professional services for others.

16. Any property damage directly relating to a "personal data breach".

## SECTION III – SUPPLEMENTARY PAYMENTS

"We" will pay, with respect to any claim "we" investigate or settle, or any "personal data breach suit" "we" defend against an insured:

1. All expenses "we" incur.

2. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. "We" do not have to furnish these bonds.

3. All reasonable expenses for lodging and meals incurred by an insured for deposition appearances and court proceedings (at "our" request to assist "us" in the investigation or defense of the claim or "personal data breach suit", including actual loss of earnings up to $250 per day because of time off from work).

4. All court costs assessed against an insured in the "personal data breach suit".

5. Prejudgment interest awarded against an insured on that part of the judgment "we" pay. If "we" make an offer to pay the applicable limit of insurance, "we" will not pay any prejudgment interest based on that period of time after the offer.

6. All interest on the full amount of any judgment that accrues after entry of the judgment and before "we" have

paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

## SECTION IV – WHO IS AN INSURED

If "you" are designated in the Declarations as:

1. An individual, "you" and "your" spouse are insureds, but only with respect to the conduct of a business of which "you" are the sole owner.

2. A partnership or joint venture, "you" are an insured. "Your" members, "your" partners, and their spouses are also insureds, but only with respect to the conduct of "your" business.

3. A limited liability company, "you" are an insured. "Your" members are also insureds, but only with respect to the conduct of "your" business. "Your" managers are insureds, but only with respect to their duties as "your" managers.

4. An organization other than a partnership, joint venture, or limited liability company, "you" are an insured. "Your" executive officers and directors are insureds, but only with respect to their duties as "your" officers or directors.

5. A trust, "you" are an insured. "Your" trustees are also insureds, but only with respect to their duties as trustees.

## SECTION V – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations for this Data Breach Liability Coverage and the rules below fix the most "we" will pay regardless of the number of:

   a. Persons insured under this coverage;

   b. Claims made or "personal data breach suits" brought; or

   c. Persons or organizations making claims or bringing "personal data breach suits".

2. The Data Breach Liability Coverage Limit of Insurance is the most "we" will pay for the sum of all damages to one or more persons or organizations as a result of all "personal data breaches" occurring during the policy period.

## SECTION VI – CONDITIONS

1. **BANKRUPTCY OR INSOLVENCY**

   Bankruptcy or insolvency of "you" or "your" estate will not relieve "us" of "our" obligations under this Data Breach Liability Coverage.

2. **DUE DILIGENCE**

   "You" agree to use due diligence to prevent and mitigate costs covered under this Data Breach Liability Coverage. This includes, but is not limited to, complying with reasonable and industry accepted protocols for:

2

a. Providing and maintaining appropriate physical security for "your" premises, computer systems, and hard copy files, electronic media, handheld devices, and storage devices;

b. Providing and maintaining appropriate computer, network, and Internet security;

c. Maintaining and updating at appropriate intervals backups of computer data;

d. Protecting transactions, such as processing credit card, debit card, and check payments;

e. Appropriate disposal of files containing "personally identifying information", including shredding hard copy files and destroying physical media used to store "electronic data";

f. Providing appropriate security awareness training on "your" physical, electronic, and procedural security measures; and

g. Providing reasonable and necessary notification monitoring and other services.

3. **NO BENEFIT TO BAILEE**

No bailee, having custody of "personally identifying information", shall benefit, directly or indirectly, from this insurance.

4. **OTHER INSURANCE**

If other valid and collectible insurance is available to "you" for a loss "we" cover under this coverage, "our" obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when **b.** – Excess Insurance below applies. If this insurance is primary, "our" obligations are not affected unless any of the other insurance is also primary. Then, "we" will share with all that other insurance by the method described in c. – Method of Sharing below.

b. **Excess Insurance**

When this insurance is excess, "we" will have no duty under this "Data Breach Liability Coverage to defend "you" against any "personal data breach suit" if any other insurer has a duty to defend "you" against that "personal data breach suit". If no other insurer defends, "we" will undertake to do so, but "we" will be entitled to the insured's rights against all other insurers.

When this insurance is excess over other insurance, "we" will pay only "our" share of the amount of the loss, if any, that exceeds the sum of:

1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

2) The total of all deductible and self-insured amounts under all that other insurance.

"We" will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the limits of insurance shown in the Declarations for this endorsement.

c. **Method of Sharing**

If all of the other insurance permits contribution by equal shares, "we" will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, "we" will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **RECORDS**

"You" must keep proper records so that "we" can accurately determine the "affected individuals" of a "personal data breach".

6. **SETTLEMENTS**

With "your" written consent, "we" may settle a "personal data breach suit" in any way "we" consider reasonable. If "you" withhold consent, then "our" liability for damages is limited to what "we" would have paid as of the date of the proposed settlement. "You" assume any further responsibilities and expenses regarding settlement of the "personal data breach suit".

7. **YOUR DUTIES AFTER A PERSONAL DATA BREACH**

In case of a covered "personal data breach", "you" must perform the following duties:

a. Give "us" prompt notice of the "personal data breach";

b. Take all reasonable steps to protect "personally identifying information" remaining in "your" care, custody, or control;

c. Preserve all evidence of the "personal data breach";

d. Permit "us" to inspect the property and records proving the "personal data breach";

e. Produce for examination, with permission to copy, all books of accounts, bills, invoices, receipts, and other vouchers as "we" may reasonably require;

f. Send "us", within 60 days after the "personal data breach", "your" signed and sworn proof of loss statement which includes:

1) Time and cause of the "personal data breach";

2) Other policies which may cover the "personal data breach";

3) The method of the "personal data breach";

4) The approximate number of "affected individuals" compromised as a result of the "personal data breach";

5) A detailed description of the type and nature of the information that was compromised;

6) Whether or not the information was encrypted and if so, the level of encryption;

7) Whether or not law enforcement has been notified;

8) If available, the states in which the "affected individuals" are domiciled; and

9) If available who received the "personally identifying information" as a result of the "personal data breach";

g. Cooperate with "us" in "our" investigation of a "personal data breach";

h. Separately submit to examinations under oath and sign a transcript of the same; and

i. Agree to help "us" enforce any right of recovery against any party liable for the "personal data breach" under this policy. This will not apply if "you" have waived recovery rights in writing prior to a "personal data breach".

## SECTION VII DEFINITIONS

- "Affected Individual" means any person who is "your" current, former, or prospective customer, client, member, director, or employee and whose "personally identifying information" is lost, stolen, accidentally released, or accidentally published by a "personal data breach" covered under this endorsement. This definition is subject to the following provisions:

1. "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual".

2. An "affected individual" must have a direct relationship with "your" interests as an insured under this policy. The following are examples of individuals who would not meet this requirement:
    a. If "you" aggregate or sell information about individuals as part of "your" business, the individuals about whom "you" keep such information do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of "yours".

b. If "you" store, process, transmit, or transport records, the individual whose "personally identifying information" "you" are storing, processing, transmitting, or transporting for another entity do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of "yours".

c. "You" may have operations, interests, or properties that are not insured under this policy. Individuals who have a relationship with "you" through such other operations, interests, or properties do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of "yours".

3. An "affected individual" may reside anywhere in the world but must be a citizen or legal alien of the United States (its territories and possessions), Puerto Rico, or Canada with a valid Social Security Number (SSN) or Social Insurance Number (SIN).

- "Coverage territory" means the United States (including its territories and possessions), Puerto Rico, and Canada.

- "Electronic data" means information, facts, or computer programs stored as or on, created or used on, or transmitted to or from software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices, or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve, or send data.

- "Identity theft" means the fraudulent use of "personally identifying information". This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts, or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a, or any other method of identifying a business activity.

- "Malicious code" means any loss of data that results from a worm, virus, Trojan, BOT, or other piece of computer code, software, spyware, or malware that is used to collect, destroy, alter, retrieve, or affect computer software and/or data on a computer system, network, storage device, Smartphone, or other peripheral device; and on the date the "personal data breach" occurred is named and recognized by the CERT Coordination Center or any other industry acceptable third party antivirus, antimalware, or other solution that monitors malicious code activity.

- "Personal data breach" means the loss, theft, accidental release, or accidental publication of "personally identify-

4

ing information" regarding one or more "affected individuals", if such loss, theft, accidental release, or accidental publication has or could reasonably result in the fraudulent use of such information. This definition is subject to the following provisions:

1. At the time of the loss, theft, accidental release, or accidental publication, the "personally identifying information" must be in "your" direct care, custody, or control.

2. "Personal data breach" does not include the loss, theft, release, or publication of information that is in the care, custody, or control of a third party to whom "you" have directly or indirectly turned over such information for any reason. This includes but is not limited to storage, processing, transmission, or transportation of such information.

3. "Personal data breach" includes disposal or abandonment of "personally identifying information" without appropriate safeguards such as shredding or destruction, subject to the following provisions:

    a. "Your" failure to use appropriate safeguards must be accidental and not reckless or deliberate; and

    b. Such disposal or abandonment must take place during the time period for which this Data Breach Liability Coverage is effective.

4. "Personal data breach" includes situations where there is a reasonable cause to suspect that such "personally identifying information" has been lost, stolen, accidentally released, or accidentally published, even if there is no firm proof.

5. All "personal data breaches" that are discovered at the same time or arise from the same cause will be considered one "personal data breach".

- "Personal data breach suit" means written notice or demand for monetary damages for a covered "personal data breach".

- "Personally identifying information" means information that could be used to commit fraud or other illegal activity involving the credit or identity of an "affected individual". This includes but is not limited to social security numbers, drivers license numbers, credit card numbers, bank account information, or any other account numbers correlated with names and addresses.

"Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses with no correlated security numbers or account numbers.

5

ERIE INSURANCE
ULTRAFLEX PACKAGE
UL-UQ (Ed. 6/14) UF-B450

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# IDENTITY RECOVERY COVERAGE -   OWNERS

Various provisions in this coverage form restrict coverage. Read the entire coverage form carefully to determine rights, duties, and what is and is not covered.

Throughout this coverage form the words "you" and "your" refer to the "Named Insured" shown in the Declarations. The words "we", "us", and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I - INSURING AGREEMENT

"We" will provide Identity Recovery Restoration Case Management Services and Expense Reimbursement Coverage indicated below as a result of an "identity theft" involving the personal identity of an "identity recovery insured" that is:

1. First discovered by "you" during the policy period shown in the "Declarations" for which this Identity Recovery Coverage is applicable; and

2. Reported to "us" within 60 days from the date it is first discovered by the "identity recovery insured".

### What is Covered

1. Identity Restoration Case Management Services

   This covers the services of an identity restoration professional. This professional will help the "identity recovery insured" to recover control over their personal identity. This includes, with the permission and cooperation of the "identity recovery insured" contacting authorities, credit bureaus, creditors, and businesses for the process of correcting credit, other records, and accounts, within the constraints of what is possible and reasonable, to restore control over their personal identity.

2. Expense Reimbursement Coverage

   Provides reimbursement of necessary and reasonable "identity theft expenses" incurred as a result of an "identity theft".

## SECTION II – EXCLUSIONS

"We" do not cover any costs for an "identity theft" arising from the following:

1. Theft of a professional or business identity.

2. Any criminal; fraudulent; dishonest act, error, or omission; or any intentional or knowing violation of the law by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured",

whether acting alone or in collusion with others. However, this exclusion does not apply to the interests of an "identity recovery insured" who has no knowledge of or involvement in such fraud, dishonesty, or criminal act.

3. An "identity theft" that is not reported in writing to the police.

## SECTION III –LIMITS OF INSURANCE

The Identity Restoration Case Management Services are available as needed for any "identity theft" for up to 12 consecutive months from the inception of the service. Expenses "we" incur to provide Identity Restoration Case Management Services do not reduce the Limit of Insurance available for Expense Reimbursement Coverage.

"We" will pay up to $25,000 for all expenses covered under Expense Reimbursement Coverage because of all "identity thefts" occurring during the policy period to any one "identity recovery insured".

An "identity theft" may be first discovered by the "identity recovery insured" in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "identity theft" will be subject to the $25,000 limit of liability for Expense Reimbursement Coverage.

Legal costs as provided under Paragraph 4. of the definition of "identity theft expenses" are part of, and not in addition to, the Expense Reimbursement Coverage limit.

Lost wages as provided under Paragraph 5. and child and elder care expenses as provided under Paragraph 6. of the definition of "identity theft expenses" are jointly subject to a sublimit of $5,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to lost wages and expenses incurred within 12 months after the "identity theft" is first discovered by the "identity recovery insured".

Mental health counseling as provided under Paragraph 7. of the definition of "identity theft expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to counseling that takes place within 12 months after the "identity theft" is first discovered by the "identity recovery insured".

Miscellaneous unnamed costs as provided under Paragraph 8. of the definition of "identity theft expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to costs incurred within 12 months after the

1

"identity theft" is first discovered by the "identity recovery insured".

## SECTION IV – CONDITIONS

1. **IDENTITY RECOVERY ASSISTANCE**

   The Identity Recovery Help Line is available to provide the "identity recovery insured" with the following:

   a. Information and advice on how to respond to a possible "identity theft"; and

   b. Instructions for how to submit a service request for Identity Recovery Case Management Services and/or claim form for Expense Reimbursement Coverage.

   In some cases, "we" provide Identity Recovery Case Management Services at "our" expense to an "identity recovery insured" prior to determining that a covered "identity theft" has occurred. "Our" provision of such services is not an admission of liability under this Identity Recovery Coverage. "We" reserve the right to deny further coverage or service if, after investigation, "we" determine that a covered "identity theft" has not occurred.

   Regarding Expense Reimbursement Coverage, the "identity recovery insured" must send "us" receipts, bills, or other records that support "your" claim for "identity theft expenses". Such records must be sent to "us" within 60 days after "our" request.

2. **SERVICES**

   The following conditions apply regarding any services provided to the "identity recovery insured" by "us", "our" designees, or any service firm paid for in whole or in part under this Identity Recovery Coverage:

   a. The effectiveness of such services depends on "your" cooperation and assistance;

   b. All services may not be available or applicable to all "identity recovery insureds". For example, "identity recovery insureds" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions;

   c. "We" cannot guarantee, after "our" vendor has provided the applicable services, that the problems associated with the covered "identity theft" will be eliminated or prevent future "identity thefts"; and

   d. "You" will have a direct relationship with the professional service firms paid for in whole or in part under this coverage. Those firms work for "you".

3. **YOUR DUTIES AFTER A IDENTITY THEFT INCIDENT**

   In case of an "identity theft", "you" must perform the following duties:

   a. Give "us" prompt notice of the "identity theft". "You" must report the "identity theft" within 60 days of "your" discovery.

   b. Produce for examination, with permission to copy, all books of accounts, bills, invoices, receipts, and other vouchers as "we" may reasonable require.

   c. Send "us", within 30 days after the "identity theft", "your" signed and sworn proof of loss statement which includes:

      1) Time and cause of the "identity theft";
      2) Other policies which may cover the "identity theft";
      3) The method of the "identity theft";
      4) A detailed description of the type and nature of the information that was compromised;
      5) Whether or not the information was encrypted and if so, the level of encryption; and
      6) Whether or not law enforcement has been notified.

   d. Cooperate with "us" in "our" investigation of the "identity theft'".

   e. Separately submit to examinations under oath and sign a transcript of the same.

   f. Agree to help "us" enforce any right of recovery against any party liable for the "identity theft" under this policy. This will not apply if "you" have waived recovery rights in writing prior to the "identity theft".

## SECTION V DEFINITIONS

- "Identity theft" means the fraudulent use of "personally identifying information". This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts, or commit crimes.

  "Identity theft" does not include the fraudulent use of a business name, d/b/a, or any other method of identifying a business activity.

- "Identity theft expenses" means any of the following reasonable and necessary expenses that are incurred as a direct result of an "identity theft":

  1. Costs for re-filing applications for loans, grants, or other credit instruments.

  2. Costs for notarizing affidavits or other similar documents, long distance telephone calls, and postage.

  3. Costs for credit reports from established credit bureaus.

  4. Fees and expenses for an attorney approved by "us" for the following:

     a. The defense of any civil suit brought against the "identity recovery insured";

2

b.  The removal of any civil judgment wrongfully entered against an "identity recovery insured";

c.  Legal assistance for an "identity recovery insured" at an audit or hearing by a government agency;

d.  Legal assistance in challenging the accuracy of the consumer credit of an "identity recovery insured"; or

e.  The defense of any criminal charges brought against an "identity recovery insured" arising from the actions of a third party using the personal identity of an "identity recovery insured".

5.  Actual lost wages of an "identity recovery insured" for time reasonable and necessary taken away from work and the work premises.  Time away from work includes partial or whole work days.  Actual lost wages may include payment for vacation days, discretionary days, floating holidays, and paid personal days.  Actual lost wages does not include sick days or any loss arising from time taken away from self employment.  Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours.

6.  Actual costs for supervision of children; elderly or infirm relatives; or dependents of the "identity recovery insured" during the time reasonable and necessary taken away from such supervision.  Such care must be provided by a professional health care provider who is not a relative of the "identity recovery insured".

7.  Actual costs for counseling from a licensed mental health professional.  Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured".

8.  Any other reasonable and necessary costs incurred by an "identity recovery insured" as a direct result of an "identity theft".  Such costs include:

a.  Costs by the "identity recovery insured" to recover control over their personal identity; and

b.  Deductibles or service fees from financial institutions.

Such costs do not include:

a.  Costs to avoid, prevent, or detect "identity theft" or other loss;

b.  Monies lost or stolen; or

c.  Costs that are restricted or excluded elsewhere in this Identity Recovery Coverage.

- "Identity recovery insured" means the following:

1.  When the entity insured is a sole proprietorship, the "identity recovery insured" is the individual person who is the sole proprietor of the insured entity.

2.  When the entity insured is a partnership, the "identity recovery insureds" are the current partners of the insured entity.

3.  When the entity insured is a corporation or other organization, the "identity recovery insureds" are all individuals having an ownership position of 20% or more of the insured entity.  However, if and only if, there is no one who has such an ownership position, then the "identity recovery insured" is:

a.  The chief executive of the insured entity; or

b.  The senior ministerial employee of a religious institution.

An "identity recovery insured" must always be an individual person.  The entity under this policy is not an "identity recovery insured".

- "Personally identifying information" means information that could be used to commit fraud or other illegal activity involving the credit or identity of an "affected individual".  This includes but is not limited to social security numbers, drivers license numbers, credit card numbers, bank account information, or any other account numbers correlated with names and addresses.

"Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses with no correlated security numbers or account numbers.

3


ERIE INSURANCE GROUP
ERIE®

INLAND MARINE
IM-RC-CE (Ed. 4/10) UF-0013

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# REPLACEMENT COST COVERAGE - CONTRACTORS' EQUIPMENT AND MOBILE EQUIPMENT

This endorsement modifies insurance provided under the following:

CONTRACTORS' EQUIPMENT COVERAGE - COMPREHENSIVE PERILS

CONTRACTORS' EQUIPMENT COVERAGE - NAMED PERILS

CONTRACTORS' EQUIPMENT - NAMED PERILS LIMITED COVERAGE

**A.** Paragraph 1. **COINSURANCE** of **Section VIII - ADDITIONAL CONDITIONS** is deleted and replaced by:

## 1. COINSURANCE

All covered property must be insured for at least 100% of its' replacement cost.

We will pay only the proportion of any "loss" that the amount of insurance shown in the "Declarations" or in the schedule for the lost or damaged item(s) bears to the 100% replacement cost at the time of insurance.

If there is more than one amount of insurance indicated in the "Declarations" for this coverage, this procedure applies separately to each amount of insurance.

If there is only one amount of insurance indicated in the "Declarations" for this coverage, this procedure applies to the total of all covered property to which the amount of insurance applies.

**B.** Paragraph 2. **VALUATION** of **Section VIII - ADDITIONAL CONDITIONS** is deleted and replaced by:

## 2. VALUATION

In the event of "loss" or damage to covered property, we agree to repair, rebuild, or replace the property with other property of like kind and quality subject to the following terms and conditions:

    a. We will not pay more for "loss" or damage on a replacement cost basis than the least of:

       1) The amount of insurance applicable to the lost or damaged property;

       2) The cost to replace the lost or damaged property with other property;

         a) Of comparable material and quality; and

         b) Used for the same purpose;

       3) The amount you actually spend that is necessary to repair or replace the lost or damaged property

    b. We will not pay on a replacement cost basis for any "loss":

       1) Until the lost or damaged property is actually repaired or replaced; and

       2) Unless the repairs or replacement are made as soon as reasonably possible after the "loss" or damage. If the property is not repaired within such reasonable time, it will be valued at its actual cash value as of the time of "loss".

If you choose an actual cash value settlement, (Actual Cash Value is Replacement Cost minus depreciation) you can still select a replacement cost settlement if the property is repaired or replaced within 6 months of loss. If you choose a replacement cost settlement, the coinsurance requirement applies on a replacement cost basis.

DECLARATIONS

ERIE INSURANCE EXCHANGE
ULTRAFLEX POLICY

**Erie Insurance Group**
100 Erie Ins. Pl.
Erie, PA 16530

AMENDED DECLARATIONS   * * EFFECTIVE 02/11/16
ATTACH THIS TO YOUR POLICY.

REASON FOR AMENDMENT SEE *** ON FIRST DECLARATIONS PAGE

| AGENT | ITEM 2. POLICY PERIOD | POLICY NUMBER |
|---|---|---|
| AA3746   THE LOWA GROUP INC | 01/01/16 TO 01/01/17 | Q37 0158532 A |

| ITEM 1 NAMED INSURED AND ADDRESS | ITEM 3. OTHER INTEREST |
|---|---|
| CROMEDY CONSTRUCTION CORP<br>& ENDT #1<br>5702 NEWTON AVE<br>PHILADELPHIA PA  19120-1619 | |

* * * * NOTICE OF AMENDMENT * * * *

KEEP THIS COPY AND ATTACH IT TO YOUR POLICY
----------------------------------------------

***ADDED ADDITIONAL INSURED - ULRH

ADDITIONAL CHARGE DUE TO THIS CHANGE - - - - - -      $

SCHEDULE OF FORMS

| FORM NUMBER | EDITION DATE | DESCRIPTION |
|---|---|---|
| ULRH | 06/13 * | ADDITIONAL INSURED - OWNERS, LESSEES, OR<br>CONTRACTORS - AUTOMATIC STATUS WHEN REQUIRED<br>IN CONSTRUCTION AGREEMENT WITH YOU |

BAT        03/09/16

ERIE INSURANCE
COMMERCIAL GENERAL LIABILITY
FIVESTAR CONTRACTORS
ULTRAFLEX PACKAGE
UL-RH (Ed. 6/13) UF-3886

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - OWNERS, LESSEES, OR CONTRACTORS - AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused in whole or in part, by:

1. Your acts or omissions; or

2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

However, the insurance afforded to such additional insured:

1. Only applies to the extent permitted by law; and

2. Will not be broader than that which you are required by the contact or agreement to provide for such additional insured.

A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

2. **Exclusions**

This insurance does not apply to:

1. "Bodily injury", "property damage", or "personal and advertising injury" arising out of the rendering of or the failure to render, any professional architectural, engineering, or surveying services, including:

   a. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; or

   b. Supervisory, inspection, architectural, or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or the failure to render any professional architectural, engineering, or surveying services.

2. "Bodily injury" or "property damage" occurring after:

   a. All work, including materials, parts, or equipment furnished in connection with such work, on the project (other than service, maintenance, or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

   b. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance**:

The most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement you have entered into with the additional insured; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

DECLARATIONS

**Erie Insurance Group**
100 Erie Ins. Pl
Erie, PA 16530

**ERIE INSURANCE EXCHANGE**
**ULTRAFLEX POLICY**

AMENDED DECLARATIONS    * * EFFECTIVE 04/12/16
ATTACH THIS TO YOUR POLICY.

REASON FOR AMENDMENT SEE *** ON FIRST DECLARATIONS PAGE

| AGENT | ITEM 2. POLICY PERIOD | POLICY NUMBER |
|---|---|---|
| AA3746    THE LOWA GROUP INC | 01/01/16 TO 01/01/17 | Q37 0158532 A |

| ITEM 1. NAMED INSURED AND ADDRESS | ITEM 3. OTHER INTEREST |
|---|---|
| CROMEDY CONSTRUCTION CORP<br>& ENDT #1<br>5702 NEWTON AVE<br>PHILADELPHIA PA  19120-1619 | |

* * * * * NOTICE OF AMENDMENT * * * * *

KEEP THIS COPY AND ATTACH IT TO YOUR POLICY
---------------------------------------------

***ADDED THE FOLLOWING AS ADDITIONAL INSURED ULRH & CG2037:

EMCOR, FLUIDICS, THE SCHOOL DISTRICT OF
PHILADELPHIA INCLUDING THE SCHOOL REFORM
COMMISSION & THE BOARD OF EDUCATION ITS
OFFICERS, AGENTS & EMPLOYEES, BOARD
MEMBERS & COMMISSIONERS
9815 ROOSEVELT BLVD
PHILADELPHIA PA  19114

LOCATION AND DESCRIPTION OF COMPLETED OPERATIONS:
 67 E BRINGHURST ST, PHILADELPHIA PA  19144

ADDITIONAL CHARGE DUE TO THIS CHANGE - - - - - -        $

SCHEDULE OF FORMS

| FORM NUMBER | EDITION DATE | DESCRIPTION |
|---|---|---|
| END101J | * | LONG NAMED ADDITIONAL INSURED ENDORSEMENT |
| CG2037 | 04/13 * | ADDITIONAL INSURED - OWNERS LESSEES OR<br>CONTRACTORS - COMPLETED OPERATIONS |

MTS     07/13/16

ERIE INSURANCE
COMMERCIAL GENERAL LIAILITY
CG 20 37 (Ed. 4/13) UF-3293

POLICY NUMBER:

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
|  |  |
|  |  |
|  |  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

# EXHIBIT F



**Liberty Mutual.**
INSURANCE

Coverage Is Provided In:
Ohio Security Insurance Company

**Policy Change Endorsement**

Policy Number:
**BKS   (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
Endorsement Period:
**From 05/01/2016 to 05/01/2017**
*12:01 am Standard Time
at Insured Mailing Location*

---

**Named Insured & Mailing Address**

J. MANN-R FINLEY INC.
167 W STREET RD
FEASTERVILLE TREVOSE, PA 19053

**Agent Mailing Address & Phone No.**

(609) 387-0606
T. C. IRONS INSURANCE AGENCY
PO BOX 158
BURLINGTON, NJ 08016-0158

**CHANGES TO POLICY -** TRANSACTION # 2

**This Policy Change Endorsement Results In A Change In The Charges As Follows:**

| | | |
|---|---|---|
| Additional Premium | | $2,248.00 |
| *Total Additional Charges* | | *$2,248.00* |
| *Certified Acts of Terrorism Additional Charges* | *$9.00* | *(Included)* |
| | | *Note: This is not a bill* |

**Description of Change(s)**

AMNDING PAYROLL ON THE GENERAL LIABILITY

CLASS 91341 FROM $85,000 TO $150,000.

(CARPENTRY-INTERIOR)

See The Revised Declarations and Declarations Schedule

---

Servicing Office          New Jersey Regional Office
and Issue Date            05/17/16

Authorized Representative

*To report a claim, call your Agent or 1-800-362-0000*

**DS 70 27 01 08**
05/17/16      57302771        N0221318      435           PCAFPPN0          INSURED COPY      004203      PAGE   1   OF   18


**Liberty Mutual.**
**INSURANCE**

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Policy Change Endorsement**

Policy Number:
**BKS (17) 57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
Endorsement Period:
**From 05/01/2016 to 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF LOCATIONS

0001 167 W Street Rd, Feasterville Trevose, PA 19053-4168

## POLICY FORMS AND ENDORSEMENTS

This section lists the Forms and Endorsements for your policy. Refer to these documents as needed for detailed information concerning your coverage.

| FORM NUMBER | TITLE |
|---|---|
| CG 00 01 04 13 | Commercial General Liability Coverage Form - Occurrence |
| CG 21 06 05 14 | Exclusion - Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability - With Limited Bodily Injury Exception |
| CG 21 47 12 07 | Employment-Related Practices Exclusion |
| CG 21 67 12 04 | Fungi or Bacteria Exclusion |
| CG 21 70 01 15 | Cap on Losses from Certified Acts of Terrorism |
| CG 21 76 01 15 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| CG 21 86 12 04 | Exclusion - Exterior Insulation and Finish Systems |
| CG 21 96 03 05 | Silica or Silica-Related Dust Exclusion |
| CG 22 79 04 13 | Exclusion - Contractors - Professional Liability |
| CG 24 26 04 13 | Amendment of Insured Contract Definition |
| CG 83 20 12 08 | Contractors Amendment of Pollution Exclusion (Job Sites) |
| CG 84 94 12 08 | Exclusion - Consolidated Insurance Programs Wrap-Up |
| CG 84 99 01 12 | Non-Cumulation Of Liability Limits Same Occurrence |
| CG 88 10 04 13 | Commercial General Liability Extension |
| CG 88 60 12 08 | Each Location General Aggregate Limit |
| CG 88 65 12 08 | Voluntary Property Damage Extension |
| CG 88 67 12 08 | Property Damage - Borrowed Equipment - $100,000 Limit |

Servicing Office     New Jersey Regional Office
and Issue Date       05/17/16

Authorized Representative

*To report a claim, call your Agent or 1-800-362-0000*



**Liberty Mutual.**
**INSURANCE**

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Policy Change Endorsement**

Policy Number:
**BKS   (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
Endorsement Period:
**From 05/01/2016 to 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 |
| | T. C. IRONS INSURANCE AGENCY |

## POLICY FORMS AND ENDORSEMENTS - CONTINUED

This section lists the Forms and Endorsements for your policy. Refer to these documents as needed for detailed information concerning your coverage.

| FORM NUMBER | TITLE |
|---|---|
| CG 88 70 12 08 | Construction Project(s)-General Aggregate Limit (Per Project) |
| CG 88 72 12 08 | Off Premises Property Damage Including Care, Custody or Control |
| CG 88 77 12 08 | Medical Expense At Your Request Endorsement |
| CG 88 80 12 08 | Property Damage - Customers' Goods ($100,000 Limit) |
| CG 88 86 12 08 | Exclusion - Asbestos Liability |
| CG 89 02 12 08 | Employment Practices Liability Coverage Form |
| CG 89 56 11 10 | Amendment of Occurrence Definition |
| CG 90 13 10 11 | Employment Related Practices Liability - Extended Reporting Period Amendment - Custom Protector |
| CL 01 00 03 99 | Common Policy Conditions |
| CL 01 24 10 06 | Amendatory Endorsement - Pennsylvania |
| CL 06 00 01 15 | Certified Terrorism Loss |
| CL 07 00 10 06 | Virus or Bacteria Exclusion |
| CM 76 13 07 13 | Waiver of Theft Deductible |
| CP 00 10 10 12 | Building and Personal Property Coverage Form |
| CP 00 90 07 88 | Commercial Property Conditions |
| CP 01 40 07 06 | Exclusion of Loss Due to Virus or Bacteria |
| CP 10 30 10 12 | Causes of Loss - Special Form |
| CP 88 04 03 10 | Removal Permit |
| CP 88 44 02 15 | Equipment Breakdown Coverage Endorsement |
| CP 90 51 09 11 | Pennyslvania - Property Amendatory Endorsement - Custom Protector |
| CP 90 59 12 12 | Identity Theft  Administrative Services and Expense Coverage |
| CP 91 00 10 14 | Contractors Custom Protector Endorsement |
| CP 91 42 01 15 | Custom Protector Plus Endorsement |

| Servicing Office and Issue Date | New Jersey Regional Office 05/17/16 | Authorized Representative |
|---|---|---|

*To report a claim, call your Agent or 1-800-362-0000*



**Liberty Mutual.**
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Policy Change Endorsement**

Policy Number:
**BKS (17) 57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
Endorsement Period:
**From 05/01/2016 to 05/01/2017**
*12:01 am Standard Time
at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 <br> T. C. IRONS INSURANCE AGENCY |

## POLICY FORMS AND ENDORSEMENTS - CONTINUED

This section lists the Forms and Endorsements for your policy. Refer to these documents as needed for detailed information concerning your coverage.

| FORM NUMBER | TITLE |
|---|---|
| IL 00 17 11 98 | Common Policy Conditions |
| IL 00 21 09 08 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| IL 00 22 05 87 | Effective Time Changes - Replacement of 12 Noon |
| IL 01 66 09 07 | Pennsylvania Changes - Actual Cash Value |
| IL 01 72 09 07 | Pennsylvania Changes |
| IL 02 46 09 07 | Pennsylvania Changes - Cancellation and Nonrenewal |
| IL 09 10 07 02 | Pennsylvania Notice |
| IL 09 35 07 02 | Exclusion of Certain Computer-Related Losses |
| IL 09 52 01 15 | Cap On Losses From Certified Acts Of Terrorism |
| IL 88 36 01 15 | Cap On Losses From Certified Acts Of Terrorism |
| IL 88 38 01 15 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| IM 20 77 09 08 | Amendatory Endorsement - Pennsylvania |
| IM 70 00 04 04 | Contractors' Equipment Coverage |
| IM 70 34 01 12 | Tools Endorsement |

| Servicing Office and Issue Date | New Jersey Regional Office 05/17/16 | Authorized Representative |
|---|---|---|

*To report a claim, call your Agent or 1-800-362-0000*



Liberty
Mutual.
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial   Property**
**Declarations   -Revised**

Policy Number:
**BKS  (17)  57 30 27 71**

Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 |
| | T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF CHARGES

**Explanation of Charges**

| DESCRIPTION | PREMIUM |
|---|---|
| Property Schedule Totals | $407.00 |
| Certified Acts of Terrorism Coverage | $10.00 |

*Total Advance Charges:*   **$417.00**
*Note: This is not a bill*


**Liberty Mutual.**
INSURANCE

Coverage Is Provided In:
Ohio Security Insurance Company

**Commercial  Property**
**Declarations  Schedule  -Revised**

Policy Number:
**BKS  (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 |
| | T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF PROPERTY COVERAGES - BY LOCATION

Insurance at the described premises applies only for coverages for which a limit of insurance is shown. Optional coverages apply only when entries are made in this schedule.

*0001  167 W Street Rd, Feasterville  Trevose, PA 19053-4168*

**Property**
**Characteristics**

**Description:**

**Construction:** Frame

**Your Business**
**Personal Property**
**Coverage**

**Occupancy:** Contractors - Subcontracted Work - In Connection With
Construction, Reconstruction, Erection or Repair - Not
Buildings - Office

| Description | |
|---|---|
| Limit of Insurance - Replacement Cost | $25,000 |
| Coinsurance | 80% |
| Inflation Guard - Annual Increase | 2% |
| Agreed Value - Expires 05/01/2017 | $25,000 |
| **Covered Causes of Loss** | |
| Special Form - Including Theft | |
| Deductible - All Covered Causes of Loss Unless Otherwise Stated | $1,000 |
| *Premium* | *$234.00* |

**Equipment**
**Breakdown**
**Coverage**

*To report a claim,  call  your Agent or  1-800-362-0000*

**DS 70 23 01 08**



**Liberty Mutual.** INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial   Property**
**Declarations   Schedule   -Revised**

Policy Number:
**BKS   (17)   57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |



## SUMMARY OF PROPERTY COVERAGES - BY LOCATION

This Equipment Breakdown insurance applies to the coverages shown for this location. The Equipment Breakdown limit(s) of insurance and deductible are included in, and not in addition to, the limits and deductible shown for the Building, Your Business Personal Property, Your Business Personal Property of Others, Tenants Improvements and Betterments, Business Income and Extra Expense, Business Income Without Extra Expense, and Extra Expense coverages.

|  | *Premium* | *$3.00* |
|---|---|---|

## SUMMARY OF OTHER PROPERTY COVERAGES

| Identity Theft<br>Administrative<br>Services<br>And Expense Coverage | <u>Description</u> |  |
|---|---|---|
|  | Limit of Insurance | **See Endorsement CP9059** |
|  | *Premium* | *$12.00* |

| Property<br>Extension<br>Endorsement | <u>Description</u> |  |
|---|---|---|
|  | Custom Protector Plus Endorsement | **$8.00** |
|  | *Premium* | *$8.00* |

| Property<br>Extension<br>Endorsement | <u>Description</u> |  |
|---|---|---|
|  | Contractors Custom Protector Endorsement | **$150.00** |
|  | *Premium* | *$150.00* |

**Commercial Property Schedule Total:**                           $407.00

This page intentionally left blank.



**Liberty Mutual.**
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial   Inland   Marine
Declarations   -Revised**

Policy Number:
**BKS   (17)   57 30 27 71**

Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time
at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 <br> T. C. IRONS INSURANCE AGENCY |



## SUMMARY OF CHARGES

**Explanation of
Charges**

| DESCRIPTION | PREMIUM |
|---|---|
| Commercial Inland Marine Schedule Totals | $825.00 |
| Certified Acts of Terrorism  Coverage | $21.00 |

*Total Advance Charges:*   **$846.00**

*Note: This is not a bill*

*To report a claim, call your Agent or 1-800-362-0000*

**DS 70 22 01 08**

AAIS
IM 7005 01 12
PAGE 1 OF 2

## SCHEDULE OF COVERAGES

## CONTRACTORS' EQUIPMENT

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

### PROPERTY COVERED

(check one)

[ X ] Scheduled Equipment (Refer to Equipment Schedule)

[   ] Schedule On File

|  | "LIMIT" |
|---|---|
| **Catastrophe Limit --** The most "we" pay for loss in any one occurrence is: | $     25,000 |

### COVERAGE EXTENSIONS

| Additional Debris Removal Expenses | $     5,000 |
|---|---|

### SUPPLEMENTAL COVERAGES

| Employee Tools | $     5,000 |
|---|---|
| Equipment Leased or Rented From Others | $     25,000 |
| Newly Purchased Equipment (check one) | |
|    [X] Percentage of Catastrophe Limit | 30 % |
|    [   ] Dollar Limit | $ |
| Pollutant Cleanup and Removal | $     25,000 |
| Rental Reimbursement | |
|    -- Reimbursement Limit | $     5,000 |
|    -- Waiting Period | 72 Hours |
| Spare Parts and Fuel | $     5,000 |

Copyright, American Association of Insurance Services, Inc., 2012

AAIS
IM 7005 01 12
PAGE 2 OF 2

COINSURANCE (check one)

[ ] 80%        [ ] 90%        [x] 100%        [ ] OTHER      %

REPORTING CONDITIONS (check if applicable)

[  ] Equipment Leased or Rented From Others

-- Reporting  Rate                          $

-- Deposit  Premium                         $

-- Minimum  Premium                         $

VALUATION (check if applicable)

[  ] Actual Cash Value          [  ] Replacement Cost

[ x ] Indicated  on Equipment  Schedule

DEDUCTIBLE (check one)

[ x ] Flat Deductible  Amount               $      500

[  ] Percentage  Deductible                        %

Maximum  Deductible  Amount          $

Minimum  Deductible  Amount          $

ADDITIONAL INFORMATION

IM 7005 01 12

Copyright, American Association of Insurance Services, Inc., 2012

**AAIS**
**IM 7031 01 12**

BKS   (17)   57 30 27 71

# EQUIPMENT  SCHEDULE
## CONTRACTORS'  EQUIPMENT
## VALUATION  BASIS

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

### SCHEDULED EQUIPMENT

**AA** = Agreed Amount          **ACV** = Actual Cash Value          **RP** = Replacement Cost

| Item No. | Valuation | Description of Equipment | "Limit" |
|---|---|---|---|
| 1 | ACV | Tools-Owners with $2,500 per Item Max (See IM 7034) | $ 25,000 |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |

**IM 7031 01 12**

Copyright, American Association of Insurance Services, Inc., 2012



Coverage Is Provided In:
Ohio Security Insurance Company

Policy Number:
**BKS (17) 57 30 27 71**

Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time
at Insured Mailing Location*

**Commercial   General   Liability
Declarations   -Revised**

Basis: Occurrence

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |



## SUMMARY OF LIMITS AND CHARGES

**Commercial General Liability Limits of Insurance**

| DESCRIPTION | LIMIT |
|---|---|
| Each Occurrence Limit | 1,000,000 |
| Damage To Premises Rented To You Limit (Any One Premises) | 1,000,000 |
| Medical Expense Limit (Any One Person) | 15,000 |
| Personal and Advertising Injury Limit | 1,000,000 |
| General Aggregate Limit (Other than Products - Completed Operations) | 2,000,000 |
| Products - Completed Operations Aggregate Limit | 2,000,000 |

**Explanation of Charges**

| DESCRIPTION | PREMIUM |
|---|---|
| General Liability Schedule Totals | 6,523.00 |
| Certified Acts of Terrorism   Coverage | 26.00 |

*Total Advance Charges:*          **$6,549.00**
*Note: This is not a bill*

To report a claim, call your Agent or 1-800-362-0000


**Liberty Mutual.**
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial   General   Liability**
**Declarations   Schedule  -Revised**

Policy Number:
**BKS   (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF CLASSIFICATIONS  - BY LOCATION

**0001**   *167 W Street Rd, Feasterville  Trevose, PA 19053-4168*
    **Insured:**  J. MANN-R FINLEY INC.

**CLASSIFICATION -**  91341
Carpentry  - Interior

| COVERAGE DESCRIPTION | PREMIUM BASED ON -   Executive Officers | RATED / PER 1,000 | PREMIUM |
|---|---|---|---|
| Premise/Operations | 2,080 Dollars Of Payroll | 26.393 | **$55.00** |
| | | *Total:* | *$55.00* |
| Products/Completed  Operations | | 7.205 | **$15.00** |
| | | *Total:* | *$15.00* |

**CLASSIFICATION -**  91341
Carpentry  - Interior

| COVERAGE DESCRIPTION | PREMIUM BASED ON -   Employees Payroll | RATED / PER 1,000 | PREMIUM |
|---|---|---|---|
| Premise/Operations | 147,920 Dollars Of Payroll | 26.393 | **$3,904.00** |
| | | *Total:* | *$3,904.00* |
| Products/Completed  Operations | | 7.205 | **$1,066.00** |
| | | *Total:* | *$1,066.00* |



**Liberty Mutual. INSURANCE**

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial  General  Liability**
**Declarations  Schedule  -Revised**

Policy Number:
**BKS   (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| **Named Insured** | **Agent** |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |



## SUMMARY OF CLASSIFICATIONS - BY LOCATION

**CLASSIFICATION -** 91585
Contractors - Subcontracted Work - In Connection With
Construction, Reconstruction, Repair or Erection Of
Buildings NOC

| COVERAGE DESCRIPTION | PREMIUM BASED ON - | RATED / PER 1,000 | PREMIUM |
|---|---|---|---|
| Premise/Operations | 300,000 Dollars Of Total Cost | 2.394 | $718.00 |
| | | Total: | $718.00 |
| Products/Completed Operations | | 1.356 | $407.00 |
| | | Total: | $407.00 |

**CLASSIFICATION -** 91581
Contractors - Subcontracted Work - In Connection With
Construction, Reconstruction, Erection or Repair -
Not Buildings

| COVERAGE DESCRIPTION | PREMIUM BASED ON - | RATED / PER 1,000 | PREMIUM |
|---|---|---|---|
| Premise/Operations | Dollars Of Total Cost - if any | 3.826 | |
| | | Total: | |
| Products/Completed Operations | | 2.909 | |
| | | Total: | |



**Liberty Mutual.**
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial   General   Liability**
**Declarations   Schedule   -Revised**

Policy Number:
**BKS   (17)   57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF OTHER COVERAGE

| COVERAGE DESCRIPTION | | PREMIUM |
|---|---|---|
| Contractors Custom Protector Coverages | See Policy Forms and Endorsements List | $311.00 |
| | Contractors Amendment of Pollution Exclusion (Job Sites) | $47.00 |

| | |
|---|---|
| **Commercial General Liability Schedule Total** | **$6,523.00** |



**Liberty Mutual.**
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Employment Practices Liability**
**Declarations   -Revised**

Basis: Claims Made and Reported Coverage

Policy Number:
**BKS  (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*



THIS INSURANCE PROVIDES CLAIMS MADE COVERAGE. ANY DEFENSE EXPENSES PAID UNDER THIS COVERAGE PART WILL REDUCE THE AVAILABLE LIMITS OF INSURANCE AND MAY EXHAUST THEM COMPLETELY. DEFENSE EXPENSES MEANS REASONABLE AND NECESSARY FEES, COSTS AND EXPENSES RESULTING SOLELY FROM THE INVESTIGATION, LEGAL DEFENSE AND LEGAL APPEAL OF A CLAIM AGAINST THE INSURED, BUT EXCLUDING SALARIES OF OFFICERS AND EMPLOYEES OF THE INSURER. READ YOUR COVERAGE FORM CAREFULLY.

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 <br> T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF LIMITS AND CHARGES

**Employment Practices Liability Limits of Insurance**

| DESCRIPTION | LIMIT |
|---|---|
| Each Claim Limit | 10,000 |
| Aggregate Limit | 10,000 |

This Coverage is subject to a $5,000. Per Claim Deductible
Coinsurance Participation   0 %
Subject to a Maximum of: $0 Each Claim
Retroactive Date:   05/01/2016

**Explanation of Charges**

| DESCRIPTION | PREMIUM |
|---|---|
| Employment Practices Liability | 24.00 |

*Total Advance Charges:* ***$24.00***

*Note: This is not a bill*

*To report a claim,  call  your Agent or  1-800-362-0000*



**Liberty Mutual.**
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

Policy Number:
**BKS   (17)  57 30 27 71**

**Employment   Practices   Liability**
**Declarations   Schedule   -Revised**

Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF CLASSIFICATIONS  - continued

*0001*   *167 W Street Rd, Feasterville  Trevose, PA 19053-4168*
   **Insured:**  J. MANN-R FINLEY INC.

**CLASSIFICATION -**
Employment Practices Liability - Claims Made

| COVERAGE DESCRIPTION | PREMIUM BASED ON | PREMIUM |
|---|---|---|
| Employment Practices Liability | 4 Employee(s) | $24.00 |
| | *Total:* | *$24.00* |

| | |
|---|---|
| **Employment Practices Liability Schedule Total** | $24.00 |



**Policyholder   Information**

**Named Insured & Mailing Address**

J. MANN-R FINLEY INC.
167 W STREET RD
FEASTERVILLE TREVOSE, PA 19053

**Agent Mailing Address & Phone No.**

(609) 387-0606
T. C. IRONS INSURANCE AGENCY
PO BOX 158
BURLINGTON, NJ 08016-0158





THIS IS
NOT A
BILL

### *Dear Policyholder:*

We know you work hard to build your business. We work together with your agent,
**T. C. IRONS INSURANCE AGENCY        (609) 387-0606**
to help protect the things you care about. Thank you for selecting us.

Enclosed are your insurance documents consisting of:

**Your Commercial Documents**

- Commercial Package

To find your specific coverages, limits of liability, and premium, please refer to your
Declarations page(s).

If you have any questions or changes that may affect your insurance needs, please
contact your Agent at (609) 387-0606



**Reminders**

- Verify that all information is correct
- If you have any changes, please contact your
  Agent at (609) 387-0606
- In case of a claim, call your Agent or  1-800-362-0000

## You Need To Know

- **CONTINUED ON NEXT PAGE**

*To report a claim, call your Agent or 1-800-362-0000*

DS 70 20 01 08

**You Need To Know - continued**

- **NOTICE(S) TO POLICYHOLDER(S)**
  The Important Notice(s) to Policyholder(s) provide a general explanation of changes in coverage to your policy. The Important Notice(s) to Policyholder(s) is not a part of your insurance policy and it does not alter policy provisions or conditions. Only the provisions of your policy determine the scope of your insurance protection. It is important that you read your policy carefully to determine your rights, duties and what is and is not covered.

| FORM NUMBER | TITLE |
| --- | --- |
| NP 72 42 01 15 | Terrorism Insurance Premium Disclosure And Opportunity To Reject |
| NP 73 47 03 04 | Premium Determination for Subcontractors |
| NP 74 06 01 06 | Flood Insurance Notice |
| NP 74 44 09 06 | U.S. Treasury Department's Office of Foreign Assets Control (OFAC) Advisory Notice to Policyholders |
| NP 74 50 01 07 | Important Audit Information |
| NP 89 69 11 10 | Important Policyholder Information Concerning Billing Practices |
| NP 98 20 01 15 | Jurisdictional Boiler And Pressure Vessel Inspections |

- This policy will be direct billed. You may choose to combine any number of policies on one bill with your billing account. Please contact your agent for more information.

05/03/16

J. MANN-R FINLEY INC.                        BKS   (17)   57 30 27 71
                                             From 05/01/2016 To 05/01/2017

167 W STREET RD
FEASTERVILLE TREVOSE, PA 19053



(609) 387-0606
T. C. IRONS INSURANCE AGENCY

PO BOX 158
BURLINGTON, NJ 08016-0158

## TERRORISM INSURANCE PREMIUM DISCLOSURE
## AND OPPORTUNITY TO REJECT

**This notice contains important information about the Terrorism Risk Insurance Act and its effect on your policy. Please read it carefully.**

### THE TERRORISM RISK INSURANCE ACT

The Terrorism Risk Insurance Act, including all amendments ("TRIA" or the "Act"), establishes a program to spread the risk of catastrophic losses from certain acts of terrorism between insurers and the federal government. If an individual insurer's losses from certified acts of terrorism exceed a specified deductible amount, the government will reimburse the insurer for a percentage of losses (the "Federal Share") paid in excess of the deductible, but only if aggregate industry losses from such acts exceed the "Program Trigger". An insurer that has met its insurer deductible is not liable for any portion of losses in excess of $100 billion per year. Similarly, the federal government is not liable for any losses covered by the Act that exceed this amount. If aggregate insured losses exceed $100 billion, losses up to that amount may be pro-rated, as determined by the Secretary of the Treasury.

The Federal Share and Program Trigger by calendar year are:

| Calendar Year | Federal Share | Program Trigger |
|---|---|---|
| 2015 | 85% | $100,000,000 |
| 2016 | 84% | $120,000,000 |
| 2017 | 83% | $140,000,000 |
| 2018 | 82% | $160,000,000 |
| 2019 | 81% | $180,000,000 |
| 2020 | 80% | $200,000,000 |

### MANDATORY OFFER OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM" AND DISCLOSURE OF PREMIUM

TRIA requires insurers to make coverage available for any loss that occurs within the United States (or outside of the U.S. in the case of U.S. missions and certain air carriers and vessels), results from a "certified act of terrorism" AND that is otherwise covered under your policy.

A "certified act of terrorism" means:

[A]ny act that is certified by the Secretary [of the Treasury], in consultation with the Secretary of Homeland Security, and the Attorney General of the United States.

**(i)** to be an act of terrorism;

**NP 72 42 01 15**                 © 2015 Liberty Mutual Insurance                 **Page 1 of 2**

**(ii)** to be a violent act or an act that is dangerous to -
**(I)** human life;
**(II)** property; or
**(III)** infrastructure;

**(iii)** to have resulted in damage within the United States, or outside of the United States in the case of -
**(I)** an air carrier (as defined in section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States); or
**(II)** the premises of a United States mission; and

**(iv)** to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

## REJECTING TERRORISM INSURANCE COVERAGE - WHAT YOU MUST DO

We have included in your policy coverage for losses resulting from "certified acts of terrorism" as defined above.

THE PREMIUM CHARGE FOR THIS COVERAGE APPEARS ON THE DECLARATIONS PAGE OF THE POLICY AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT. If we are providing you with a quote, the premium charge will also appear on your quote as a separate line item charge.

IF YOU CHOOSE TO REJECT THIS COVERAGE, PLEASE CHECK THE BOX BELOW, SIGN THE ACKNOWLEDGMENT, AND RETURN THIS FORM TO THE ADDRESS BELOW: **Please ensure any rejection is received within thirty (30) days of the effective date of your policy.**

Before making a decision to reject terrorism insurance, refer to the Disclaimer for Standard Fire Policy States located at the end of this Notice.

☐ I hereby reject this offer of coverage. I understand that by rejecting this offer, I will have no coverage for losses arising from "certified acts of terrorism" and my policy will be endorsed accordingly.

Policyholder/Applicant's   Signature          Print Name                    Date Signed

_____     _____     _____

Named Insured                              Policy Number
J. MANN-R FINLEY INC.                      BKS   (17)   57 30 27 71

Policy Effective/Expiration   Date
From 05/01/2016 To 05/01/2017

**IF YOU REJECTED THIS COVERAGE, PLEASE RETURN THIS FORM TO:**

Attn: Commercial Lines Division - Terrorism
PO Box 66400
London, KY 40742-6400

**Note:** Certain states (currently CA, GA, IA, IL, ME, MO, NY, NC, NJ, OR, RI, WA, WI and VW) mandate coverage for loss caused by fire following a "certified act of terrorism" in certain types of insurance policies. If you reject TRIA coverage in these states on those policies, you will not be charged any additional premium for that state mandated coverage.

**The summary of the Act and the coverage under your policy contained in this notice is necessarily general in nature. Your policy contains specific terms, definitions, exclusions and conditions. In case of any conflict, your policy language will control the resolution of all coverage questions. Please read your policy carefully.**

If you have any questions regarding this notice, please contact your agent.

NP 73 47 03 04

# Important  Notice
## Notice  to Policyholders

This explanation is not a part of your insurance policy, and it does not alter any of its provisions or conditions.

Please refer any questions you may have to your insurance agent.

As an artisan or construction related insured, a portion of your construction operations may be performed by subcontractors. In order to minimize your loss exposure and reduce your premium charge for subcontracted work, your subcontractors must carry adequate insurance.

**Please read the following carefully to understand:**

1.  **What is an "Adequately Insured Subcontractor"?**
    "A subcontractor that has a valid certificate of insurance showing proof of Commercial General Liability coverage, or its equivalency, with the Named Insured shown as a Certificate Holder and at least $300,000 (Occurrence) limits for the period of time work was performed."

2.  **How do we determine your premium for an "Adequately Insured Subcontractor"?**
    If you are covered by our Artisan Contractors Program, there is no charge for "Adequately Insured Subcontractors" regarding your Commercial General Liability coverage.

    If you are covered by our non-artisan construction related products, we will use the total cost of the subcontracted work to determine your premium regarding your Commercial General Liability coverage. The resulting premium charge to you will normally be much less than if the subcontractor is uninsured or carries an inadequately limit of insurance.

    In order to meet the requirement of having an "Adequately Insured Subcontractor", you must present satisfactory evidence of subcontractor's insurance by providing us with a valid Certificates of Insurance from your subcontractor, at the time of audit. The certificate must show proof of Commercial General Liability coverage with you as the Certificate Holder and at least $300,000 (Occurrenc e) limit for the period of time that the subcontractor performed work for you.

    If you do not have satisfactory evidence of subcontractors insurance at the time of audit, your subcontractors will be deemed inadequately insured.

3.  **How do we determine your premium for an inadequately insured subcontractor?**
    If you cannot provide satisfactory evidence of the subcontractor's insurance at the time of audit, such as not being able to provide a Certificate of Insurance or the Certificate of Insurance has limits less than $300,000 (Occurrence), we will determine the premium for the inadequately insured subcontractor as follows:

    •   The subcontractor will be classed according to type of construction operation performed and charged the same as an employee. At the time of audit, we will request that you provide us with the subcontractor's payroll amount and a description of work performed for you.

    If we can not determine the subcontractor's payroll, your premium charge for the inadequately insured subcontractor will be based on the following:

    •   If the insured's records do not disclose a breakdown between material and labor costs, but the total subcontract costs did include materials, use a minimum of 50% of the total cost as the premium basis.

    •   If the subcontractor work was for labor only, use 90% of the total subcontract cost as the rating basis.

4.  **What records and documentation are you required to maintain?**
    Please be sure that you keep clear and accurate records with a breakdown of payrolls and subcontractor costs by type of work performed. In addition, be sure to obtain and save satisfactory evidence of subcontractor's insurance, such as Certificates of Insurance regarding all of your subcontractors.

    On the reverse side of the "Important Notice to Policyholders" we have included a helpful Subcontractor Worksheet, WS 70 03 06 00, that may assist you to establishing an organized method of monitoring your subcontractor's work and their Certificates of Insurance.

**EXAMPLE**

Subcontractor Worksheet

Agency: _____                                      Policy Number: _____

| Name of Subcontractor | Description of Operation | Total Cost Paid to Subcontractor | Cost Paid to Subcontractor for Materials Only | Certificate of Insurance for Workers Comp Coverage (Y) or (N) | Certificate of Insurance for General Liability with at least $300,000 limits per occurrence (Y) or (N) |
|---|---|---|---|---|---|
| Jones Excavating | Foundations excavated | $15,000 | $5,000 | Y | Y |
| Hart Electrical | Residential Electrical Work | $7,000 | $0 | Y | Y |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

WS 70 03 06 00

NP 74 06 01 06

# FLOOD INSURANCE  NOTICE

Unless a Flood Coverage endorsement  is attached, your policy does not provide flood coverage and you will **not** have coverage for property damage from floods unless you purchase a separate policy for flood insurance through the Federal Emergency Management  Agency (FEMA) National Flood Insurance Program.

If you would like more information  about obtaining coverage under the National Flood Insurance Program, please contact your agent.



NP 74 44 09 06

# U.S. TREASURY DEPARTMENT'S  OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY  NOTICE  TO  POLICYHOLDERS

No coverage  is provided  by this Policyholder  Notice  nor can it be construed  to replace  any provisions  of your policy. You should  read your policy and review  your Declarations  page for complete  information  on the coverages  you are provided.

This Notice provides  information  concerning  possible  impact on your insurance  coverage due to directives issued  by OFAC. **Please read this Notice  carefully.**

Please refer  any questions  you may have to your insurance  agent.

The Office of Foreign Assets Control  (OFAC) administers  and enforces  sanctions  policy,  based on Presidential declarations  of "national  emergency".  OFAC has identified  and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations;  and
- Narcotics  traffickers;

as "Specially  Designated  Nationals  and Blocked  Persons".  This  list can be  located  on the United  States Treasury's  web site - http//www.treas.gov/ofac.

In accordance  with  OFAC regulations,  if it is determined  that you or any other insured,  or any person or entity  claiming  the benefits  of this insurance  has violated  U.S. sanctions  law or is a Specially  Designated National  and Blocked  Person, as identified  by OFAC, this insurance  will be considered  a blocked  or frozen contract  and all provisions  of this insurance  are immediately  subject to OFAC. When an insurance  policy is considered  to be such a blocked  or frozen contract,  no payments  nor premium  refunds  may be made without  authorization  from OFAC. Other limitations  on the premiums  and payments  also apply.

© 2011 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

NP 74 50 01 07

# Important  Notice
## Notice  to Policyholders

This explanation  is not a part of your insurance  policy,  and it does not alter any of its provisions  or conditions.

Please refer any questions  you may have to your insurance  agent.

We would  like to thank you for being a policyholder.   We appreciate  your business.

If your policy  contains  a condition  stating  it is subject  to a premium  audit we would  like to take this opportunity  to explain  how the audit process works and answer  the most common  questions  we receive from our policyholders.   The information  in this notice will make it easier for you to prepare  for your audit.

**Insurance Premium Audit Facts**

Audits  can benefit  our policyholders   by allowing  us to collect  the appropriate  amount  of premium  for each policy.

Most commercial  policies  are written  based on estimated  or fluctuating  exposure  bases. At the end of the policy  term an audit will determine  the actual exposure  bases and the premium  will be adjusted  accordingly.  A company  representative  will conduct  the audit.

The premium  auditor  will examine  and audit records  that relate to your policy.  The records  necessary  to complete  the audit will vary, based on the coverages  you have. Types of records  that may be requested  for your audit include,  but are not limited  to:

- Payroll  Records,  including  941 forms
- Sales Journals  or income  statements
- General  Ledger
- Cash Disbursements   Journal
- Subcontractor   Certificates

Keeping  accurate  and complete  records  will allow  the auditor  to properly  classify  and allocate  your exposures correctly.   Often there are allowable  credits  available  according  to insurance  manual classification  and rating  rules.  The premium  auditor  will be able to give you the credits,  to which you are entitled,  if your records  provide  the necessary  details.  Providing  the records  your auditor  needs can save you time and money  as well as expedite  the audit process.

**How Audits are Conducted**

Audits  are handled  in different  ways, depending  on the types of coverages  you may have. We conduct audits  in the following  ways:

Physical  Audit  - An auditor  will contact  you and set up a convenient  time to personally  come to your business  and review  your records.

Phone Audit  -Forms  will  be mailed  to you, explaining  what is necessary  to complete  a phone audit. The phone auditor  will contact  you or your bookkeeper  for this information.

Voluntary  Audit  - Forms will  be mailed  to you for completion.   We will  provide  you with contact  information if you need assistance  in completing  the forms.

NP 74 50 01 07

## Completing the audit

Many states have enacted legislation that governs the time in which an audit must be completed, billed and paid. This applies to audits for cancelled policies as well as regular audits. In order to comply with state regulations, it is important to make your records available for audit when our representative contacts you. We will make every effort to complete the audit within a reasonable time after the close of the policy period stated in your policy.

## Frequently Asked Questions
**Q: What if I use subcontractors?**

A: Subcontractors are factored in to the audit process. Subcontractors who do not have insurance are treated as though they are your employees at the time of the audit. If your subcontractor furnishes you with a certificate of liability or workers' compensation insurance, your insurance cost for that subcontractor could be less. See your policy for details on limits of insurance required for certificates.

**Q: I have no employees and work alone. Does the insurance company still need to complete an audit?**

A: Yes. The auditor will need to verify you worked alone by examining business records that may include tax filings, disbursements, and check stubs.

**Q: Do I need an audit if I have cancelled my policy or am no longer insured with you?**

A: An audit may still be necessary even if you no longer have an active policy with us. The audit would cover the time period for which you were insured by us. Other factors that may determine if an audit is necessary include the time the policy was in effect and the amount of premium involved.

**Q: If I use leased employees but the leasing company carries the liability, are the leased employees excluded from my General Liability policy?**

A: No. The manual rules stipulate that all leased employees are covered on the insured's policy.

**Q: Is it necessary to keep records on any casual labor I use?**

A: Yes. Casual labor payroll is examined during the audit.

**Q: What happens if I do not comply with the audit and fail to provide all necessary records and verification?**

A: It's important to provide the necessary information in order to complete the audit. If you fail to do so, your policy may be cancelled or nonrenewed. You may also receive an estimated audit statement based on increased policy exposure estimates due to non- compliance of audit.

If you would like additional information about the policy audit process, your independent agent can assist you. The Premium Audit Department is also available to answer any questions you may have regarding this process.

Please contact us at 1-888-224-9246 or via E-mail at PremiumAuditServices@libertymutual.com

NP 74 50 01 07

NP 89 69 11 10

# IMPORTANT  POLICYHOLDER INFORMATION
# CONCERNING  BILLING PRACTICES



**Dear Valued Policyholder:** This insert provides you with important information about our policy billing practices that may affect you. Please review it carefully and contact your agent if you have any questions.

**Premium Notice:** We will mail you a policy Premium Notice separately. The Premium Notice will provide you with specifics regarding your agent, the account and policy billed, the billing company, payment plan, policy number, transaction dates, description of transactions, charges/credits, policy amount balance, minimum amount, and payment due date. This insert explains fees that may apply to and be shown on your Premium Notice.

**Available Premium Payment Plans:**

● **Annual Payment Plan:** When this plan applies, you have elected to pay the entire premium amount balance shown on your Premium Notice in full. No installment billing fee applies when the Annual Payment Plan applies.

● **Installment Payment Plan:** When this plan applies, you have elected to pay your policy premium in installments (e.g.: quarterly or monthly installments - Installment Payment Plans vary by state). As noted below, an installment fee may apply when the Installment Payment Plan applies.

The Premium Payment Plan that applies to your policy is shown on the top of your Premium Notice. Please contact your agent if you want to change your Payment Plan election.

**Installment Payment Plan Fee:** If you elected to pay your premiums in installments using the Installment Premium Payment Plan, an installment billing fee applies to each installment bill. The installment billing charge will not apply, however, if you pay the entire balance due when you receive the bill for the first installment. Because the amount of the installment charge varies from state to state, please consult your Premium Notice for the actual fee that applies.

**Dishonored Payment Fee:** Your financial institution may refuse to honor the premium payment withdrawal request you submit to us due to insufficient funds in your account or for some other reason. If that is the case, and your premium payment withdrawal request is returned to us dishonored, a payment return fee will apply. Because the amount of the return fee varies from state to state, please consult your Premium Notice for the actual fee that applies.

**Late Payment Fee:** If we do not receive the minimum amount due on or before the date or time the payment is due, as indicated on your Premium Notice, you will receive a policy cancellation notice effective at a future date that will also reflect a late payment fee charge. Issuance of the cancellation notice due to non-payment of a scheduled installment(s) may result in the billing and collection of all or part of any outstanding premiums due for the policy period. Late Payment Fees vary from state to state and are not applicable in some states.

**Special Note:** Please note that some states do not permit the charging of certain fees. Therefore, if your state does not allow the charging of an Installment Payment Plan, Dishonored Payment or Late Payment Fee, the disallowed fee will not be charged and will not be included on your Premium Notice.

**EFT-Automatic Withdrawals Payment Option:** When you select this option, you will not be sent Premium Notices and, in most cases, will not be charged installment fees. For more information on our EFT-Automatic Withdrawals payment option, refer to the attached policyholder plan notice and enrollment sheet.

Once again, please contact your agent if you have any questions about the above billing practice information.

**Thank you for selecting us to service your insurance needs.**

© 2010 Liberty Mutual Insurance Company. All rights reserved.

NP 98 20 01 15

## JURISDICTIONAL BOILER AND PRESSURE VESSEL INSPECTIONS

Most jurisdictions (cities or states) are governed by laws and regulations that require owners of boilers and pressure vessels to have their equipment inspected on a routine basis. Jurisdictions require that equipment is installed and operated according to these regulations, and it is the equipment breakdown engineering inspector's responsibility to verify the equipment complies with all requirements.

Liberty Mutual Equipment Breakdown is a National Board Accredited Authorized Inspection Agency. This designation is recognized by authorities having jurisdictions in the U.S. & provinces of Canada and gives Liberty Mutual commissioned inspectors the ability to perform jurisdictionally required inspection on boilers and pressure vessels at insured locations. We have field inspectors strategically located throughout the U.S. to perform boiler and pressure vessel inspection for our customers and clients.

**To request a Jurisdictional Inspection please:**

- **Call the LMEB Hotline (877) 526-0020**

**Or**

- **Email your request to LMEBInspections@Libertymutual.com**

The assigned EB Risk Engineer will call to schedule within 24 - 48 hours. When requesting an inspection please include the following:

- Current Policy Number
- Location Address
- Contact Name
- Contact Phone Number and/or Email Address

© 2015 Liberty Mutual Insurance



**Liberty Mutual.**
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

Policy Number:
**BKS   (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

**Common Policy Declarations**



| Named Insured & Mailing Address | Agent Mailing Address & Phone No. |
|---|---|
| J. MANN-R FINLEY INC.<br>167 W STREET RD<br>FEASTERVILLE TREVOSE, PA 19053 | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY<br>PO BOX 158<br>BURLINGTON, NJ 08016-0158 |

**Named Insured Is:** CORPORATION

**Named Insured Business Is:** COMMERCIAL CARPENTRY CONTRACTORS

*In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.*

## SUMMARY OF COVERAGE PARTS AND CHARGES  - CUSTOM PROTECTOR

This policy consists of this Common Policy Declarations page, Common Policy Conditions, Coverage Parts (which consist of coverage forms and other applicable forms and endorsements, if any, issued to form a part of them) and any other forms and endorsements issued to be part of this policy.

| COVERAGE PART | CHARGES |
|---|---|
| **Commercial Property** | $417.00 |
| **Commercial Inland Marine** | $846.00 |
| **Commercial General Liability** | $4,301.00 |
| **Employment Practices Liability** | $24.00 |

*Total Charges for all of the above coverage parts:* **$5,588.00**
*Certified Acts of Terrorism Coverage:*  *$48.00*  **(Included)**

*Note: This is not a bill*

## IMPORTANT MESSAGES

- This policy is auditable. Please refer to the conditions of the policy for details or contact your agent.

- Notice: The Employment-Related Practices Exclusion CG 21 47 is added to this policy to clarify there is no coverage for liability arising out of employment-related practices. Please read this endorsement carefully.

| Servicing Office and Issue Date | New Jersey Regional Office<br>05/03/16 | Authorized Representative |
|---|---|---|

*To report a claim, call your Agent or 1-800-362-0000*

**DS 70 21 01 08**


**Liberty Mutual.**
**INSURANCE**

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Common Policy Declarations**

Policy Number:
**BKS  (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF LOCATIONS

This policy provides coverage for the following under one or more coverage parts. Please refer to the individual Coverage Declarations Schedules, or, the individual Coverage Forms for locations or territory definition for that specific Coverage Part.

0001 167 W Street Rd, Feasterville Trevose, PA 19053-4168

## POLICY FORMS AND ENDORSEMENTS

This section lists the Forms and Endorsements for your policy. Refer to these documents as needed for detailed information concerning your coverage.

| FORM NUMBER | TITLE |
|---|---|
| CG 00 01 04 13 | Commercial General Liability Coverage Form - Occurrence |
| CG 21 06 05 14 | Exclusion - Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability - With Limited Bodily Injury Exception |
| CG 21 47 12 07 | Employment-Related Practices Exclusion |
| CG 21 67 12 04 | Fungi or Bacteria Exclusion |
| CG 21 70 01 15 | Cap on Losses from Certified Acts of Terrorism |
| CG 21 76 01 15 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| CG 21 86 12 04 | Exclusion - Exterior Insulation and Finish Systems |
| CG 21 96 03 05 | Silica or Silica-Related Dust Exclusion |
| CG 22 79 04 13 | Exclusion - Contractors - Professional Liability |
| CG 24 26 04 13 | Amendment of Insured Contract Definition |
| CG 83 20 12 08 | Contractors Amendment of Pollution Exclusion (Job Sites) |
| CG 84 94 12 08 | Exclusion - Consolidated Insurance Programs Wrap-Up |
| CG 84 99 01 12 | Non-Cumulation Of Liability Limits Same Occurrence |
| CG 88 10 04 13 | Commercial General Liability Extension |
| CG 88 60 12 08 | Each Location General Aggregate Limit |

In witness whereof, we have caused this policy to be signed by our authorized officers.

Dexter R. Legg
Secretary

Paul Condrin
President



Policy Number:
**BKS  (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

## Common Policy Declarations

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 |
| | T. C. IRONS INSURANCE AGENCY |



## POLICY FORMS AND ENDORSEMENTS - CONTINUED

This section lists all of the Forms and Endorsements for your policy. Refer to these documents as needed for detailed information concerning your coverage.

| FORM NUMBER | TITLE |
|---|---|
| CG 88 65 12 08 | Voluntary Property Damage Extension |
| CG 88 67 12 08 | Property Damage - Borrowed Equipment - $100,000 Limit |
| CG 88 70 12 08 | Construction Project(s)-General Aggregate Limit (Per Project) |
| CG 88 72 12 08 | Off Premises Property Damage Including Care, Custody or Control |
| CG 88 77 12 08 | Medical Expense At Your Request Endorsement |
| CG 88 80 12 08 | Property Damage - Customers' Goods ($100,000 Limit) |
| CG 88 86 12 08 | Exclusion - Asbestos Liability |
| CG 89 02 12 08 | Employment Practices Liability Coverage Form |
| CG 89 56 11 10 | Amendment of Occurrence Definition |
| CG 90 13 10 11 | Employment Related Practices Liability - Extended Reporting Period Amendment - Custom Protector |
| CL 01 00 03 99 | Common Policy Conditions |
| CL 01 24 10 06 | Amendatory Endorsement - Pennsylvania |
| CL 06 00 01 15 | Certified Terrorism Loss |
| CL 07 00 10 06 | Virus or Bacteria Exclusion |
| CM 76 13 07 13 | Waiver of Theft Deductible |
| CP 00 10 10 12 | Building and Personal Property Coverage Form |
| CP 00 90 07 88 | Commercial Property Conditions |
| CP 01 40 07 06 | Exclusion of Loss Due to Virus or Bacteria |
| CP 10 30 10 12 | Causes of Loss - Special Form |
| CP 88 04 03 10 | Removal Permit |
| CP 88 44 02 15 | Equipment Breakdown Coverage Endorsement |
| CP 90 51 09 11 | Pennyslvania - Property Amendatory Endorsement - Custom Protector |
| CP 90 59 12 12 | Identity Theft  Administrative Services and Expense Coverage |
| CP 91 00 10 14 | Contractors Custom Protector Endorsement |
| CP 91 42 01 15 | Custom Protector Plus Endorsement |
| IL 00 17 11 98 | Common Policy Conditions |
| IL 00 21 09 08 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| IL 00 22 05 87 | Effective Time Changes - Replacement of 12 Noon |
| IL 01 66 09 07 | Pennsylvania Changes - Actual Cash Value |
| IL 01 72 09 07 | Pennsylvania Changes |

*To report a claim, call your Agent or 1-800-362-0000*



**Liberty Mutual.**
**INSURANCE**

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Common Policy Declarations**

Policy Number:
**BKS   (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 |
| | T. C. IRONS INSURANCE AGENCY |

## POLICY FORMS AND ENDORSEMENTS - CONTINUED

This section lists all of the Forms and Endorsements for your policy. Refer to these documents as needed for detailed information concerning your coverage.

| FORM NUMBER | TITLE |
|---|---|
| IL 02 46 09 07 | Pennsylvania Changes - Cancellation and Nonrenewal |
| IL 09 10 07 02 | Pennsylvania Notice |
| IL 09 35 07 02 | Exclusion of Certain Computer-Related Losses |
| IL 09 52 01 15 | Cap On Losses From Certified Acts Of Terrorism |
| IL 88 36 01 15 | Cap On Losses From Certified Acts Of Terrorism |
| IL 88 38 01 15 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| IM 20 77 09 08 | Amendatory Endorsement - Pennsylvania |
| IM 70 00 04 04 | Contractors' Equipment Coverage |
| IM 70 34 01 12 | Tools Endorsement |

*To report a claim, call your Agent or 1-800-362-0000*

**DS 70 21 01 08**



**Liberty Mutual.**
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial   Property**
**Declarations**

Policy Number:
**BKS   (17)  57 30 27 71**

Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF CHARGES

**Explanation of Charges**

| DESCRIPTION | PREMIUM |
|---|---|
| Property Schedule Totals | $407.00 |
| Certified Acts of Terrorism Coverage | $10.00 |

*Total Advance Charges:* **$417.00**

*Note: This is not a bill*

*To report a claim, call your Agent or 1-800-362-0000*

**DS 70 22 01 08**



**Liberty Mutual.**
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial   Property
Declarations   Schedule**

Policy Number:
**BKS   (17)  57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time
at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 |
| | T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF PROPERTY COVERAGES - BY LOCATION

Insurance at the described premises applies only for coverages for which a limit of insurance is shown. Optional coverages apply only when entries are made in this schedule.

0001   167 W Street Rd, Feasterville  Trevose, PA 19053-4168

**Property
Characteristics**

Description:

**Construction:** Frame

**Your Business
Personal Property
Coverage**

**Occupancy:** Contractors - Subcontracted Work - In Connection With Construction, Reconstruction, Erection or Repair - Not Buildings - Office

| Description | |
|---|---|
| Limit of Insurance - Replacement Cost | $25,000 |
| Coinsurance | 80% |
| Inflation Guard - Annual Increase | 2% |
| Agreed Value - Expires 05/01/2017 | $25,000 |
| **Covered Causes of Loss** | |
| Special Form - Including Theft | |
| Deductible - All Covered Causes of Loss Unless Otherwise Stated | $1,000 |
| *Premium* | *$234.00* |

**Equipment
Breakdown
Coverage**

*To report a claim,  call  your Agent or 1-800-362-0000*



| | |
|---|---|
| *Coverage Is Provided In:*<br>Ohio Security Insurance Company | Policy Number:<br>**BKS  (17)  57 30 27 71**<br>Policy Period:<br>**From 05/01/2016 To 05/01/2017**<br>*12:01 am Standard Time*<br>*at Insured Mailing Location* |

**Commercial   Property**
**Declarations   Schedule**



| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF PROPERTY COVERAGES - BY LOCATION

This Equipment Breakdown insurance applies to the coverages shown for this location. The Equipment Breakdown limit(s) of insurance and deductible are included in, and not in addition to, the limits and deductible shown for the Building, Your Business Personal Property, Your Business Personal Property of Others, Tenants Improvements and Betterments, Business Income and Extra Expense, Business Income Without Extra Expense, and Extra Expense coverages.

*Premium*          *$3.00*

## SUMMARY OF OTHER PROPERTY COVERAGES

| Identity Theft<br>Administrative<br>Services<br>And Expense Coverage | **Description** | |
|---|---|---|
| | Limit of Insurance | See Endorsement CP9059 |
| | *Premium* | *$12.00* |

| Property<br>Extension<br>Endorsement | **Description** | |
|---|---|---|
| | Custom Protector Plus Endorsement | $8.00 |
| | *Premium* | *$8.00* |

| Property<br>Extension<br>Endorsement | **Description** | |
|---|---|---|
| | Contractors Custom Protector Endorsement | $150.00 |
| | *Premium* | *$150.00* |

| | |
|---|---|
| **Commercial Property Schedule Total:** | $407.00 |

*To report a claim, call your Agent or 1-800-362-0000*

This page intentionally left blank.



**Liberty Mutual.**
**INSURANCE**

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial   Inland   Marine**
**Declarations**

Policy Number:
**BKS   (17)  57 30 27 71**

Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 |
|  | T. C. IRONS INSURANCE AGENCY |



## SUMMARY OF CHARGES

| Explanation of Charges | DESCRIPTION | PREMIUM |
|---|---|---|
|  | Commercial Inland Marine Schedule Totals | $825.00 |

## SCHEDULE OF COVERAGES

## CONTRACTORS' EQUIPMENT

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

**PROPERTY COVERED**

(check one)

[ X ] Scheduled Equipment (Refer to Equipment Schedule)

[   ] Schedule On File

|  | **"LIMIT"** |
|---|---|
| **Catastrophe Limit --** The most "we" pay for loss in any one occurrence is: | $    25,000 |

**COVERAGE EXTENSIONS**

| Additional Debris Removal Expenses | $    5,000 |
|---|---|

**SUPPLEMENTAL COVERAGES**

| Employee Tools | $    5,000 |
|---|---|
| Equipment Leased or Rented From Others | $    25,000 |
| Newly Purchased Equipment (check one) | |
| [ X ] Percentage of Catastrophe Limit | 30 % |
| [   ] Dollar Limit | $ |
| Pollutant Cleanup and Removal | $    25,000 |
| Rental Reimbursement | |
| -- Reimbursement Limit | $    5,000 |
| -- Waiting Period | 72 Hours |
| Spare Parts and Fuel | $    5,000 |

Copyright, American Association of Insurance Services, Inc., 2012

AAIS
IM 7005 01 12
PAGE 2 OF 2

**COINSURANCE** (check one)

[ ] 80%         [ ] 90%         [x] 100%         [ ] OTHER        %

**REPORTING CONDITIONS** (check if applicable)

[  ] **Equipment Leased or Rented From Others**

-- Reporting  Rate                                        $

-- Deposit  Premium                                       $

-- Minimum  Premium                                       $

**VALUATION** (check if applicable)

[  ] Actual Cash Value         [  ] Replacement Cost

[ x ] Indicated  on Equipment  Schedule

**DEDUCTIBLE** (check one)

[ x ] Flat Deductible  Amount                      $        500

[  ] Percentage  Deductible                                        %

Maximum  Deductible  Amount                  $

Minimum  Deductible  Amount                   $

**ADDITIONAL INFORMATION**

IM 7005 01 12

Copyright, American Association of Insurance Services, Inc., 2012

AAIS
IM 7031 01 12

BKS   (17)   57 30 27 71

# EQUIPMENT  SCHEDULE
## CONTRACTORS'  EQUIPMENT
## VALUATION  BASIS

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

**SCHEDULED EQUIPMENT**

**AA** = Agreed Amount      **ACV** = Actual Cash Value      **RP** = Replacement Cost

| Item No. | Valuation | Description of Equipment | "Limit" |
|---|---|---|---|
| 1 | ACV | Tools-Owners with $2,500 per Item Max (See IM 7034) | $ 25,000 |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |

IM 7031 01 12

Copyright, American Association of Insurance Services, Inc., 2012



Liberty Mutual. INSURANCE

**Coverage Is Provided In:**
Ohio Security Insurance Company

**Commercial General Liability Declarations**

Policy Number:
BKS  (17)  57 30 27 71

Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time at Insured Mailing Location*

Basis: Occurrence

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606<br>T. C. IRONS INSURANCE AGENCY |



## SUMMARY OF LIMITS AND CHARGES

Commercial General Liability Limits of Insurance

| DESCRIPTION | LIMIT |
|---|---|
| Each Occurrence Limit | 1,000,000 |
| Damage To Premises Rented To You Limit (Any One Premises) | 1,000,000 |
| Medical Expense Limit (Any One Person) | 15,000 |
| Personal and Advertising Injury Limit | 1,000,000 |
| General Aggregate Limit (Other than Products - Completed Operations) | 2,000,000 |
| Products - Completed Operations Aggregate Limit | 2,000,000 |

Explanation of Charges

| DESCRIPTION | PREMIUM |
|---|---|
| General Liability Schedule Totals | 4,284.00 |
| Certified Acts of Terrorism  Coverage | 17.00 |

*Total Advance Charges:* **$4,301.00**
*Note: This is not a bill*

*To report a claim, call your Agent or 1-800-362-0000*

DS 70 22 01 08

05/03/16      57302771      NWESLEY      435           PCAOPPNO           INSURED COPY      004608      PAGE  25  OF  192


**Liberty Mutual.**
INSURANCE

Coverage Is Provided In:
Ohio Security Insurance Company

**Commercial General Liability**
**Declarations Schedule**

Policy Number:
BKS (17) 57 30 27 71

Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 |
| | T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF CLASSIFICATIONS - BY LOCATION

**0001**  167 W Street Rd, Feasterville Trevose, PA 19053-4168
**Insured:** J. MANN-R FINLEY INC.

**CLASSIFICATION -** 91341
Carpentry - Interior

| COVERAGE DESCRIPTION | PREMIUM BASED ON - Executive Officers | RATED / PER 1,000 | PREMIUM |
|---|---|---|---|
| Premise/Operations | 2,080 Dollars Of Payroll | 26.393 | **$55.00** |
| | Total: | | *$55.00* |
| Products/Completed Operations | | 7.205 | **$15.00** |
| | Total: | | *$15.00* |

**CLASSIFICATION -** 91341
Carpentry - Interior

| COVERAGE DESCRIPTION | PREMIUM BASED ON - Employees Payroll | RATED / PER 1,000 | PREMIUM |
|---|---|---|---|
| Premise/Operations | 85,000 Dollars Of Payroll | 26.393 | **$2,243.00** |
| | Total: | | *$2,243.00* |
| Products/Completed Operations | | 7.205 | **$612.00** |
| | Total: | | *$612.00* |

*of 192*

*26*

*To report a claim, call your Agent or 1-800-362-0000*



**Liberty Mutual.**
**INSURANCE**

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial   General   Liability**
**Declarations   Schedule**

Policy Number:
**BKS   (17)   57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 |
| | T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF CLASSIFICATIONS  - BY LOCATION

**CLASSIFICATION -**  91585
Contractors - Subcontracted Work - In Connection With
Construction, Reconstruction, Repair or Erection Of
Buildings NOC

| COVERAGE DESCRIPTION | PREMIUM BASED ON - | RATED / PER 1,000 | PREMIUM |
|---|---|---|---|
| Premise/Operations | 300,000 Dollars Of Total Cost | 2.394 | $718.00 |
| | | Total: | $718.00 |
| Products/Completed  Operations | | 1.356 | $407.00 |
| | | Total: | $407.00 |

**CLASSIFICATION -**  91581
Contractors - Subcontracted Work - In Connection With
Construction, Reconstruction, Erection or Repair -
Not Buildings

| COVERAGE DESCRIPTION | PREMIUM BASED ON - | RATED / PER 1,000 | PREMIUM |
|---|---|---|---|
| Premise/Operations | Dollars Of Total Cost - if any | 3.826 | |
| | | Total: | |
| Products/Completed  Operations | | 2.909 | |
| | | Total: | |

*To report a claim,  call your Agent or 1-800-362-0000*



**Liberty Mutual.** INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Commercial   General   Liability
Declarations   Schedule**

Policy Number:
**BKS   (17)   57 30 27 71**

Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time
at Insured Mailing Location*

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606
T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF OTHER COVERAGE

| COVERAGE DESCRIPTION | | PREMIUM |
|---|---|---|
| Contractors Custom Protector Coverages | See Policy Forms and Endorsements List | $204.00 |
| | Contractors Amendment of Pollution Exclusion (Job Sites) | $30.00 |

| **Commercial General Liability Schedule Total** | **$4,284.00** |
|---|---|

*To report a claim, call your Agent or 1-800-362-0000*



Coverage Is Provided In:
Ohio Security Insurance Company

**Employment Practices Liability Declarations**

Policy Number:
**BKS (17) 57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time at Insured Mailing Location*

Basis: Claims Made and Reported Coverage



THIS INSURANCE PROVIDES CLAIMS MADE COVERAGE. ANY DEFENSE EXPENSES PAID UNDER THIS COVERAGE PART WILL REDUCE THE AVAILABLE LIMITS OF INSURANCE AND MAY EXHAUST THEM COMPLETELY. DEFENSE EXPENSES MEANS REASONABLE AND NECESSARY FEES, COSTS AND EXPENSES RESULTING SOLELY FROM THE INVESTIGATION, LEGAL DEFENSE AND LEGAL APPEAL OF A CLAIM AGAINST THE INSURED, BUT EXCLUDING SALARIES OF OFFICERS AND EMPLOYEES OF THE INSURER. READ YOUR COVERAGE FORM CAREFULLY.

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF LIMITS AND CHARGES

**Employment Practices Liability Limits of Insurance**

| DESCRIPTION | LIMIT |
|---|---|
| Each Claim Limit | 10,000 |
| Aggregate Limit | 10,000 |

This Coverage is subject to a $5,000. Per Claim Deductible
Coinsurance Participation   0 %
Subject to a Maximum of: $0 Each Claim
Retroactive Date:   05/01/2016

**Explanation of Charges**

| DESCRIPTION | PREMIUM |
|---|---|
| Employment Practices Liability | 24.00 |

*Total Advance Charges:*     **$24.00**
*Note: This is not a bill*

*To report a claim, call your Agent or 1-800-362-0000*

DS 70 22 01 08


**Liberty Mutual.**
INSURANCE

*Coverage Is Provided In:*
Ohio Security Insurance Company

**Employment   Practices   Liability**
**Declarations   Schedule**

Policy Number:
**BKS   (17)   57 30 27 71**
Policy Period:
**From 05/01/2016 To 05/01/2017**
*12:01 am Standard Time*
*at Insured Mailing Location*

---

| Named Insured | Agent |
|---|---|
| J. MANN-R FINLEY INC. | (609) 387-0606 <br> T. C. IRONS INSURANCE AGENCY |

## SUMMARY OF CLASSIFICATIONS  - continued

*0001*   *167 W Street Rd, Feasterville  Trevose, PA 19053-4168*

Insured:   J. MANN-R FINLEY INC.

**CLASSIFICATION -**
Employment Practices Liability - Claims Made

| COVERAGE DESCRIPTION | PREMIUM BASED ON | PREMIUM |
|---|---|---|
| Employment Practices Liability | 4 Employee(s) | $24.00 |
| | *Total:* | *$24.00* |

| | |
|---|---|
| **Employment Practices Liability Schedule Total** | $24.00 |

---

*To report a claim, call your Agent or 1-800-362-0000*

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM



Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERAGES

## COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

   **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   **(1)** The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

   **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

   **b.** This insurance applies to "bodily injury" and "property damage" only if:

   **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

   **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II -** Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   **c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II -** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   **d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II -** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

© Insurance Services Office, Inc., 2012

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of



the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g.** **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** - Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.



**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** - Limits Of Insurance.

**COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2.  **Exclusions**

This insurance does not apply to:

a.  **Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b.  **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

c.  **Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

d.  **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e.  **Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f.  **Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

g.  **Quality Or Performance Of Goods - Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

h.  **Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

i.  **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j.  **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k.  **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l.  **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m.  **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.



**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C - MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletics contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

   These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   b. This insurance applies to such liability assumed by the insured;

   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   f. The indemnitee:

      (1) Agrees in writing to:

         (a) Cooperate with us in the investigation, settlement or defense of the "suit";

         (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

         (c) Notify any other insurer whose coverage is available to the indemnitee; and

         (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

    **(a)** Obtain records and other information related to the "suit"; and

    **(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II - WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

    **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

    **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

    **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

    **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

    **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

    **(1)** "Bodily injury" or "personal and advertising injury":

        **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

        **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

        **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

        **(d)** Arising out of his or her providing or failing to provide professional health care services.

    **(2)** "Property damage" to property:

        **(a)** Owned, occupied or used by;

        **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

    you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

© Insurance Services Office, Inc., 2012

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

   (1) With respect to liability arising out of the maintenance or use of that property; and

   (2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal And Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance**

   If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

   a. **Primary Insurance**

      This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

   b. **Excess Insurance**

      (1) This insurance is excess over:

         (a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

            (i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

            (ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

            (iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

            (iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section I - Coverage **A** - Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.** **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5.** **Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6.** **Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7.** **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8.** **Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9.** **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V - DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

   However "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in Paragraph **a.** above;

      (2) The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

COMMERCIAL GENERAL LIABILITY
CG 21 06 05 14

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

    **2. Exclusions**

    This insurance does not apply to:

    **p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

    Damages arising out of:

    **(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

    **(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

    This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

    However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

    **2. Exclusions**

    This insurance does not apply to:

    **Access Or Disclosure Of Confidential Or Personal Information**

    "Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

    This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

© Insurance Services Office, Inc., 2013

COMMERCIAL  GENERAL LIABILITY
CG 21 47 12 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT  - RELATED PRACTICES EXCLUSION

This endorsement  modifies  insurance  provided  under  the following:

COMMERCIAL  GENERAL LIABILITY  COVERAGE PART



**A.** The following  exclusion  is added to Paragraph **2., Exclusions** of Section **I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance  does not apply to:

"Bodily  injury"  to:

**(1)** A person  arising  out of any:

    **(a)** Refusal to employ  that person;

    **(b)** Termination  of that person's  employment;  or

    **(c)** Employment-related  practices,  policies,  acts  or omissions,  such  as coercion,  demotion,  evaluation,  reassignment,  discipline,  defamation,  harassment,  humiliation,  discrimination  or malicious  prosecution  directed  at that person;  or

**(2)** The spouse,  child,  parent,  brother  or sister  of that  person  as a consequence  of "bodily  injury"  to that  person  at whom  any of the employment-related  practices  described  in Paragraphs  **(a), (b),** or **(c)** above  is directed.

This exclusion  applies:

**(1)** Whether  the injury-causing  event  described  in Paragraphs  **(a), (b)** or **(c)** above  occurs  before  employment,  during  employment  or after  employment  of that person;

**(2)** Whether  the insured  may be liable  as an employer  or in any other  capacity;  and

**(3)** To any obligation  to share damages  with or repay  someone  else who must pay damages  because  of the injury.

**B.** The following  exclusion  is added to Paragraph **2., Exclusions** of Section **I - Coverage B - Personal And Advertising  Injury Liability:**

This insurance  does not apply to:

"Personal  and advertising  injury"  to:

**(1)** A person  arising  out of any:

    **(a)** Refusal to employ  that person;

    **(b)** Termination  of that person's  employment;  or

    **(c)** Employment-related  practices,  policies, acts or omissions,  such as coercion,  demotion,  evaluation,  reassignment,  discipline,  defamation,  harassment,  humiliation,  discrimination  or malicious  prosecution  directed  at that person;  or

**(2)** The spouse,  child,  parent,  brother  or sister  of that person  as a consequence  of "personal  and advertising  injury"  to that person  at whom  any of the employment-related  practices  described  in paragraphs  **(a), (b)** or **(c)** above  is directed.

This exclusion  applies:

**(1)** Whether  the injury-causing  event  described  in Paragraphs  **(a), (b)** or **(c)** above  occurs  before  employment,  during  employment  or after  employment  of that person;

**(2)** Whether  the insured  may be liable  as an employer  or in any other  capacity;  and

**(3)** To any obligation  to share damages  with or repay  someone  else who must pay damages  because  of the injury.

  © ISO Properties,  Inc.,  2006

**COMMERCIAL GENERAL LIABILITY**
**CG 21 67 12 04**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.** Exclusions of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

**2., Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2.** Exclusions of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi.

COMMERCIAL GENERAL LIABILITY
CG 21 70 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2015

COMMERCIAL GENERAL LIABILITY
CG 21 76 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF PUNITIVE DAMAGES
# RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

COMMERCIAL GENERAL LIABILITY
CG 21 86 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

**1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

**2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

**1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

**2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**3.** A reinforced or unreinforced base coat;

**4.** A finish coat providing surface texture to which color may be added; and

**5.** Any flashing, caulking or sealant used with the system for any purpose.

CG 21 86 12 04                © ISO Properties, Inc., 2003                **Page 1 of 1**

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.,** Exclusions of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2.,** Exclusions of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

© ISO Properties, Inc., 2004

COMMERCIAL GENERAL LIABILITY
CG 22 79 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - CONTRACTORS - PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART



The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

1. This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

   a. Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

   b. Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

   This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or on your behalf with respect to the operations described above.

2. Subject to Paragraph **3.** below, professional services include:

   a. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

   b. Supervisory or inspection activities performed as part of any related architectural or engineering activities.

3. Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

© Insurance Services Office, Inc., 2012

COMMERCIAL GENERAL LIABILITY
CG 24 26 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the **Definitions** section is replaced by the following:

"Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

CG 24 26 04 13 © Insurance Services Office, Inc., 2012 **Page 1 of 1**

**COMMERCIAL GENERAL LIABILITY**
**CG 83 20 12 08**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTRACTORS AMENDMENT OF POLLUTION EXCLUSION
# (JOB SITES)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART



**A.** The following is added to Paragraph **(1)(d)** of Exclusion **f.** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

**(iv)** "Bodily injury" or "property damage" sustained outside a building and arising out of the actual discharge, dispersal, seepage, migration, release or escape of "pollutants" brought on or to any premises, site or location in connection with operations being performed by you or on your behalf by a contractor or subcontractor.

As used in this endorsement, the actual discharge, dispersal, seepage, migration, release or escape of "pollutants" must:

   **(aa)** Commence on a clearly identifiable day during the policy period; and

   **(bb)** End, in its entirety, within seventy-two (72) hours of the commencement of the discharge, dispersal, seepage, migration, release or escape of "pollutants"; and

   **(cc)** Be discovered and reported to us within fifteen (15) days of the clearly identifiable day that the discharge, dispersal, seepage, migration, release or escape of "pollutants" commences; and

   **(dd)** Be neither expected nor intended from the standpoint of any insured; and

   **(ee)** Be unrelated to any previous discharge, dispersal, seepage, migration, release or escape; and

   **(ff)** Not originate at or from a storage tank or other container, duct or piping which:

      **a.** Is below the surface of the ground or water; or

      **b.** At any time has been buried under the surface of the ground or water and then is subsequently exposed.

**B.** For the purpose of coverage provided by this endorsement, the following is added to the definition of "property damage" of **Section V-Definitions** and applies only as respects this endorsement.

Land or water, whether below ground level or not, is not tangible property.

**C.** Coverage provided hereunder does not apply to any discharge, dispersal, seepage, migration, release or escape that is merely threatened or alleged rather than shown to have actually occurred.

COMMERCIAL  GENERAL LIABILITY
CG 84 94 12 08

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - CONSOLIDATED  INSURANCE  PROGRAMS (WRAP-UP)

This endorsement  modifies  insurance  provided  under  the following:

COMMERCIAL  GENERAL LIABILITY  COVERAGE PART

**A.** The following   exclusion  is added to Paragraphs  **2.** of **Section  I - Coverage  A - Bodily Injury And Property Damage Liability, Coverage  B - Personal And Advertising  Injury** and **Coverage C - Medical  Payments:**

   **2.  Exclusions**

   This insurance  does not apply to:

   "Bodily   injury",  "property  damage",  "personal  injury and advertising  injury"  or medical  expenses arising  directly  or indirectly  out of your current  ongoing  operations  or included  within  the "pro-ducts-completed  operations  hazard"  at any site  or location  where  you or your subcontractors   or employees  working  on your behalf  are performing   or previously  performed  operations  if any insured  under this policy  entered  into contracts  or agreements  commonly  referred  to as consoli-dated  insurance  programs  (Wrap-Up)  providing  general liability  coverage  at that site or location.

   However,  this exclusion  does not apply  to other jobs  or work that you performed  at such site or location  if such other jobs  or work were  not done as part of contracts  or agreements  commonly  referred  to as consolidated  insurance  programs  (Wrap-Up).

   This exclusion  applies  whether  or not the consolidated  insurance  programs  (Wrap-Up):

   **a.** Provide  coverage  identical  to that provided  by this coverage  part;

   **b.** Have limits  adequate  to cover all claims;  or

   **c.** Remain  in effect.

**B.** The following   is added  to Section  **IV - Commercial  General  Liability  Conditions**  Paragraph  **5. Premium Audit:**

   In computing   premium   for this policy,  we will  not include  any payroll  or costs paid  to your subcontractors   for work  at any site  or location  where  any insured  under this policy  had entered into contracts  or agreements  commonly  referred  to as consolidated  insurance  programs  (Wrap-Up)  providing  insurance  coverage  at that site or location  prior  to your work  at such site or location.

   A copy of the consolidated  insurance  program  (Wrap-Up)  certificate  or similar  documents  issued to you verifying  coverage  must  be provided  to us when  we audit  this policy.

Includes copyrighted material of ISO Properties, Inc., with its permission.

COMMERCIAL  GENERAL  LIABILITY
CG 84 99 01 12

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NON-CUMULATION    OF LIABILITY LIMITS
# (SAME OCCURRENCE)

This endorsement  modifies  insurance  provided  under the following:

COMMERCIAL  GENERAL LIABILITY  COVERAGE PART

The following   is added to Paragraph **5.** under **Section III - Limits Of Insurance:**

Non-Cumulation   of Liability  - Same Occurrence - If one "occurrence"   causes "bodily   injury"  or "property
damage"  during  the policy  period  and during  the policy  period  of one or more  prior,  or future,  general
liability   policies   issued  to  you  by  us,  then  this  policy's   Each  Occurrence  Limit  will  be reduced  by the
amount  of each payment  made  by us under  the other  policies  because of such "occurrence."

"For  purposes  of this  endorsement,   the  term  "us"  also  includes  any  other  company  that  is  or was  part  of
the Liberty  Mutual  Agency  Corporation   division  of Liberty  Mutual  Group."

©   2011 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission .

CG 84 99 01 12                                                                                     **Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMERCIAL GENERAL LIABILITY EXTENSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### INDEX

| SUBJECT | PAGE |
|---|---|
| NON-OWNED AIRCRAFT | 2 |
| NON-OWNED WATERCRAFT | 2 |
| PROPERTY DAMAGE LIABILITY - ELEVATORS | 2 |
| EXTENDED DAMAGE TO PROPERTY RENTED TO YOU (Tenant's Property Damage) | 2 |
| MEDICAL PAYMENTS EXTENSION | 3 |
| EXTENSION OF SUPPLEMENTARY PAYMENTS - COVERAGES A AND B | 3 |
| ADDITIONAL INSUREDS - BY CONTRACT, AGREEMENT OR PERMIT | 3 |
| PRIMARY AND NON-CONTRIBUTORY- ADDITIONAL INSURED EXTENSION | 5 |
| ADDITIONAL INSUREDS - EXTENDED PROTECTION OF YOUR "LIMITS OF INSURANCE" | 6 |
| WHO IS AN INSURED - INCIDENTAL MEDICAL ERRORS/MALPRACTICE AND WHO IS AN INSURED - FELLOW EMPLOYEE EXTENSION - MANAGEMENT EMPLOYEES | 6 |
| NEWLY FORMED OR ADDITIONALLY ACQUIRED ENTITIES | 7 |
| FAILURE TO DISCLOSE HAZARDS AND PRIOR OCCURRENCES | 7 |
| KNOWLEDGE OF OCCURRENCE, OFFENSE, CLAIM OR SUIT | 7 |
| LIBERALIZATION CLAUSE | 7 |
| BODILY INJURY REDEFINED | 7 |
| EXTENDED PROPERTY DAMAGE | 8 |
| WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US - WHEN REQUIRED IN A CONTRACT OR AGREEMENT WITH YOU | 8 |

© 2013 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

With respect to coverage afforded by this endorsement, the provisions of the policy apply unless modified by the endorsement.

**A. NON-OWNED AIRCRAFT**

Under Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability,** exclusion **g. Aircraft, Auto Or Watercraft** does not apply to an aircraft provided:

**1.** It is not owned by any insured;

**2.** It is hired, chartered or loaned with a trained paid crew;

**3.** The pilot in command holds a currently effective certificate, issued by the duly constituted authority of the United States of America or Canada, designating her or him a commercial or airline pilot; and

**4.** It is not being used to carry persons or property for a charge.

However, the insurance afforded by this provision does not apply if there is available to the insured other valid and collectible insurance, whether primary, excess (other than insurance written to apply specifically in excess of this policy), contingent or on any other basis, that would also apply to the loss covered under this provision.

**B. NON-OWNED WATERCRAFT**

Under Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability,** Subparagraph **(2)** of exclusion **g. Aircraft, Auto Or Watercraft** is replaced by the following:

This exclusion does not apply to:

**(2)** A watercraft you do not own that is:

    **(a)** Less than 52 feet long; and

    **(b)** Not being used to carry persons or property for a charge.

**C. PROPERTY DAMAGE LIABILITY - ELEVATORS**

**1.** Under Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability,** Subparagraphs **(3), (4)** and **(6)** of exclusion **j. Damage To Property** do not apply if such "property damage" results from the use of elevators. For the purpose of this provision, elevators do not include vehicle lifts. Vehicle lifts are lifts or hoists used in automobile service or repair operations.

**2.** The following is added to **Section IV - Commercial General Liability Conditions,** Condition **4. Other Insurance,** Paragraph **b. Excess Insurance:**

The insurance afforded by this provision of this endorsement is excess over any property insurance, whether primary, excess, contingent or on any other basis.

**D. EXTENDED DAMAGE TO PROPERTY RENTED TO YOU (Tenant's Property Damage)**

If Damage To Premises Rented To You is not otherwise excluded from this Coverage Part:

**1.** Under Paragraph **2. Exclusions of Section I - Coverage A - Bodily Injury and Property Damage Liability:**

    **a.** The fourth from the last paragraph of exclusion **j. Damage To Property** is replaced by the following:

    Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire, lightning, explosion, smoke, or leakage from an automatic fire protection system) to:

    **(i)** Premises rented to you for a period of 7 or fewer consecutive days; or

    **(ii)** Contents that you rent or lease as part of a premises rental or lease agreement for a period of more than 7 days.

    Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" to contents of premises rented to you for a period of 7 or fewer consecutive days.

    A separate limit of insurance applies to this coverage as described in **Section III - Limits of Insurance.**



**b.** The last paragraph of subsection **2. Exclusions** is replaced by the following:

Exclusions **c.** through **n.** do not apply to damage by fire, lightning, explosion, smoke or leakage from automatic fire protection systems to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to Damage To Premises Rented To You as described in **Section III - Limits Of Insurance.**

**2.** Paragraph **6.** under **Section III - Limits Of Insurance** is replaced by the following:

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to:

    **a.** Any one premise:

        **(1)** While rented to you; or

        **(2)** While rented to you or temporarily occupied by you with permission of the owner for damage by fire, lightning, explosion, smoke or leakage from automatic protection systems; or

    **b.** Contents that you rent or lease as part of a premises rental or lease agreement.

**3.** As regards coverage provided by this provision **D. EXTENDED DAMAGE TO PROPERTY RENTED TO YOU (Tenant's Property Damage) -** Paragraph **9.a.** of **Definitions** is replaced with the following:

**9.a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire, lightning, explosion, smoke, or leakage from automatic fire protection systems to premises while rented to you or temporarily occupied by you with the permission of the owner, or for damage to contents of such premises that are included in your premises rental or lease agreement, is not an "insured contract".

## E. MEDICAL PAYMENTS EXTENSION

If **Coverage C Medical Payments** is not otherwise excluded, the Medical Payments provided by this policy are amended as follows:

Under Paragraph **1. Insuring Agreement** of **Section I - Coverage C - Medical Payments,** Subparagraph **(b)** of Paragraph **a.** is replaced by the following:

**(b)** The expenses are incurred and reported within three years of the date of the accident; and

## F. EXTENSION OF SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

**1.** Under **Supplementary Payments - Coverages A** and **B**, Paragraph **1.b.** is replaced by the following:

**b.** Up to **$3,000** for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**2.** Paragraph **1.d.** is replaced by the following:

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to **$500** a day because of time off from work.

## G. ADDITIONAL INSUREDS - BY CONTRACT, AGREEMENT OR PERMIT

**1.** Paragraph **2.** under **Section II - Who Is An Insured** is amended to include as an insured any person or organization whom you have agreed to add as an additional insured in a written contract, written agreement or permit. Such person or organization is an additional insured but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused in whole or in part by:

**a.** Your acts or omissions, or the acts or omissions of those acting on your behalf, in the performance of your on going operations for the additional insured that are the subject of the written contract or written agreement provided that the "bodily injury" or "property damage" occurs, or the "personal and advertising injury" is committed, subsequent to the signing of such written contract or written agreement; or

**b.** Premises or facilities rented by you or used by you; or

**c.** The maintenance, operation or use by you of equipment rented or leased to you by such person or organization; or

**d.** Operations performed by you or on your behalf for which the state or political subdivision has issued a permit subject to the following additional provisions:

    **(1)** This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" arising out of the operations performed for the state or political subdivision;

    **(2)** This insurance does not apply to "bodily injury" or "property damage" included within the "completed operations hazard".

    **(3)** Insurance applies to premises you own, rent, or control but only with respect to the following hazards:

        **(a)** The existence, maintenance, repair, construction, erection, or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoist away openings, sidewalk vaults, street banners, or decorations and similar exposures; or

        **(b)** The construction, erection, or removal of elevators; or

        **(c)** The ownership, maintenance, or use of any elevators covered by this insurance.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

With respect to Paragraph **1.a.** above, a person's or organization's status as an additional insured under this endorsement ends when:

    **(1)** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

    **(2)** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

With respect to Paragraph **1.b.** above, a person's or organization's status as an additional insured under this endorsement ends when their written contract or written agreement with you for such premises or facilities ends.

With respects to Paragraph **1.c.** above, this insurance does not apply to any "occurrence" which takes place after the equipment rental or lease agreement has expired or you have returned such equipment to the lessor.

The insurance provided by this endorsement applies only if the written contract or written agreement is signed prior to the "bodily injury" or "property damage".

We have no duty to defend an additional insured under this endorsement until we receive written notice of a "suit" by the additional insured as required in Paragraph **b.** of Condition **2. Duties In the Event Of Occurrence, Offense, Claim Or Suit** under **Section IV - Commercial General Liability Conditions.**

**2.** With respect to the insurance provided by this endorsement, the following are added to Paragraph **2. Exclusions** under **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

**a.** "Bodily injury" or "property damage" arising from the sole negligence of the additional insured.

**b.** "Bodily injury" or "property damage" that occurs prior to you commencing operations at the location where such "bodily injury" or "property damage" occurs.

**c.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

    **(1)** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(2)** Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of, or the failure to render, any professional architectural, engineering or surveying services.

**d.** "Bodily injury" or "property damage" occurring after:

    **(1)** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

    **(2)** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**e.** Any person or organization specifically designated as an additional insured for ongoing operations by a separate **ADDITIONAL INSURED -OWNERS, LESSEES OR CONTRACTORS** endorsement issued by us and made a part of this policy.

**3.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**a.** Required by the contract or agreement; or

**b.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declaratio ns.

## H.  PRIMARY AND NON-CONTRIBUTORY ADDITIONAL INSURED EXTENSION

This provision applies to any person or organization who qualifies as an additional insured under any form or endorsement under this policy.

Condition **4. Other Insurance** of SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS is amended as follows:

**a.** The following is added to Paragraph **a. Primary Insurance:**

If an additional insured's policy has an Other Insurance provision making its policy excess, and you have agreed in a written contract or written agreement to provide the additional insured coverage on a primary and noncontributory basis, this policy shall be primary and we will not seek contribution from the additional insured's policy for damages we cover.

**b.** The following is added to Paragraph **b. Excess Insurance:**

When a written contract or written agreement, other than a premises lease, facilities rental contract or agreement, an equipment rental or lease contract or agreement, or permit issued by a state or political subdivision between you and an additional insured does not require this insurance to be primary or primary and non-contributory, this insurance is excess over any other insurance for which the additional insured is designated as a Named Insured.

Regardless of the written agreement between you and an additional insured, this insurance is excess over any other insurance whether primary, excess, contingent or on any other basis for which the additional insured has been added as an additional insured on other policies.

**I.    ADDITIONAL INSUREDS - EXTENDED PROTECTION OF YOUR "LIMITS OF INSURANCE"**



This provision applies to any person or organization who qualifies as an additional insured under any form or endorsement under this policy.

**1.**   The following is added to Condition **2. Duties In The Event Of Occurrence, Offense, Claim or Suit:**

An additional insured under this endorsement will as soon as practicable:

**a.**   Give written notice of an "occurrence" or an offense that may result in a claim or "suit" under this insurance to us;

**b.**   Tender the defense and indemnity of any claim or "suit" to all insurers whom also have insurance available to the additional insured; and

**c.**   Agree to make available any other insurance which the additional insured has for a loss we cover under this Coverage Part.

**d.**   We have no duty to defend or indemnify an additional insured under this endorsement until we receive written notice of a "suit" by the additional insured.

**2.**   The limits of insurance applicable to the additional insured are those specified in a written contract or written agreement or the limits of insurance as stated in the Declarations of this policy and defined in **Section III - Limits of Insurance** of this policy, whichever are less. These limits are inclusive of and not in addition to the limits of insurance available under this policy.

**J.    WHO IS AN INSURED - INCIDENTAL MEDICAL ERRORS / MALPRACTICE**
**WHO IS AN INSURED - FELLOW EMPLOYEE EXTENSION - MANAGEMENT EMPLOYEES**

Paragraph **2.a.(1)** of **Section II - Who Is An Insured** is replaced with the following:

**(1)**   "Bodily injury" or "personal and advertising injury":

**(a)**   To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)**   To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1) (a)** above;

**(c)**   For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1) (a)** or **(b)** above; or

**(d)**   Arising out of his or her providing or failing to provide professional health care services. However, if you are not in the business of providing professional health care services or providing professional health care personnel to others, or if coverage for providing professional health care services is not otherwise excluded by separate endorsement, this provision (Paragraph **(d)**) does not apply.

Paragraphs **(a)** and **(b)** above do not apply to "bodily injury" or "personal and advertising injury" caused by an "employee" who is acting in a supervisory capacity for you. Supervisory capacity as used herein means the "employee's" job responsibilities assigned by you, includes the direct supervision of other "employees" of yours. However, none of these "employees" are insureds for "bodily injury" or "personal and

advertising injury" arising out of their willful conduct, which is defined as the purposeful or willful intent to cause "bodily injury" or "personal and advertising injury", or caused in whole or in part by their intoxication by liquor or controlled substances.

The coverage provided by provision **J.** is excess over any other valid and collectable insurance available to your "employee".

**K.  NEWLY FORMED OR ADDITIONALLY ACQUIRED ENTITIES**

Paragraph **3.** of **Section II - Who Is An Insured** is replaced by the following:

   **3.**  Any organization you newly acquire or form and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   **a.**  Coverage under this provision is afforded only until the expiration of the policy period in which the entity was acquired or formed by you;

   **b.**  Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   **c.**  Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

   **d.**  Records and descriptions of operations must be maintained by the first Named Insured.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations or qualifies as an insured under this provision.

**L.  FAILURE TO DISCLOSE HAZARDS AND PRIOR OCCURRENCES**

Under **Section IV - Commercial General Liability Conditions,** the following is added to Condition **6. Representations:**

   Your failure to disclose all hazards or prior "occurrences" existing as of the inception date of the policy shall not prejudice the coverage afforded by this policy provided such failure to disclose all hazards or prior "occurrences" is not intentional.

**M.  KNOWLEDGE OF OCCURRENCE, OFFENSE, CLAIM OR SUIT**

Under **Section IV - Commercial General Liability Conditions,** the following is added to Condition **2. Duties In The Event of Occurrence, Offense, Claim Or Suit:**

   Knowledge of an "occurrence", offense, claim or "suit" by an agent, servant or "employee" of any insured shall not in itself constitute knowledge of the insured unless an insured listed under Paragraph **1.** of **Section II - Who Is An Insured** or a person who has been designated by them to receive reports of "occurrences", offenses, claims or "suits" shall have received such notice from the agent, servant or "employee".

**N.  LIBERALIZATION CLAUSE**

If we revise this Commercial General Liability Extension Endorsement to provide more coverage without additional premium charge, your policy will automatically provide the coverage as of the day the revision is effective in your state.

**O.  BODILY INJURY REDEFINED**

Under **Section V - Definitions,** Definition **3.** is replaced by the following:

   **3.**  "Bodily Injury" means physical injury, sickness or disease sustained by a person. This includes mental anguish, mental injury, shock, fright or death that results from such physical injury, sickness or disease.

**P. EXTENDED PROPERTY DAMAGE**

**Exclusion a.** of **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is replaced by the following:

   **a. Expected Or Intended Injury**

   "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

**Q. WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US - WHEN REQUIRED IN A CONTRACT OR AGREEMENT WITH YOU**

Under **Section IV - Commercial General Liability Conditions,** the following is added to Condition **8. Transfer Of Rights Of Recovery Against Others To Us:**



We waive any right of recovery we may have against a person or organization because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard" provided:

   **1.** You and that person or organization have agreed in writing in a contract or agreement that you waive such rights against that person or organization; and

   **2.** The injury or damage occurs subsequent to the execution of the written contract or written agreement.

COMMERCIAL  GENERAL LIABILITY
CG 88 60 12 08

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EACH LOCATION  GENERAL AGGREGATE LIMIT

This endorsement  modifies  insurance  provided  under the following:

COMMERCIAL  GENERAL LIABILITY  COVERAGE PART

**A.** For all sums which  the insured becomes  legally  obligated  to pay as damages  caused by "occurrences"  under **Section I - Coverage A - Bodily Injury And Property Damage  Liability,** and for all medical  expenses  caused by accidents  under **Section I - Coverage C Medical  Payments,** which  can be attributed  only to operations  at a single  "location"  owned by or rented to you:

   **1.** A separate Each Location General Aggregate  Limit  applies  to each "location",  and that limit  is equal  to the amount  of the General Aggregate  Limit  shown in the Declarations.

   **2.** The Each Location  General  Aggregate  Limit  is the most we will  pay for the sum  of all damages  under Coverage **A,** except damages  because of "bodily  injury"  or "property  damage"  included  in the "products-completed    operations  hazard",  and for medical  expenses  under Coverage  C regardless  of the number  of:

      **a.** Insureds;

      **b.** Claims made or "suits"  brought;  or

      **c.** Persons or organizations  making claims or bringing  "suits".

   **3.** Any payments  made under Coverage **A** for damages  or under Coverage  **C** for medical  expenses  shall  reduce the Each Location  General  Aggregate  Limit  for that "location".   Such payments  shall  not reduce the General  Aggregate  Limit  shown in the Declarations  nor shall  they reduce any other  Each Location  General Aggregate  Limit  for any other  "location".

   **4.** The limits  shown  in the Declarations  for Each Occurrence,  Fire Damage and Medical  Expense  continue  to apply. However,  instead  of being  subject  to the General Aggregate  Limit  shown in the Declarations,  such limits  will  be subject  to the applicable  Each Location  General Aggregate  Limit.

**B.** For all sums which  the insured becomes  legally  obligated  to pay as damages  caused by "occurrences"  under **Section I - Coverage A - Bodily Injury And Property Damage  Liability,** and for all medical  expenses  caused by accidents  under **Section I - Coverage C Medical  Payments,** which  cannot be attributed  only to operations  at a single  "location"   owned by or rented to you:

   **1.** Any payments  made under Coverage **A** for damages  or under Coverage  **C** for medical  expenses  shall  reduce the amount  available  under the General  Aggregate  Limit  or the Products-Completed  Operations  Aggregate  Limit,  whichever  is applicable;  and

   **2.** Such payments  shall  not reduce any Each Location  General Aggregate  Limit.

**C.** When coverage for liability  arising  out of the "products-completed    operations  hazard"  is provided,  any  payments  for damages  because of "bodily  injury"  or "property  damage"  included  in the "products-completed  operations  hazard"  will  reduce the Products-Completed   Operations  Aggregate  Limit,  and not  reduce the General  Aggregate  Limit  nor the Each Location  General Aggregate  Limit.

**D.** For the purposes  of this endorsement,  the following   definition   is added to **Section V - Definitions:**

   "Location"  means premises  involving   the same or connecting   lots, or premises  whose connection  is  interrupted   only by a street,  roadway,  waterway  or right-of-way   of a railroad.

**E.** The provisions  of **Section III - Limits Of Insurance** not otherwise   modified   by this endorsement  shall  continue  to apply as stipulated.

COMMERCIAL  GENERAL LIABILITY
CG 88 65 12 08

**THIS  ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# VOLUNTARY  PROPERTY DAMAGE  EXTENSION

This endorsement  modifies  insurance  provided  under the following:

COMMERCIAL  GENERAL LIABILITY  COVERAGE PART

With respect to coverage  afforded  by this endorsement,  the provisions  of the policy  apply  unless  modified
by this endorsement.

**A.   COVERAGE**

Subject  to Section  **B - Limits Of Insurance**  and Section  **C - Deductible**  of this endorsement:

The following  is added to Paragraph  **1. Insuring  Agreement**  of **Section I - Coverage  A-Bodily Injury And
Property  Damage  Liability:**

At your request, Property  Damage  coverage  provided  under Paragraph  **1.a.** for "property  damage"
to property  of others that:

**(1)**  Is caused by the insured,  and

**(2)**  Arises out of your business  operations  for which this policy  provides  liability  coverage

will  apply  without  regard  to the insured's  legal obligation  to pay damages.

**B.   LIMITS OF INSURANCE**

As respects  the coverage  afforded  by this endorsement,  **Section III - Limits Of Insurance**  is replaced  by
the following:

Regardless  of the number  of insureds,  claims  made or "suits"  brought,  or persons  or organizations
making  claims  or bringing  "suits":

**1.**   Subject  to **2.** below,  the most  we will pay for "property  damage"  arising  from any one "occur-
rence"  under this endorsement  is **$5,000.** This amount  is part of and not in addition  to the each
occurrence  limit  described  in Paragraph  **5.** of **Section III - Limits Of Insurance.**

**2.**   The most  we will pay for the sum of all "property  damage"  in an annual policy  period is **$25,000.**
This amount  is part of and not in addition  to the General Aggregate  Limit  described  in Paragraph  **2.**
of **Section III - Limits Of Insurance.**

**C.   DEDUCTIBLE**

We will  not pay for "property  damage"  in any one "occurrence"  until the amount  of "property  damage"
exceeds **$250.** If the policy  to which  this endorsement  is attached  contains  a "property  damage"  deduct-
ible, that deductible  shall apply  if it is greater  than **$250.**

**D.  EXCLUSIONS**

For the purposes of the coverage provided by this endorsement, the following exclusion is added:

This insurance does not apply to damage to property owned by any insured.

**E.  CONDITIONS**

For the purposes of the coverage provided by this endorsement, **Section IV - Commercial General Liability Conditions** is amended as follows:

**1.**  The following conditions are added:

  **a.**  Any payment made under this endorsement shall not be interpreted as an admission of liability by you or us.

  **b.**  In the event of a loss covered by this endorsement, you shall, at our request, replace the damaged property or furnish labor and materials necessary for repairs at your actual cost, excluding profit or overhead charges.

**2.**  The following is added to Condition **4. Other Insurance,** Paragraph **b. Excess Insurance.**

The insurance afforded by this endorsement is excess over any other insurance, whether primary, excess, contingent or on any other basis that applies to "property damage" covered by this endorsement.

**3.**  Condition **7. - Separation of Insureds** is deleted and replaced with the following:

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured this insurance applies:

  **a.**  As if each Named Insured were the only Named Insured; and

  **b.**  Separately to each insured against whom claim is made or suit is brought.

However, this condition does not apply if damages are to the property of any insured.

**F.  DEFINITIONS**

For the purposes of the coverage provided by this endorsement, Paragraph **17.** of **Section V - Definitions** is replaced by the following:

**17.**  "Property damage" means physical injury to tangible property. It does not include:

  **a.**  Loss of use of property, whether physically injured or not; or

  **b.**  Injury or loss caused by or arising from disappearance or theft.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

COMMERCIAL  GENERAL LIABILITY
CG 88 67 12 08

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROPERTY DAMAGE  - BORROWED  EQUIPMENT
## ($100,000  LIMIT)

This endorsement  modifies  insurance  provided  under  the following:

COMMERCIAL  GENERAL LIABILITY  COVERAGE PART

### Schedule



| | |
|---|---|
| **Property Damage - Borrowed  Equipment  Occurrence  Limit** | **$100,000** |
| **Property Damage - Borrowed  Equipment  Aggregate  Limit** | **$100,000** |

For the purposes  of the coverage  provided  by this endorsement:

**A.** Under **Section I - Coverages, Coverage A - Bodily Injury And Property Damage Liability, 2. Exclusions, j. Damage To Property,** item **(4)** does not apply to "property  damage"  to borrowed  equipment  while that equipment  is not being used to perform  operations  at a job site.

**B.** The following  is added to Section **III - Limits Of Insurance:**

    **1.** Subject to **2.** below, the Property Damage - Borrowed  Equipment  Occurrence  Limit shown in the Schedule is the most we will pay due to "property  damage"  arising out of any one "occurrence"  to borrowed  equipment  while that equipment  is not being used to perform  operations  at a job site. This limit is part of and not in addition  to the Each Occurrence  Limit applicable  to **Coverage A - Bodily Injury And Property Damage  Liability.**

    **2.** The Property Damage - Borrowed  Equipment  Aggregate  Limit shown in the Schedule is the most that is payable  under this coverage  regardless  of the number  of claims or suits made against you and is part of, and not in addition  to the General  Aggregate  Limit.

**C.** Under **Section IV - Commercial  General Liability Conditions, 4. Other Insurance, b. Excess Insurance,** the following  is added:

The insurance  afforded  by this endorsement  is excess over any of the other insurance,  whether  primary, excess, contingent  or on any other basis, that is property  insurance.

Nothing  contained  in this endorsement  shall be held to vary, alter, waive, or extend any of the terms, conditions,  provisions,  agreements  or limitations  of the policy, other than as stated above.

COMMERCIAL  GENERAL LIABILITY
CG 88 70 12 08

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONSTRUCTION   PROJECT(S) - GENERAL AGGREGATE LIMIT
# (PER PROJECT)

This endorsement  modifies  insurance  provided  under the following:

COMMERCIAL  GENERAL LIABILITY  COVERAGE PART

**A.** For all sums which  the insured  becomes  legally  obligated  to pay as damages  caused by "occurrences"
under **Section  I - Coverage  A - Bodily  Injury And Property  Damage  Liability,** and for all medical ex-
penses caused by accidents  under **Section  I - Coverage  C Medical  Payments,** which  can be attributed
only to ongoing  operations  at a single  construction  project  away from  premises  owned by or rented to
you:

   **1.** A separate  Construction  Project General Aggregate  Limit applies  to each construction  project, and
that limit is equal to the amount of the General  Aggregate  Limit shown  in the Declarations .

   **2.** The Construction  Project  General Aggregate  Limit is the most  we will pay for the sum of all
damages  under  Coverage  **A,** except  damages  because of "bodily  injury"  or "property  damage"
included  in the "products-completed  operations  hazard",  and for medical  expenses  under Cov-
erage **C** regardless  of the number  of:

      **a.** Insureds;

      **b.** Claims made or "suits"  brought;  or

      **c.** Persons or organizations  making claims  or bringing  "suits".

   **3.** Any payments  made under Coverage  **A** for damages  or under Coverage  **C** for medical  expenses
shall reduce the Construction  Project General Aggregate  Limit for that construction  project. Such
payments  shall not reduce the General Aggregate  Limit shown  in the Declarations  nor shall they
reduce any other Construction  Project General Aggregate  Limit for any other construction  project.

   **4.** The limits  shown  in the Declarations  for Each Occurrence,  Fire Damage  and Medical  Expense
continue  to apply. However,  instead of being subject  to the General Aggregate  Limit shown  in the
Declarations,  such limits  will be subject  to the applicable  Construction  Project General Aggregate
Limit.

**B.** For all sums which  the insured  becomes  legally  obligated  to pay as damages  caused by "occurrences"
under **Section  I - Coverage  A - Bodily  Injury And Property  Damage  Liability,** and for all medical ex-
penses caused by accidents  under **Section  I - Coverage  C Medical  Payments,** which  cannot be attrib-
uted only to ongoing  operations  at a single  construction  project  away from  premises  owned by or
rented to you:

   **1.** Any payments  made under Coverage  **A** for damages  or under Coverage  **C** for medical  expenses
shall reduce the amount  available  under the General Aggregate  Limit or the Products-Completed
Operations  Aggregate  Limit, whichever  is applicable;  and

   **2.** Such payments  shall not reduce any Construction  Project General Aggregate  Limit.

**C.** When coverage  for liability  arising  out of the "products-completed  operations  hazard"  is provided,  any
payments  for damages  because of "bodily  injury"  or "property  damage"  included  in the "products-
completed  operations  hazard"  will reduce the Products-Completed  Operations  Aggregate  Limit, and not
reduce the General Aggregate  Limit nor the Construction  Project General Aggregate  Limit.

**D.** If the applicable  construction  project  has been abandoned,  delayed,  or abandoned  and then restarted,
or if the authorized  contracting  parties  deviate from  plans, blueprints,  designs,  specifications  or
timetables,  the project  will still be deemed  to be the same construction  project.

**E.** The provisions  of **Section  III - Limits Of Insurance** not otherwise  modified  by this endorsement  shall
continue  to apply.

COMMERCIAL GENERAL LIABILITY
CG 88 72 12 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OFF PREMISES PROPERTY DAMAGE
# INCLUDING CARE, CUSTODY OR CONTROL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Property Damage - Off Premises Care, Custody Or Control Occurrence Limit**   25,000

**Property Damage - Off Premises Care, Custody Or Control Aggregate Limit**   25,000

(Information required to complete this Schedule, if not shown above, will be shown in the Declarations.)

With respect to coverage afforded by this endorsement, the provisions of the policy apply unless modified by this endorsement.

**A. COVERAGE**

Subparagraph **j.(4)** of Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced with the following:

**(4)** Personal property of others in the care, custody, or control of an insured at premises owned, occupied by, or rented to an insured;

Subparagraphs **j.(5)** and **(6)** of Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** are deleted.

**B. EXCLUSIONS**

The following are added to Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance shall not apply to:

**1.** "Property damage" :

**a.** To property owned by any Named Insured, any person qualifying as an insured in Paragraph **1.** of **Section II - Who Is An Insured,** or any "employee" of any Named Insured;

**b.** To property on any premises owned, rented, leased, operated or used by you; or

**c.** To property while in transit to or from any premises owned, rented, leased, operated or used by you.

**2.** "Property damage" to property included in the "products-completed operations hazard".

**3.** "Property damage" to borrowed equipment if coverage is provided by another endorsement attached to this policy described as **Property Damage - Borrowed Equipment.**

**CG 88 72 12 08**          Includes copyrighted material of ISO Properties, Inc., with its permission.          **Page 1 of 2**

**C.   LIMITS OF INSURANCE**

The following  is added to **Section III - Limits Of Insurance:**

**1.**   Subject to **2.** below, the Property Damage - Off Premises Care, Custody Or Control Occurrence Limit shown in the Schedule is the most we will pay due to "property damage" to property of others as a result of any one "occurrence". This limit is part of and not in addition to the Each Occurrence Limit applicable to **Coverage A - Bodily Injury And Property Damage Liability** described in Paragraph **5.** of **Section III - Limits Of Insurance.**

**2.**   The Property Damage - Off Premises Care, Custody Or Control Aggregate Limit shown in the Schedule is the most that is payable under this coverage regardless of the number of claims or "suits" made against you. This limit is part of, and not in addition to the General Aggregate Limit described in Paragraph **2.** of **Section III - Limits Of Insurance.**

**D.   DEDUCTIBLE**

For the purposes of the coverage provided by this endorsement:

We will not pay for "property damage" in any one "occurrence" until the amount of "property damage" exceeds **$250.** If the policy to which this endorsement is attached contains a "property damage" deductible, that deductible shall apply if it is greater than **$250.**

**E.   CONDITIONS**

For the purposes of the coverage provided by this endorsement, **Section IV - Commercial General Liability Conditions** is amended as follows:

**1.**   The following  condition is added:

In the event of a loss covered by this endorsement, you shall, at our request, replace the damaged property or furnish labor and materials necessary for repairs at your actual cost, excluding profit or overhead charges.

**2.**   The following  is added to condition **4. Other Insurance,** Paragraph **b. Excess Insurance:**

The insurance afforded by this endorsement is excess over any other insurance, whether primary, excess, contingent or on any other basis that applies to "property damage" covered by this endorsement.

**3.**   Condition **7. Separation of Insureds** is replaced with the following:

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.**   As if each Named Insured were the only Named Insured; and

**b.**   Separately to each insured against whom claim is made or "suit" is brought.

However, this condition does not apply if damages are to the property of any insured.

COMMERCIAL  GENERAL  LIABILITY
CG 88 77 12 08

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MEDICAL  EXPENSE AT YOUR REQUEST ENDORSEMENT

This endorsement  modifies  insurance  provided  under the following:

COMMERCIAL  GENERAL LIABILITY  COVERAGE PART



The following   is added to **Section I - Coverage C - Medical  Payments:**

If **Medical  Payments** or **Medical  Expenses** are not otherwise  excluded  from  the policy,  medical  expenses
will  be paid only  if an insured  has requested  that we pay such expenses.

Includes Copyrighted Material of ISO Properties, Inc., with its permission.

COMMERCIAL  GENERAL LIABILITY
CG 88 80 12 08

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROPERTY DAMAGE  - CUSTOMERS'  GOODS
## ($100,000 LIMIT)

This endorsement  modifies  insurance  provided  under  the following:

COMMERCIAL  GENERAL LIABILITY  COVERAGE PART

### Schedule

| | |
|---|---|
| **Property  Damage  - Customers'  Goods Occurrence  Limit** | **$100,000** |
| **Property  Damage  - Customers'  Goods Aggregate  Limit** | **$100,000** |

**A.** Under **Section I - Coverages, Coverage A-Bodily Injury And Property  Damage Liability, 2. Exclusions, j. Damage  To Property,** items **(3), (4)** and **(6)** do not apply to "property  damage" to "customers'  goods" while  on your premises.

**B.** For purposes  of the coverage  afforded  by this endorsement:

    **1.** Subject  to **2.** below,  the Property  Damage  - Customers'  Goods Occurrence  Limit  shown  in the Schedule  is the most we will  pay due to "property  damage" to "customers'  goods"  while on your premises  arising  out of any one "occurrence."  This limit  is part of and not in addition  to the Each Occurrence  limit  applicable  to **Coverage  A - Bodily Injury And Property  Damage Liability.**

    **2.** The Property  Damage  - Customers'  Goods Aggregate  Limit  shown  in the Schedule  is the most that is payable  under  this coverage  regardless  of the number  of claims  or "suits"  made against  you and is part of, and not in addition  to the General Aggregate  Limit.

**C.** Under **Section IV - Commercial  General  Liability  Conditions,  4. Other Insurance,  b. Excess Insurance,** the following  is added:

The insurance  afforded  by this endorsement  is excess over any of the other  insurance,  whether  primary, excess, contingent  or on any other basis, that is property  insurance.

**D.** Under **Section V - Definitions,** the following  definition  is added:

"Customers'  goods"  means  property  of your customer  on your premises  for the purpose  of being worked  on or used in your manufacturing  process.

Nothing  contained  in this endorsement  shall be held to vary, alter, waive, or extend  any of the terms, conditions,  provisions,  agreements  or limitations  of the policy,  other than as stated above.

**COMMERCIAL GENERAL LIABILITY**
**CG 88 86 12 08**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ASBESTOS LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS AND COMPLETED OPERATIONS COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

This insurance does not apply to:

1. "Bodily injury", "property damage" or "personal and advertising injury" arising, in whole or in part, either directly or indirectly out of the manufacture, storage, processing, mining, use, sale, installation, removal, disposal, distribution, handling, inhalation, ingestion, absorption, or existence of, exposure to or contact with asbestos, asbestos contained in goods, products or materials, asbestos fibers or asbestos dust; or

2. Any loss, cost or expense arising out of any:

   a. Request, demand, order, or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of asbestos, asbestos contained in goods, products or materials, asbestos fibers or asbestos dust; or

   b. Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of asbestos, asbestos contained in goods, products or materials, asbestos fibers or asbestos dust.

COMMERCIAL GENERAL LIABILITY
CG 89 02 12 08

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

**THIS INSURANCE PROVIDES CLAIMS MADE AND REPORTED COVERAGE. DEFENSE COSTS APPLY AGAINST THE LIMITS OF INSURANCE AND ARE SUBJECT TO THE DEDUCTIBLE.**

**PLEASE READ THE ENTIRE FORM CAREFULLY.**

THERE IS A SEPARATE COINSURANCE PROVISION APPLICABLE TO ALL PAYMENTS FOR "DAMAGES".

PLEASE READ THIS POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES, COVERAGE AND COVERAGE RESTRICTIONS.

Throughout this form the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance. The word "insured" means any person or organization qualifying as such under SECTION II - WHO IS AN INSURED.

All words and phrases that appear in quotation marks have special meaning. Refer to SECTION VIII - DEFINITIONS.

**SECTION I - COVERAGE**

**A. INSURING AGREEMENT**

1. We will pay on behalf of the insured for "damages" in excess of the Deductible arising out of any "employment practices" to which this insurance applies. We have no obligation under this insurance to make payments or perform acts or services except as provided for in this paragraph and in Item **B.** below.

2. This insurance applies to such "damages" only if:

   **a.** The "damages" result from "claims" made by "employees", "leased workers", "temporary workers", former "employees" or applicants for employment by you;

   **b.** The "employment practices" take place in the "coverage territory";

   **c.** Such "employment practices" occurred after the Retroactive Date, if any, shown in the Declarations and before the end of the "policy period"; and

   **d.** A "claim" is both:

      **(1)** First made against any insured, in accordance with Paragraph **3.** below, during the "policy period" or any Extended Reporting Period we provide under **SECTION VII - EXTENDED REPORTING PERIODS;** and

      **(2)** Reported to us either:

         **(a)** During the "policy period" or within thirty (30) days thereafter; or

         **(b)** With respect to any "claim" first made during any Extended Reporting Period we provide under **SECTION VII -EXTENDED REPORTING PERIODS,** during such Extended Reporting Period.

3. A "claim" will be deemed to have been made at the earlier of the following times:

   **a.** When notice of such "claim" is received and recorded by you or by us, whichever comes first; or

    **b.** When we make settlement in accordance with Paragraph **B.3.** below.

**4.** All "claims" for "damages" based on or arising out of:

    **a.** One "employment practice", or

    **b.** "Interrelated" "employment practices"

by one or more insureds shall be deemed to be one "claim" and to have been made at the time the first of those "claims" is made against any insured.

Each payment we make for "damages" or "defense expense" reduces the amount of insurance available, as provided under **SECTION III - LIMITS OF INSURANCE.** Each payment we make for "damages" under this insurance is further subject to your coinsurance participation, as specifically described in **SECTION V - COINSURANCE FOR PAYMENT OF "DAMAGES".**

**B. DEFENSE OF CLAIMS, ADMINISTRATIVE HEARINGS AND SETTLEMENT AUTHORITY**



**1.** We have the right and duty to defend the insured against "claims" seeking "damages" to which this insurance applies and to pay for related "defense expense". However, we have no duty to:

    **a.** Defend the insured against "claims" seeking "damages", or

    **b.** Pay for related "defense expense",

when this insurance does not apply.

**2.** Our right and duty to defend the insured against "claims" end when we have used up the amount of insurance available, as provided under **SECTION III - LIMITS OF INSURANCE.** This applies both to "claims" pending at that time and those filed thereafter.

**3.** We may:

    **(a)** At our sole discretion, investigate any "employment practice" that may result in "damages"; and

    **(b)** Settle any "claim" which may result, provided:

        **(1)** We have your written consent to settle; and

        **(2)** The settlement is within the applicable Limit of Insurance available.

Our liability will be limited as described below if:

    **(i)** You refuse to consent to any settlement we recommend, and

    **(ii)** Such recommended settlement is also acceptable to the claimant.

When this happens, our liability under this Coverage Part for such "claim" shall not exceed the amount we would have paid for "damages" and "defense expense" if you had consented at the time of our recommendation. You shall thereafter negotiate and defend that "claim" at your own cost and without our involvement.

**4.** **a.** When we control defense of a "claim", we will pay associated "defense expense" and choose a counsel of our choice from the panel of attorneys we have selected to deal with "employmen t practices" "claims". If you give us a specific written request at the time a "claim" is first made:

        **(1)** You may select one of our panel of employment law attorneys; or

    **(2)**  You may ask us to consider the approval of a defense attorney of your choice who is not on our panel.

    We will use the panel attorney you selected in **(1)** above, or consider your request in **(2)** above, when we deem it appropriate to engage counsel for such "claim".

**b.** If by mutual agreement or court order the insured assumes control of such defense before the applicable Limit of Insurance is used up, we will reimburse the insured for reasonable "defense expense", subject to item c. immediately below. You and any involved insured must continue to comply with **SECTION VI - CONDITIONS, B. Duties In Event Of "Employment Practices" And "Claims".** Additionally, you or such insured must direct defense counsel to:

    **(1)**  Furnish us with additional information we request to evaluate the "employment practices" or "claims"; and

    **(2)**  Cooperate with any counsel we may select to montitor or associate in the defense of the "employment practices" or "claim".

**c.** If we defend the insured under a reservation of rights, counsel will be required to maintain records pertinent to the insured's "defense expenses". These records will be used to determine the allocation of any "defense expenses" for which you or any insured may be solely responsible, including defense of an allegation not covered by this insurance.

**d.** We will notify you in writing when the applicable limit of insurance has actually been used up by the payment of judgment, settlements or "defense expense". We will also initiate and cooperate in the transfer of defense of any "claim" to an appropriate insured for which the duty to defend has ended by reason of **SECTION B.2.** above.

In any case, however, we only pay amounts in excess of the Deductible and such payments will reduce the Limit of Insurance available, as provided under **SECTION III - LIMITS OF INSURANCE.**

## C.  EXCLUSIONS

This insurance does not apply to "claims" arising directly or indirectly from any:

**1.  Prior "Employment Practices", Facts Or Circumstances**

**a.** "Employment practices" which were the subject of any demand, suit or other proceeding which was initiated against any insured; or

**b.** Facts, incidents and circumstances which would cause a reasonable person to believe a "claim" would be made and which were known to any insured,

prior to the effective date of the earlier of:

**(a)** The first Employment Practices Liability Coverage Part that we issued to you of which this policy was an uninterrupted renewal of this type of coverage, or

**(b)** This Employment Practices Liability Coverage Part.

**2.  Contractual Liability**

**a.** Breach of any express contract of employment or any express obligation to make payments in the event of termination of employment; or

b. Obligation to pay "damages" by reason of the assumption of liability in any contract or agreement. This exclusion does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement.

3. **Statutory Obligations**

Of the following laws:

a. Any workers compensation, disability benefits or unemployment compensation law, or any similar law, provided however, this exclusion shall not apply to any "claim" based upon, arising from, or in consequence of any actual or alleged retaliatory treatment of the claimant by the insured on account of the claimant's exercise of rights pursuant to any such law; or

b. The Fair Labor Standards Act, or any state or common law wage or hour law, including, but not limited to laws governing minimum wages, hours worked, overtime compensation, and including any recordkeeping and reporting related thereto. This exclusion includes actions or claims brought by or on behalf of individuals or agencies seeking wages, fines, penalties, taxes, disgorgement, or other affirmative relief or compensation, but does not include claims based on the Equal Pay Act, or retaliation; or

c. The National Labor Relations Act of 1938, the Worker Adjustment and Retraining Notification Act (Public Law 100- 37991988), the Consolidated Omnibus Budget Reconciliation Act of 1985, or the Occupational Safety and Health Act.

This exclusion also applies to any rules or regulations promulgated under any of the foregoing and amendments thereto or any similar provisions of any federal, state or local law, and to that part of any "damages" awarded for the cost or replacement of any insurance benefits due or alleged to be due to any current or former "employee".

4. **Employees' Retirement Income Security Act And Administration Of Employee Benefit Plans**

a. Responsibilities, obligations or duties imposed under the Employees' Retirement Income Security Act of 1974, Public Law 93- 406, (E.R.I.S.A.) as now or hereafter amended, or any similar state or other governmental law. This includes fiduciary liability and any other liability under any such laws.

b. Administration of employee benefits plans whether or not liability arises out of E.R.I.S.A.

5. **Publication Of Material With Knowledge Of Falsity Or Prior To Retroactive Date**

Oral or written publication of material, if such material:

a. Was published by or at the direction of the insured with knowledge of the material's falsity; or

b. Was first published before the Retroactive Date, if any, shown in the Declarations.

6. **Dishonest, Criminal Or Fraudulent Acts, Or Failure To Comply With Law**

a. Dishonest, criminal or fraudulent acts of the insured; or

b. The willful failure by the insured or with the insured's consent to comply with any law or any governmental or administrative order or regulation relating to "employment practices". Willful, as used in this exclusion, means acting with intentional or reckless disregard for such employment related laws, orders or regulations.

The enforcement of this exclusion against any insured under this policy shall not be imputed to any other insured.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

7. **Bodily Injury**

"Bodily  injury".

8. **Bankruptcy Or Acquisition By Another Entity**

"Employment  practices"  which occur when or after:

a. You file for or are placed in any bankruptcy,  receivership,  liquidation  or reorganizat ion proceeding;  or

b. Any other business entity acquires an ownership  interest in you which is greater than fifty percent.

9. **Americans With Disabilities Act - Costs Of Accommodations**

Costs of complying  with physical modifications  to your premises or any changes to your usual business operations  as mandated  by the Americans  with Disabilities  Act of 1990 including any amendment  thereto, or any similar  federal, state or local law.

10. **Strikes, Lockouts And Other Similar Actions**

Lockout, strike, picket line, related worker replacement(s)  or other similar  actions resulting  from labor disputes  or labor negotiations.

11. **War**

a. War, including  undeclared  or civil war; or

b. Warlike action by a military  force, including  action in hindering  or defending  against an actual or expected attack, by any government,  sovereign  or other authority  using military  personnel or other agents; or

c. Insurrection,  rebellion,  revolution,  usurped power, or action taken by governmental  authority in hindering  or defending  against any of these.

## SECTION II - WHO IS AN INSURED

**A.** If you are designated  in the Declarations  as:

1. An individual,  you and your spouse are insureds, but only with respect to the conduct  of a business of which you are the sole owner.

2. A partnership  or joint venture, you are an insured. Your current  or former members,  your partners, and their spouses are also insureds, but only with  respect to the conduct  of your business.

3. A limited  liability  company, you are an insured. Your current  or former members  are also insureds, but only with  respect to the conduct  of your business. Your current  or former  managers are insureds, but only with  respect to their duties as your managers.

4. An organization  other than a partnership,  joint venture or limited  liability  company,  you are an insured. Your current  or former directors  are insureds, but only with respect to their duties as your directors.

**B.** Each of the following  is also an insured:

1. Your current  or former "employees"  but only for acts within  the scope of their employment  by you or while performing  duties related to the conduct  of your business.



    **2.**  Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**C..**  Any heirs, executors, administrators, assignees or legal representatives of any individual insured described in provisions **1.** and **2.** of Paragraphs **A.** and **B.** above, in the event of the death, bankruptcy or incapacity of such insured, shall be insureds, but only to the extent this insurance would have been available to such insured but for their death, bankruptcy or incapacity.

**D.**  Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

    **1.**  You must provide us notice of such acquisition or formation within 30 days of the effective date of your acquisition or formation;

    **2.**  Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the "policy period", whichever is earlier;

    **3.**  Coverage does not apply to any "employment practices" that occurred before you acquired or formed the organization; and

    **4.**  You must pay us any additional premium due as a condition precedent to the enforceability of this additional extension of coverage.

This Part **D.** does not apply to any organization after it is shown in the Declarations or added to this policy by endorsement.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

**A.**  The Limits of Insurance shown in the Declarations for this Coverage Part and the rules below fix the most we will pay regardless of the number of:

    **1.**  Insureds;

    **2.**  "Claims" made; or

    **3.**  Persons or organizations making "claims".

**B.**  The amount of insurance stated as Aggregate Limit is the most we will pay for the sum of :

    **1.**  All "damages" for all "claims" arising out of any actual or alleged "employment practices" covered by this insurance; and

    **2.**  All "defense expense" for all "claims" seeking "damages" payable under Paragraph **B.1.** above.

Each payment we make for such "damages" or "defense expenses" reduces the Aggregate Limit by the amount of the payment. This reduced limit will then be the amount of insurance available for further "damages" and "defense expenses" under this Coverage Part.

**C.**  Subject to **B.** above, the amount of insurance stated as the Each "Claim" Limit is the most we will pay in excess of the Deductible as further described in **SECTION IV - DEDUCTIBLE** for the sum of :

    **1.**  All " damages" for injury arising from "employment practices" covered by this insurance arising out of one "claim" whether such "claim" is brought by one or more claimants; and

    **2.**  All "defense expense" associated with that specific "claim" in Item **C.1.** immed iately preceding.

**D.** In addition to the payments for "damages" and "defense expense" in Paragraphs **B.** and **C.** above, we will also pay all interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under the provisions of Paragraphs **B.** and **C.** above.

These Limits of Insurance apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period", unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - DEDUCTIBLE

**A.** A deductible applies to all "damages" for injury arising from "employment practices" and any "defense expense" however caused.

**B.** Our obligation under this Employment Practices Liability Insurance to pay "damages" and "defense expense" on behalf of any insured applies only to the sum of the amount of "damages" and "defense expense" for each "claim" which are in excess of the deductible amount stated in Declaration s.

**C.** Your obligation is to pay that deductible which is applicable to each "claim" made against this insurance. That deductible applies to the sum of all "damages" because of injury arising from "employment practices" paid for each "claim" and applicable "defense expense" associated therewith. If there should be no "damages" paid for a "claim", you are still obligated to pay the applicable deductible for any "defense expense" incurred by us in connection with that "claim".

**D.** The terms of this insurance apply irrespective of the application of the deductible, including those with respect to:

**1.** Our right and duty to defend any "claims" seeking those "damages"; and

**2.** Your duties in the event of a "claim".

**E.** We may pay any part or all of the deductible to effect settlement of any "claim" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible as we may have paid for "damages" or "defense expense".

**F.** The application of the deductible does not erode the Limits of Insurance provided.

## SECTION V - COINSURANCE FOR PAYMENT OF "DAMAGES"

**A.** With respect to any "claim" for which we pay "damages" under this insurance, you will be responsible for your share of such "damages", in excess of the applicable deductible, at the percentage shown in the Declarations as coinsurance participation. We will be responsible for the remaining percentage of "damages" payable under this Coverage Part subject to the applicable Limits of Insurance.

**B.** Your coinsurance participation is limited as shown in the declarations to a maximum amount per "claim".

**C.** Subject to the provisions of this section we may make payments for "damages" and then request you to pay us your percentage share. You agree to reimburse us for your share. By making such payments for "damages", we do not waive our right to recover your share of such payment(s).

**D.** The application of this coinsurance provision does not erode the Limits of Insurance provided.

## SECTION VI - CONDITIONS

We have no duty to provide insurance under this Coverage Part unless you and any involved insured have fully complied with Conditions contained in this Coverage Part.

**A.  Bankruptcy**

Subject to exclusion **8.,** the bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**B.  Duties in Event of "Employment Practices" or "Claims"**



  **1.**  You must see to it that we are notified as soon as practicable of any specific "employment practices" which you believe may result in an actual "claim". Your belief must be reasonably certain as the result of specific allegations made by a potential claimant or such potential claimant's representative, or as the result of specifically identifiable injury sustained by a potential claimant. To the extent possible, notice should include:

   **a.**  How, when and where such "employment practices" took place;

   **b.**  The names and addresses of any potential claimants and witnesses; and

   **c.**  The nature of any injury arising out of such "employment practices".

   Notice of such "employment practices" is not notice of a "claim", but preserves any insured's rights to future coverage for subsequent "claims" arising out of such "employment practices" as described in the Basic Extended Reporting Period of **SECTION VII - EXTENDED REPORTING PERIODS.**

  **2.**  If a "claim" is received by any insured:

   **a.**  You must immediately record the specifics of the "claim" and the date received;

   **b.**  You and any other involved insured must see to it that we receive written notice of the "claim", as soon as practicable, but in any event we must receive notice either:

    **(1)**  During the "policy period" or within thirty (30) days thereafter; or

    **(2)**  With respect to any "claim" first made during any Extended Reporting Period we provide under **SECTION VII - EXTENDED REPORTING PERIODS,** during such Extended Reporting Period,

   as a condition precedent for coverage under this insurance. Such notice must provide us with the same information as is required in Item **1.** immediately preceding; and

   **a.**  You and any other involved insured must:

    **(1)**  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim";

    **(2)**  Authorize us to obtain records and other information;

    **(3)**  Cooperate with us in the investigation, settlement or defense of the "claim"; and

    **(4)**  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

  **3.**  No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

**C.  Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**1.**  To join us as a party or otherwise bring us into a "claim" seeking "damages" from any insured;  or

**2.**  To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for "damages" that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**D.  Other Insurance**

If other valid and collectible insurance is available to the insured for "damages" or "defense expense" we cover under this Coverage Part, our obligations are limited as follows:

**1.**  As this insurance is primary insurance, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **2.** below.

**2.**  If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**E.  Premium Audit**

**1.**  We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**2.**  Premium shown in this Coverage Part as advance premium is deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the "policy period" is greater than the earned premium, we will return the excess to the first Named Insured.

**3.**  The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**F.  Representations**

By accepting this policy, you agree:

**1.**  The statements in the Declarations are accurate and complete;

**2.**  Those statements are based upon representations you made to us; and

**3.**  We have issued this policy in reliance upon your representations.

**G.  Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**1.**  As if each Named Insured were the only Named Insured; and

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**2.** Separately to each insured against whom "claim" is made.

**H. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will sue those responsible or transfer those rights to us and help us enforce them.

**I. Payment of Deductibles and Coinsurance Amounts**

The first Named Insured shown in the Declarations is responsible for the payment of all deductible and coinsurance participation amounts.

**J. When We Do Not Renew**

If we decide not to renew this insurance, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date. If notice is mailed, proof of mailing will be sufficient proof of notice.

Any State amendatory endorsement changing Nonrenewal Conditions for any part of this policy to which this Coverage Part forms a part, shall also apply to this Coverage Part.

**K. Common Policy Conditions**

The following additional conditions apply with respect to this Coverage Part:

**1.** The Common Policy Conditions contained in form **IL 00 17;** and

**2.** Any applicable State amendments thereto.

**SECTION VII - EXTENDED REPORTING PERIODS**

**A.** We will provide Extended Reporting Periods, as described below, if:

  **1.** This insurance is cancelled or not renewed; or

  **2.** We renew or replace this Coverage Part with insurance that:

    **a.** Has a Retroactive Date later than the date shown in the Declarations of this Coverage Part; or

    **b.** Does not apply on a claims-made basis.

**B.** Extended Reporting Periods do not extend the "policy period" or change the scope of coverage provided. They apply only to "claims" as the result of "employment practices" which occurred after the Retroactive Date, if any, shown in the Declarations and before the end of the "policy period". Once in effect, Extended Reporting Periods may not be cancelled.

**C.** Extended Reporting Periods do not reinstate or increase the Limits of Insurance.

**D.** A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the "policy period" and lasts for:

  **1.** Five years with respect to "claims" arising out of "employment practices" which had been properly reported to us during the "policy period" in accordance with provision **1.** of Paragraph **B. Duties in Event of "Employment Practices" or "Claims",** under **SECTION VI - CONDITIONS;** and

  **2.** Sixty days with respect to "claims" arising from "employment practices" not previously reported to us.



The Basic Extended Reporting Period does not apply to "claims" that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such claims.

**E.** A Supplemental Extended Reporting Period of twelve (12) months duration is available, but only by an endorsement and for an extra charge. This supplemental period starts when the Basic Extended Reporting Period, set forth in Paragraph **D.2.** above, ends. You must give us a written request for the endorsement within 30 days after the end of the "policy period". The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium when due. We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

**1.** The exposures insured;

**2.** Previous types and amounts of insurance;

**3.** Limits of Insurance available under this Coverage Part for future payment of "damages" or "defense expense"; and

**4.** Other related factors.

The additional premium will not exceed 200% of the annual premium for this Coverage Part.

**F.** The Supplemental Extended Reporting Period endorsement we issue shall set forth the terms, not inconsistent with this Section, applicable to the Supplemental Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Supplemental Extended Reporting Period begins.

## SECTION VIII - DEFINITIONS

**A.** "Bodily injury" means physical injury to the body, sickness or disease sustained by a person as the result of direct physical injury to the body, including death resulting from any of these at any time. "Bodily injury" does not include mental anguish that results from an "employment practice".

**B.** "Claim" means written or oral notice presented by:

**1.** Any "employee", "leased worker", "temporary worker", former "employee" or applicant for employment by you; or

**2.** The EEOC or any other Federal, state or local administrative or regulatory agency on behalf of such person in Item **1.** immediately preceding,

alleging that the insured is responsible for "damages" as a result of injury arising out of any "employment practices".

"Claim" includes any civil proceeding in which either "damages" are alleged or fact finding will take place, when either is the actual or alleged result of any "employment practice" to which this insurance applies. This includes:

**(1)** An arbitration proceeding in which such "damages" are claimed and to which the insured submits with our consent;

**(2)** Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the insured submits with our consent; or

**(3)** Any administrative proceedings established under applicable federal, state or local laws as may be applicable to "employment practices" covered under this insurance.

**C.** "Coverage territory" means:

**1.** The United States of America (including its territories and possessions) and Puerto Rico; or

**2.** Anywhere in the world with respect to the activities of a person whose place of employment is in the territory described in **1.** above, while he or she is away for a short time on your business;

provided that the insured's responsibility to pay "damages" is determined in a suit (or in any other type of civil proceeding as described under the definition of "claim") on the merits in, and under the substantive law of, the United States of America (including its territories and possessions) or Puerto Rico.

**D.** "Damages" means monetary amounts to which this insurance applies and which the insured is legally obligated to pay as judgments or awards, or as settlements to which we have agreed in writing.

"Damages" include:

**1.** "Pre-judgment interest" awarded against the insured on that part of the judgment we pay,

**2.** To the extent allowed by law, any portion of a judgment or award that represents a multiple of the compensatory amounts or punitive or exemplary damages, and

**3.** "Legal fees" unless the "claim" is seeking solely equitable relief, injunctive relief, declarative relief or any other relief or recovery other than money.

"Damages" do not include:

**(1)** Civil, criminal, administrative or other fines or penalties;

**(2)** Equitable relief, injunctive relief, declarative relief or any other relief or recovery other than money;

**(3)** "Legal fees" when solely equitable relief, injunctive relief, declarative relief or any other relief or recovery other than money is sought; or

**(4)** Judgments or awards because of acts deemed uninsurable by law.

**E.** "Defense expense" means payments allocated to a specific "claim" for its investigation, settlement, or defense, including:

**1.** Attorney fees and all other litigation expenses.

**2.** The cost of bonds to appeal a judgment or award in any "claim" we defend. We do not have to furnish these bonds.

**3.** The cost of bonds to release attachments, but only for bond amounts within the available limits of insurance. We do not have to furnish these bonds.

**4.** Reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of any "claim", including actual loss of earnings up to $250 a day because of time off from work.

**5.** Costs taxed against the insured in the "claim".

"Defense expense" does not include:

**(1)** Salaries and expenses of our employees or your "employees", other than:

**(a)** That portion of our employed attorneys' fees, salaries and expenses allocated to a specific "claim" for the defense of the insured; and

**(b)** The expenses described in **4.** above; and

    (2)  Interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under the provisions of **SECTION III - LIMITS OF INSURANCE.**

**F.**  "Employee" means a person

    **1.**  Employed by you for wages or salary, or

    **2.**  Who is a current or former member of your board of directors.

    But "employee" does not include any independent contractor, any employees of any independent contractor while acting within the scope of their employment, any "leased worker" or any "temporary worker".

**G.**  "Employment practices" means any of the following actual or alleged practices which are directed against any of your "employees", "leased workers", "temporary workers", former "employees" or any applicant for employment by you, and for which remedy is sought under any federal, state or local statutory or common civil employment law:

    **1.**  Wrongful refusal to employ a qualified applicant for employment;

    **2.**  Wrongful failure to promote, or wrongful deprivation of career opportunity;

    **3.**  Wrongful demotion, negligent evaluation, negligent reassignment or wrongful discipline;

    **4.**  Wrongful termination of employment, including retaliatory or constructive discharge;

    **5.**  Employment related misrepresentation;

    **6.**  Harassment, coercion, discrimination or humiliation as a consequence of race, color, creed, national origin, marital status, medical condition, gender, age, physical appearance, physical and/or mental impairments, pregnancy, sexual orientation or sexual preference or any other protected class or characteristic established by any applicable federal, state, or local statute; or

    **7.**  Oral or written publication of material that slanders, defames or libels or violates or invades a right of privacy.

**H.**  "Interrelated" means:

    **1.**  Having as a common nexus any fact, circumstance, situation, event, transaction or cause; or

    **2.**  A series of related facts, circumstances, situations, events, transactions or causes.

**I.**  "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**J.**  "Legal fees" means attorneys fees, or expenses that the insured is legally obligated to pay as a result of an adverse judgment. "Legal fees" does not include cost of compliance with any equitable relief, injunctive relief, declarative relief or any other relief or recovery other than money.

**K.**  "Policy period" means the period stated in the Declarations of the policy of which this Coverage Part forms a part including an extension after issuance of the policy for an additional period of less than 12 months. However:

    **1.**  If this Coverage Part is issued to be effective subsequent to the effective date of such policy, the "policy period" for the Coverage Part will start with the effective date of the Coverage Part; and



2.   If this Coverage Part is cancelled prior to the expiration date of such policy, the "policy period" for this Coverage Part will end with the cancellation date of the Coverage Part.

L.   "Pre-judgment interest" means interest added to a settlement, verdict, award or judgment based on the amount of time prior to the settlement, verdict, award or judgment, whether or not made part of the settlement, verdict, award or judgment.

M.   "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

COMMERCIAL  GENERAL LIABILITY
CG 89 56 11 10

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT   OF OCCURRENCE DEFINITION

This endorsement  modifies  insurance  provided  under  the  following:

COMMERCIAL  GENERAL LIABILITY  COVERAGE PART

The  definition  of "occurrence"   in Section  **V - Definitions**  is replaced  with  the following:

"Occurrence"   means an accident, including   continuous   or repeated  exposure  to substantially   the  same general harmful  conditions.

"Occurrence"   also means:

**a.**   An accident,  including   continuous   or repeated  exposure  to substantially   the same general  harmful conditions,  that involves  "property   damage"  to property  that is not "your  work",  but is caused by "your  work",  regardless  of whether  the work is performed  by you or on your behalf  by a sub-contractor;  or

**b.**   An accident,  including   continuous   or repeated  exposure  to substantially   the same general  harmful conditions,  that involves  "property   damage"  to "your  work",  but only if the damaged  work or the work out of which  the damage  arises was performed  on your behalf  by a subcontractor,   and the "property  damage"  is included  within  the "products-completed   operations  hazard".

©2010 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted  material of Insurance Services Office, Inc.,
with its permission.

COMMERCIAL GENERAL LIABILITY
CG 90 13 10 11

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT RELATED PRACTICES LIABILITY - EXTENDED REPORTING PERIOD AMENDMENT - CUSTOM PROTECTOR™

This endorsement modifies insurance provided under the following:

EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE FORM



**SECTION VII - EXTENDED REPORTING PERIODS,** Paragraph **E.** is replaced by the following:

**E.** A Supplemental Extended Reporting Period of twelve (12) months duration is available, but only by an endorsement and for an extra charge. This supplemental period starts when the Basic Extended Reporting Period, set forth in Paragraph **D.2.** above, ends. You must give us a written request for the endorsement within 60 days after the end of the "policy period". The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium when due. We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

**1.** The exposures insured;

**2.** Previous types and amounts of insurance;

**3.** Limits of Insurance available under this Coverage Part for future payment of "damages" or "defense expense"; and

**4.** Other related factors.

The additional premium will not exceed 200% of the annual premium for this Coverage Part.

© 2011 Liberty Mutual Agency Corporation. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

AAIS
CL 0100 03 99
Page 1 of 1

# COMMON   POLICY CONDITIONS

1. **Assignment --** This policy may not be assigned without "our" written consent.

2. **Cancellation --** "You" may cancel this policy by returning the policy to "us" or by giving "us" written notice and stating at what future date coverage is to stop.

   "We" may cancel this policy, or one or more of its parts, by written notice sent to "you" at "your" last mailing address known to "us". If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

   If "we" cancel this policy for nonpayment of premium, "we" will give "you" notice at least ten days before the cancellation is effective. If "we" cancel this policy for any other reason, "we" will give "you" notice at least 30 days in advance of cancellation. The notice will state the time that the cancellation is to take effect.

   "Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

3. **Change, Modification, or Waiver of Policy Terms - -** A waiver or change of the "terms" of this policy must be issued by "us" in writing to be valid.

4. **Inspections --** "We" have the right, but are not obligated, to inspect "your" property and operations at any time. This inspection may be made by "us" or may be made on "our" behalf. An inspection or its resulting advice or report does not warrant that "your" property or operations are safe, healthful, or in compliance with laws, rules, or regulations. Inspections or reports are for "our" benefit only.

5. **Examination of Books and Records --** "We" may examine and audit "your" books and records that relate to this policy during the policy period and within three years after the policy has expired.

Copyright, American Association of Insurance Services, Inc., 1998

AAIS
CL 0124 10 06
Page 1 of 2

This endorsement changes
the policy
**--PLEASE READ THIS CAREFULLY--**

# AMENDATORY ENDORSEMENT
## PENNSYLVANIA

**1.** The following provision applies to policies that do not include coverage for owner-occupied private residential structures with four or less household units or household personal property contained in a private residence.

Under Common Policy Conditions, Cancellation is deleted and replaced by the following:

**Cancellation and Nonrenewal --** "You" may cancel this policy by returning the policy to "us" or by giving "us" written notice and stating at what future date coverage is to stop.

"We" may cancel or not renew this policy by written notice to "you" at the address shown on the "declarations". "Our" notice will include the specific reason for cancellation or nonrenewal. Proof of delivery or mailing is sufficient proof of notice.

If this policy has been in effect less than 60 days, "we" may cancel for any reason. "We" will give "you" at least 30 days notice before cancellation is effective.

After this policy has been in effect 60 days or more, or if it is a renewal of a policy issued by "us", "we" may cancel only if one or more of the following reasons apply:

**a.** a condition, factor, or loss experience material to insurability has changed substantially, or a substantial condition, factor, or loss experience material to insurability has become known during the policy term;

**b.** loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease will, at the time of cancellation, be certified to the Insurance Commissioner as directly affecting inforce policies;

**c.** "you" have made a material misrepresentation which affects the insurability of the risk;

**d.** the policy was obtained through fraudulent statements, omissions, or concealment of fact material to the acceptance of the risk or hazard assumed by "us";

**e.** "you" have failed to pay a premium when due, whether the premium is payable directly to "us" or "our" agents or indirectly under a premium finance plan or extension of credit;

**f.** material failure to comply with policy "terms", conditions, or contractual duties. This includes material failure to comply with safety standards and loss control recommendations if:

   **1)** "we" have provided "you" with written notice of the failure to comply with safety standards and loss control recommendations;

   **2)** "we" have provided "you" with a reasonable opportunity to cure deficiencies with respect to safety standards and loss control recommendations; and

   **3)** the deficiencies with respect to safety standards and loss control recommendations have not been cured; or

**g.** other reasons that the Insurance Commissioner may approve.

After this policy has been in effect 60 days or more: if "we" cancel or nonrenew for nonpayment of premium or material misrepresentation, "we" will give "you" at least 15 days notice before cancellation is effective; if "we" cancel or nonrenew for any other reason, "we" will give "you" at least 60 days notice before cancellation or nonrenewal is effective.

The policy may also be cancelled from inception upon discovery that it was obtained through fraudulent statements, omissions, or concealment of fact material to the acceptance of the risk or to the hazard assumed by "us".

CL 0124 10 06

Copyright, American Association of Insurance Services, Inc., 2006

AAIS
CL 0124 10 06
Page 2 of 2

The return premium, if any, will be refunded to "you" not later than ten business days after the effective date of the termination if "we" cancel this policy, or not later than 30 days after the effective date of the termination if "you" cancel this policy.

2. The following provision applies to policies that include coverage for owner-occupied private residential structures with four or less household units or household personal property contained in a private residence.

Under Common Policy Conditions, Cancellation is deleted and replaced by the following:

**Cancellation and Nonrenewal --** "You" may cancel this policy by returning the policy to "us" or by giving "us" written notice and stating at what future date coverage is to stop.

"We" may cancel or not renew this policy by written notice to "you" at the address shown on the "declarations". "Our" notice will include the specific reason for cancellation or nonrenewal. Proof of delivery or mailing is sufficient proof of notice.

If this policy has been in effect less than 60 days, "we" may cancel for any reason.

After this policy has been in effect for 60 days or more, or if it is a renewal of a policy issued by "us", "we" may cancel or not renew only for the following reasons:

a. the premium has not been paid when due;

b. the policy was obtained through fraud, material misrepresentation, or omission of fact which, if known by "us", would have caused "us" not to issue the policy;

c. there has been a substantial change or increase in hazard in the risk assumed by "us" subsequent to the date the policy was issued;

d. there is a substantial increase in the hazards insured against by reason of willful or negligent acts or omissions by "you"; or

e. any other reasons approved by the Insurance Commissioner pursuant to rules and regulations promulgated by the Insurance Commissioner.

"We" will give "you" notice at least 30 days in advance of cancellation or nonrenewal.

This policy terminates automatically on its expiration or anniversary if "you": surrender the policy to "us"; have notified "us" or "our" agent in writing of "your" intent not to renew; or have not paid the renewal or installment premium when due.

"Your" return premium, if any, will be refunded at the time of cancellation or as soon as practical. Payment or tender of the unearned premium is not a condition of cancellation.

3. Under Common Policy Conditions, the following condition is added:

**Notice Of Increased Premium --** "We" will give "you" notice at least 30 days before the renewal date if "we" intend to increase the renewal premium.

Copyright, American Association of Insurance Services, Inc., 2006

AAIS
CL 0600 01 15
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# CERTIFIED TERRORISM LOSS



1.  The following definitions are added.

    a.  "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:

        1)  to be an act of terrorism;

        2)  to be a violent act or an act that is dangerous to human life, property, or infrastructure;

        3)  to have resulted in damage:

            a)  within the United States; or

            b)  to an air carrier (as defined in section 40102 of title 49, United States Code); to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or at the premises of any United States mission;

        4)  to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion; and

        5)  to have resulted in insured losses in excess of five million dollars in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended.

    b.  "Certified terrorism loss" means loss that results from a "certified act of terrorism".

2.  The "terms" of any terrorism exclusion that is part of or that is attached to this Coverage Part are amended by the following provision:

    This exclusion does not apply to "certified terrorism loss".

3.  The following provision is added.

    If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a calendar year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a calendar year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

4.  The following provisions are added.

    a.  Neither the "terms" of this endorsement nor the "terms" of any other terrorism endorsement attached to this Coverage Part provide coverage for any loss that would otherwise be excluded by this Coverage Part under:

        1)  exclusions that address war, military action, or nuclear hazard; or

        2)  any other exclusion; and

    b.  the absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by this Coverage Part under:

        1)  exclusions that address war, military action, or nuclear hazard; or

        2)  any other exclusion.

CL 0600 01 15

Copyright, American Association of Insurance Services, Inc., 2015

AAIS
CL 0700 10 06
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# VIRUS OR BACTERIA EXCLUSION

## DEFINITIONS

**Definitions Amended --**

When "fungus" is a defined "term", the definition of "fungus" is amended to delete reference to a bacterium.

When "fungus or related perils" is a defined "term", the definition of "fungus or related perils" is amended to delete reference to a bacterium.

## PERILS EXCLUDED

The additional exclusion set forth below applies to all coverages, coverage extensions, supplemental coverages, optional coverages, and endorsements that are provided by the policy to which this endorsement is attached, including, but not limited to, those that provide coverage for property, earnings, extra expense, or interruption by civil authority.

1. The following exclusion is added under Perils Excluded, item 1.:

   **Virus or Bacteria --**

   "We" do not pay for loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:

**a.** any contamination by any virus, bacterium, or other microorganism; or

**b.** any denial of access to property because of any virus, bacterium, or other microorganism.

2. **Superseded Exclusions --** The Virus or Bacteria exclusion set forth by this endorsement supersedes the "terms" of any other exclusions referring to "pollutants" or to contamination with respect to any loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

## OTHER CONDITIONS

**Other Terms Remain in Effect --**

The "terms" of this endorsement, whether or not applicable to any loss, cost, or expense, cannot be construed to provide coverage for a loss, cost, or expense that would otherwise be excluded under the policy to which this endorsement is attached.

CL 0700 10 06

Copyright, American Association of Insurance Services, Inc., 2006

**COMMERCIAL  INLAND  MARINE**
**CM 76 13 07 13**

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WAIVER  OF THEFT  DEDUCTIBLE

This endorsement  modifies  insurance  provided  under the following:

CONTRACTORS' EQUIPMENT  COVERAGE
CONTRACTORS' EQUIPMENT  COVERAGE - Blanket  Equipment  Form

The following  is added to your policy:

Waiver  of Deductible:

In the event of a theft  loss to covered  "contractors'  equipment",  we agree to waive  up to $10,000 of the
applicable  deductible  if:

**1.**  the stolen "contractors'  equipment"  is "Properly  Registered"  on the National  Equipment  Register  (NER)
database;  and

**2.**  NER warning  decals are on the stolen "contractors'  equipment";  at the time of theft. (equipment  can be
registered  with NER by calling  866-663-7872 or at www.NER.net  ); and

**3.**  Following  the theft loss, "you"  must:

**1)**  Report  the theft  to the local  law enforcement  agency having  jurisdiction  as soon as "you"  become
aware  of the theft;  and

**2)**  Report the claim  to "us"  in accordance  with the terms  and conditions  of this policy

"Properly  Registered"  means  providing  National  Equipment  Register  (NER) with  the specific  manufacturer,
model number,  serial number,  and year manufactured  either  through  your on-line  entry of this information  in
the NER website  or sending  this information  on an electronic  spreadsheet  directly  to NER prior to the theft.

CM 76 13 07 13                         © 2013 Liberty Mutual Insurance. All rights reserved.                    **Page 1 of 1**

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H.** Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.,** and limited in **A.2.** Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery; and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire-extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

© Insurance Services Office, Inc., 2011

c. **Personal Property Of Others** that is:

(1) In your care, custody or control; and

(2) Located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

2. **Property Not Covered**

Covered Property does not include:

a. Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

b. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

c. Automobiles held for sale;

d. Bridges, roadways, walks, patios or other paved surfaces;

e. Contraband, or property in the course of illegal transportation or trade;

f. The cost of excavations, grading, backfilling or filling;

g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

(1) The lowest basement floor; or

(2) The surface of the ground, if there is no basement;

h. Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

i. Personal property while airborne or waterborne;

j. Bulkheads, pilings, piers, wharves or docks;

k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

l. Retaining walls that are not part of a building;

m. Underground pipes, flues or drains;

n. Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph, **n.**, does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system;

o. The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

p. Vehicles or self-propelled machines (including aircraft or watercraft) that:

(1) Are licensed for use on public roads; or

(2) Are operated principally away from the described premises.

This paragraph does not apply to:

(a) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

© Insurance Services Office, Inc., 2011     CP 00 10 10 12

**(b)** Vehicles or self-propelled machines, other than autos, you hold for sale;

**(c)** Rowboats or canoes out of water at the described premises; or

**(d)** Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers; or

**q.** The following property while outside of buildings:

**(1)** Grain, hay, straw or other crops;

**(2)** Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes Of Loss form as shown in the Declarations.

**4. Additional Coverages**

**a. Debris Removal**

**(1)** Subject to Paragraphs **(2), (3)** and **(4),** we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)** Debris Removal does not apply to costs to:

**(a)** Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

**(b)** Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

**(c)** Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

**(d)** Remove property of others of a type that would not be Covered Property under this Coverage Form;

**(e)** Remove deposits of mud or earth from the grounds of the described premises;

**(f)** Extract "pollutants" from land or water; or

**(g)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4),** the following provisions apply:

**(a)** The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

**(4)** We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(4)(a)** and/or **(4)(b)** applies, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

**(5) Examples**

The following examples assume that there is no Coinsurance penalty.

**Example 1**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 - $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |
| ($10,000 is 20% of $50,000.) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

**Example 2**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 80,000 |
| Amount of Loss Payable: | $ 79,500 |
| | ($80,000 - $500) |
| Debris Removal Expense: | $ 40,000 |
| Debris Removal Expense Payable | |
| Basic Amount: | $ 10,500 |
| Additional Amount: | $ 25,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000, capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4)**. Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

(1) While it is being moved or while temporarily stored at another location; and

(2) Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for service at each premises described in the Declarations, unless a higher limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

(1) Assumed by contract or agreement prior to loss; or

(2) Required by local ordinance.

No Deductible applies to this Additional Coverage.

© Insurance Services Office, Inc., 2011

CP 00 10 10 12

**d. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced at the same or another premises; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment and Valuation Conditions, and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

**f.**   **Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data. This Additional Coverage does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes of Loss - Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(b)** If the Causes Of Loss - Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

© Insurance Services Office, Inc., 2011

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage, Electronic Data, is $2,500 (unless a higher limit is shown in the Declarations) for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

a. **Newly Acquired Or Constructed Property**

(1) **Buildings**

If this policy covers Building, you may extend that insurance to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at locations, other than the described premises, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

(2) **Your Business Personal Property**

(a) If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

(i) Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions; or

(ii) Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

(b) This Extension does not apply to:

(i) Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

(ii) Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to your cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes of Loss - Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(3)** If the Causes of Loss - Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and, therefore, coverage of such costs is not additional insurance.

**d. Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

© Insurance Services Office, Inc., 2011

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

**(2)** This Extension does not apply to property:

**(a)** In or on a vehicle; or

**(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion;  or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

**f. Non-owned Detached Trailers**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

**(a)** The trailer is used in your business;

**(b)** The trailer is in your care, custody or control at the premises described in the Declarations;  and

**(c)** You have a contractual responsibility to pay for loss or damage to the trailer.

**(2)** We will not pay for any loss or damage that occurs:

**(a)** While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

**(b)** During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

**(3)** The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

**g. Business Personal Property Temporarily In Portable Storage Units**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the building or structure described in the Declarations or within 100 feet of the premises described in the Declarations, whichever distance is greater.

 © Insurance Services Office, Inc., 2011

**(2)** If the applicable Covered Causes of Loss form or endorsement contains a limitation or exclusion concerning loss or damage from sand, dust, sleet, snow, ice or rain to property in a structure, such limitation or exclusion also applies to property in a portable storage unit.

**(3)** Coverage under this Extension:

    **(a)** Will end 90 days after the business personal property has been placed in the storage unit;

    **(b)** Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the business personal property has been stored there for 90 or fewer days as of the time of loss or damage.

**(4)** Under this Extension, the most we will pay for the total of all loss or damage to business personal property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units. Such limit is part of, not in addition to, the applicable Limit of Insurance on Your Business Personal Property. Therefore, payment under this Extension will not increase the applicable Limit of Insurance on Your Business Personal Property.

**(5)** This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form or policy, and does not apply to loss or damage to the storage unit itself.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage:

**1.** Fire Department Service Charge;

**2.** Pollutant Clean-up And Removal;

**3.** Increased Cost Of Construction;  and

**4.** Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount (of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example 1**

(This example assumes there is no Coinsurance penalty.)

| | |
|---|---:|
| Deductible: | $ 250 |
| Limit of Insurance - Building 1: | $ 60,000 |
| Limit of Insurance - Building 2: | $ 80,000 |
| Loss to Building 1: | $ 60,100 |
| Loss to Building 2: | $ 90,000 |

The amount of loss to Building 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building 1 plus the Deductible.

© Insurance Services Office, Inc., 2011

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building 1:

$60,100
-   250
$59,850   Loss Payable - Building 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building 2. Loss payable for Building 2 is the Limit of Insurance of $80,000.

Total amount of loss payable: $59,850 + $80,000 = $139,850

**Example 2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example 1.

Loss to Building 1:     $ 70,000
(Exceeds Limit of Insurance plus Deductible)
Loss to Building 2:     $ 90,000
(Exceeds Limit of Insurance plus Deductible)
Loss Payable - Building 1:     $ 60,000
(Limit of Insurance)
Loss Payable - Building 2:     $ 80,000
(Limit of Insurance)
Total amount of loss payable:     $ 140,000

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

    © Insurance Services Office, Inc., 2011    

(8) Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At our option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

© Insurance Services Office, Inc., 2011

6. **Vacancy**

   a. **Description Of Terms**

      **(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

      **(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

      **(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

         **(i)** Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

         **(ii)** Used by the building owner to conduct customary operations.

      **(2)** Buildings under construction or renovation are not considered vacant.

   b. **Vacancy Provisions**

      If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

      **(1)** We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

         **(a)** Vandalism;

         **(b)** Sprinkler leakage, unless you have protected the system against freezing;

         **(c)** Building glass breakage;

         **(d)** Water damage;

         **(e)** Theft; or

         **(f)** Attempted theft.

      **(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

7. **Valuation**

   We will determine the value of Covered Property in the event of loss or damage as follows:

   a. At actual cash value as of the time of loss or damage, except as provided in **b., c., d.** and **e.** below.

   b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

      The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

      However, the following property will be valued at the actual cash value, even when attached to the building:

      **(1)** Awnings or floor coverings;

      **(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

      **(3)** Outdoor equipment or furniture.

   c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

   d. Glass at the cost of replacement with safety-glazing material if required by law.

   e. Tenants' Improvements and Betterments at:

      **(1)** Actual cash value of the lost or damaged property if you make repairs promptly.

      **(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

         **(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

CP 00 10 10 12 © Insurance Services Office, Inc., 2011 **Page 13 of 17**

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

## F. Additional Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

### 1. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies:

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2)**; and

**(4)** Subtract the deductible from the figure determined in Step **(3)**.

We will pay the amount determined in Step **(4)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example 1 (Underinsurance)**

| When: | The value of the property is: | $ 250,000 |
|---|---|---|
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 100,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |

Step **(1)**: $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2)**: $100,000 ÷ $200,000 = .50

Step **(3)**: $40,000 x .50 = $20,000

Step **(4)**: $20,000 - $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example 2 (Adequate Insurance)**

| When: | The value of the property is: | $ 250,000 |
|---|---|---|
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 200,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate, and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example 3**

| When: | The value of property is: | |
|---|---|---|
| | Building at Location 1: | $ 75,000 |
| | Building at Location 2: | $ 100,000 |
| | Personal Property at Location 2: | $ 75,000 |
| | | $ 250,000 |
| | The Coinsurance percentage for it is: | 90% |
| | The Limit of Insurance for Buildings and Personal Property at Location 1 and 2 is: | $ 180,000 |
| | The Deductible is: | $ 1,000 |
| | The amount of loss is: | |
| | Building at Location 2: | $ 30,000 |
| | Personal Property at Location 2: | $ 20,000 |
| | | $ 50,000 |

© Insurance Services Office, Inc., 2011

Step **(1):** $250,000 x 90\% = \$225,000$
  (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)
Step **(2):** $180,000 \div \$225,000 = .80$
Step **(3):** $50,000 x .80 = \$40,000.$
Step **(4):** $40,000 - \$1,000 = \$39,000.$
We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

  **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

  **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

  **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

  All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

  **(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

  **(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

  **(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

  **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item:

**1. Agreed Value**

**a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

**b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

**c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

  **(1)** On or after the effective date of this Optional Coverage; and

  **(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

 © Insurance Services Office, Inc., 2011

**2. Inflation Guard**

    **a.** The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

    **b.** The amount of increase will be:

        **(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

        **(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

        **(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example**

| If: | The applicable Limit of Insurance is: | $ 100,000 |
|---|---|---|
| | The annual percentage increase is: | 8% |
| | The number of days since the beginning of the policy year (or last policy change) is: | 146 |
| | The amount of increase is: | |
| | $100,000 x .08 x 146 ÷ 365= | $ 3,200 |

**3. Replacement Cost**

    **a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

    **b.** This Optional Coverage does not apply to:

        **(1)** Personal property of others;

        **(2)** Contents of a residence;

        **(3)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

        **(4)** "Stock", unless the Including "Stock" option is shown in the Declarations.

    Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

    **(1)** Until the lost or damaged property is actually repaired or replaced; and

    **(2)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also apply:

    **(3)** If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

    **(4)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

    **(1)** The Limit of Insurance applicable to the lost or damaged property;

    **(2)** The cost to replace the lost or damaged property with other property:

        **(a)** Of comparable material and quality; and

        **(b)** Used for the same purpose; or

    **(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

© Insurance Services Office, Inc., 2011

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**4. Extension Of Replacement Cost To Personal Property Of Others**

**a.** If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

**b.** With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**3.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

# COMMERCIAL  PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

**1.** We cover loss or damage commencing:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

     Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

**2.** The coverage territory is:

    **a.** The United States of America (including its territories and possessions);

    **b.** Puerto Rico; and

    **c.** Canada.

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

**1.** Prior to a loss to your Covered Property or Covered Income.

**2.** After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

    **a.** Someone insured by this insurance;

    **b.** A business firm:

        **(1)** Owned or controlled by you; or

        **(2)** That owns or controls you; or

    **c.** Your tenant.

This will not restrict your insurance.

COMMERCIAL PROPERTY
CP 01 40 07 06

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVEAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph B., such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

**1.** Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

**2.** Additional Coverage - Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.,** or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

# CAUSES OF LOSS - SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.** Definitions.

**A. Covered Causes Of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

**B. Exclusions**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

  **a. Ordinance Or Law**

  The enforcement of or compliance with any ordinance or law:

    **(1)** Regulating the construction, use or repair of any property; or

    **(2)** Requiring the tearing down of any property, including the cost of removing its debris.

  This exclusion, Ordinance Or Law, applies whether the loss results from:

    **(a)** An ordinance or law that is enforced even if the property has not been damaged; or

    **(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

  **b. Earth Movement**

    **(1)** Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

    **(2)** Landslide, including any earth sinking, rising or shifting related to such event;

    **(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

    **(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

  But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

    **(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

  Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

    **(a)** Airborne volcanic blast or airborne shock waves;

    **(b)** Ash, dust or particulate matter; or

    **(c)** Lava flow.

  With respect to coverage for Volcanic Action as set forth in **(5)(a)**, **(5)(b)** and **(5)(c)**, all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

  Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

© Insurance Services Office, Inc., 2011

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings; or

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **(1)** through **(5)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungus", wet or dry rot or bacteria result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d. (1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

e. Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

f. Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

g. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

h. Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

(1) Applies whether or not an act occurs during your normal hours of operation;

(2) Does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

i. Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

j. Rain, snow, ice or sleet to personal property in the open.

k. Collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;

(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.,** does not apply:

(a) To the extent that coverage is provided under the Additional Coverage, Collapse; or

(b) To collapse caused by one or more of the following:

(i) The "specified causes of loss";

(ii) Breakage of building glass;

© Insurance Services Office, Inc., 2011

**(iii)** Weight of rain that collects on a roof; or

**(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

**4.** **Special Exclusions**

The following provisions apply only to the specified Coverage Forms:

**a.** **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.,** Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.** Ordinance Or Law;

**(b)** Paragraph **B.1.c.** Governmental Action;

**(c)** Paragraph **B.1.d.** Nuclear Hazard;

**(d)** Paragraph **B.1.e.** Utility Services; and

**(e)** Paragraph **B.1.f.** War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated:

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

**a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

© Insurance Services Office, Inc., 2011

**b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

    **(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

    **(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**d.** Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

    However, this limitation does not apply to:

    **(1)** Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

    **(2)** Business Income Coverage or Extra Expense Coverage.

**e.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

**f.** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

**g.** Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

    **(1)** Dampness or dryness of atmosphere or of soil supporting the vegetation;

    **(2)** Changes in or extremes of temperature; or

    **(3)** Disease;

    **(4)** Frost or hail; or

    **(5)** Rain, snow, ice or sleet.

**2.** We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

**a.** Animals, and then only if they are killed or their destruction is made necessary.

**b.** Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

    **(1)** Glass; or

    **(2)** Containers of property held for sale.

**c.** Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

    However, this limitation does not apply:

    **(1)** If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

    **(2)** To Business Income Coverage or to Extra Expense Coverage.

**3.** The special limit shown for each category, **a.** through **d.,** is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are (unless a higher limit is shown in the Declarations):

**a.** $2,500 for furs, fur garments and garments trimmed with fur.

**b.** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

**c.** $2,500 for patterns, dies, molds and forms.

**d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

© Insurance Services Office, Inc., 2011

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

4. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire- extinguishing equipment if the damage:

   a. Results in discharge of any substance from an automatic fire protection system; or

   b. Is directly caused by freezing.

   However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D.** **Additional Coverage - Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

   b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

   c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

   d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (1) A cause of loss listed in **2.a.** or **2.b.;**

      (2) One or more of the "specified causes of loss";

      (3) Breakage of building glass;

      (4) Weight of people or personal property; or

      (5) Weight of rain that collects on a roof.

3. This **Additional Coverage - Collapse** does **not** apply to:

   a. A building or any part of a building that is in danger of falling down or caving in;

   b. A part of a building that is standing, even if it has separated from another part of the building; or

   c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

   a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

   b. Awnings, gutters and downspouts;

   c. Yard fixtures;

   d. Outdoor swimming pools;

   e. Fences;

   f. Piers, wharves and docks;

   g. Beach or diving platforms or appurtenances;

   h. Retaining walls; and

   i. Walks, roadways and other paved surfaces;

   if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.,** we will pay for loss or damage to that property only if:

      (1) Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

---

**Page 8 of 11**      © Insurance Services Office, Inc., 2011      **CP 10 30 10 12**

**(2)** The property is Covered Property under this Coverage Form.

5. If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

   **a.** The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.;**

   **b.** The personal property which collapses is inside a building; and

   **c.** The property which collapses is not of a kind listed in **4.,** regardless of whether that kind of property is considered to be personal property or real property.

   The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

6. This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

7. This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

8. The term Covered Cause of Loss includes the Additional Coverage, Collapse, as described and limited in **D.1.** through **D.7.**

**E. Additional Coverage - Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

1. The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

   **a.** A "specified cause of loss" other than fire or lightning; or

   **b.** Flood, if the Flood Coverage Endorsement applies to the affected premises.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

   **a.** Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

   **b.** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

   **c.** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

© Insurance Services Office, Inc., 2011

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss form or under the Additional Coverage, Collapse.

6. The following, **6.a.** or **6.b.**, applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

   a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

   b. If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

F. **Additional Coverage Extensions**

1. **Property In Transit**

   This Extension applies only to your personal property to which this form applies.

   a. You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

   b. Loss or damage must be caused by or result from one of the following causes of loss:

      (1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

      (2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

      (3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

   c. The most we will pay for loss or damage under this Extension is $5,000.

   This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2. **Water Damage, Other Liquids, Powder Or Molten Material Damage**

   If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

   ® Insurance Services Office, Inc., 2011   CP 10 30 10 12

3. **Glass**

   **a.** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

   **b.** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

   This Coverage Extension **F.3.** does not increase the Limit of Insurance.

**G. Definitions**

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   **a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

      **(1)** The cost of filling sinkholes; or

      **(2)** Sinking or collapse of land into man-made underground cavities.

   **b.** Falling objects does not include loss or damage to:

      **(1)** Personal property in the open; or

      **(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

   **c.** Water damage means:

      **(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and

      **(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

   But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

   To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss," such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground.

COMMERCIAL PROPERTY
CP 88 04 03 10

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## REMOVAL PERMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART



If Covered Property is removed to a new location that is added by endorsement to the policy subsequent to its original issue, you may extend this insurance to include that Covered Property at each location during the removal. Coverage at each location will apply in the proportion that the value at each location bears to the value of all Covered Property being removed. This permit applies up to 10 days after the effective date of the endorsement adding the new location; after that, this insurance does not apply at the previous location.

©2010 Liberty Mutual Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission .

**COMMERCIAL PROPERTY**
**CP 88 44 02 15**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EQUIPMENT BREAKDOWN COVERAGE ENDORSEMENT

This endorsement modifies the insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
CAUSES OF LOSS - BASIC FORM
CAUSES OF LOSS - BROAD FORM
CAUSES OF LOSS - SPECIAL FORM
BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM
EXTRA EXPENSE COVERAGE FORM
COMMON POLICY CONDITIONS

**A.** The following is added as an Additional Coverage to the CAUSES OF LOSS - BASIC FORM, CAUSES OF LOSS - BROAD FORM, and CAUSES OF LOSS - SPECIAL FORM:

**Additional Coverage - Equipment Breakdown**

**1.** We will pay for direct physical damage to Covered Property that is caused by an "accident" to "covered equipment".

**2.** The most we will pay for loss, damage or expense under this endorsement arising from any "one accident" is the applicable Limit of Insurance in the Declarations unless otherwise shown in the Equipment Breakdown Coverage Schedule. Coverage provided under this endorsement does not increase and is not in addition to any other Limit of Insurance.

**3.** The following coverages also apply to covered losses caused by an "accident". These coverages do not provide additional limits of insurance.

    **a. Expediting Expenses**

    With respect to your damaged Covered Property, we will pay the reasonable extra cost to:

    **(1)** Make temporary repairs; and

    **(2)** Expedite permanent repairs or replacement.

    Reasonable extra cost shall mean the extra cost of temporary repair and of expediting the repair of such damaged equipment of the insured, including overtime and the extra cost of express or other rapid means of transportation.

    The most we will pay for under this coverage is $100,000 unless otherwise provided in this policy.

    **b. Hazardous Substances**

    We will pay for the additional cost to repair or replace Covered Property because of contamination by a "hazardous substance". This includes the additional expense to clean up or dispose of such property.

    This does not include contamination of "perishable goods" by a refrigerant, including ammonia, which is addressed in **3.d.** below. As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

    The most we will pay for under this coverage, including any actual loss of Business Income you sustain and necessary Extra Expense you incur, is $100,000 unless otherwise provided in this policy.

© 2015 Liberty Mutual Insurance

**CP 88 44 02 15**    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    **Page 1 of 6**

**c. Spoilage**

**(1)** We will pay for physical damage to "perishable goods" due to spoilage. The spoilage damage must be due to the lack of or excess of power, light, heat, steam or refrigeration caused by an "accident" to "covered equipment".

**(2)** You must own the "perishable goods" or they must be in your care, custody or control and you must be legally liable for them.

**(3)** We will also pay any necessary expense you incur to reduce the amount of loss under this coverage. We will pay such expenses to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

**(4)** If you are unable to replace the "perishable goods" before their anticipated sale date, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident" less discounts and expense you otherwise would have had. Otherwise, our payment will be determined in accordance with the Valuation condition.

The most we will pay for loss, damage or expense under this coverage is $100,000 unless otherwise provided in this policy.

**d. Refrigerant Contamination**

We will pay for physical damage to Covered Property due to contamination from the release of a refrigerant, including any related salvage expense.

The most we will pay for loss or damage under this coverage is $100,000 unless otherwise provided in this policy.

**e. Data Restoration**

We will pay for your reasonable and necessary cost to research, replace and restore lost "data". The most we will pay for loss or expense under this coverage, including any actual loss of Business Income you sustain and necessary Extra Expense you incur, is $100,000 unless otherwise provided in this policy.

**f. Utility Services**

**(1)** Insurance provided for Business Income, Extra Expense and Spoilage is extended to apply to your loss, damage or expense caused by an "accident" to equipment that is owned, managed, or controlled by your landlord or landlord's utility, or utility or other supplier with whom you have a contract, that directly supplies you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that it is not Covered Property.

**(2)** Unless otherwise provided in this policy, Utility Services coverage will not apply unless the loss of or disruption of service exceeds 24 hours immediately following the "accident".

**(3)** The most we will pay for loss, damage or expense under this coverage is the limit that applies to Business Income, Extra Expense or Spoilage, respectively.

**g. Business Income and Extra Expense**

Any insurance provided under this Policy for Business Income or Extra Expense is extended to the coverage provided by this endorsement. However, if a separate Equipment Breakdown deductible is shown in the Policy, then as respects Equipment Breakdown coverage, the "period of restoration" will begin immediately after the "accident", and the separate Equipment Breakdown deductible shown in the Policy will apply. The most we will pay for loss of Business Income you sustain, and necessary Extra Expense you incur is the limit that applies to Business Income or Extra Expense unless otherwise provided in this policy.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

4. **Exclusions**

For the purposes of this endorsement, all exclusions in the CAUSES OF LOSS - BASIC FORM, CAUSES OF LOSS - BROAD FORM, and CAUSES OF LOSS - SPECIAL FORM apply except as modified below.

a.  The exclusions are modified as follows:

(1)  The following is added to Paragraph **B.1.g Water:**

However, if electrical "covered equipment" requires drying out because of Water as described in **g.(1)** through **g.(3)** above, we will pay for the direct expense of such drying out subject to the applicable Limit of Insurance and deductible for Building or Business Personal Property, whichever applies.

(2)  If CAUSES OF LOSS - BASIC FORM or CAUSES OF LOSS - BROAD FORM applies, the following is added to **Exclusions B.2:**

Depletion, deterioration, corrosion, erosion, wear and tear, or other gradually developing conditions. But if an "accident" results, we will pay for the resulting loss, damage or expense.

(3)  If CAUSES OF LOSS - SPECIAL FORM applies, the last paragraph of **B.2.d. Exclusions** is deleted and replaced with the following:

But if an excluded cause of loss that is listed in **B.2.d. (1)** through **(7)** results in an "accident", we will pay for the loss, damage or expense caused by that "accident".

b.  We will not pay under this endorsement for loss, damage or expense caused by or resulting from:

(1)  Your failure to use all reasonable means to protect Covered Property from damage following an "accident".

(2)  Any defect, programming error, programming limitation, computer virus, malicious code, loss of "data", loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind. But if an "accident" results, we will pay for the resulting loss, damage or expense; or

(3)  Any of the following tests:

(a)  Hydrostatic, pneumatic, or gas pressure test of any boiler or pressure vessel; or

(b)  Electrical insulation breakdown test of any type on electrical equipment.

c.  With respect to Utility Services coverage, we will also not pay for an "accident" caused by or resulting from: fire; lightning; windstorm or hail; explosion (except as specifically provided in paragraph **5.a.(3)** of this endorsement); smoke; aircraft; or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

d.  With respect to Business Income, Extra Expense and Utility Services coverages, we will also not pay for:

(1)  Loss caused by your failure to use due diligence and all reasonable means to resume business; or

(2)  Any increase in loss resulting from an agreement between you and your customer or supplier.

e.  We will not pay for loss, damage or expense caused directly or indirectly by the following, whether or not caused by or resulting from an "accident":

Any mold, fungus, mildew or yeast, including any spores or toxins produced by or emanating from such mold, fungus, mildew or yeast. This includes, but is not limited to, costs arising from clean up, removal, or abatement of such mold, fungus, mildew or yeast, spores or toxins. However, this exclusion does not apply to spoilage of personal property that is "perishable goods", to the extent that spoilage is covered under Spoilage coverage.

f.  We will not pay under this endorsement for any loss or damage to animals.

**5.    Definitions**

The following  are added to **H. Definitions**

**a.**  "Accident"  means a fortuitous  event that causes direct  physical  damage  to "covered  equip-ment"  that requires  repair  or replacement.  The event must be one of the following:

   **(1)**  Mechanical  breakdown,  including  rupture or bursting  caused by centrifugal  force;

   **(2)**  Artificially  generated electrical  current, including  electric  arcing,  that damages  electrical  devices,  appliances  or wires;

   **(3)**  Explosion  of steam boilers,  steam pipes,  steam engines  or steam turbines  owned  or leased by you, or operated  under your control;

   An "accident"  does not include the functioning  of any safety or protective  device, or any other condition,  which can be corrected  by resetting,  tightening,  adjusting,  cleaning,  or the perfor-mance of maintenance.

**b.**  "Covered  equipment"

   **(1)**  means, unless otherwise  provided  in this policy,  Covered Property:

       **(a)**  That generates,  transmits  or utilizes  energy,  including  electronic  communications  and data processing  equipment;  or

       **(b)**  Which,  during  normal  usage,  operates  under vacuum  or pressure,  other than the weight  of its contents.

   **(2)**  None of the following  is "covered  equipment":

       **(a)**  Structure,  foundation,  cabinet, compartment  or air supported  structure  or building;

       **(b)**  Insulating  or refractory  material;

       **(c)**  Sewer piping,  underground  vessels or piping,  or piping  forming  part of a sprinkler  system;

       **(d)**  Water piping  other than boiler feedwater  piping,  boiler condensate  return  piping or water piping  forming  a part of a refrigerating  or air conditioning  system;

       **(e)**  "Vehicle"  or any equipment  mounted  on a "vehicle";

       **(f)**  Satellite,  spacecraft  or any equipment  mounted  on a satellite  or spacecraft;

       **(g)**  Dragline,  excavation  or construction  equipment;  or

       **(h)**  Equipment  manufactured  by you for sale.

**c.**  "Data"  means information  or instructions  stored in digital  code capable of being  processed  by machinery.

**d.**  "Hazardous  substance"  means any substance  that has been declared  to be hazardous  to health  by any governmental  agency.

**e.**  "Media"  means material  on which  "data"  is recorded,  such as magnetic  tapes,  hard disks, optical  disks or floppy  disks.

**f.**  "One accident"  means if an initial  "accident"  causes other "accidents",  all will be considered "one accident".  All "accidents"  at any one premises  that manifest  themselves  at the same time and are the direct  result  of the same cause will be considered  one "accident".

**g.**  "Perishable  goods"  means personal  property  maintained  under controlled  conditions  for its preservation  and susceptible  to loss or damage if the controlled  conditions  change.

**h.**  For the purposes  of this endorsement,  "vehicle"  means any machine or apparatus  that is used for transportation  or moves under its own power.  "Vehicle"  includes  a car, truck, bus, trailer, train, aircraft,  watercraft,  forklift,  bulldozer,  or harvester.

   However,  any property  that is permanently  installed  at a covered  location  and that receives electrical  power from an external  power source  will not be considered  a "vehicle".

**B.** The BUILDING AND PERSONAL PROPERTY COVERAGE FORM, CONDOMINIUM ASSOCIATION COVERAGE FORM and CONDOMINIUUM COMMERCIAL UNIT-OWNERS COVERAGE FORM are modified as follows:

The definitions stated above in Paragraph **A.5.** also apply to section **B.** of this endorsement.

1. **Deductible**

   The deductible in the Declarations applies unless a separate Equipment Breakdown deductible is shown in the Policy. If a separate Equipment Breakdown deductible is shown, the following applies.

   Regarding Equipment Breakdown Coverage only, section **D. Deductible** is deleted and replaced with the following:

   **a.** Deductible for Each Coverage

   **(1)** Unless the Declarations or Schedule indicates that your deductible is combined for all coverages, multiple deductibles may apply to any "one accident".

   **(2)** We will not pay for loss, damage or expense under any coverage until the amount of the covered loss, damage or expense exceeds the deductible amount indicated for that coverage in the Policy. We will then pay the amount of loss, damage or expense in excess of the applicable deductible amount, subject to the applicable limit.

   **(3)** If deductibles vary by type of "covered equipment" and more than one type of "covered equipment" is involved in any "one accident", only the highest deductible for each coverage will apply.

   **b.** Application of Deductibles

   **(1)** Dollar Deductibles

   We will not pay for loss, damage or expense resulting from any "one accident" until the amount of loss, damage, or expense exceeds the applicable Deductible shown in the Policy. We will then pay the amount of loss, damage or expense in excess of the applicable Deductible or Deductibles, up to the applicable Limit of Insurance.

   **(2)** Time Deductible

   If a time deductible is shown in the Policy, we will not be liable for any loss occurring during the specified number of hours or days immediately following the "accident". If a time deductible is expressed in days, each day shall mean twenty-four consecutive hours.

   **(3)** Multiple of Average Daily Value (ADV)

   If a deductible is expressed as a number times ADV, that amount will be calculated as follows:

   The ADV (Average Daily Value) will be the Business Income (as defined in any Business Income Coverage that is part of this policy) that would have been earned during the period of interruption of business had no "accident" occurred, divided by the number of working days in that period. No reduction shall be made for the Business Income not being earned, or in the number of working days, because of the "accident" or any other scheduled or unscheduled shutdowns during the period of interruption. The ADV applies to the Business Income value of the entire location, whether or not the loss affects the entire location. If more than one location is included in the valuation of the loss, the ADV will be the combined value of all affected locations. For purposes of this calculation, the period of interruption may not extend beyond the "period of restoration".

   The number indicated in the Policy will be multiplied by the ADV as determined above. The result shall be used as the applicable deductible.

**(4)** Percentage of Loss Deductibles

If a deductible is expressed as a percentage of loss, we will not be liable for the indicated percentage of the gross amount of loss, damage or expense (prior to any applicable deductible or coinsurance) insured under the applicable coverage. If the dollar amount of such percentage is less than the indicated minimum deductible, the minimum deductible will be the applicable deductible.

## 2. Conditions

The following conditions are added to the **Conditions** in the COMMON POLICY CONDITIONS and to section **F. Additional Conditions** in the BUILDING AND PERSONAL PROPERTY COVERAGE FORM, CONDOMINIUM ASSOCIATION COVERAGE FORM, CONDOMINUIUM COMMERCIAL UNIT -OWNERS COVERAGE FORM:

**a.** Suspension

Whenever "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend coverage under this endorsement for that "covered equipment". This can be done by mailing or delivering a written notice of suspension to:

**(1)** Your last known address; or

**(2)** The address where the "covered equipment" is located.

Once suspended, your insurance can only be reinstated by an endorsement for that "covered equipment". If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment" for the period of suspension. But the suspension will be effective on the date in which our notice is mailed or delivered to you, even if we have not yet made or offered a refund.

**b.** Jurisdictional Inspections

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf.

**c.** Environmental, Safety and Efficiency Improvements

If "covered equipment" requires replacement due to an "accident", we will pay your additional cost to replace it with equipment that is better for the environment, safer or more efficient than the equipment being replaced. However, we will not pay more than 125% of what the cost would have been to repair or replace with like kind and quality. This condition does not increase any of the applicable limits. This condition does not apply to any property to which Actual Cash Value applies.

COMMERCIAL PROPERTY
CP 90 51 09 11

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA-PROPERTY AMENDATORY ENDORSEMENT- CUSTOM PROTECTOR

This endorsement modifies insurance provided under the following:

**Custom Protector Endorsement, CP 90 00**
**Custom Protector Endorsement, CP 90 11**
**Custom Protector Plus Endorsement, CP 91 42**
**Custom Protector Condominium Unit Owners Plus Endorsement, CP 91 43**

**Paragraph F.4. Back-Up of Sewers or Drains** is replaced with the following:

We cover direct physical loss or damage caused by water:

a. Which backs up into a building or structure through sewers or drains which are directly connected to a sanitary sewer or septic system; or

b. Which enters into and overflows from within a sump pump, sump pump well or other type of system designed to remove subsurface water which is drained from the foundation area.

The most we will pay for loss or damage under this Coverage Extension is $25,000

® 2012 Liberty Mutual Agency Corporation. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

COMMERCIAL PROPERTY
CP 90 59 12 12

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# IDENTITY THEFT ADMINISTRATIVE SERVICES
# AND EXPENSE COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM

The following is added to paragraph **A.4. Additional Coverages:**

**IDENTITY THEFT ADMINISTRATIVE SERVICES AND EXPENSE COVERAGE**

We will provide "Identity Theft Administrative Services" and will reimburse up to $25,000 for "Identity Theft Expenses" incurred by an "identity theft insured" as a direct result of any one "identity theft" in the "coverage territory" if all of the following requirements are met:

1. The personal identity of an "identity theft insured" under this policy was the subject of an "identity theft"; and

2. Such "identity theft" is first discovered by the "identity theft insured" during the policy period for which this Identity Theft Expense Coverage is applicable; and

3. Such "identity theft" is reported to us as soon as practicable but in no event later than 60 days after it is first discovered by the "identity theft insured"; and

4. The "identity theft insured" reports the "identity theft" in writing to the appropriate e law enforcement agency.

Any act or series of acts committed by one or more persons, or in which such person or persons are aiding or abetting others, against an "identity theft insured" is considered to be one "identity theft", even if a series of acts continues into a subsequent policy period.

**LIMITS**

Regardless of the number of claims or "Identity Theft Insureds", the most we will pay in the aggregate for all "identity theft expenses" resulting from "identity theft" discovered during the policy period is $25,000.

1. The $25,000 Identity Theft Expense Limit shall be reduced by the amount of any payment made by us under the terms of this insurance. If the Identity Theft Expense Limit of Insurance is exhausted, we will have no further liability to pay for loss which may be discovered during the remainder of the policy period.

2. Any recovery made by us after settlement of a loss covered by this insurance shall not be used to increase or reinstate the Limit of Insurance.

3. "Identity Theft Incident Administrative Services" is provided up to 12 consecutive months after service begins.

4. "Identity Theft Administrative Services "do not reduce the "Identity Theft" limit.

This "Identity Theft Administrative Service" and "Identity Theft Expense" Coverage is additional insurance.

**EXCLUSIONS**

The following exclusions are added to the applicable Cause of Loss Form shown on the Declarations.

We do not provide "Identity Theft Administrative Services" or cover "identity theft expenses":

1. Incurred as the result of "identity theft" due to any fraudulent, dishonest, or criminal act by you, your partners, employees, members, "executive officers", managers, directors, or trustees or by any authorized representative of yours, whether acting alone or in collusion with others.

   In the event of any such act, no "identity theft insured" is entitled to "identity theft expenses", even an "identity theft insured" who did not commit or conspire to commit the act causing the "identity theft".

CP 90 59 12 12      Includes copyrighted material of Insurance Services Office, Inc., with its permission.      Page 1 of 3

2. Arising out of "identity theft" committed by or with knowledge of any relative or former relative of the "identity theft insured".

3. Arising out of an "identity theft" first discovered by the "identity theft insured "prior to the policy period or after the policy period, even if the "identity theft" began or continued during the policy period.

4. Arising out of an "identity theft" that is not reported to us within 60 days after it is first discovered by the "identity theft insured".

**DEDUCTIBLE**

1. There is no deductible applicable to the "Identity Theft Administrative Services".

2. We will not pay for "identity theft expenses" resulting from an "identity theft" unless the amount exceeds $250. We will then pay the amount of "identity theft expense" in excess of the Deductible Amount, up to the Limit of Insurance. Each "identity theft insured" shall be subject to only one deductible during any one policy period.

**CONDITIONS**

The following additional conditions are added for "Identity Theft Administrative Services" and Expense Coverage:

1. The coverage provided under this endorsement will be excess over any other insurance covering the same loss or damage, whether you can collect on it or not. But we will not pay any more than the Identity Theft Expense Limits of Insurance applicable to this coverage.

2. Reimbursement for "Identity Theft Expense" will be made to the "Identity Theft Insured."

3. "Identity Theft Administrative Services" will provide instructions on:

    a. How to respond to a potential "Identity Theft";

    b. How to submit a request for "Identity Theft Administrative Services"; and

    c. Information needed for reimbursement of "Identity Theft Expenses".

    We may provide "Identity Theft Administrative Services" prior to a final determination of "Identity Theft." However, if we determine there was not an "Identity Theft" these services will end and we will not have a right or duty to continue these services. Offering "Identity Theft Administrative Service" does not indicate an admission of liability under this policy.

4. Identify Theft Administrative Services. The following apply with respect to "Identity Theft Administrative Services":

    a. Services will depend on the cooperation, permissions, and assistance provided by the "Identity Theft Insured";

    b. There is no warranty or guarantee that "Identity Theft" issues will end and it will not prevent future "Identity Theft" incidences; and

    c. All services may not be offered or applicable to all "Identity Theft Insureds." For example, minors may not have credit reports available to be monitored.

**DEFINITIONS**

1. "Coverage Territory" means:

    a. The United States of America (including its territories and possessions);

    b. Puerto Rico; and

    c. Canada.

2. "Executive officers" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

3. "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of an "identity theft insured" with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law. "Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

© 2012 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

4. "Identity Theft Expenses" means the following reasonable and necessary items incurred as a result of "identity theft":

    **a.** Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies.

    **b.** Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors.

    **c.** Costs for obtaining credit reports.

    **d.** Charges incurred for long distance telephone calls to merchants, vendors, suppliers, customers, law enforcement agencies, financial institutions or similar credit grantors, or credit agencies to report or discuss an actual "identity theft".

    **e.** Application fees for re-applying for a loan, or loans when the original application is rejected solely because the lender received incorrect credit information as a result of a covered "identity theft."

    **f.** Lost income resulting from time taken off from work to complete fraud affidavits, meet with or talk to law enforcement agencies, credit agencies and/or legal counsel, up to a maximum of $250 per day. Total payment for loss of income is not to exceed $5,000 per "identity theft insured" and is included within the "identity theft expense" and aggregate limits.

    **g.** Attorney fees to:

        **i.** Defend lawsuits brought against an "identity theft insured" by merchants, vendors, suppliers, financial institutions, or their collection agencies.

        **ii.** Remove any criminal or civil judgments wrongly entered against an "identity theft insured"; and

        **iii.** Challenge the accuracy or completeness of any information in a consumer credit report.

    **h.** Advertising expenses to restore the reputation of your business after an "identity theft insured" has been the victim of "identity theft". Total payment for advertising expenses is not to exceed $5,000 per "identity theft insured" and is included within the "identity theft expense" and aggregate limits.

5. "Identity Theft Administrative Services" means one or more individuals assigned by us to the "identity theft insured" to assist with the communication needed to re-establish the integrity of the "identity theft insured's" identity, including with the "identity's theft insured's" permission and cooperation, written and telephone communication with law enforcement authorities, government agencies, credit agencies, and individual creditors and businesses.

6. "Identity Theft Insured" means the following if you are designated in the Declarations as:

    **a.** An individual or sole proprietorship, you and your spouse are insureds.

    **b.** A partnership or joint venture, your members, your partners, and their spouses are insured's.

    **c.** A limited liability company, your members are insured's.

    **d.** An organization other than a partnership, joint venture, or limited liability company, your "executive officers" and directors are insureds. Your stockholders are not "identity theft insureds."

© 2012 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTRACTORS CUSTOM PROTECTOR™ ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CAUSES OF LOSS - SPECIAL FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
CUSTOM PROTECTOR™ ENDORSEMENT

The following is a summary of increased limits of insurance and additional coverages provided by this endorsement. This endorsement is subject to the provisions of your policy which means that it is subject to all limitations and conditions applicable to this Coverage Part, Coverage Form or Causes of Loss Form unless specifically deleted, replaced, or modified herein. This endorsement is applicable only to those locations described in the Declarations.

**Coverage for loss of Business Income or Extra Expense, whether provided by this endorsement or elsewhere, does not apply if a loss is covered only as a result of this endorsement.**

**If coverage is provided elsewhere in this policy for the same loss or damage as the coverage provided under this endorsement, the coverage under this endorsement will apply excess over that other coverage unless otherwise stated. We will not pay more than the actual amount of the covered loss or damage.**

| Coverage Description | Limit of Insurance |
|---|---|
| Computer Fraud | $ 25,000 |
| Installation Coverage | $ 15,000 |
| Leasehold Interest | $ 25,000 |
| Business Income - Dependent Properties | $ 50,000 |
| Loss to Pair or Set | Included |
| Personal Effects and Property of Others | $ 25,000 |

A. The following changes apply to Section **A. COVERAGE** of the BUILDING AND PERSONAL PROPERTY COVERAGE FORM and the CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM.

   1. The following are added to paragraph **A.4. Additional Coverages:**

      **Computer Fraud**

      We will pay for loss of or damage to your "money", "securities" and other property resulting directly from the use of any "computer" to fraudulently cause a transfer of that property from inside a building at the described premises or from any bank or similar safe depository:

      **(1)** To a person outside those premises; or

      **(2)** To a place outside those premises.

      The most we will pay under this Additional Coverage for loss or damage in any one occurrence is $25,000.

      For the purposes of this provision:

      "Computer" means:

      Your programmable electronic equipment that is used to store, retrieve and process electronic data. It includes their component parts and dedicated air conditioning, fire suppression equipment and electrical equipment used exclusively in your "computer" operations; and associated peripheral equipment that provides communication, including input and output functions such as printing or auxiliary functions such as electronic data transmission.

      It does not include electronic data and media.

© 2014 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office Inc., with its permission.

"Money"  means:

Currency,  coins  and  bank  notes  in  current  use  and  having  a  face  value;  and  travelers  checks, register  checks and money  orders held for sale to the public.

"Securities"  means negotiable  and non-negotiable  instruments  or contracts  representing  either "money"  or other  property  and includes:

Redeemed  coupons,  tokens,  tickets,  revenue  and other  stamps  (whether  represented  by actual stamps  or unused value in a meter) in current  use; and evidences  of debt issued in connection  with credit  or charge cards,  which  cards  are not issued by you; but does not include  "money".

**Installation  Coverage**

You may  extend  the insurance  that applies  to your  Business  Personal  Property  to apply to loss or damage  by a Covered  Cause of Loss  to property  intended  for installation  away  from the described location(s)  in connection  with  your  occupation  as an artisan  contractor.  This may be your  property or the property  of others  for which  you are legally  liable.

However,  we will  not pay for loss or damage  to the following:

(1)  Contraband,  or property  in the course of illegal  transportation  or trade;

(2)  Existing  buildings,  structures  or land to which  improvements,  alterations,  repairs or addi-tions  are being  made;

(3)  Machinery,  tools or equipment  that will  not be a permanent  part of the installation  ;

(4)  Accounts,  bills,  currency,  food  stamps,  or other  evidences  of debt,  lottery  tickets  not held for sale, money,  notes or securities;

(5)  Property  at locations  you own,  lease  or operate  unless  it is specifically  assigned  and invoiced  for a particular  job;

(6)  Trees,  shrubs,  plants  and lawns;  or

(7)  Property  while  waterborne,  except while  in transit  in the custody  of carrier  for hire.

Coverage  begins  from  the time  the property  intended  for installation  in connection  with  your occupation  as an artisan  contractor  is at your  risk,  starting  on or after  the time this policy  begins. Coverage  ends at the earliest  of the following:

(1)  After  the owner  or buyer accepts  the property;

(2)  When your  insurable  interest  in the property  ceases;

(3)  When this policy  expires  or is canceled;

(4)  When  you abandon  your  installation,  fabrication,  or erection  project  with  no intent  to complete  it;

(5)  When the installation,  fabrication,  or erection  project  has been completed  for more than 30 days;  or

(6)  When the covered  property  has been put to its intended  use.

The most  we will  pay under  this Extension  is $15,000  in any one occurrence.

**Leasehold  Interest**

We will  pay for loss of "tenants  lease  interest"  you sustain  due to the cancellation  of your  lease. The cancellation  must  result  from  direct  physical  loss  or damage  at a location  described  in the Declarations  due to a Covered  Cause of Loss.

"Tenants  lease  interest"  means  the difference  between  the rent you will  pay under  a new lease at the described  location;  or elsewhere,  and the rent you now pay.

The most we will pay for such loss is the least of:

   **(1)** The total difference in rent based on the period of time remaining under your current lease; or

   **(2)** The total difference in rent for one year; or

   **(3)** $25,000 in any one occurrence.

2.  The following are added to Paragraph **5. Coverage Extensions:**

   **Business Income - Dependent Properties**

   **If the Declarations show you have Business Income Coverage, the following Additional Coverage is added:**

   We will pay for the actual loss of business income you sustain due to direct physical loss or damage at the location of a "dependent property" not described in the Declarations, caused by or resulting from any Covered Cause of Loss. "Dependent property" means property operated by others on whom you depend to:

   **(1)** Deliver material or services to you, or to others for your account;

   **(2)** Accept your products or services;

   **(3)** Manufacture products for delivery to your customers under contract of sale; or

   **(4)** Attract customers to your business.

   "Dependent property" does not include locations that provide water, power or communication supply services including services relating to internet access or access to any electronic network.

   The most we will pay for this coverage is $50,000 in any one occurrence.

   **Loss To Pair Or Set**

   If there is a loss or damage by a Covered Cause of Loss to covered property which is a part of a pair or set, we will pay; at our option, for:

   **(1)** The cost to repair or replace any part to restore the pair or set to its value before the loss; or

   **(2)** The difference between the value of the pair or set before and after the loss; or

   **(3)** The full actual cash value for the pair or set at the time of loss, and you will give us the remainder of the pair or set.

B.  The following change applies to the **CUSTOM PROTECTOR™ ENDORSEMENT:**

   **Personal Effects And Property Of Others** under **Section A.** is deleted and replaced by the following:

   The most we will pay for loss or damage under this Extension is $25,000 in any one occurrence. Our payment for loss of or damage to personal property of others (including property of others held by you on consignment) will only be for the account of the owner of the property. Except as provided by Employee Tools Additional Coverage extension, this coverage does not apply to tools or equipment used in your business.


**All other terms and conditions remain unchanged.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CUSTOM PROTECTOR™ PLUS ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CAUSES OF LOSS - SPECIAL FORM

The following is a summary of increased limits of insurance and additional coverages provided by this endorsement. This endorsement is subject to the provisions of your policy which means that it is subject to all limitations and conditions applicable to this Coverage Part, Coverage Form or Causes of Loss Form unless specifically deleted, replaced, or modified herein. This endorsement is applicable only to those locations described in the Declarations.

**Coverage for loss of Business Income or Extra Expense, whether provided by this endorsement or elsewhere, does not apply if a loss is covered only as a result of this endorsement.**

**If coverage is provided elsewhere in this policy for the same loss or damage as the coverage provided under this endorsement, the coverage under this endorsement will apply excess over that other coverage unless otherwise stated. We will not pay more than the actual amount of the covered loss or damage.**

| Coverage Description | Limit of Insurance | Section |
|---|---|---|
| Accounts Receivable, Valuable Papers and Electronic Data | | |
| Blanket Limit of Insurance - On Premises | $   200,000  Blanket | A.10. |
| Off Premises: | | |
| Valuable Papers | $   10,000 | A.10. |
| Accounts Receivable | $   10,000 | A.10. |
| Electronic Data | $   10,000 | A.10. |
| Additional Covered Property | Included | A.2. |
| Appurtenant Structures | | |
| Buildings | $   50,000 | A.16.u. |
| Business Personal Property | $   5,000 | A.16.u. |
| Back-up of Sewers or Drains | $   25,000 | F. |
| Broadened Premises | Included | A.1. |
| Business Income | $   25,000 | A.16.s. |
| Business Income - Newly Acquired Locations | $   250,000 | A.16.s. |
| Business Income - Utility Services - Time Element | $   25,000 | A.16.t. |
| Business Personal Property - Seasonal Increase | 33% | A.16.v. |
| "Cellular Phones" - Coverage | $   1,000 | A.16.i. |
| Computer Equipment | $   50,000 | A.16.n. |
| Consequential Loss | Included | A.16.r. |
| Debris Removal | $   50,000 | A.6. |
| Employee Dishonesty | $   50,000 | A.11.h. |
| Employee Tools Coverage | $   25,000 | A.16.w. |
| Extra Expense | $   25,000 | A.16.j. |
| Fine Arts | $   25,000 | A.16.k. |
| Fire Department Service Charge | $   25,000 | A.8. |
| Fire Protective Devices | $   25,000 | A.16.l. |
| Forgery or Alteration | $   50,000 | A.11.k. |
| Foundations | Included | A.5. |
| Inventory and Appraisal Expense Coverage | $   10,000 | A.11.g. |
| Lock Replacement | $   10,000 | A.16.o. |

©  2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

| Coverage Description | Limit of Insurance | Section |
|---|---|---|
| Loss of Refrigeration | $   25,000 | **A.16.m.** |
| Lost Key Coverage | $   10,000 | **A.11.j.** |
| Money and Securities | | |
|     Inside the Premises | $   25,000 | **A.16.p.** |
|     Outside the Premises | $   25,000 | **A.16.p.** |
| Money Orders and Counterfeit Money | $   25,000 | **A.11.i.** |
| Newly Acquired or Constructed Property | 180 days | **A.12.** |
|     Buildings | $ 1,000,000 | **A.12.** |
|     Business Personal Property | $   500,000 | **A.12.** |
| Off-Premises Services Interruption | $   25,000 | **A.16.q.** |
| Ordinance or Law | A - Incl. in Building Limit B & C - 25% of the Building Limit subject to $200,000 | **A.11.l.** |
| Outdoor Property | $   25,000 | **A.15.** |
| Personal Effects and Property of Others | $   15,000 | **A.13.** |
| Pollutant Clean Up and Removal | $   50,000 | **A.9.** |
| Preservation of Property | 90 days | **A.7.** |
| Property Off-Premises (Including while in Transit) | $   50,000 | **A.14.** |
| Real Property of Others Required by Contract | $   25,000 | **A.4.** |
| Reward **(Not available in New York)** | $   25,000 | **A.16.h.** |
| Signs | $   25,000 | **B.** |
| Special Deductible Provision | Included | **C.** |
| Undamaged Improvements & Betterments | Included | **A.3. & D.1.** |
| Waiver of Coinsurance on losses $10,000 or less | Included | **E.** |

**A.**   The following changes apply to Section A. COVERAGE of the BUILDING AND PERSONAL PROPERTY COVERAGE FORM and the CONDOMINIUM ASSOCIATION COVERAGE FORM:

   **1.**   **Broadened Premises**

      The **within 100 feet of the described premises** description stated in Paragraph **A.1.a.(5)(b), Building,** Paragraph **A.1.b., Your Business Personal Property,** Paragraph **A.1.c.(2), Personal Property of Others** and Paragraph **A.5., Coverage Extensions** is deleted and replaced by **within 1000 feet of the described locations.**

   **2.**   **Additional Covered Property**

      The following are added to item **a. Building** of Paragraph **1. Covered Property:**

      Bridges, roadways, walks, patios or other paved surfaces; Retaining walls (except retaining walls used to contain water) that are not part of a building.

      Item **d.** is deleted from paragraph **2. Property Not Covered.**

      Item **l.** of paragraph **2.,** Property Not Covered is deleted and replaced by the following:

         **l.**   Retaining walls used to contain water.

   **3.**   **Undamaged Improvements And Betterments**

      (This coverage does not apply to the CONDOMINIUM ASSOCIATION COVERAGE FORM.)

      The following is added to paragraph **A.1.b** Your Business Personal Property:

      **(8)**  Undamaged Improvements and Betterments:

         **(a)**  Improvements and betterments coverage includes the portion of improvements and betterments not damaged in a covered loss.

         **(b)**  We will pay for the portion of undamaged improvements and betterments only if a minimum of six months is required to repair or rebuild the building for your occupancy, and only when your lease is cancelled:

            **(i)**  By the lessor;

            **(ii)**  By a valid condition of your lease; and

            **(iii)**  Due to direct physical loss or damage by a Covered Cause of Loss to property at the location(s) stated in the Declarations.

4. **Real Property Of Others Required By Contract**

The following is added to item **b. Your Business Personal Property** of Paragraph **1. Covered Property** of the BUILDING AND PERSONAL PROPERTY COVERAGE FORM as subparagraph **(9)** and to the CONDOMINIUM ASSOCIATION COVERAGE FORM as subparagraph **(4):**

Real Property including but not limited to building, doors and windows which are your responsibility to insure under any contract.

The most we will pay for loss or damage to covered property is $25,000 in any one occurrence.

5. **Foundations**

Item **g.** is deleted in its entirety from Paragraph **2., Property Not Covered.**

6. **Debris Removal**

Paragraph **A.4.a.(4)** is deleted and replaced by the following:

**(4)** We will pay up to an additional $50,000 for debris removal expense, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

    **(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

    **(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(4)(a)** and/or **(4)(b)** apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $50,000.

7. Paragraph **A.4. Additional Coverage** is amended as follows:

    **b. Preservation of Property**

        The 30 day limitation in paragraph **A.4.b.(2)** is increased to 90 days.

8. **Fire Department Service Charge**

Item **c. Fire Department Service Charge** of Paragraph **4. Additional Coverages** is deleted and replaced by the following:

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $25,000 in any one occurrence for your liability for fire department service charges. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, regardless of the number or type of services performed.

This Additional coverage applies to your fire department service charges:

    **(1)** Assumed by contract or agreement prior to loss; or

    **(2)** Required by local ordinance.

No deductible applies to this Additional Coverage.

9. **Pollutant Clean Up And Removal**

Item **d. Pollutant Clean Up And Removal** of Paragraph **4. Additional Coverages,** the last paragraph is amended as follows:

The most we will pay under this Additional Coverage is $50,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

10. **Accounts Receivable, Valuable Papers And Electronic Data:**

The following is added to Paragraph **5. Coverage Extensions:**

    **h. Accounts Receivable**

        We will pay:

        **(1)** All amounts due from your customers that you are unable to collect;



**(2)** Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

**(3)** Collection expenses in excess of your normal collection expenses that are made necessary by the loss or damage; and

**(4)** Other reasonable expenses that you incur to re-establish your records of accounts receivable;

that result from a Covered Cause of Loss to your records of accounts receivable.

The limits of insurance as respects the following Additional Coverages And Coverage Extensions:

Electronic Data; Valuable Papers and Records (Other Than Electronic Data);

are deleted and included in the following blanket limit:

**Accounts Receivable, Valuable Papers And Electronic Data Blanket Limit of Insurance:**

The most we will pay for loss or damage as respects the following Additional Coverages or Coverage Extensions is $200,000 in total for each described location in any one occurrence:

Accounts Receivable;

Valuable Papers and Records;

Electronic Data;

However, as respects to Valuable Papers and Records or Accounts Receivable at a location not described in the Declarations the most we will pay is $10,000 respectively in any one occurrence.

The most we will pay for Electronic Data at a premise not described in the Declarations or in transit is $10,000 in any one policy year, regardless of the number of occurrences of loss or damage or computer systems involved. Under this Extension, electronic data has the meaning described in the BUILDING AND PERSONAL PROPERTY COVERAGE FORM and the CONDOMINIUM ASSOCIATION COVERAGE FORM under Property Not Covered - Electronic Data.

**11.** The following are added to paragraph **A.4. Additional Coverages:**

**g. Inventory And Appraisal Expense Coverage**

We will pay up to $10,000 in any one occurrence for incurred inventory and appraisal costs, and expenses for preparation of loss data, due to loss or damage as a result of a Covered Cause of Loss to covered property. We will only pay if the costs are reasonable and necessary to establish the amount of the loss. Attorney or public adjuster fees are not covered costs under this section.

**h. Employee Dishonesty**

**(1)** We will pay for direct loss of or damage to business personal property, including money and securities, resulting from dishonest acts committed by any of your employees acting alone, or in collusion with other persons (except you or your partner) with the manifest intent to:

**(a)** Cause you to sustain loss or damage; and

**(b)** Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

**(i)** Any employee; or

**(ii)** Any other person or organization.

**(2)** We will not pay for loss or damage:

**(a)** Resulting from any dishonest or criminal act that you or any of your partners commit whether acting alone or in collusion with other persons; or

**(b)** The only proof of which as to its existence or amount is dependent upon:

**(i)** An inventory computation; or

**(ii)** A profit and loss computation.

**(3)** The most we will pay for loss or damage in any one occurrence is $50,000.

**(4)** All loss or damage:

© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.



   **(a)** Caused by one or more persons; or

   **(b)** Involving a single act or series of related acts;

is considered one occurrence.

**(5)** If any loss is covered:

   **(a)** Partly by this insurance; and

   **(b)** Partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest,

the most we will pay is the larger amount recoverable under this insurance or the prior insurance.

**(6)** We will pay for loss or damage you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

**(7)** This Additional Coverage does not apply to the dishonest act of any employee that occurs after the discovery by:

   **(a)** You; or

   **(b)** Any of your partners, officers, directors or trustees not in collusion with the employee of any dishonest act committed by that employee whether before or after becoming employed by you.

**(8)** Will pay only for covered loss or damage discovered no later than one year from the end of the Policy Period.

**(9)** If you (or any predecessor in interest) sustained loss or damage during the period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Additional Coverage, provided:

   **(a)** This Additional Coverage became effective at the time of cancellation or termination of the prior insurance; and

   **(b)** The loss or damage would have been covered by this Additional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

**(10)** The insurance under paragraph (9) above is part of, not in addition to, the Limit of Insurance applying to this Additional Coverage and is limited to the lesser of the amount recoverable under:

   **(a)** This Additional Coverage as of its effective date; or

   **(b)** The prior insurance had it remained in effect.

Coverage provided under this Additional Coverage is subject to a Deductible equal to the Property Deductible shown in the Declarations.

"Employee" means:

**(1)** Any natural person:

   **(a)** While in your service and for 30 days after termination of service; and

   **(b)** Whom you compensate directly by salary, wages or commissions; and

   **(c)** Whom you have the right to direct and control while performing services for you; or

**(2)** Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while having care and custody of property outside the premises.

But "employee" does not mean any:

**(1)** Agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

**(2)** Director or trustee except while performing acts coming within the scope of the usual duties of an employee.

© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**i.    Money Orders And Counterfeit Money**

We will pay for your loss when you accept in good faith:

**(1)**  Any money order in exchange for goods or services if the money order is not paid when presented to the issuer; or

**(2)**  Counterfeit U.S. or Canadian paper money in the regular course of business.

The most we will pay under this additional coverage is $25,000 in any one occurrence.

**j.    Lost Key Coverage**

We will pay for consequential loss to keys and locks if a master key or grand master key is lost or damaged resulting from a Covered Cause of Loss. We will pay for the actual cost to replace keys, adjustment of locks to accept new keys, or if required, new locks, including the cost of their installation.

The most we will pay for loss or damage under this coverage is $10,000 in any one occurrence.

**k.    Forgery Or Alteration**

**(1)**  We will pay for loss resulting directly from forgery or alteration of, any check, draft, promissory note, bill of exchange or similar written promise of payment in "money", that you or your agent has issued, or that was issued by someone who impersonates you or your agent. We will pay for loss you sustain through acts committed or events occurring during the policy period. Regardless of the number of years this policy remains in force or the number of premiums paid, no limit of insurance cumulates from year to year or period to period.

**(2)**  If you are sued for refusing to pay the check, draft, promissory note, bill of exchange or similar written promise of payment in "money", on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur in that defense.

**(3)**  For the purpose of this coverage, check includes a substitute check as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

**(4)**  We will not pay for loss resulting from any dishonest or criminal acts committed by you or any of your partners, employees, managers, members, officers, directors or trustees whether acting alone or in collusion with others.

**(5)**  The most we will pay for all loss, including legal expenses, under this Additional Coverage is $50,000.

"Money" means:

**(1)**  Currency, coins and bank notes in current use and having a face value; and

**(2)**  Travelers checks, register checks and money orders held for sale to the public.

**l.    Ordinance Or Law**

**(1)**  If a Covered Cause of Loss occurs to covered Building property, we will pay:

**(a)**  For the loss in value of the undamaged portion of the building as a consequence of enforcement of any ordinance or law that:

**(i)**  Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;

**(ii)**  Regulates the construction or repair of buildings, or establishes zoning or land use requirements at a described location; and

**(iii)**  Is in force at the time of loss.

**(b)**  The cost to demolish and clear the site of undamaged parts of the property caused by the enforcement of building, zoning or land use ordinance or law.

The COINSURANCE Additional Condition does not apply to this demolition cost coverage.

**(c)**  The increased cost to:

**(i)**  Repair or reconstruct damaged portions of that Building property; and/or

**(ii)**  Reconstruct or remodel undamaged portions of that Building property, whether or not demolition is required;

      © 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

When the increased cost is a consequence of enforcement of building, zoning or land use ordinance or law.

However:

   **(i)** This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

   **(ii)** We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

The COINSURANCE Additional Condition does not apply to this increased cost of construction coverage.

**(2)** We will not pay the increased costs of construction under this coverage:

   **(a)** Until the property is actually repaired or replaced, at the same or another location; and

   **(b)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(3)** We will not pay under this coverage for the costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

**(4)** The most we will pay under this coverage in any one occurrence is:

   **(a)** Coverage I.(1.)(a.) above is included within the Limit of Insurance shown in the Declarations as applicable to the covered building. The loss in value of the undamaged portion of the building does not increase the Limit of Insurance.

   **(b)** For coverages I.(1.)(b.) and (c.) above the lesser of:

      **(i)** 25% of the Limit of Insurance shown in the Declarations for Building Coverage; or

      **(ii)** $200,000.

**(5)** We will not pay for loss due to any ordinance or law that:

   **(a)** You were required to comply with before the loss, even if the building was undamaged, and

   You failed to comply with.

**12. Newly Acquired Or Constructed Property**

Item **a. Newly Acquired Or Constructed Property** of Paragraph **5. Coverage Extensions** is deleted and replaced by the following:

**(1) Buildings**

If this policy covers Building, you may extend that insurance to apply to:

   **(a)** Your new buildings while being built at the described location(s); and

   **(b)** Buildings you acquire away from the described location(s), intended for:

      **(i)** Similar use as the building described in the Declarations; or

      **(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $1,000,000 at any one location.

**(2) Your Business Personal Property**

   **(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

      **(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions; or



       **(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

The most we will pay for loss or damage under this Extension is $500,000 at any one location.

**(b)** This Extension does not apply to:

       **(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

       **(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property coverage will end when any of the following occurs:

**(a)** This policy expires;

**(b)** 180 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**13. Personal Effects And Property Of Others**

Item **b. Personal Effects And Property Of Others** of Paragraph **5. Coverage Extensions,** the last paragraph is amended as follows:

The most we will pay for loss or damage under this Extension is $15,000 in any one occurrence. Our payment for loss of or damage to personal property of others (including property of others held by you on consignment) will only be for the account of the owner of the property. Except as provided by Employee Tools Additional Coverage extension, this coverage does not apply to tools or equipment used in your business.

**14. Property Off-Premises**

Item **d. Property Off-Premises** of Paragraph **5. Coverage Extensions** is deleted and replaced by the following:

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described location(s) if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

This Extension applies only if loss or damage is caused by a Covered Cause of Loss. This extension does **not** apply to loss to property covered under the Wholesalers Custom Protector Endorsement, Manufacturers Custom Protector Endorsement, or Food Processors Custom Protector Endorsement.

**(2)** You may extend the insurance provided by this Coverage Form to apply to your personal property in a vehicle or in transit more than 1,000 feet from the described location(s) while:

**(a)** In or on a vehicle you own, rent or lease;

**(b)** In the custody of a carrier for hire; or

**(c)** In the custody of an air or rail carrier

within the coverage territory.

© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

The reference to Property Not Covered in A.2.i. for Property while airborne or waterborne does not apply to this Coverage Extension. However, there is no coverage under this Extension for shipments of any exported or imported property that originate or terminate outside of the United States of America, its territories and possessions, Canada, and Puerto Rico.

There is no coverage under this Extension for:

**(a)** Fine arts, antiques, fur garments, jewelry, precious or semiprecious stones, gold, silver, platinum, or other precious metals or alloys; or

**(b)** Mail shipments in the custody of the U.S. Postal Service.

**(3)** The most we will pay for loss or damage under this Extension is $50,000.

**15. Outdoor Property**

Item **e. Outdoor Property** of Paragraph **5. Coverage Extensions** is deleted and replaced by the following:

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, lighting, lighting standards, radio and television antennas, satellite dish, signs (other than signs attached to buildings), playground equipment, scoreboards, trees, shrubs and plants (other than "stock" of trees, shrubs or plants or part of a vegetated roof) including debris removal expense, caused by or resulting from any of the Covered Causes of Loss.

The most we will pay for loss or damage under this Extension is $25,000, but not more than $1,000 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or numbers of items lost or damaged in that occurrence.

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described location the debris of trees, shrubs and plants which are property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described location.

**16.** The following are added to Paragraph **5. Coverage Extensions:**

**h. Reward (Not available in New York)**

We will pay on behalf of the insured up to $25,000 for information which leads to an arson or theft conviction in connection with a fire loss covered under this Coverage Form. Regardless of the number of persons involved in providing information, our liability under this Coverage Extension will not be increased.

**i.** "Cellular Phones".

The most we will pay for loss or damage to "Cellular Phones" is $1,000 in any one calendar year.

With regard to this provision: "Cellular Phone" is defined as any cellular phone that is:

**(1)** Permanently installed in a vehicle by other than the manufacturer of the vehicle; or

**(2)** Not permanently installed in a vehicle.

**j. Extra Expense**

We will pay the actual and necessary Extra Expense you incur due to direct physical loss of or damage to the property at the location(s) described in the Declarations, including personal property in the open or in a vehicle, within 1,000 feet of such location, caused by or resulting from any Covered Cause of Loss.

If you are a tenant, your location is the portion of the building which you rent, lease or occupy, including:

**(1)** All routes within the building to gain access to the described location; and

**(2)** Your personal property in the open (or in a vehicle) within 1000 feet of the described location.

The following definitions are added as respects this Coverage Extension:

**(1)** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage:

**(a)** To avoid or minimize the suspension of business and to continue "operations":

**(i)** At the described location(s); or

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

    **(ii)** At replacement location(s) or at temporary locations,

    Including relocation expenses or costs to equip and operate the replacement or temporary locations.

**(b)** To minimize the suspension of business if you cannot continue "operations".

**(c)** **(i)** To repair or replace any property; or

    **(ii)** To research, replace or restore the lost information on damaged valuable papers and records;

    to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Extension .

**(2)** "Operations" means the type of your business activities occurring at the described location(s).

**(3)** "Period of Restoration" means the period of time that:

    **(a)** Begins with the date of direct physical loss or damage caused by or resulting from a Covered Cause of Loss at the described location(s); and

    **(b)** Ends on the earlier of:

        **(i)** The date when the property at the described location(s) should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

        **(ii)** The date when business is resumed at a new permanent location.

    "Period of Restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

    **(a)** Regulates the construction, use or repair, or requires the tearing down of any property; or

    **(b)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

    The expiration date of this policy will not cut short the "period of restoration".

The most we will pay for loss under this Extension is $25,000 in any one occurrence.

**k.** **Fine Arts**

You may extend the insurance that applies to your Business Personal Property to apply to your fine arts and fine arts owned by others that are in your care, custody or control.

This Extension does not apply to loss or damage caused by or resulting from:

**(1)** While fine arts are at any fair or on exhibition;

**(2)** Any repairing, restoration or retouching process;

**(3)** Insects, birds, rodents or other animals;

**(4)** Wear and tear;

**(5)** Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in the property that causes it to damage or destroy itself;

**(6)** Breakage of art glass windows, statuary, marbles, glassware, bric-a-brac, porcelains and similar fragile articles. But we will pay for loss or damage caused directly by fire, lightning, aircraft, theft or attempted theft, cyclone, tornado, windstorm, explosion, vandalism, or by accident to the vehicle carrying the property.

The most we will pay for loss or damage under this Extension is $25,000 in any one occurrence.

**l.** **Fire Protective Devices**

You may extend the insurance provided by this Coverage Form to apply to recharging or refilling of your fire protective devices that are permanently installed in buildings at the described location(s) when such devices have been discharged by accident or after being used in fighting a fire. This Extension does not apply to periodic recharge or refilling.

The most we will pay under this Extension is $25,000 for each separate 12-month period of this policy.

© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**m.  Loss of Refrigeration**

You may extend the insurance provided by this Coverage Form to apply to direct physical loss of or damage to property owned by you and used in your business or owned by others and in your care, custody or control, contained in any refrigeration or cooling apparatus or equipment resulting from:

**(1)**  The fluctuation or total interruption of electrical power, either at or away from the described location(s), due to conditions beyond your control; or

**(2)**  Mechanical failure of any refrigeration or cooling apparatus or equipment at the described location(s).

The most we will pay for loss or damage under this Extension is $25,000 in any one occurrence.

**n.  Computer Equipment**

You may extend the insurance that applies to your Business Personal Property to apply to loss or damage to "computer equipment" owned by you or similar property of others in your care, custody or control for which you are legally liable, caused by a Covered Cause of Loss.

You may extend the insurance that applies to your Business Personal Property to apply to loss or damage to "laptop/portable computers" owned by you and in your care, custody and control or in the care, custody or control of your employee.

**(1)**  Property Not Covered

We will not cover the following kinds of property under this Extension:

**(a)**  Property which you rent or lease to others;

**(b)**  Software or other electronic data;

**(c)**  Accounts, bills, evidences of debt, valuable papers, records, abstracts, deeds, manuscripts, program documentation or other documents.

**(d)**  "Computer equipment" held for sale by you;

**(e)**  "Computer equipment" of others on which you are performing repairs or work;

**(f)**  "Computer equipment" or that is part of any:

**(i)**  Production or processing equipment (such as CAD, CAM or CNC machines);

**(ii)**  Equipment used to maintain or service your building (such as heating, ventilating, cooling or alarm systems); or

**(iii)**  Communication equipment (such as telephone systems).

**(g)**  Property that is covered under another coverage form of this or any other policy in which such property is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance.

**(2)**  Property In Transit

We will pay for your "computer equipment", or "laptop/portable computer" while in transit.

**(3)**  Loss Payment will be determined as follows:

"Computer equipment" or "laptop/portable computers"

We will pay the lesser of the following amounts:

**(a)**  The cost of reasonably restoring that property to its condition immediately before the loss or damage; or

**(b)**  The cost of replacing that property with identical property of like kind and quality and used for the same purpose.

However, when repair or replacement with identical property is not possible, we will pay the cost to replace that property with property of like kind and quality capable of performing the same functions.

If not repaired or replaced, the property will be valued at its actual cash value.

© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.



"Computer equipment" means a network of electronic machine components capable of accepting information, processing it according to instructions and producing the results in a desired form.

"Laptop/portable computers" means "computer equipment" and accessories that are designed to function with it that can easily be carried and is designed to be used at more than one location.

The most we will pay for loss or damage to "computer equipment" and "laptop/portable computers" under this Extension is $50,000 in any one occurrence.

**o. Lock Replacement**

You may extend the insurance provided by this Coverage Form to apply to replacement of locks necessitated by theft of Covered Property or theft of keys from the described location(s).

The most we will pay for loss under this Coverage Extension is $10,000 in any one occurrence.

**p. Money And Securities**

**(1)** You may extend the insurance that applies to Business Personal Property to apply to loss of "money" and "securities" used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having use and custody of the property, at the described premises, or in transit between any of these places, resulting directly from:

　**(a)** Theft, meaning any act of stealing;

　**(b)** Disappearance; or

　**(c)** Destruction.

**(2)** In addition to the Limitations and Exclusions applicable to property coverage, we will not pay for loss:

　**(a)** Resulting from accounting or arithmetical errors or omissions;

　**(b)** Due to the giving or surrendering of property in any exchange or purchase; or

　**(c)** Of property contained in any money-operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

**(3)** The most we will pay for loss in any one occurrence is:

　**(a)** $25,000 for Inside the Premises for "money" and "securities" while:

　　**(i)** In or on the described premises; or

　　**(ii)** Within a bank or savings institution; and

　**(b)** $25,000 for Outside the Premises for "money" and "securities" while anywhere else.

**(4)** All loss:

　**(a)** Caused by one or more persons; or

　**(b)** Involving a single act or series of related acts;

is considered one occurrence.

**(5)** You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

**(6)** "Money" means:

　**(a)** Currency, coins and bank notes in current use and having a face value; and

　**(b)** Travelers checks, register checks and money orders held for sale to the public.

**(7)** "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

　**(a)** Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

　**(b)** Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**q.   Off-Premises Services Interruption**

You may extend the insurance provided by this Coverage Form to apply to loss of or damage to Covered Property caused by an interruption in utility service to the described location. The interruption in utility service must result from direct physical loss or damage by a Covered Cause of Loss to the following property away from the described location:

**(1)   Water Supply Services,** meaning the following types of property supplying water to the described location:

**(a)**   Pumping stations; and

**(b)**   Water mains.

**(2)   Communication Supply Services,** meaning property supplying communication services, including telephone, radio, microwave or television services to the described location, such as:

**(a)**   Communication transmission lines, including optic fiber transmission lines;

**(b)**   Coaxial cables; and

**(c)**   Microwave radio relays except satellites.

Coverages does not include above ground communication lines.

**(3)   Power Supply Services,** meaning the following types of property supplying electricity, steam or gas to the described location:

**(a)**   Utility generating plants;

**(b)**   Switching stations;

**(c)**   Substations;

**(d)**   Transformers; and

**(e)**   Transmission lines.

Coverage does not include above ground transmission or distribution lines.

This Extension does not apply to loss of or damage to property owned by you and used in your business or owned by others and in your care, custody or control, contained in any refrigeration or cooling apparatus or equipment, resulting from:

**(a)**   The fluctuation or total interruption of electrical power, either on or off the described location, due to conditions beyond your control; or

**(b)**   Mechanical failure of any refrigeration or cooling apparatus or equipment.

The most we will pay under this Extension is $25,000 in any one occurrence.

**r.   Consequential Loss And Personal Property Of Others**

The following is added to the Loss Payment provisions of Part E. Property Loss Conditions:

If a Covered Cause of Loss occurs to covered stock and/or Personal Property Of Others, we will pay any reduction in value of the remaining undamaged parts of covered stock including loss or damage resulting from confusion of personal property of others caused by a Covered Cause of Loss.

Payment for any reduced value in stock is included within the applicable Limit of Insurance.

**s.   Business Income**

We will pay up to $25,000 for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss or damage to your covered Building or Business Personal Property at locations that are described in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

If you are a tenant, your location is the portion of the building which you rent, lease or occupy, including:

**(1)**   All routes within the building to gain access to the described location; and

© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(2)** Your personal property in the open (or in a vehicle) within 100 feet of the described location.

The COINSURANCE Additional Condition does not apply as respects this Coverage Extension.

We will also pay up to $250,000 in any one occurrence for the actual loss of Business Income you sustain due to the necessary suspension of your operations during the period of restoration caused by direct physical loss or damage to any location you acquire, other than fairs or exhibitions. Insurance under this Coverage Extension for each newly acquired location will end when any of the following first occurs:

**(1)** This policy expires;

**(2)** 180 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

The following definitions are added as respects this Coverage Extension:

**(1)** Business Income means the:

    **(a)** Net income (net profit or loss before income taxes) that would have been earned or incurred; and

    **(b)** Continuing normal operating expenses incurred, including payroll.

**(2)** "Operations" means the type of your business activities occurring at the described location(s).

**(3)** "Period of Restoration" means the period of time that:

    **(a)** Begins 72 hours after the time of direct physical loss or damage for Business Income coverage caused by or resulting from a Covered Cause of Loss at the described location(s); and

    **(b)** Ends on the earlier of:

        **(i)** The date when the property at the described location(s) should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

        **(ii)** The date when business is resumed at a new permanent location.

"Period of Restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

    **(a)** Regulates the construction, use or repair, or requires the tearing down of any property; or

    **(b)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**t.** **Business Income - Utility Services - Time Element**

We will pay up to $25,000 in any one occurrence for the actual loss of Business Income you sustain at the described location caused by an interruption in utility service to the described location. The interruption in utility service must result from direct physical loss or damage by a Covered Cause of Loss to the following types of property located outside of a covered building described in the Declarations. This Coverage Extension begins 72 hours after such direct physical loss or damage.

**(1)** **Water Supply Services,** meaning the following types of property supplying water to the described location:

    **(a)** Pumping stations; and

    **(b)** Water mains.

**(2)** **Communication Supply Services,** meaning property supplying communication services, including telephone, radio, microwave or television services to the described location, such as:

    **(a)** Communication transmission lines, including optic fiber transmission lines;

© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.



 **(b)** Coaxial cables; and

 **(c)** Microwave radio relays except satellites.

 Coverage does not include above ground communication lines.

**(3) Power Supply Services,** meaning the following types of property supplying electricity, steam or gas to the described location:

 **(a)** Utility generating plants;

 **(b)** Switching stations;

 **(c)** Substations;

 **(d)** Transformers; and

 **(e)** Transmission lines.

 Coverage does not include above ground transmission or distribution lines.

**u. Appurtenant Structures**

You may extend the insurance that applies to Building to apply to your storage buildings, your garages and your other appurtenant structures, except outdoor fixtures, at the described location(s). The most we will pay for Building loss or damage under this Extension is $50,000 in any one occurrence.

You may extend the insurance that applies to Business Personal Property to apply to such property in your storage buildings, your garages and your other appurtenant structures at the described location(s). The most we will pay for Business Personal Property loss or damage under this Extension is $5,000 in any one occurrence.

**v. Business Personal Property Limit Seasonal Increase**

The Limit of Insurance for Business Personal Property will automatically increase by 33% to provide for seasonal variations. This increase will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 90% of your average monthly value during the lesser of:

**(1)** The 12-month period immediately preceding the date the loss or damage occurs; or

**(2)** The period of time you have been in business as of the date loss occurs.

**w. Employee Tools Coverage**

You may extend the insurance that applies to your Business Personal Property to apply to loss or damage by a Covered Cause of Loss to tools owned by your employees while used in your business or when in your building.

However, we will not pay for a loss that is caused by or results from theft or attempted theft of employee tools unless such loss occurs:

**(1)** In a building and there is visible evidence of forcible entry to or exit from that building; or

**(2)** From a locked vehicle and there is visible evidence of forcible entry.

The value of Employee Tools will be determined at actual cash value as of the time of loss or damage.

The most we will pay with respect to employee tools is $25,000 in any one occurrence.

Coverage provided under this Coverage Extension is subject to a Deductible equal to the Property Deductible shown in the Declarations.

**B.** The second paragraph of Section **C. LIMITS OF INSURANCE** of the BUILDING AND PERSONAL PROPERTY COVERAGE FORM and the CONDOMINIUM ASSOCIATION COVERAGE FORM is deleted and replaced by the following:

**Signs**

The most we will pay for loss or damage to outdoor signs is $25,000 per sign in any one occurrence.

© 2015 Liberty Mutual Insurance

**CP 91 42 01 15**  Includes copyrighted material of Insurance Services Office, Inc., with its permission.  **Page 15 of 17**

**C.** The following  is added to Section  **D. DEDUCTIBLE,** of the  BUILDING  AND PERSONAL PROPERTY COVERAGE FORM and the CONDOMINIUM  ASSOCIATION  COVERAGE FORM:

**Special Deductible  Provision**

We will deduct from  any loss or damage  under  the  Coverage  Extensions  in any one occurrence  the Deductible  shown in the Declarations  or $500, whichever  is less.

This deductible  applies  to all Coverage  Extensions,  except for:

**a.** Newly  Acquired  or Constructed  Property;  and

**e.** Outdoor  Property.

**i.** "Cellular  Phone"  coverage  has a $50 per occurrence  deductible.

This deductible  will be used to satisfy the requirements  of the deductible  in the Declaratio ns, but it will not increase the deductible  shown in the Declarations.

**D.** The following  changes  apply to Section  E. Loss Conditions  of the BUILDING  AND PERSONAL PROP- ERTY COVERAGE FORM:

**1.** The following  is added to Paragraph  **E. 7. Valuation**

Undamaged  Tenants Improvements  and Betterments

We will determine  the value for Undamaged  Tenants Improvements  and Betterments  as in- cluded  in section  **A.3.** of this endorsement  as follows:

**(a)** The cost to repair or replace on the same or another site if you make repairs promptly;

**(b)** A proportion  of your original  cost if you do not make repairs promptly.  We will determine the proportionate   value as follows:

**(i)** Multiply  the  original  cost by the number  of days from  the loss or damage  to the expiration  of the lease; and

**(ii)** Divide the amount  determined  in (i) above by the number  of days from  the installation of improvements  to the expiration  of the lease.

If your lease contains  a renewal  option,  the expiration  of the renewal  option  period  will replace the expiration  of the lease in this procedure.

**E.** **Coinsurance**

Section  **F. ADDITIONAL  CONDITIONS,**  Paragraph  **1. Coinsurance**  of the BUILDING  AND PERSONAL PROPERTY COVERAGE FORM and the CONDOMINIUM  ASSOCIATION  COVERAGE FORM applies  only when the total loss or damage  to all Covered Property  in any one occurrence  is greater than $10,000.

**F.** **Back-Up Of Sewers Or Drains**

Paragraph  **B.1.g.(3). Water** of the CAUSES OR LOSS SPECIAL FORM is deleted  and replaced  by the following:

**(3)** Except as provided  under the Back-Up of Sewers or Drains Additional  Coverage  Extension, water that backs up or overflows  or is otherwise  discharged  from  a sewer, drain, sump, sump pump or related  equipment;

The following  is added to Section  **F. Additional  Coverage  Extensions**  of the CAUSES OF LOSS - SPECIAL FORM:

**4.** **Back-Up Of Sewers Or Drains**

We cover direct physical  loss or damage  caused by water:

**a.** Which backs up into a building  or structure  through  sewers or drains which  are directly connected  to a sanitary sewer or septic system;  or

**b.** Which enters into and overflows  from within  a sump pump, sump pump well or other type of system  designed to remove subsurface  water which  is drained  from the foundation  area.

This coverage  does not apply if the loss or damage  is caused by your negligence.

The most we will pay for loss or damage  under this Coverage  Extension  is $25,000 in any one occurrence.

© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

If the DISCHARGE FROM SEWER, DRAIN OR SUMP (NOT FLOOD-RELATED) endorsement is attached to and made a part of this policy, the provisions of this Coverage Extension are superseded for any location to which the aforementioned endorsement applies.

**All other terms and conditions remain unchanged.**



© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties under this policy will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

IL 00 21 09 08 © ISO Properties, Inc., 2007 Page 1 of 2

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

**THIS ENDORSEMENT  CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EFFECTIVE TIME  CHANGES -
# REPLACEMENT  OF 12 NOON

This endorsement  modifies  the COMMON  POLICY DECLARATIONS.

To the extent that coverage in this policy replaces coverage in other policies terminating  noon standard  time on the inception  date of this policy, coverage  under this policy shall not become effective  until such other coverage  has terminated.

**IL 00 22 05 87**

Copyright,  Insurance  Services  Office, Inc., 1987
Copyright,  ISO Commercial  Risk Services,  Inc., 1987

IL 01 66 09 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES - ACTUAL CASH VALUE

This endorsement modifies insurance provided under the following:

> CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> CRIME AND FIDELITY COVERAGE PART
> EQUIPMENT BREAKDOWN COVERAGE PART
> FARM COVERAGE PART
> STANDARD PROPERTY POLICY

The following is added to any provision which uses the term actual cash value:

Actual cash value is calculated as the amount it would cost to repair or replace Covered Property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. Actual cash value applies to valuation of Covered Property regardless of whether that property has sustained partial or total loss or damage.

The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

IL 01 66 09 07                © ISO Properties, Inc., 2006                **Page 1 of 1**

IL 01 72 09 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART

**A.** For insurance provided under the:

Capital Assets Program (Output Policy) Coverage Part
Commercial Inland Marine Coverage Part
Commercial Property Coverage Part
Crime and Fidelity Coverage Part
Equipment Breakdown Coverage Part

The **TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY** Common Policy Condition is replaced by the following:

**F.   TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

If you die, this Coverage Part will remain in effect as provided in **1.** or **2.** below, whichever is later:

**1.** For 180 days after your death regardless of the policy period shown in the Declarations, unless the insured property is sold prior to that date; or

**2.** Until the end of the policy period shown in the Declarations, unless the insured property is sold prior to that date.

Coverage during the period of time after your death is subject to all provisions of this policy including payment of any premium due for the policy period shown in the Declarations and any extension of that period.

**B.** For insurance provided under the:

Capital Assets Program (Output Policy) Coverage Part
Commercial Inland Marine Coverage Part
Commercial Property Coverage Part
Farm Coverage Part

The following is added to the **LOSS PAYMENT** Loss Condition and supersedes any provision to the contrary:

**NOTICE OF ACCEPTANCE OR DENIAL OF CLAIM**

**1.** Except as provided in **3.** below, we will give you notice, within 15 working days after we receive a properly executed proof of loss, that we:

**a.** Accept your claim;

**b.** Deny your claim; or

**c.** Need more time to determine whether your claim should be accepted or denied.

If we deny your claim, such notice will be in writing, and will state any policy provision, condition or exclusion used as a basis for the denial.

If we need more time to determine whether your claim should be accepted or denied, the written notice will state the reason why more time is required.

2. If we have not completed our investigation, we will notify you again in writing, within 30 days after the date of the initial notice as provided in **1.c.** above, and thereafter every 45 days. The written notice will state why more time is needed to investigate your claim and when you may expect us to reach a decision on your claim.

3. The notice procedures in **1.** and **2.** above do not apply if we have a reasonable basis, supported by specific information, to suspect that an insured has fraudulently caused or contributed to the loss by arson or other illegal activity. Under such circumstances, we will notify you of the disposition of your claim within a period of time reasonable to allow full investigation of the claim, after we receive a properly executed proof of loss.

IL 02 46 09 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**

**1.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**2.** **Cancellation Of Policies In Effect For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**3.** **Cancellation Of Policies In Effect For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**a.** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**b.** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**c.** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**d.** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**e.** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**f.** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

© ISO Properties, Inc., 2006

4. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

5. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

7. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

B. The following are added and supersede any provisions to the contrary:

1. **Nonrenewal**

   If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

2. **Increase Of Premium**

   If we increase your renewal premium, we will mail or deliver to the first Named Insured written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to the first Named Insured's last known address. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

IL 09 10 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. Surveys;

2. Consultation or advice; or

3. Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;

2. To consultation services required to be performed under a written service contract not related to a policy of insurance; or

3. If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

**Instruction to Policy Writers**

Attach the Pennsylvania Notice to all new and renewal certificates insuring risks located in Pennsylvania.

**IL 09 10 07 02**              ©ISO Properties, Inc., 2001              **Page 1 of 1**

IL 09 35 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY



**A.** We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

**1.** The failure, malfunction or inadequacy of:

**a.** Any of the following, whether belonging to any insured or to others:

**(1)** Computer hardware, including microprocessors;

**(2)** Computer application software;

**(3)** Computer operating systems and related software;

**(4)** Computer networks;

**(5)** Microprocessors (computer chips) not part of any computer system; or

**(6)** Any other computerized or electronic equipment or components; or

**b.** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **A.1.a.** of this endorsement;

due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

**2.** Any device, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **A.1.** of this endorsement.

**B.** If an excluded Cause of Loss as described in Paragraph **A.** of this endorsement results:

**1.** In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

**2.** Under the Commercial Property Coverage Part:

**a.** In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss - Special Form; or

**b.** In a Covered Cause of Loss under the Causes of Loss - Basic Form or the Causes of Loss - Broad Form;

we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

**C.** We will not pay for repair, replacement or modification of any items in Paragraphs **A.1.a.** and **A.1.b.** of this endorsement to correct any deficiencies or change any features.

© ISO Properties, Inc., 2001

IL 09 52 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> EQUIPMENT BREAKDOWN COVERAGE PART
> FARM COVERAGE PART
> STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

IL 88 36 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
PASTORAL PROFESSIONAL LIABILITY COVERAGE PART
PRINTERS ERRORS AND OMISSIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART



**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to a pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any injury, damage, damages, claims, suits, wrongful acts, losses or employment practices that are otherwise excluded under this Coverage Part.

IL 88 38 01 15

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF PUNITIVE DAMAGES RELATED TO
# A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
PASTORAL PROFESSIONAL LIABILITY COVERAGE PART
PRINTERS ERRORS AND OMISSIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   **1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   **2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any injury, damage, damages, claims, suits, wrongful acts, losses or employment practices that are otherwise excluded under this Coverage Part.

© 2015 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# AMENDATORY ENDORSEMENT
## PENNSYLVANIA

1. In all coverage forms except the Builders' Risk - Rehabilitation Or Renovation Form, the "term" actual cash value throughout the policy means the cost to repair or replace property using materials of like kind and quality, to the extent practical, less a deduction for depreciation, however caused.

2. In the Builders' Risk Coverage - Rehabilitation And Renovation Form, under Valuation, Existing Building, Actual Cash Value is deleted and replaced by the following:

   **Actual Cash Value --** If Actual Cash Value is indicated on the "schedule of coverages" for Existing Building, the value of the part of an "existing building" that sustains direct physical loss or damage will be based on the actual cash value at the time of loss. Actual cash value means the cost to repair or replace property using materials of like kind and quality to the extent practical, less a deduction for depreciation, however caused.

3. In the Builders' Risk Coverage - Rehabilitation And Renovation Form, under Valuation, Building Materials, is deleted and replaced by the following:

   **Building Materials --**

   a. **Actual Cash Value --** The value of "building materials" will be based on the actual cash value at the time of loss, less a deduction for depreciation, however caused.

   b. **Actual Cash Value Means --** The actual cash value of "building materials" means:

      1) the necessary and reasonable costs of materials (using materials of like kind and quality to the extent practical, less a deduction for depreciation, however caused) and labor incurred to repair or replace the part of the covered "building materials" that sustains direct physical loss or damage;

      2) the reasonable overhead and profit related to the covered "building materials" that sustains direct physical loss or damage but not to exceed the overhead and profit being charged for the "rehabilitation or renovation project" in accordance with the construction contracts; and

      3) other related construction costs and expenses that are re-incurred to repair or replace the part of "building materials" that sustain direct physical loss or damage, but only if such costs have been included as part of the "limit" for a covered "rehabilitation or renovation project".

4. What Must Be Done In Case Of Loss is amended to include the following provision:

   **Notice Of Our Intent --** Unless "we" need more time to investigate "your" claim, "we" will give "you" notice of "our" intent to accept or deny "your" claim within 15 working days after receipt of a duly executed proof of loss.

   If "we" deny "your" claim, "we" give "you" written notice of "our" denial. "Our" notice will identify any provision of this policy on which the denial is based.

          Copyright, American Association of Insurance Services, Inc., 2008

AAIS
IM 2077 09 08
Page 2 of 2

If "we" need more time to investigate "your" claim, "we" will give "you" notice of "our" need for more time within 15 working days after receipt of a duly executed proof of loss. "Our" notice will state why more time is needed.

If "our" investigation cannot be completed within 30 days of the date of "our" initial notice, "we" will give "you" written notice to state why more time is needed. "We" will give "you" such notice within 30 days of the date of "our" initial notice.

"We" will continue to give "you" written notice every 45 days thereafter to state why more time is needed until "we" give "you" notice of "our" intent to accept or deny "your" claim.

The requirements of this provision do not apply if there is a reasonable basis supported by specific information available for review by the insurance regulatory authority that "you" have fraudulently caused or contributed to the loss by arson or other illegal activity. Under such circumstances, "we" will give notice of "our" intent to accept or deny "your" claim within a reasonable period of time after receipt of a duly executed proof of loss.

Copyright, American Association of Insurance Services, Inc., 2008

AAIS
IM 7000 04 04
Page 1 of 13

# CONTRACTORS' EQUIPMENT COVERAGE



## AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Contractors' Equipment Coverage. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment or transfer of rights or duties, cancellation, changes or modifications, inspections, and examination of books and records.

Endorsements and schedules may also apply. They are identified on the "schedule of coverages".

Refer to Definitions for words and phrases that have special meaning. These words and phrases are shown in quotation marks or bold type.

## DEFINITIONS

1. The words "you" and "your" mean the persons or organizations named as the insured on the declarations.

2. The words "we", "us", and "our" mean the company providing this coverage.

3. "Contractors' equipment" means machinery, equipment, and tools of a mobile nature that "you" use in "your" contracting, installation, erection, repair, or moving operations or projects.

   "Contractors' equipment" also means:

   a. self-propelled vehicles designed and used primarily to carry mounted equipment; or

   b. vehicles designed for highway use that are unlicensed and not operated on public roads.

4. "Equipment schedule" means a schedule of "contractors' equipment" that is attached to this policy and that describes each piece of covered equipment.

5. "Jobsite" means any location, project, or work site where "you" are in the process of construction, installation, erection, repair, or moving.

6. "Limit" means the amount of coverage that applies.

7. "Pollutant" means:

   a. any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of; and

   b. electrical or magnetic emissions, whether visible or invisible, and sound emissions.

8. "Schedule of coverages" means:

   a. all pages labeled schedule of coverages or schedules which pertain to this coverage; and

   b. declarations or supplemental declarations which pertain to this coverage.

9. "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

Copyright, American Association of Insurance Services, Inc., 2004

10. "Specified perils" means aircraft; civil com-motion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm.

Falling objects does not include loss to:

a. personal property in the open; or

b. the interior of buildings or structures or to personal property inside buildings or structures unless the exterior of the roofs or walls are first damaged by a falling ob-ject.

Water damage means the sudden or acciden-tal discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the wa-ter or steam.

11. "Terms" means all provisions, limitations, exclusions, conditions, and definitions that apply.

12. "Volcanic action" means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow.

Volcanic action does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss to the cov-ered property.

## PROPERTY COVERED

"We" cover the following property unless the property is excluded or subject to limitations.

1. **Scheduled Equipment --**

a. **Coverage** -- "We" cover direct physical loss caused by a covered peril to:

1) "your" "contractors' equipment"; and

2) "contractors' equipment" of others in "your" care, custody, or control.

b. **Coverage Limitation** -- "We" only cover "your" "contractors' equipment" and "contractors' equipment" of others:

1) that are described on the "equipment schedule"; and

2) when Scheduled Equipment is indi-cated on the "schedule of cover-ages".

2. **Schedule On File --**

a. **Coverage** -- "We" cover direct physical loss caused by a covered peril to:

1) "your" "contractors' equipment"; and

2) "contractors' equipment" of others in "your" care, custody, or control.

b. **Coverage Limitation** -- "We" only cover "your" "contractors' equipment" and "contractors' equipment" of others:

1) that are listed in a schedule which "you" must submit to "us" and "we" keep on file, the schedule must con-tain a description of each item to be covered and a "limit" for each item; and

2) when Schedule on File is indicated on the "schedule of coverages".

## PROPERTY NOT COVERED

1. **Aircraft Or Watercraft** -- "We" do not cover aircraft or watercraft.

2. **Contraband** -- "We" do not cover contraband or property in the course of illegal transporta-tion or trade.

3. **Leased Or Rented Property** -- "We" do not cover property that "you" lease or rent to oth-ers.

Copyright, American Association of Insurance Services, Inc., 2004

AAIS
IM 7000 04 04
Page 3 of 13

4. **Loaned Property** -- "We" do not cover property that "you" loan to others.

5. **Underground Mining Operations** -- "We" do not cover property while stored or operated underground in connection with any mining operations.

6. **Vehicles** -- "We" do not cover automobiles, motor trucks, tractors, trailers, and similar conveyances designed for highway use and used for over the road transportation of people or cargo. However, this does not include:

   a. self-propelled vehicles designed and used primarily to carry mounted equipment; or

   b. vehicles designed for highway use that are unlicensed and not operated on public roads.

7. **Waterborne Property** -- "We" do not cover property while waterborne except while in transit in the custody of a carrier for hire.

## COVERAGE EXTENSIONS

**Provisions That Apply To Coverage Extensions** -- The following Coverage Extensions indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Coverage Extension, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, the coverages provided below are part of and not in addition to the applicable "limit" for coverage described under Property Covered.

The "limit" provided under a Coverage Extension cannot be combined or added to the "limit" for any other Coverage Extension or Supplemental Coverage including a Coverage Extension or Supplemental Coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following coverage extensions are not subject to and not considered in applying coinsurance conditions.

**Debris Removal** --

1. **Coverage** -- "We" pay the cost to remove the debris of covered property that is caused by a covered peril.

2. **We Do Not Cover** -- This coverage does not include costs to:

   a. extract "pollutants" from land or water; or

   b. remove, restore, or replace polluted land or water.

3. **Limit** -- "We" do not pay any more under this coverage than 25% of the amount "we" pay for the direct physical loss. "We" will not pay more for loss to property and debris removal combined than the "limit" for the damaged property.

4. **Additional Limit** -- "We" pay up to an additional $5,000 for debris removal expense when the debris removal expense exceeds 25% of the amount "we" pay for direct physical loss or when the loss to property and debris removal combined exceeds the "limit" for the damaged property.

5. **You Must Report Your Expenses** -- "We" do not pay any expenses unless they are reported to "us" in writing within 180 days from the date of direct physical loss to covered property.

IM 7000 04 04

Copyright, American Association of Insurance Services, Inc., 2004

## SUPPLEMENTAL COVERAGES

**Provisions That Apply To Supplemental Coverages** -- The following Supplemental Coverages indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Coverage, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for a Supplemental Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

The "limit" available for coverage described under a Supplemental Coverage:

**a.** is the only "limit" available for the described coverage; and

**b.** is not the sum of the "limit" indicated for a Supplemental Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Coverage cannot be combined or added to the "limit" for any other Supplemental Coverage or Coverage Extension including a Supplemental Coverage or Coverage Extension that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following supplemental coverages are not subject to and not considered in applying coinsurance conditions.

1. **Employee Tools** --

   **a.** **Coverage** -- "We" cover direct physical loss caused by a covered peril to tools owned by "your" employees.

   **b.** **Coverage Limitation** -- "We" only cover tools owned by "your" employees while at a:

      1) premises that "you" own or operate; or

      2) "jobsite".

   **c.** **Limit** -- The most "we" pay in any one occurrence for loss to employee tools is $5,000.

2. **Equipment Leased Or Rented From Others** --

   **a.** **Coverage** -- "We" cover direct physical loss caused by a covered peril to "contractors' equipment" that "you" have leased or rented from others.

   **b.** **Limit** -- The most "we" pay in any one occurrence for equipment leased or rented from others is $25,000.

3. **Newly Purchased Property** --

   **a.** **Coverage** -- "We" cover direct physical loss caused by a covered peril to additional "contractors' equipment" that "you" purchase during the policy period.

   **b.** **Limit** -- The most that "we" pay for any loss under this supplemental coverage is the least of the:

      1) actual cash value of the covered property; or

      2) "limit" for newly purchased property indicated on the "schedule of coverages". If no "limit" is indicated, then 30% of the Catastrophe Limit indicated on the "schedule of coverages" applies to this coverage.

Copyright, American Association of Insurance Services, Inc., 2004



c. **Time Limitation** -- "We" extend coverage to the additional "contractors' equipment" that "you" purchase for up to 60 days.

This supplemental coverage will end when any of the following first occur:

1) this policy expires;

2) 60 days after "you" obtain the additional "contractors' equipment"; or

3) "you" report the additional "contractors' equipment" to "us".

d. **Additional Premium** -- "You" must pay any additional premium due from the date "you" purchase the additional "contractors' equipment".

4. **Pollutant Cleanup And Removal** --

a. **Coverage** -- "We" pay "your" expense to extract "pollutants" from land or water if the discharge, dispersal, seepage, migration, release, or escape of the "pollutants" is caused by a covered peril that occurs during the policy period.

b. **Time Limitation** -- The expenses to extract "pollutants" are paid only if they are reported to "us" in writing within 180 days from the date the covered peril occurs.

c. **We Do Not Cover** -- "We" do not pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants".

However, "we" pay the cost of testing which is necessary for the extraction of "pollutants" from land or water.

d. **Limit** -- The most "we" pay for each location is $25,000 for the sum of all such expenses arising out of a covered peril occurring during each separate 12-month period of this policy.

5. **Rental Reimbursement** --

a. **Coverage** -- In the event of a direct physical loss by a covered peril to "your" "contractors' equipment", "we" reimburse "you" for "your" expense to rent similar equipment while "your" equipment is inoperable.

The deductible amount indicated on the "schedule of coverages" does not apply to a loss covered under this supplemental coverage.

b. **Waiting Period** -- "We" will not reimburse "you" for the rental of equipment until after the first 72-hours (unless otherwise indicated on the "schedule of coverages") following the direct physical loss to "your" "contractors' equipment" caused by a covered peril.

c. **Incurred Rental Expenses** -- After the waiting period has passed, "we" will only reimburse "you" for the rental expenses that "you" actually incur.

d. **Coverage After Expiration Date** -- "We" will continue to reimburse "you" for the rental of equipment after the expiration date of this coverage, provided the loss occurred before the expiration date.

e. **Coverage Limitations** -- "We" will not reimburse "you":

1) if "you" can continue or resume "your" operations with similar equipment that is available to "you" at no additional expense to "you"; or

2) for the rental expense of any equipment unless "you" make every reasonable effort to repair, replace, or rebuild the inoperable equipment after the loss by a covered peril occurs.

f. **Limit** -- The most "we" reimburse "you" in any one occurrence for rental expenses is $5,000.

Copyright, American Association of Insurance Services, Inc., 2004

6. **Spare Parts And Fuel** --

a. **Coverage** -- "We" cover direct physical loss caused by a covered peril to:

1) spare parts and accessories for "contractors' equipment"; and

2) fluids for vehicles and "contractors' equipment"; fluids include gasoline, oil, and hydraulic fluid.

b. **Limit** -- The most "we" pay in any one occurrence for loss to spare parts and accessories is $5,000.

## PERILS COVERED

"We" cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

a. **Civil Authority** -- "We" do not pay for loss caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

"We" do cover loss resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this coverage.

b. **Nuclear Hazard** -- "We" do not pay for loss caused by or resulting from a nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct loss by fire resulting from the nuclear hazard is covered.

c. **War And Military Action** -- "We" do not pay for loss caused by:

1) war, including undeclared war or civil war; or

2) a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or

3) insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War and Military Action Exclusion will apply in place of the Nuclear Hazard Exclusion.

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following:

a. **Contamination or Deterioration** -- "We" do not pay for loss caused by contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust, or any quality, fault, or weakness in the covered property that causes it to damage or destroy itself.

But if contamination or deterioration results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

Copyright, American Association of Insurance Services, Inc., 2004

b. **Criminal, Fraudulent, Dishonest Or Illegal Acts** -- "We" do not pay for loss caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by:

1) "you";

2) others who have an interest in the property;

3) others to whom "you" entrust the property;

4) "your" partners, officers, directors, trustees, joint venturers, or "your" members or managers if "you" are a limited liability company; or

5) the employees or agents of **1), 2), 3),** or **4)** above, whether or not they are at work.

This exclusion does not apply to acts of destruction by "your" employees, but "we" do not pay for theft by employees.

This exclusion does not apply to covered property in the custody of a carrier for hire.

c. **Loss Of Use** -- "We" do not pay for loss caused by or resulting from loss of use, delay, or loss of market.

d. **Mechanical Breakdown** -- "We" do not pay for loss caused by any mechanical, structural, or electrical breakdown or malfunction including a breakdown or malfunction resulting from a structural, mechanical, or reconditioning process.

But if a mechanical, structural, or electrical breakdown or malfunction results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

e. **Missing Property** -- "We" do not pay for missing property where the only proof of loss is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property.

This exclusion does not apply to covered property in the custody of a carrier for hire.

f. **Pollutants** -- "We" do not pay for loss caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of "pollutants":

1) unless the release, discharge, seepage, migration, dispersal, or escape is caused by a "specified peril"; or

2) except as specifically provided under the Supplemental Coverages - Pollutant Cleanup and Removal.

"We" do cover any resulting loss caused by a "specified peril".

g. **Temperature/Humidity** -- "We" do not pay for loss caused by dryness, dampness, humidity, or changes in or extremes of temperature.

But if dryness, dampness, humidity, or changes in or extremes of temperature results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

h. **Voluntary Parting** -- "We" do not pay for loss caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

Copyright, American Association of Insurance Services, Inc., 2004

i. **Wear And Tear** -- "We" do not pay for loss caused by wear and tear, marring, or scratching.

But if wear and tear, marring, or scratching results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

## WHAT MUST BE DONE IN CASE OF LOSS

1. **Notice** -- In case of a loss, "you" must:

   a. give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice); and

   b. give notice to the police when the act that causes the loss is a crime.

2. **You Must Protect Property** -- "You" must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss.

   a. **Payment of Reasonable Costs** -- "We" do pay the reasonable costs incurred by "you" for necessary repairs or emergency measures performed solely to protect covered property from further damage by a peril insured against if a peril insured against has already caused a loss to covered property. "You" must keep an accurate record of such costs. "Our" payment of reasonable costs does not increase the "limit".

   b. **We Do Not Pay** -- "We" do not pay for such repairs or emergency measures performed on property which has not been damaged by a peril insured against.

3. **Proof Of Loss** -- "You", must send "us", within 60 days after "our" request, a signed, sworn proof of loss. This must include the following information:

   a. the time, place, and circumstances of the loss;

   b. other policies of insurance that may cover the loss;

   c. "your" interest and the interests of all others in the property involved, including all mortgages and liens;

   d. changes in title of the covered property during the policy period; and

   e. estimates, specifications, inventories, and other reasonable information that "we" may require to settle the loss.

4. **Examination** -- "You" must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

5. **Records** -- "You" must produce records, including tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

6. **Damaged Property** -- "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

7. **Volunteer Payments** -- "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

8. **Abandonment** -- "You" may not abandon the property to "us" without "our" written consent.

9. **Cooperation** -- "You" must cooperate with "us" in performing all acts required by this policy.

Copyright, American Association of Insurance Services, Inc., 2004

AAIS
IM 7000 04 04
Page 9 of 13



## VALUATION

1. **Actual Cash Value** -- The value of covered property will be based on the actual cash value at the time of the loss (with a deduction for depreciation) unless replacement cost is indicated on the "schedule of coverages".

2. **Replacement Cost** -- The value of covered property will be based on the replacement cost without any deduction for depreciation unless Actual Cash Value is indicated on the "schedule of coverages".

   a. **Replacement Cost Limitation** -- The replacement cost is limited to the cost of repair or replacement with similar materials and used for the same purpose. The payment will not exceed the amount "you" spend to repair or replace the damaged or destroyed property.

   b. **Replacement Cost Does Not Apply Until Repair Or Replacement** -- Replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced.

   c. **Time Limitation** -- "You" may make a claim for actual cash value before repair or replacement takes place, and later for the replacement cost if "you" notify "us" of "your" intent within 180 days after the loss.

3. **Pair Or Set** -- The value of a lost or damaged article which is part of a pair or set is based on a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

4. **Loss To Parts** -- The value of a lost or damaged part of an item that consists of several parts when it is complete is based on the value of only the lost or damaged part or the cost to repair or replace it.

## HOW MUCH WE PAY

1. **Insurable Interest** -- "We" do not cover more than "your" insurable interest in any property.

2. **Flat Deductible** -- "We" pay only that part of "your" loss over the deductible amount indicated on the "schedule of coverages" in any one occurrence unless Percentage Deductible is indicated on the "schedule of coverages".

3. **Percentage Deductible** -- When a percentage deductible is indicated on the "schedule of coverages", "we" pay only that part of "your" loss over the deductible amount as determined below.

   a. **Determining The Deductible Amount** -- The deductible amount is determined by applying the percentage indicated on the "schedule of coverages" to the value of the covered property that is involved in the loss. The value is determined by the provisions described under the Valuation section of this policy.

   b. **Two Or More Items** -- If a loss involves two or more pieces of equipment, the percentage indicated on the "schedule of coverages" will apply only to the covered property with the highest value.

   c. **Minimum and Maximum Deductible** -- The percentage deductible will not exceed the Maximum Deductible amount and will not be less than the Minimum Deductible amount indicated on the "schedule of coverages".

4. **Loss Settlement Terms** -- Subject to paragraphs **1., 2., 3., 5., 6.,** and **7.** under How Much We Pay, "we" pay the lesser of:

   a. the amount determined under Valuation;

IM 7000 04 04

Copyright, American Association of Insurance Services, Inc., 2004

b. the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or

c. the "limit" that applies to the covered property. However, the most "we" pay for loss in any one occurrence is the Catastrophe Limit indicated on the "schedule of coverages".

5. **Coinsurance** --

a. **When Coinsurance Applies** -- "We" only pay a part of the loss if the "limit" is less than the percentage of the value of the covered property that is indicated on the "schedule of coverages".

b. **How We Determine Our Part Of The Loss** -- "Our" part of the loss is determined using the following steps:

1) multiply the percent indicated on the "schedule of coverages" by the value of the covered property at the time of loss;

2) divide the "limit" for covered property by the result determined in **b.1)** above;

3) multiply the total amount of loss, after the application of any deductible, by the result determined in **b.2)** above.

The most "we" pay is the amount determined in **b.3)** above or the "limit", whichever is less. "We" do not pay any remaining part of the loss.

c. **If There Is More Than One Limit** -- If there is more than one "limit" indicated on the "schedule of coverages" for this coverage part, this procedure applies separately to each "limit".

d. **If There Is Only One Limit** -- If there is only one "limit" indicated on the "schedule of coverages" for this coverage, this procedure applies to the total of all covered property to which the "limit" applies.

e. **When Coinsurance Does Not Apply** -- Conditions for coinsurance do not apply unless a coinsurance percentage is indicated on the "schedule of coverages".

6. **Insurance Under More Than One Coverage** -- If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

7. **Insurance Under More Than One Policy** --

a. **Proportional Share** -- "You" may have another policy subject to the same "terms" as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

b. **Excess Amount** -- If there is another policy covering the same loss, other than that described above, "we" pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" do not pay more than the applicable "limit".

## LOSS PAYMENT

1. **Loss Payment Options** --

a. **Our Options** -- In the event of loss covered by this coverage form, "we" have the following options:

1) pay the value of the lost or damaged property;

2) pay the cost of repairing or replacing the lost or damaged property;

Copyright, American Association of Insurance Services, Inc., 2004

AAIS
IM 7000 04 04
Page 11 of 13



   3) rebuild, repair, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or

   4) take all or any part of the property at the agreed or appraised value.

**b. Notice Of Our Intent To Rebuild, Repair, Or Replace** -- "We" must give "you" notice of "our" intent to rebuild, repair, or replace within 30 days after receipt of a duly executed proof of loss.

**2. Your Losses --**

   **a. Adjustment And Payment Of Loss** -- "We" adjust all losses with "you". Payment will be made to "you" unless another loss payee is named in the policy.

   **b. Conditions For Payment Of Loss** -- An insured loss will be payable 30 days after:

      1) a satisfactory proof of loss is received, and

      2) the amount of the loss has been established either by written agreement with "you" or the filing of an appraisal award with "us".

**3. Property Of Others --**

   **a. Adjustment And Payment of Loss To Property of Others** -- Losses to property of others may be adjusted with and paid to:

      1) "you" on behalf of the owner; or

      2) the owner.

   **b. We Do Not Have To Pay You If We Pay The Owner** -- If "we" pay the owner, "we" do not have to pay "you". "We" may also choose to defend any suits brought by the owners at "our" expense.

## REPORTING CONDITIONS

**Equipment Leased Or Rented From Others** -- If indicated on the "schedule of coverages", the following reporting conditions apply.

**1. Reports --**

   **a. You Will Report To Us** -- Within 30 days after the end of the policy period, "you" will report to "us" the total amount of "your" expenditures for "contractors' equipment" that "you" lease or rent from others.

   **b. Cancellation** -- If this policy is canceled, "you" will report the total amount of expenditures up to and including the date of cancellation.

**2. Premium Computation And Adjustment --**

   **a.** The premium will be adjusted at the end of the policy period. The total computed premium will be determined by multiplying "your" total equipment expenditures by the reporting rate indicated on the "schedule of coverages" for Equipment Leased or Rented From Others.

   **b.** "We" will compare the total computed premium to the deposit premium. If it is more than the deposit premium, "you" will pay "us" the difference. If it is less than the deposit premium, "we" will pay "you" the difference subject to the minimum premium indicated on the "schedule of coverages".

**3. Provisions That Affect How Much We Pay** -- The following provisions apply to reports that are submitted and may affect How Much We Pay:

   **a. Failure To Submit Reports** -- If "you" have failed to submit the required reports or no report has been submitted, the most "we" will pay is 90% of the "limit".

IM 7000 04 04

Copyright, American Association of Insurance Services, Inc., 2004

b. **Reported Values Are Less Than The Full Value** -- If "your" last report before a loss shows less than the actual value of "your" expenditures for "contractors' equipment" that "you" lease or rent from others, "we" will only pay a part of the loss. "We" will not pay a greater portion of the loss, prior to the application of the deductible, than the total expenditures "you" reported divided by "your" actual expenditures for "contractors' equipment" that "you" lease or rent from others during the reporting period.

c. **We Will Not Pay More Than The Limit** -- "We" will not pay more than the applicable "limit" regardless of any reported value used in computing the premium.

## OTHER CONDITIONS

1. **Appraisal** -- If "you" and "we" do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal.

   If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

   The appraisers will then determine and state separately the amount of each loss.

The appraisers will also determine the value of covered property items at the time of the loss, if requested.

If the appraisers submit a written report of any agreement to "us", the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three, sets the amount of the loss.

Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by "you" and "us".

2. **Benefit to Others** -- Insurance under this coverage will not directly or indirectly benefit anyone having custody of "your" property.

3. **Conformity With Statute** -- When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

4. **Estates** -- This provision applies only if the insured is an individual.

   a. **Your Death** -- On "your" death, "we" cover the following as an insured:

      1) the person who has custody of "your" property until a legal representative is qualified and appointed; or

      2) "your" legal representative.

      This person or organization is an insured only with respect to property covered by this coverage.

   b. **Policy Period Is Not Extended** -- This coverage does not extend past the policy period indicated on the declarations.

Copyright, American Association of Insurance Services, Inc., 2004

AAIS
IM 7000 04 04
Page 13 of 13



5. **Misrepresentation, Concealment, Or Fraud** -- This coverage is void as to "you" and any other insured if, before or after a loss:

a. "you" or any other insured have willfully concealed or misrepresented:

1) a material fact or circumstance that relates to this insurance or the subject thereof; or

2) "your" interest herein.

b. there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

6. **Policy Period** -- "We" pay for a covered loss that occurs during the policy period.

7. **Recoveries** -- If "we" pay "you" for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

a. "you" must notify "us" promptly if "you" recover property or receive payment;

b. "we" must notify "you" promptly if "we" recover property or receive payment;

c. any recovery expenses incurred by either are reimbursed first;

d. "you" may keep the recovered property but "you" must refund to "us" the amount of the claim paid or any lesser amount to which "we" agree; and

e. if the claim paid is less than the agreed loss due to a deductible or other limiting "terms" of this policy, any recovery will be pro rated between "you" and "us" based on "our" respective interest in the loss.

8. **Restoration Of Limits** -- A loss "we" pay under this coverage does not reduce the applicable "limit" unless it is a total loss to a scheduled item. In the event of a total loss to a scheduled item, "we" refund the unearned premium on that item.

9. **Subrogation** -- If "we" pay for a loss, "we" may require "you" to assign to "us" "your" right of recovery against others. "You" must do all that is necessary to secure "our" rights. "We" do not pay for a loss if "you" impair this right to recover.

"You" may waive "your" right to recover from others in writing before a loss occurs.

10. **Suit Against Us** -- No one may bring a legal action against "us" under this coverage unless:

a. all of the "terms" of this coverage have been complied with; and

b. the suit has been brought within two years after "you" first have knowledge of the loss.

If any applicable law makes this limitation invalid, then suit must begin within the shortest period permitted by law.

11. **Territorial Limits** -- "We" cover property while it is in the United States of America, its territories and possessions, Canada, and Puerto Rico.

IM 7000 04 04

Copyright, American Association of Insurance Services, Inc., 2004

AAIS
IM 7034 01 12
Page 1 of 1

This endorsement changes the
Contractors' Equipment Coverage
**-- PLEASE READ THIS CAREFULLY --**

**POLICY NUMBER**

# TOOLS ENDORSEMENT

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

## SCHEDULE

**"Limit"**

1.  Your Tools --
    a.  The most "we" pay for loss to any one "tool"  is:  $ <u>2500</u>
    b.  The most "we" pay in any one occurrence
        for loss to "your" "tools"  is:  $ <u>25000</u>

**Deductible Amount   $** <u>500</u>

## ADDITIONAL  DEFINITIONS

"Tools" means equipment, and tools of a mobile
nature that "you" use in "your" contracting, in-
stallation, erection, repair, or moving operations
or projects.

## SUPPLEMENTAL  COVERAGES

1.  **Your Tools --** "We" cover direct physical loss
    caused by a covered peril to "your" "tools".

## HOW  MUCH  WE  PAY

**Tools Deductible --** "We" pay only that part of
"your" loss over the deductible amount indicated
for "tools".

IM 7034 01 12

Copyright, American Association of Insurance Services, Inc., 2012

# EXHIBIT
# G

## MARCH, HURWITZ & DeMARCO, P.C.
Attorneys at Law
1100 N. Providence Road
P.O. Box 108
Media, PA  19063
610-565-3950

JOSEPH M. DeMARCO

Direct Dial: 610-565-3952
Email: jdemarco@mhdlegal.com

January 18, 2018

Rich Hudson
Cromedy Construction
5702 Newtown Ave
Philadelphia, PA 19120
*rhudson@cromedyconstruction.com*

Re:   *Wintersteen v. Five Star Mechanical Services, Inc.*
      *Philadelphia Court of Common Pleas, Docket No. 171100138*

Dear Mr. Hudson:

My office represents Five Star Mechanical with regard to the above. My review of the contract in this matter indicates that you agreed to defend and indemnify us, as well as obtain insurance coverage naming us as an additional insured.

Please accept this as a tender for a defense in the above. Would you please advise to your position in this regard as promptly as possible. Additionally, would you please advise as to whether you ever obtained insurance naming us as an additional insured for the present claim.

To the extent you are represented by counsel in this matter, would you kindly forward this correspondence on to your attorney and request that they contact us regarding these issues.

I look forward to hearing back. Thank you for your prompt attention to this matter.

Very truly yours,

JOSEPH M. DeMARCO

JMD/jc

Cc:   Chuck Standiford *(Claim No. 374776)*

# EXHIBIT H

## MARCH, HURWITZ & DeMARCO, P.C.
Attorneys at Law
1100 N. Providence Road
P.O. Box 108
Media, PA  19063
610-565-3950

JOSEPH M. DeMARCO

Direct Dial: 610-565-3952
Email: jdemarco@mhdlegal.com

January 25, 2018

Debra W. Wilson
Erie Insurance
1400 N. Providence Rd,
Suite 216
Media, PA 19063
debra.wilson@erieinsurance.com

Re:    *Wintersteen v. Five Star Mechanical Services, Inc.*
       *Philadelphia Court of Common Pleas, Docket No. 171100138*

Dear Debra,

It was a pleasure speaking with you on the telephone.

Attached please find a copy of the Plaintiff's Complaint in this matter.

My understanding is that Mr. Wintersteen was an employee of Mann Finley. My understanding is that Mann Finley actually cut the penetration into which Mr. Wintersteen alleges he fell.

I look forward to hearing from you once you've had an opportunity to review this matter.

Very truly yours,

JOSEPH M. DeMARCO

JMD/jc
Encl.

Cc:    Chuck Standiford *(Claim No. 374776)*

# EXHIBIT

# I

# MARCH, HURWITZ & DeMARCO, P.C.
Attorneys at Law
1100 N. Providence Road
P.O. Box 108
Media, PA 19063
610-565-3950

JOSEPH M. DeMARCO

Direct Dial: 610-565-3952
Email: jdemarco@mhdlegal.com

February 9, 2018

Philip D. Priore, Esquire
McCormick & Priore, P.C.
Four Penn Center, Suite 800
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
ppriore@mccormickpriore.com

Re:     *Wintersteen v. Five Star Mechanical Services, Inc.*
        *Philadelphia Court of Common Pleas, Docket No. 171100138*

Dear Phil:

I enclose herewith for your easy reference a copy of mine of January 18th addressed to Rich Hudson at Cromedy Construction. Does your client have a response to this tender? I look forward to hearing from you. As always, thank you for your courtesies.

Very truly yours,

JOSEPH M. DeMARCO

JMD/jc

Cc:     Chuck Standiford *(Claim No. 374776)*

# EXHIBIT "J"



**Erie Insurance**®

Philadelphia Claims Office • 1400 North Providence Rd. • Suite 216 • Media, PA 19063-2094
610.891.6400 • Toll free 1.800.821.2902 • Fax 800.562.6964 • www.erieinsurance.com

February 26, 2018

Joseph Demarco, Esq.
March, Hurwitz & DeMarco, PC
P O Box 108
Media, PA  19063-0108

<table>
<tr><td>Re: ERIE Claim</td><td># A00000741342</td></tr>
<tr><td>ERIE Insured:</td><td>Cromedy Construction Corp</td></tr>
<tr><td>Policy Number</td><td># Q37 0158532</td></tr>
<tr><td>Loss Date:</td><td>11/16/16</td></tr>
<tr><td>Your Insured:</td><td>Five Star Mechanical Services</td></tr>
<tr><td>Your Claim</td><td># docket 17-1100138</td></tr>
<tr><td>Claimant:</td><td>Mark Wintersteen</td></tr>
</table>

Dear Attorney DeMarco:

We acknowledge receipt of your tender request in our office.  I have been assigned to review your request and will be in contact with you concerning this loss.

If you have not already done so, we urge you to submit any documentation or information that is relevant to your tender request.

Sincerely,

Debra W Wilson
Commercial Liability Specialist
215-653-7215

/DWW CA20
cc: File

# EXHIBIT
# K

## MARCH, HURWITZ & DeMARCO, P.C.
Attorneys at Law
1100 N. Providence Road
P.O. Box 108
Media, PA 19063
610-565-3950

JOSEPH M. DeMARCO

Direct Dial: 610-565-3952
Email: jdemarco@mhdlegal.com

March 5, 2018

Debra W. Wilson
Erie Insurance
1400 N. Providence Rd,
Suite 216
Media, PA 19063
debra.wilson@erieinsurance.com

Re:   *Wintersteen v. Five Star Mechanical Services, Inc.*
      *Philadelphia Court of Common Pleas, Docket No. 171100138*

Dear Debra,

Thank you for yours of February 26, 2018. As per your request, I enclose herewith an additional copy of the Complaint filed in this matter as well as the contract between Five Star and Cromedy Construction.

We believe a review of this contract will cause you to reach a conclusion that Cromedy has an obligation to defend and indemnify Five Star from the above referenced claim.

Additionally, it is our understanding that Five Star is an additional insured under the Erie Policy issued to Cromedy. We would ask for your position as related to this issue as well.

I look forward to hearing from you.

Very truly yours,

JOSEPH M. DeMARCO

JMD/jc
Encl.

Cc:   Chuck Standiford *(Claim No. 374776)*

# EXHIBIT

# L

2000 Market Street, Suite 2300, Philadelphia, PA 19103
(215) 575-2600  Fax (215) 575-0856

Direct Dial:  (215) 575-3577
Email:  dswolf@mdwcg.com

September 14, 2018

Philip D. Priore, Esquire
Mark J. Spross, Esquire
McCormick & Priore, P.C.
4 Penn Center, 1600 JFK Boulevard
Suite 800
Philadelphia, PA 19103

      RE:    Mark Wintersteen and Kelly Wintersteen v. Five Star Mechanical Service, Inc., et al.
             Docket No.:   CCP Philadelphia - November Term, 2017 - No. 00138
             Our File No.:  41310-00252

Dear Mssrs. Priore and Spross:

On behalf of my client, Five Star, Inc., I am tendering my client's defense and indemnification to your client, Cromedy Construction Corporation, based on the allegations of the Complaint and facts surrounding this accident.

As you know, the plaintiff, a carpenter for J. Mann-R. Finley, Inc., alleges that on November 16, 2016, while descending a ladder on the school renovation project at issue, he contacted an uncovered floor opening. Co-defendant Jack Pears & Associates, admits to creating the opening, but, based upon information, it was your client who installed the single flue pipe as shown in the plaintiff's photographs.  It is also asserted that your client's work was not complete as a second pipe had not yet been installed, and it was your client's obligation to cover the opening or otherwise safeguard the area while its work was pending.

Attached is a copy of your client's subcontract with Five Star, Inc.  The insurance and indemnification provisions are included as an addendum.  As noted, your client "assumes entire responsibility and liability for any and all claims and/or damages of any nature or character whatsoever with respect to the work covered by this Subcontract Agreement...," and Cromedy agreed to "defend, indemnify and hold harmless the Contractor [Five Star]" from claims brought by "any and all persons" "resulting from the work covered by this Subcontract, arising therefrom or occurring in connection therewith and whether any such claims are alleged to have been caused in whole or in part, by a party indemnified hereunder." Also enclosed is a Certificate of Insurance under which Five Star, Inc. was to be named as an additional insured per the subcontract documents.

Philip D. Priore, Esquire/Mark J. Spross, Esquire
September 14, 2018
Page 2

    Please respond within ten (10) days of this letter.  If this tender is denied, Five Star, Inc. and its carrier,
reserve the right to seek all accumulated legal fees and costs which they incur in this matter.

    Thank you for your cooperation.

                                        Very truly yours,



                                        David S. Wolf


DSW/Enclosure

# EXHIBIT M



**McCORMICK PRIORE, P.C.**

ATTORNEYS AT LAW

WWW.McCORMICKPRIORE.COM

**PHILADELPHIA**
1600 JFK Blvd.
Suite 800
Philadelphia, PA
19103

T: 215.972.0161
F: 215.972.5580

December 19, 2018

**Via Email** (dswolf@mdwcg.com)
David Wolf, Esquire
Marshall, Dennehey, Warner,
Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA  19103

RE:   Wintersteen v. Cromedy Construction Corporation, et. al.
      Our File No.: 2591-17797

Dear Mr. Wolf:

As you are aware, this office represents Cromedy Construction Corporation (hereinafter, "Cromedy").  We acknowledge receipt of your letter tendering the defense of Defendant, Five Star Mechanical Services, Inc. (hereinafter, "Five Star") to our client.

We regret to inform you that, given the present knowledge of the circumstances of this case, Cromedy cannot accept your client's tender of its defense in this matter for several reasons, discussed below.

As you are aware, there are two conflicting and ambiguous contractual indemnification provisions of which we are aware contained in the documents between Five Star and Cromedy which we currently possess.  The first such provision provides:

> *Subcontractor assumes entire responsibility and liability and agrees to indemnify and save harmless the CONTRACTOR and/or Owner from any loss, liability, expense, including attorney's fees, damage or injury caused or occasioned, directly or indirectly, by its failure to comply with any of the following:*
>
> . . . . . . . .

**PLYMOUTH MEETING**
450 Plymouth Road
Suite 204
Plymouth Meeting, PA
19462

T: 215.664.4004
F: 215.664.4005

**DELAWARE**
1000 North West St.
Suite 1200
Wilmington, DE 19801

T: 302.295.4895
F: 302.295.4801

**NEW JERSEY**
301 Carnegie Ctr. Blvd.
Suite 101
Princeton, NJ 08540

T: 609.716.9550
F: 609.716.8140

**NEW YORK**
The Chrysler Building
405 Lexington Avenue
26th Floor
New York, NY 10174

T: 212.964.5160
F: 917.368.8005

David Wolf, Esquire
December 19, 2018
Page 2

> (c)     The payment of any and all loss or damage, direct or
> consequential, and claims of any kind or nature whatsoever, for
> property damage or personal injury, including death to any and all
> persons, whether employees of CONTRACTOR or others caused
> by, resulting from, arising out of or from, or occurring in
> connection with the performance of the work undertaken by
> SUBCONTRACTOR hereunder, **including but not limited to
> claims due to the negligence of CONTRACTOR or Owner**, or to
> any defect in material, equipment, or workmanship whenever the
> same may develop.

In addition to this provision, there also appears to be a second provision in the documents produced to date.  This indemnification provision provides:

> INDEMNIFICATION.  Subcontractor assumes entire responsibility
> and liability for any and all claims and/or damages of any nature
> or character whatsoever with respect to the work covered by this
> Subcontract Agreement (including but not limited to, work
> performed under this Subcontract Agreement, work performed
> under change order or any other work incidental thereto, whether
> performed at or off the project site) and Subcontractor agrees [to]
> defend, indemnify and hold harmless the Contractor, its affiliates,
> parents and subsidiaries, the Contractor's surety, if any, the
> owner, any other Contractor that the Contractor may be obligated
> to defend and indemnify in the Main Contract, and the architect
> from and against any and all claims, demands, liabilities, interests,
> loss, damage, fires, penalties, attorney's fees, cost and expenses of
> whatever kind or nature, including property damage or for
> personal injuries (including death) to any and all persons (whether
> such persons are employees of Contractor or employees of
> Subcontractor, or employees of Subcontractors' subcontractors, or
> others) resulting from the work covered by this Subcontract,
> arising therefrom or occurring in connection therewith and
> whether any such claims are alleged to have been caused in whole
> or in part, by a party indemnified hereunder.

Based on the allegations in the Complaint, the plaintiff, Mark Wintersteen (hereinafter, "plaintiff"), was an employee of Mann Finley and was working as a union carpenter in connection with a heating system installation project at William McKinley Elementary School at 2101 N. Orkney Street, Philadelphia, Pennsylvania.  While he was attempting to step down from a ladder, plaintiff allegedly stepped into an open penetration on the floor and subsequently injured himself.   At this time, upon information and belief, it is our understanding that Defendant, Jack Pears & Associates (hereinafter, "Jack Pears"), created this open penetration in the floor, and this was acknowledged by you in your letter to us.

David Wolf, Esquire
December 19, 2018
Page 3

Under the indemnification provisions discussed above, and assuming without conceding that a valid contract existed that included both provisions, potential indemnity only exists, if at all, for injuries arising out of or occurring in connection with the work performed by Cromedy. Based on the information currently available to us that Defendant, Jack Pears, created this penetration rather than Cromedy, Cromedy is not obligated to indemnify Five Star, *inter alia,* because the injury did not arise out of and/or was not connected to the work performed by Cromedy.

Moreover, upon information and belief, it was not Cromedy's duty to cover this penetration as alleged in your letter, and the contract between Five Star and Cromedy does not appear to contain any language requiring Cromedy to cover any open penetrations at the location where plaintiff alleges he injured himself.

Furthermore, as you are likely aware, under Pennsylvania law, in order for an indemnification provision to be deemed enforceable, it must be unambiguous and unequivocal. Here, the two provisions produced in the documents identified to date contain different language, creating an ambiguity and/or conflict in any potential indemnity obligation. In addition, considering there are two indemnification provisions, if nothing else it is ambiguous as to which indemnification provision is applicable in this particular case. Furthermore, as far as we presently know, the contract documents are not signed by both parties, which adds to the ambiguity as to which is applicable and enforceable, if any.

Further, the language in the two provisions also appears to lack the necessary specificity under Pennsylvania law to require any defense and/or indemnification of Five Star.

On a final note, to the extent it may become warranted by developments in the investigation and discovery in this case, Five Star's tender can be revisited at a later date.

Assuming without knowing that a similar contract was entered into between Five Star and Defendant, Jack Pears, it would appear that the proper tender for Five Star would be to that entity, as it was the entity that created the alleged dangerous condition on which plaintiff supposedly injured himself. In this regard, it has now come to our attention that J. Mann- R. Finley and/or its carrier has, in fact, accepted the tender of Five Star.

Based on these considerations, Cromedy is denying Five Star's tender for a contractual defense and indemnity in this matter.

We have noted that your tender also includes Five Star's status as an additional insured under Cromedy's insurance policy. We have forwarded your letter requesting tender under the additional insured status to the carrier for Cromedy, and they will presumably respond to this request from your client.

David Wolf, Esquire
December 19, 2018
Page 4


Thank you for your attention to this matter.  If you would like to discuss the issues further, please do not hesitate to contact the undersigned.


Very truly yours,

*s/Mark J. Spross*

Philip D. Priore
Mark J. Spross

PDP/MJS

# EXHIBIT N

From: "Pasternak - Giocondo, Cynthia" <CYNTHIA.PASTERNAK@LibertyMutual.com>
Sent: Monday, March 11, 2019 08:36 AM
To: DSWolf@MDWCG.com
Cc:
Subject: FW: Claimant: Mark Wintersteen; Liberty Mutual Claim Number: Erie Claim Number:
A00000741342; Claim Number: 23-379596-001

**Cynthia Pasternak-Giocondo, MBA and SCLA**
Sr. Technical Claims Specialist
LIBERTY MUTUAL INSURANCE– Global Retail Markets U.S. Casualty Claims
East Syracuse, NY
Direct Dial: 315-431-6144



If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying
of this email, and any attachments thereto, is strictly prohibited. If you have received this email in error, please notify me
via return email and via telephone at XXX-XXX-XXXX and permanently delete the original and any copy of any email,
attachment, and any printout thereof. Thank you.

**From:** Wilson, Debra [mailto:Debra.Wilson@ERieInsurance.com]
**Sent:** Monday, March 11, 2019 8:28 AM
**To:** Pasternak - Giocondo, Cynthia <CYNTHIA.PASTERNAK@LibertyMutual.com>
**Subject:** RE: Claimant: Mark Wintersteen; Liberty Mutual Claim Number: Erie Claim Number:
A00000741342

Cynthia,

Attached please find a copy of our tender response as prepared by our coverage counsel and sent to
your defense counsel.

Thank you.

**From:** Pasternak - Giocondo, Cynthia [mailto:CYNTHIA.PASTERNAK@LibertyMutual.com]
**Sent:** Wednesday, March 06, 2019 10:50 AM
**To:** Wilson, Debra
**Subject:** Claimant: Mark Wintersteen; Liberty Mutual Claim Number: Erie Claim Number: A00000741342

**Good Morning Debra,**

This claim was originally tendered to Cromedy Construction on 1/18/18.
You acknowledged receipt of same on 2/26/18.
As of 12/19/18, Mark Spross of McCormick & Priore indicated that he would forward our coverage request to you.
As of this writing, Erie's coverage position for Five Star Mechanical Services is pending.
Please advise asap of your coverage position.

Cindie
**Cynthia Pasternak-Giocondo, MBA and SCLA**
Sr. Technical Claims Specialist
LIBERTY MUTUAL INSURANCE- Global Retail Markets U.S. Casualty Claims
East Syracuse, NY
Direct Dial: 315-431-6144



If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you have received this email in error, please notify me via return email and via telephone at XXX-XXX-XXXX and permanently delete the original and any copy of any email, attachment, and any printout thereof. Thank you.

**Disclaimer**

This message (and any attachments) is confidential and is intended only for the addressee(s). This message may contain information that is protected by one or more legally recognized privileges. If the reader of this message is not the intended recipient, I did not intend to waive, and I do not waive, any legal privilege or the confidentiality of the message. If you receive this message in error, please notify me immediately by return e-mail and delete this message from your computer and network without saving it in any manner. The unauthorized use, dissemination, distribution, or reproduction of this message, including attachments, is prohibited and may be unlawful.



2000 Market Street
Suite 550
Philadelphia, PA 19103
P (215) 789-4848
www.fhmslaw.com

Frances A. Lettieri
Partner
Direct Dial: (267) 457-4569
Cell: (215) 518-9687
Fax: (215) 253-4698
E-mail: flettieri@fhmslaw.com

February 27, 2019

Joseph DeMarco, Esq.
March, Hurwitz & DeMarco, P.C.
1100 N. Providence Rd.
P.O. Box 108
Media, Pa., 19063

**Re:    Wintersteen v. Five Star Mechanical Services, Inc.**
**Philadelphia Court of Common Pleas, Docket No. 171100138**
**Erie Claim No. A00000741342**

Dear Mr. DeMarco,

Please be advised that this firm has been retained as coverage counsel by Erie Insurance Exchange ("Erie"). We acknowledge receipt of correspondence from your office tendering the defense of Five Star Mechanical Services, Inc., in the above identified action in the Philadelphia County Court of Common Pleas ("the Underlying Action"). You state that Five Star Mechanical Services ("Five Star") qualifies as an additional insured under the policy of insurance issued by Erie ("the Erie Policy") to Cromedy Construction ("Cromedy"). Additionally, you assert that Five Star is contractually entitled to defense and indemnification from Cromedy. Our review of the materials indicates that Five Star is not entitled to defense or indemnification as an additional insured or pursuant to a contractual indemnification theory. Therefore, we write to advise you that Erie denies any obligation to defend or indemnify Five Star in this matter.

Mark and Kelly Wintersteen filed, as co-plaintiffs, a complaint in the Court of Common Pleas of Philadelphia County at docket number 171100138 on November 3, 2017 ("the Complaint"). The named defendants are Five Star Mechanical, Jack Pears & Assocs ("Jack Pears" or "JPA"), and Erie's insured, Cromedy.

{W0885040.1}
Lancaster Office: 1860 Charter Lane | Suite 201 | Lancaster, PA 17601-5865 | P (717) 553-2600 | F (717) 229-1239
Allentown Office: 4949 Liberty Lane | Suite 330 | Allentown, PA 18106 | P (484) 408-0300 | F (484) 550-7992
New Jersey Office: 10000 Midlantic Drive | Suite 402W | Mount Laurel, NJ 08054 | P (856) 242-2130 | F (856) 861-6226

February 27, 2019
Page 2

The Complaint alleges that, on November 16, 2016, Mr. Wintersteen was a union carpenter working to install a heating system on William McKinley Elementary School in Philadelphia, Pa. ("the project"). Five Star was the general contractor on this job, and was performing construction management duties. Five Star was responsible to monitor the project for safety violations and unsafe conditions, to ensure that everyone was safe, to ensure that unsafe conditions were not left unremediated on the premises, and to ensure that all applicable industry safety regulation and standards were followed.

It is further alleged that Cromedy was an HVAC/sheet metal contractor working at the project. As such, Cromedy allegedly owed a duty of care to all others working at the project.

Mr. Wintersteen was injured at the project on November 16, 2016, when he attempted to step down from a ladder. When he attempted to dismount the ladder and step away, his foot entered a hole created by and left uncovered by all defendants. He twisted his ankle, fell, and landed on his left arm and shoulder, injuring them ("the Accident"). Inadequate lighting is alleged to have contributed to the accident.

Mr. Wintersteen alleges that all defendants failed to cover and/or guard the hole, as they were required to do under unspecified OSHA, ANSI, and other applicable industry safety standards. In addition, all defendants failed to ensure that the area had sufficient lighting.

Count I is styled Mark Wintersteen v. Five Star Mechanical Services, Inc., and alleges that Five Star was responsible for supervision at the project and, consequently, established, plans, recommendations, designs, and specifications for the performance of all project work. It is alleged that Five Star had a duty to Mr. Wintersteen, as a business invitee, to provide a reasonably safe environment free of unreasonable hazards. Five Star maintained, inspected, supervised, and established, safety rules for all workers at the project.

Counts II and III are styled Mark Wintersteen v. Jack Pears & Associates, LLC, and Mark Wintersteen v. Cromedy Construction Corporation, respectively. These Counts are completely identical to each other. According to these counts, JPA and Cromedy, respectively, were negligent in failing to provide the Plaintiff with a safe place to work, failing to inspect, creating holes and allowing holes to be left open and uncovered, among other allegations of negligence.

Count IV is styled Loss of Consortium, Kelly Wintersteen v. All Defendants. The three paragraphs in this count contain general allegations that Ms. Wintersteen has been deprived of the services, society, support, companionship, and consortium of Mr. Wintersteen as a result of the defendants' actions. No additional facts are alleged.

We have been provided with a document dated March 2, 2016, which purports to be a subcontract between Five Star and Cromedy. The document presented to us is unsigned.

February 27, 2019
Page 3

This subcontract purports to incorporate an attached set of Terms and Conditions ("T&C") and an attached Addendum to Contract. Each of those documents contains a different indemnification provision.

Paragraph 4 of the T&C states in pertinent part:

> SUBCONTRACTOR assumes entire responsibility and liability and agrees to indemnify and save harmless the CONTRACTOR and/or Owner from any loss, liability, expense, including attorneys' fees, damage or injury caused occasioned, directly or indirectly by its failure to comply with any of the following:
>
> . . .
>
> (c) the payment of any and all loss or damage, direct or consequential, and claims of any kind or nature whatsoever, for property damage or personal injury, including death to any and all persons, whether employees of CONTRACTOR or others, caused by, resulting from, arising out of or from, or occurring in connection with the performance of the work undertaken by SUBCONTRACTOR hereunder, including but not limited to claims due to the negligence of CONTRACTOR or OWNER, or to any defect in material, equipment, or workmanship, whenever the same may develop.

Paragraph 1 of the Addendum to Contract, states:

> 1) INDEMNIFICATION.   Subcontractor   assumes   entire responsibility and liability for any and all claims and/or damages of any nature or character whatsoever with respect to the work covered by this Subcontract Agreement (including but not limited to, work performed under this Subcontract Agreement, work performed under change order or any other work incidental thereto, whether performed at or off the project site) and Subcontractor agrees defend, indemnify and hold harmless the Contractor, its affiliates, parents and subsidiaries, the Contractor's surety, if any, the owner, any other Contractor that the Contractor may be obligated to defend and indemnify in the Main Contract, and the architect from and against any and all claims, demands, liabilities, interests, loss, damage, fires, penalties, attorney's fees, cost and expenses of whatever kind or nature, including property damage or for personal injuries (including death) to any and all persons (whether such persons   are   employees   of   Contractor   or   employees   of

February 27, 2019
Page 4

> Subcontractor, or employees of Subcontractor's subcontractors, or others) resulting from the work covered by this Subcontract, arising therefrom or occurring in connection therewith and whether any such claims are alleged to have been caused in whole or in part by a party indemnified hereunder.

The subcontract further requires Cromedy to name Five Star as an additional insured under its commercial general liability policy on a primary and non-contributory basis.

Again, our review of the materials suggests that subcontract was not executed at the time of incident.

Erie issued its Ultraflex Policy to Cromedy under policy number Q37 0158532 A for the policy period of January 1, 2016 through January 1, 2017.

The Commercial General Liability coverage was written on form CG 00 01 (04/13).

Additional insured coverage on was written on form UL RH (06/13), entitled "Additional Insured – Owners, Lessees, or Contractors – Automatic Status when Required in Construction Agreement with You." This endorsement modified the CGL form as follows:

> A. **Section II – Who Is An Insured** is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused in whole or in party, by"
>
> 1. Your acts or omissions; or
>
> 2. The acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured.
>
> …

Here, Five Star is neither an additional insured under the Erie policy nor entitled to contractual indemnification because there was no signed subcontract between Five Star and Cromedy in place at the time of the incident. The absence of a signed agreement fails to establish the existence of a written contract in effect at the time of the loss. Five Star has failed to demonstrate any acceptance by Cromedy of a written agreement.

February 27, 2019
Page 5

Similarly, Five Star does not qualify for contractual indemnification under the terms of the purported subcontract because there is no evidence that Cromedy executed the subcontract, thereby assenting to the terms of the indemnification provisions.   Moreover, any contractual indemnification tender is premature in the absence of a causal determination of liability.

In accordance with the foregoing analysis, your tender demand is denied.  The reasons set forth in this letter for denial are not intended to be exhaustive.  Erie reserves its right to raise other defenses and policy exclusions.  In particular, if a signed subcontract between Five Star and Cromedy existing prior to the incident is discovered, Erie reserves the right to conduct a substantive analysis of Five Star's entitlement to additional insured status and to contractual indemnification and further reserves it right to deny coverage for any reason that becomes apparent through additional investigation.

Should you have any additional materials that you wish for us to consider to further evaluate your tender, please feel free to forward same to my attention.  You may also contact me should you have any questions or comments regarding the foregoing.

Very truly yours,

Frances A. Lettieri

# EXHIBIT

# O



**Liberty Mutual Insurance**
**Policy Underwritten by Ohio Security**
POB 515097
Los Angeles, CA 90051
315-431-6144
Fax: 877-613-2441

April 16, 2019

Frances A. Lettieri
Fowler, Hirtzel, McNulty, Spaulding
2000 Market Street
Suite 550
Philadelphia, Pennsylvania  19103

| RE: | | |
|---|---|---|
| | Plaintiffs: | Mark Wintersteen and Kelly Wintersteen |
| | Erie Insurance Claim No.: | A00000741342 |
| | Erie Insurance Insured: | Cromedy Construction Corp. |
| | Ohio Security Ins. Co. Claim No.: | 23379596 |
| | Ohio Security Ins. Co. Insured: | Five Star Mechanical Services, Inc. |
| | Lawsuit Caption: | ***Mark Wintersteen and Kelly Wintersteen v. Five Star Mechanical Services, Inc., Cromedy Construction, et al.*** Court of Common Pleas, Philadelphia County, Pennsylvania No. 171100138 |

Dear Ms. Lettieri:

As you are aware, Five Star Mechanical Services, Inc. ("Five Star") and Ohio Security Insurance Company ("Ohio Security") first presented their demand to Cromedy Construction Corp. ("Cromedy") and Erie Insurance Exchange ("Erie") for defense and indemnity for Five Star as an additional insured for the above-referenced claim and lawsuit in January 2018.  A second tender was presented in September 2018.  This will serve as Five Star's and Ohio Security's **final tender** of this matter to Erie.  Failure of Erie to accept this demand within 10 days of this letter will result in the immediate filing of a **declaratory judgment action** by Five Star and Ohio Security against Erie.

Erie only deigned to respond to Five Star's tender in January 2019, when you communicated Erie's rejection of the tender on the basis that the copy of the Five Star — Cromedy subcontract ("the contract") in Erie's possession does not include the signatures of the Five Star and Cromedy representatives.  As of the date of this letter, Ohio Security does not have knowledge of whether there exists a version of the contract that was executed by one or both parties.  The presence or absence of a signature or signatures on the contract, however, is entirely irrelevant to Five Star's entitlement to additional insured coverage under the Erie policy.

First, let's be clear about what is not disputed.  Erie, Cromedy, Five Star and Ohio Security all agree to the following facts:

- Five Star and Cromedy entered into a contract pursuant to which Cromedy agreed to perform work at William McKinley Elementary School.
- The contract was reduced to writing.
- Cromedy performed work under the contract pursuant to the terms of the written contract and was compensated for such work according to the terms of the written contract.
- Cromedy and/or Five Star asked for and received Change Orders during the performance of the work and such Change Orders incorporated, modified or memorialized the terms of the written contract.
- The written contract required Cromedy to name Five Star as an additional insured under Cromedy's commercial general liability policy on a primary, non-contributory basis.

Second, we would remind Erie of the language of the relevant additional insured endorsement in the commercial general liability policy it issued to Cromedy:

### UL-RH (Ed. 6/13) UF-3886 – Additional Insured – Owners, Lessees, or Contractors – Automatic Status When Required In Construction Agreement With You

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.  Section II – Who Is An Insured is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1.  Your acts or omissions; or

2.  The acts or omissions of those acting on your behalf;

This endorsement does not require, as it could have done, that the written contract between "you," that is, Cromedy, and the organization seeking additional insured status, Five Star, "be executed." Instead, the endorsement simply requires that Cromedy to have agreed in a written contract that Five Star be added as an additional insured under Cromedy's CGL policy. The endorsement includes no reference to execution, signatures, performance or any other term or requirement. Erie's attempt to avoid its duty to defend and, if necessary, indemnify Five Star by demanding an executed version of the contract is entirely without legal basis.

Courts across the country have repeatedly construed endorsements which include the "agreed in writing in a contract or agreement" language that appears in the Erie endorsement to require only an enforceable written promise to procure the additional insured coverage. Erie has conceded the existence of and its possession of a written contract between Cromedy and Five Star in which Cromedy agreed to obtain additional insured coverage for Five Star. Under Pennsylvania law, Five Star can enforce against Cromedy the obligation to provide insurance coverage for Five Star even if a signed copy of the contract cannot be located. Erie cannot escape its obligation to Five Star under its additional insured endorsement any more than Cromedy or Five Star could have escaped any the mutual obligations they undertook in their contract.

Five Star has had a valid basis for coverage as an additional insured under the Erie policy since the complaint naming Five Star and Cromedy as defendants was filed in 2017. Should Erie not immediately assume Five Star's defense and agree to reimburse Five Star and/or Ohio Security Mutual for all defense fees and costs incurred on Five Star's behalf, we will have no choice but to retain coverage counsel to file a declaratory judgment action against Erie in the appropriate jurisdiction.

We look forward to Erie's acceptance of this tender within 10 days of the date of this letter.

Sincerely,

Cynthia Pasternak-Giocondo
Senior Technical Claims Specialist

# EXHIBIT

# P



Liberty Mutual Insurance
Policy Underwritten by Ohio Security
POB 515097
Los Angeles, CA 90051
315-431-6144
Fax: 877-613-2441

May 5, 2019                                          2nd Request

Certified Return Mail Receipt
Frances A. Lettieri
Fowler, Hirtzel, McNulty, Spaulding
2000 Market Street
Suite 550
Philadelphia, Pennsylvania  19103

RE:        Plaintiffs:                      Mark Wintersteen and Kelly Wintersteen

           Erie Insurance Claim No.:        A00000741342
           Erie Insurance Insured:          Cromedy Construction Corp.

           Ohio Security Ins. Co. Claim No.: 23379596
           Ohio Security Ins. Co. Insured:   Five Star Mechanical Services, Inc.

           Lawsuit Caption:                 *Mark Wintersteen and Kelly Wintersteen v.*
                                            *Five   Star   Mechanical   Services,   Inc.,   Cromedy*
                                            *Construction, et al.*
                                            Court   of   Common   Pleas,   Philadelphia   County,
                                            Pennsylvania
                                            No. 171100138

Dear Ms. Lettieri:

As you are aware, Five Star Mechanical Services, Inc. ("Five Star") and Ohio Security Insurance Company ("Ohio Security") first presented their demand to Cromedy Construction Corp. ("Cromedy") and Erie Insurance Exchange ("Erie") for defense and indemnity for Five Star as an additional insured for the above-referenced claim and lawsuit in January 2018. A second tender was presented in September 2018. This will serve as Five Star's and Ohio Security's **final tender** of this matter to Erie. Failure of Erie to accept this demand within 10 days of this letter will result in the immediate filing of a **declaratory judgment action** by Five Star and Ohio Security against Erie.

Erie only deigned to respond to Five Star's tender in January 2019, when you communicated Erie's rejection of the tender on the basis that the copy of the Five Star – Cromedy subcontract ("the contract") in Erie's possession does not include the signatures of the Five Star and Cromedy representatives. As of the date of this letter, Ohio Security does not have knowledge of whether there exists a version of the contract that was executed by one or both parties. The presence or absence of a signature or signatures on the contract, however, is entirely irrelevant to Five Star's entitlement to additional insured coverage under the Erie policy.

First, let's be clear about what is not disputed. Erie, Cromedy, Five Star and Ohio Security all agree to the following facts:

- Five Star and Cromedy entered into a contract pursuant to which Cromedy agreed to perform work at William McKinley Elementary School.
- The contract was reduced to writing.
- Cromedy performed work under the contract pursuant to the terms of the written contract and was compensated for such work according to the terms of the written contract.
- Cromedy and/or Five Star asked for and received Change Orders during the performance of the work and such Change Orders incorporated, modified or memorialized the terms of the written contract.
- The written contract required Cromedy to name Five Star as an additional insured under Cromedy's commercial general liability policy on a primary, non-contributory basis.

Second, we would remind Erie of the language of the relevant additional insured endorsement in the commercial general liability policy it issued to Cromedy:

### UL–RH (Ed. 6/13) UF-3886 – Additional Insured – Owners, Lessees, or Contractors – Automatic Status When Required In Construction Agreement With You

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.   Section II – Who Is An Insured is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1.   Your acts or omissions; or

2.   The acts or omissions of those acting on your behalf;

This endorsement does not require, as it could have done, that the written contract between "you," that is, Cromedy, and the organization seeking additional insured status, Five Star, "be executed." Instead, the endorsement simply requires that Cromedy to have agreed in a written contract that Five Star be added as an additional insured under Cromedy's CGL policy. The endorsement includes no reference to execution, signatures, performance or any other term or requirement. Erie's attempt to avoid its duty to defend and, if necessary, indemnify Five Star by demanding an executed version of the contract is entirely without legal basis.

Courts across the country have repeatedly construed endorsements which include the "agreed in writing in a contract or agreement" language that appears in the Erie endorsement to require only an enforceable written promise to procure the additional insured coverage. Erie has conceded the existence of and its possession of a written contract between Cromedy and Five Star in which Cromedy agreed to obtain additional insured coverage for Five Star. Under Pennsylvania law, Five Star can enforce against Cromedy the obligation to provide insurance coverage for Five Star even if a signed copy of the contract cannot be located. Erie cannot escape its obligation to Five Star under its additional insured endorsement any more than Cromedy or Five Star could have escaped any the mutual obligations they undertook in their contract.

Five Star has had a valid basis for coverage as an additional insured under the Erie policy since the complaint naming Five Star and Cromedy as defendants was filed in 2017. Should Erie not immediately assume Five Star's defense and agree to reimburse Five Star and/or Ohio Security Mutual for all defense fees and costs

incurred on Five Star's behalf, we will have no choice but to retain coverage counsel to file a declaratory judgment action against Erie in the appropriate jurisdiction.

We look forward to Erie's acceptance of this tender within 10 days of the date of this letter.

Sincerely,

Cynthia Pasternak-Giocondo
Senior Technical Claims Specialist

# EXHIBIT Q

**Zavalas, Stacey**

| | |
|---|---|
| **From:** | Frances Lettieri <FLettieri@fhmslaw.com> |
| **Sent:** | Tuesday, June 18, 2019 3:59 PM |
| **To:** | Sullivan, John |
| **Cc:** | Zavalas, Stacey; Allan Molotsky |
| **Subject:** | RE: Wintersteen v. Five Star mechanical Services, Inc. Erie Claim No. A00000741342 |

Jack:

Thank you for your note.  Allan sends his regards, and we both extend our best wishes to your family as well.

At this time, we are trying to confirm that a valid contract existed prior to the incident.  I appreciate your position concerning the signature; however, we are still trying to determine whether Erie's insured knew of and accepted the terms of any contract prior to the incident.  If you or your client have any materials that speak to this, I would be happy to review same.

Franny

**Frances A. Lettieri, Esq.**
**Partner**
**Fowler Hirtzel McNulty & Spaulding, LLP**
2000 Market Street, Suite 550
Philadelphia, PA 19103

(267) 457-4569 (Phone)
(215) 518-9687 (Cell)
flettieri@fhmslaw.com
www.fhmslaw.com

**From:** Sullivan, John [mailto:jsullivan@postschell.com]
**Sent:** Monday, June 17, 2019 1:32 PM
**To:** Frances Lettieri <FLettieri@fhmslaw.com>
**Cc:** Zavalas, Stacey <SZavalas@PostSchell.com>
**Subject:** Wintersteen v. Five Star mechanical Services, Inc. Erie Claim No. A00000741342

Franny:

I hope that you and your family are doing well and I hope you will extend my best wishes to Allan and his family.

Stacey and I have been asked to assist Liberty Mutual in this matter.  We have been provided with a copy of the February 27, 2019 coverage denial letter you sent on behalf of Erie.  Based on that letter, it is our understanding that Erie is asserting that Five Star does not qualify as an additional insured under the Erie policy because the subcontract between Five Star and Erie's insured, Cromedy, was not signed.  We believe that this is incorrect because the additional insured provision in the Erie policy did not require that the contract must be both written and executed.  We have been asked to look into filing a declaratory judgment action, but I thought it might be helpful to explain our position to see if we can convince Erie to change its position

1

Although we have not located any Pennsylvania insurance coverage case directly on point, "[a]s a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties." *Allan A Meyers, LP v. Montgomery Cty.*, 92 A.3d 102, 108 (Pa. Commw. Ct. 2014) (citations omitted). To the contrary, Pennsylvania has recognized that "objective language memorialized in writing by the parties creates a valid and enforceable contract." *See Wells Fargo Bank, N.A. v. Chun Chin Yung*, 317 F. Supp. 3d 879, 886 (E D Pa. 2018) (citations omitted).

In the insurance context, courts generally have recognized a distinction between an additional insured provision requiring a "written" contract and an "executed" contract. This issue was examined in detail in *10 Ellicott Square Court Corp. v. Mt Valley Indem. Co.,* 634 F.3d 112 (2d Cir. 2011). In that case, the plaintiffs were the owner and construction manager of a construction project who sought additional insured status under the CGL and umbrella policies issued to a contractor, Ellicott Maintenance. The contract between the plaintiffs and Ellicott required Ellicott to purchase liability coverage to protect the plaintiffs and Ellicott purchased the two policies at issue. Further, Ellicott's agent issued a certificate of insurance evidencing the policies and the status of the plaintiffs as additional insureds. After the work began but before the Ellicott contract was signed, a worker on the project was injured and brought suit against the plaintiffs. When the plaintiffs sought coverage under the two policies for the lawsuit, both carriers denied coverage on the basis that the contract had not been signed.

Significantly, the wording of the additional insured endorsement in Ellicott's primary policy differed from the language of the endorsement in the umbrella policy. The AI endorsement in the primary policy required that in order for an organization to be entitled to additional insured coverage , the contract must "be executed." Relying on earlier New York case law, the Second Circuit held that because the contract had not been signed and the construction contract had not been fully performed, the contract had not been "executed," and the plaintiffs were not entitled to coverage as additional insureds under the CGL policy. (The court certified to the New York Court of Appeals the issue of whether the issuance of the certificate of insurance by the insured's agent estopped the CGL insurer from denying coverage).

In contrast, the AI endorsement in the umbrella policy provided, "Any person or organization with whom or with you have agreed in writing prior to any loss, 'occurrence, or "offense' to provide insurance such as is afforded by this policy is an insured." 634 F.2d at 124. The court that under the facts, this language entitled the plaintiffs to coverage under the umbrella policy. The court recognized that "[t]he New York Court of Appeals 'ha[s] long held that a contract may be valid even if it is not signed by the party to be charged, provided its subject matter does not implicate a statute . . . that imposes such a requirement.'" *Id.* (citation omitted). Further, "[a]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound." *Id.* (citation omitted). The Second Circuit therefore concluded that Mountain Valley is bound to provide coverage to the plaintiffs under the umbrella policy.

Similarly, in *City of Bothell v. Berkley Regional Specialty Insurance Co.*, the court recognized that "[w]hile neither a generic regulatory pronouncement nor an oral agreement would trigger the additional insured coverage, there is no reason to presume that a signature, a bilateral contract, or any other formality other than a writing indicating the mutual intent of the parties to provide additional insurance coverage is required." No. C14-0791RSL, 2014 U.S. Dist. LEXIS 145644, at *15 (W.D. Wash. Oct. 10, 2014). In fact, in finding that the insurer in that case had acted in bad faith, the court cited "the insistence that the written contract be signed by [the proposed additional insured] is only one of a string of requirements superimposed upon the additional insured provision." *Id.* at *26.

Based on the above, we are asking Erie to rescind its denial and provide additional insured coverage to Five Star. We would be happy to discuss this with you.

Jack

2

**John C. Sullivan**
**Principal**
**Post & Schell, P.C.**
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

215-587-1487 (Phone)
215-806-9117 (Cell)
215-320-4773 (Fax)
jsullivan@postschell.com
www.postschell.com
Download My Contact Information

This message is from the law firm Post & Schell, P.C. . This message and any attachments may contain legally
privileged or confidential information, and are intended only for the individual or entity identified above
as the addressee. If you are not the addressee, or if this message has been addressed to you in error, you
are not authorized to read, copy, or distribute this message and any attachments, and we ask that you please
delete this message and attachments (including all copies) and notify the sender by return e-mail or by phone
at 215-587-1000. Delivery of this message and any attachments to any person other than the intended recipient(s)
is not intended in any way to waive confidentiality or a privilege. All personal messages express views only
of the sender, which are not to be attributed to Post & Schell, P.C., and may not be copied or distributed
without this statement.

# EXHIBIT R

**Zavalas, Stacey**

| | |
|---|---|
| **From:** | Zavalas, Stacey <SZavalas@PostSchell.com> |
| **Sent:** | Wednesday, July 10, 2019 2:27 PM |
| **To:** | Frances Lettieri |
| **Cc:** | Sullivan, John; Allan Molotsky |
| **Subject:** | RE: Wintersteen v. Five Star Mechanical Services, Inc. Erie Claim No. A0000074134 |

Franny,

Thank you for your email.  While we appreciate your interpretation of Mr. Hudson's deposition testimony, Mr. Hudson was asked if the subcontract between Cromedy and Five Star was the contract under which Cromedy did work at the McKinely School.  Mr. Hudson's response to that question was "yes."  He refers to reviewing the scope of work at the deposition in connection with identifying the contract he was being asked to testify to, but he never says that he only agreed to that portion of the contract.  Rather, his next statements confirm that the subcontract with Five Star was in full force and effect for the McKinely School project.

Further, you do not address the fact that Erie's insured attaches a copy of the entire subcontract, including the Insurance and Indemnity provisions, to its response to a discovery request in the underlying case for any contract it entered into for work at the project involved in plaintiff's accident.  We submit that this is an admission by Cromedy that it agreed to all terms of the contract, including the Insurance and Indemnity provisions.  The fact that a Certificate of Insurance may or may have not been procured or provided has no bearing on whether Erie's insured knew and accepted the terms of this contract.

We again ask Erie to rescind its denial and provide additional insured coverage to Five Star.

If you would like to discuss this further, please do not hesitate to give me a call.

Best regards,
Stacey

**Stacey M. Zavalas**
**Principal**
**Post & Schell, P.C.**
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)
215-320-4146 (Fax)
SZavalas@PostSchell.com
www.postschell.com

---

**From:** Frances Lettieri [mailto:FLettieri@fhmslaw.com]
**Sent:** Tuesday, July 09, 2019 6:16 PM
**To:** Zavalas, Stacey
**Cc:** Sullivan, John; Allan Molotsky
**Subject:** RE: Wintersteen v. Five Star Mechanical Services, Inc. Erie Claim No. A0000074134

Hi Stacey.

Thank you for that information.  According to the agent, it appears that additional insured coverage for Five Star was not requested until March 2017, months after the loss.  We are still trying to confirm whether the terms of the insurance coverage requirements and indemnity provision were known and accepted by Erie's insured prior to the loss.

I did review the materials that you provided.  None of those materials speak to the insurance and indemnity provisions.  I note, in Richard Hudson's deposition, he acknowledges only the scope of the work performed, as that is the extent of what he would review. 103:13-16.   While it appears that the scope of work was consistent with that set forth in the written agreement, we still are unable to confirm that Erie's insured knew of and accepted the indemnity and insurance terms prior to the loss.  The "Insurance Requirements" purportedly attached the subcontract indicates that a certificate of insurance was "required" before a subcontractor could perform work at any Five Star, Inc. jobsite and that such certificate was required to be mailed or faxed prior to the subcontractor arriving on site.  It does not appear that such certificate was ever procured or provided.

I am happy to review any additional materials that you can provide which may speak to this issue.

Franny

**Frances A. Lettieri, Esq.**
**Partner**
**Fowler Hirtzel McNulty & Spaulding, LLP**
2000 Market Street, Suite 550
Philadelphia, PA 19103

(267) 457-4569 (Phone)
(215) 518-9687 (Cell)
flettieri@fhmslaw.com
www.fhmslaw.com

**From:** Zavalas, Stacey [mailto:SZavalas@PostSchell.com]
**Sent:** Tuesday, July 09, 2019 9:58 AM
**To:** Frances Lettieri <FLettieri@fhmslaw.com>
**Cc:** Sullivan, John <jsullivan@postschell.com>
**Subject:** Re: Wintersteen v. Five Star Mechanical Services, Inc. Erie Claim No. A0000074134

Hi Franny,

The settlement conference in this matter scheduled for 7/10 has been rescheduled for 8/22 at 11 am.  Has your client had the chance to look over this additional information yet?

Best,
Stacey

**Stacey M. Zavalas**
**Principal**
**Post & Schell, P.C.**
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)
215-320-4146 (Fax)

SZavalas@PostSchell.com
www.postschell.com

**From:** Zavalas, Stacey [mailto:SZavalas@PostSchell.com]
**Sent:** Monday, July 01, 2019 1:06 PM
**To:** flettieri@fhmslaw.com
**Cc:** Sullivan, John
**Subject:** Wintersteen v. Five Star mechanical Services, Inc. Erie Claim No. A0000074134

Hi Franny,

In connection with your request, I attach materials from the underlying action which evidence that Erie's insured, Cromedy Construction, knew and accepted the terms of the contract with Five Star Mechanical Contractors prior to the incident.

Specifically, I attach Cromedy's reply to Five Star's cross-claim, where in response to paragraph 77 Cromedy "admits that Cromedy and Five Star entered into a contract for the work to be performed at the construction project that is the subject of plaintiff's Complaint."

In addition, I attach the transcript and exhibits for the deposition of Richard Hudson from Cromedy. On page 103 of this transcript, Mr. Hudson admits that the Cromedy/Five Star contract was the contract under which Cromedy did their work at the McKinely School. On page 105, Mr. Hudson testifies that Cromedy was paid for the work done under the contract.

Further, we have been advised that Cromedy responded to the following discovery request and attached a copy of the unsigned contract between Cromedy and Five Star to their discovery responses, responding as follows:

36.	Did your company enter into contracts for its work at the project involved in plaintiff's accident? If the answer to this Interrogatory is in the affirmative, produce full and complete copies of any and all contracts that your company was a party to.

Answer: Yes, see responsive documents attached to Cromedy's response to plaintiffs' Request for Production of Documents.

Based on the above, we are asking Erie to rescind its denial and provide additional insured coverage to Five Star. There is a settlement conference scheduled in the underlying case on July 10th. Thus, time is of the essence in Erie accepting coverage on behalf of Five Star for the underlying matter.

Should you have any questions, please do not hesitate to call me.

Best regards,
Stacey

**Stacey M. Zavalas**
**Principal**
**Post & Schell, P.C.**
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)
215-320-4146 (Fax)

3

SZavalas@PostSchell.com
www.postschell.com

---

This message is from the law firm Post & Schell, P.C. . This message and any attachments may contain legally
privileged or confidential information, and are intended only for the individual or entity identified above
as the addressee. If you are not the addressee, or if this message has been addressed to you in error, you
are not authorized to read, copy, or distribute this message and any attachments, and we ask that you please
delete this message and attachments (including all copies) and notify the sender by return e-mail or by phone
at 215-587-1000. Delivery of this message and any attachments to any person other than the intended recipient(s)
is not intended in any way to waive confidentiality or a privilege. All personal messages express views only
of the sender, which are not to be attributed to Post & Schell, P.C., and may not be copied or distributed
without this statement.

# EXHIBIT S

**Zavalas, Stacey**

| | |
|---|---|
| **From:** | Frances Lettieri <FLettieri@fhmslaw.com> |
| **Sent:** | Thursday, August 15, 2019 11:45 AM |
| **To:** | Zavalas, Stacey |
| **Subject:** | RE: Wintersteen v. Five Star Mechanical |

Stacey,

Respectfully, this additional material still does not speak to the question of whether the unsigned written contract containing indemnification and additional insured obligations was provided to Cromedy *prior* to the incident.  My question is straightforward – when did Five Star first provide Cromedy with the written contract containing the insurance and indemnity obligations?

As a putative additional insured, Five Star has the burden to demonstrate its entitlement to coverage.  The additional materials reference the term "contract," but the written document under which the purported insurance and indemnity obligations exist are not attached nor are such obligations specifically referenced.  Certainly, you are aware that mere references to the word "contract" are impermissible to bind a party to indemnity terms never disclosed and accepted.  See e.g. Bernotas v. Super Fresh Food Mkts., Inc., 863 A.2d 478 (Pa. 2004).  Effectively, you are arguing that the term "contract" in the request for payment binds Cromedy to the terms of another document, which were never timely disclosed.

Further, I would suggest that you review the depositions transcript again, as they do not state what you represent.  No deponent could testify to the acceptance of the insurance and indemnity terms.  Mr. Hudson was specifically asked about whether the written subcontract was in effect (and by written subcontract, I am referring the document containing the indemnity and AI terms).  He answers "So, basically, under the scope of work is about the extent of what I would review on the contract. So I can see that here. So I would say yes."  He opined strictly on the scope of the work.  He does not acknowledge acceptance of the entire document or first-hand knowledge of the insurance and indemnity.  He was later asked if Five Star was added as an additional insured.  Mr. Hudson said "I don't know.  I wouldn't handle that piece of paperwork."  Mr. Kirchner likewise testified that he never reviewed the written subcontract between Five Star and Cromedy.

I am still awaiting word from my client; however, as I have repeatedly advised, it would be very helpful if you could confirm the date that Five Star first provided Cromedy with written subcontract, as our investigation suggests it was not until after the accident.  This is critical to Liberty's demand.

Franny

**Frances A. Lettieri, Esq.**
**Partner**
**Fowler Hirtzel McNulty & Spaulding, LLP**
2000 Market Street, Suite 550
Philadelphia, PA 19103

(267) 457-4569 (Phone)
(215) 518-9687 (Cell)
flettieri@fhmslaw.com
www.fhmslaw.com

**From:** Zavalas, Stacey [mailto:SZavalas@PostSchell.com]
**Sent:** Thursday, August 15, 2019 10:08 AM
**To:** Frances Lettieri <FLettieri@fhmslaw.com>
**Cc:** Sullivan, John <jsullivan@postschell.com>
**Subject:** RE: Wintersteen v. Five Star Mechanical

Franny,

In connection with your question as to whether Cromedy was aware of the contract before the accident date, please see the attached documentation which prove that Cromedy had accepted the written contract terms prior to the accident. I have attached an application for payment from Cromedy dated 5/15/2016, several months before the accident wherein Cromedy seeks payment for work done pursuant to the contract between Five Star and Cromedy. Not only does this request for payment acknowledge the original contract amount and whether there have been changes to the contract, etc., it states, "I hereby certify that the work performed and the materials supplied to date, as shown on the above represent the actual value of the accomplishment under the terms of the Contract (and all authorized changes thereof) between the undersigned and the Five Star Mechanical relating to the referenced project." This Request for Payment is signed by Cromedy and notarized. In addition, I have also attached change orders to the contract, certain ones which were made prior to the accident.

You now have deposition testimony from your insured acknowledging that Cromedy performed work pursuant to the contract with Five Star, discovery answers from Cromedy acknowledging that it did its work at the site pursuant to the contract between Five Star and Cromedy (wherein Cromedy attaches the contract between Five Star and Cromedy in connection with that response), a notarized statement signed by Cromedy several months before the accident seeking payment pursuant to the contract between Five Star and Cromedy and certifying that the work done by Cromedy was done pursuant to the terms of the contract between Five Star and Cromedy, as well as change orders concerning changes to the work described under the contract issued prior to the accident. The contract is dated March 2, 2016, which is also several months before the accident. There is no basis for Erie's statement that the contract was backdated. Instead, the above illustrates that Cromedy knew of the terms of the contract and expressly accepted those terms well before the accident. Erie has no reasonable basis for denying additional insured coverage to Five Star in connection with the Wintersteen case. Thus, we request that Erie immediately assume the defense of Five Star in connection with this matter.

As I have advised, I have been instructed to file a DJ complaint against Erie, which I will be doing in short order if Erie does not immediately assume its responsibilities under its policy and accept Five Star's tender of the Wintersteen case.

Should you have any questions, please feel free to call me.

Best regards,
Stacey


**Stacey M. Zavalas**
**Principal**
**Post & Schell, P.C.**
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)
215-320-4146 (Fax)

2

SZavalas@PostSchell.com
www.postschell.com

---

**From:** Frances Lettieri [mailto:FLettieri@fhmslaw.com]
**Sent:** Wednesday, August 14, 2019 2:00 PM
**To:** Zavalas, Stacey
**Subject:** RE: Wintersteen v. Five Star Mechanical

Stacey,

I have a report out to my client.  However, our further investigation suggests that Five Star did <u>not</u> provide the written contract to Cromedy prior to incident.  I believe that I have requested this information from you previously – can Five Star confirm when the contract was sent to Cromedy?  It appears that Cromedy was on site and was performing work pursuant to its bid but that Five Star failed to send the purported contract documents until after the loss.  I suspect that the absence of a valid written contract in existence prior to the loss is going to be a sticking point.  Absent information to dispute this, Liberty seeks to enforce a "backdated" contract, which was not in the form of a written contract at the time of the accident.


Franny

### Frances A. Lettieri, Esq.
**Partner**
**Fowler Hirtzel McNulty & Spaulding, LLP**
2000 Market Street, Suite 550
Philadelphia, PA 19103

(267) 457-4569 (Phone)
(215) 518-9687 (Cell)
flettieri@fhmslaw.com
www.fhmslaw.com


**From:** Zavalas, Stacey [mailto:SZavalas@PostSchell.com]
**Sent:** Wednesday, August 14, 2019 10:11 AM
**To:** Frances Lettieri <FLettieri@fhmslaw.com>
**Subject:** RE: Wintersteen v. Five Star Mechanical

Franny,

Any progress on this file? My client is pushing me to file the DJ Complaint.

Thanks,
Stacey

**Stacey M. Zavalas**
**Principal**
**Post & Schell, P.C.**
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)

3

# EXHIBIT T

## Zavalas, Stacey

| | |
|---|---|
| **From:** | Zavalas, Stacey <SZavalas@PostSchell.com> |
| **Sent:** | Friday, August 16, 2019 9:08 AM |
| **To:** | 'flettieri@fhmslaw.com' |
| **Cc:** | Sullivan, John |
| **Subject:** | FW: McKinley ES Agreement  - Wintersteen case |
| **Attachments:** | Cromedy Agreement 16-198.pdf |

Franny,

As you have requested, attached is the email sent to Rich Hudson at Cromedy from Mary Ellen Strubilla at Five Star Mechanical attaching a copy of the subcontract agreement with the Insurance and Indemnity provisions contained within on March 4, 2016.

I believe this shows that Cromedy was in possession of the written contract and all its terms, performed work pursuant to the written contract, sought payment for this work and certified that it was performed pursuant to the written contract, and that change invoices in connection with the written contract were all performed prior to the Wintersteen accident.

Please do not hesitate to call with any questions.

Best regards,
Stacey

**Stacey M. Zavalas**
**Principal**
**Post & Schell, P.C.**
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)
215-320-4146 (Fax)
SZavalas@PostSchell.com
www.postschell.com

**From:** Mary Ellen Strubilla
**Sent:** Friday, March 04, 2016 12:43 PM
**To:** Rich Hudson
**Cc:** Joe Gaffney
**Subject:** McKinley ES Agreement

Rich,
Attached is the subcontractor agreement for the sheetmetal at the McKinley Elementary School. Please review, sign and return for final execution.
Thanks!
Mary Ellen

*Mary Ellen Strubilla*

Five Star Mechanical
833 Lincoln Ave, Unit 8
West Chester, PA 19380

610-719-6415 x20



---

**From:** Joe Gaffney
**Sent:** Monday, February 29, 2016 3:14 PM
**To:** Mary Ellen Strubilla
**Subject:** FW: McKinley ES

Can you request the cad files for Rich @ Cromedy Construction for the McKinley school

Joe Gaffney

---

**From:** Rich Hudson [mailto:rhudson@cromedyconstruction.com]
**Sent:** Monday, February 29, 2016 2:36 PM
**To:** Joe Gaffney
**Cc:** Mary Ellen Strubilla
**Subject:** RE: McKinley ES

Confirmed…. Do we have access to the cad files.



*Please note that our corporate name has change from Advantage Contracting to **Cromedy Construction Corporation**. Thank you*

Respectfully,


Rich Hudson
Senior Project Manager
Cromedy Construction
Ph: 215-437-7606
Fx: 215-437-7655
Cell: 215-760-0500
www.CromedyConstruction.com

*A SBA 8(a) SDB, MBE/DBE Certified Firm*


*"It's Simple, It's Service"*

*"Everyone Wants Your Business, It's What They Do With It After They Get It That Matters"*

2





Notice: This communication, including attachments, is PRIVATE AND CONFIDENTIAL and may contain information that is proprietary and legally privileged by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, reproduction of, or reliance on this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

**From:** Joe Gaffney [mailto:joeg@fivestarmechanical.com]
**Sent:** Monday, February 29, 2016 2:23 PM
**To:** rhudson@cromedyconstruction.com
**Cc:** Mary Ellen Strubilla
**Subject:** FW: McKinley ES

Rich,
Please find the cuts on the AHU'S for McKinley School.

Please note that they are just going in for approval but being that I am going with the basis of design for the project I would imagine that they should be good to start your drawings.

Joe Gaffney
484-614-0486

This message is from the law firm Post & Schell, P.C. . This message and any attachments may contain legally privileged or confidential information, and are intended only for the individual or entity identified above as the addressee. If you are not the addressee, or if this message has been addressed to you in error, you are not authorized to read, copy, or distribute this message and any attachments, and we ask that you please delete this message and attachments (including all copies) and notify the sender by return e-mail or by phone at 215-587-1000. Delivery of this message and any attachments to any person other than the intended recipient(s) is not intended in any way to waive confidentiality or a privilege. All personal messages express views only of the sender, which are not to be attributed to Post & Schell, P.C., and may not be copied or distributed without this statement.

**Zavalas, Stacey**

| | |
|---|---|
| **From:** | Frances Lettieri <FLettieri@fhmslaw.com> |
| **Sent:** | Friday, August 16, 2019 9:27 AM |
| **To:** | Zavalas, Stacey |
| **Subject:** | Re: McKinley ES Agreement  - Wintersteen case |

Thanks Stacey. I will review and confirm with Cromedy. Additionally, can you send the Liberty policy? I understand that Liberty accepted the tender, so, if the Erie policy is triggered, we need to review the other insurance provisions.

**Frances A. Lettieri, Esq.**
Fowler Hirtzel McNulty & Spaulding, LLP
2000 Market Street, Suite 550
Philadelphia, PA 19103
(267) 457-4569 (Phone)
(215) 518-9687 (Cell)
flettieri@fhmslaw.com
www.fhmslaw.com

On Aug 16, 2019, at 9:08 AM, Zavalas, Stacey <SZavalas@postschell.com> wrote:

> Franny,
>
> As you have requested, attached is the email sent to Rich Hudson at Cromedy from Mary Ellen Strubilla at Five Star Mechanical attaching a copy of the subcontract agreement with the Insurance and Indemnity provisions contained within on March 4, 2016.
>
> I believe this shows that Cromedy was in possession of the written contract and all its terms, performed work pursuant to the written contract, sought payment for this work and certified that it was performed pursuant to the written contract, and that change invoices in connection with the written contract were all performed prior to the Wintersteen accident.
>
> Please do not hesitate to call with any questions.
>
> Best regards,
> Stacey
>
> Stacey M. Zavalas<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.postschell.com_attorneys_stacey-2Dzavalas-2Djumper&d=DwMFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=CVh3WYzT6WtDOKD8ztxycawCyasg4oh4izSTv8VfR50&m=ghwEuaSNxj17S4rLkh7t_7aYK3K0eQ23I3GtqHSfTgU&s=b6BxiCiVnPALSghPWjASBAiSIbmaGSFS5jqXDeYXVw8&e=>
> Principal
> Post & Schell, P.C.
> Four Penn Center
> 1600 John F. Kennedy Blvd.
> Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)
215-320-4146 (Fax)
SZavalas@PostSchell.com<mailto:SZavalas@PostSchell.com>
www.postschell.com<https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.postschell.com_&d=DwMFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=CVh3WYzT6WtDOKD8ztxycawCyasg4oh4izSTv8VfR50&m=ghwEu
aSNxj17S4rLkh7t_7aYK3K0eQ23I3GtqHSfTgU&s=njLufZThgui2SUhM4G9h-
IFR08U3R8M16eKmWoxTHBo&e=>

From: Mary Ellen Strubilla
Sent: Friday, March 04, 2016 12:43 PM
To: Rich Hudson
Cc: Joe Gaffney
Subject: McKinley ES Agreement

Rich,
Attached is the subcontractor agreement for the sheetmetal at the McKinley Elementary School.
Please review, sign and return for final execution.
Thanks!
Mary Ellen

Mary Ellen Strubilla
Five Star Mechanical
833 Lincoln Ave, Unit 8
West Chester, PA 19380

610-719-6415 x20

[Five Star Logo BW]

From: Joe Gaffney
Sent: Monday, February 29, 2016 3:14 PM
To: Mary Ellen Strubilla
Subject: FW: McKinley ES

Can you request the cad files for Rich @ Cromedy Construction for the McKinley school

Joe Gaffney

From: Rich Hudson [mailto:rhudson@cromedyconstruction.com]
Sent: Monday, February 29, 2016 2:36 PM
To: Joe Gaffney
Cc: Mary Ellen Strubilla
Subject: RE: McKinley ES

Confirmed…. Do we have access to the cad files.

*Please note that our corporate name has change from Advantage Contracting to Cromedy Construction Corporation.  Thank you

Respectfully,


Rich Hudson
Senior Project Manager
Cromedy Construction
Ph: 215-437-7606
Fx: 215-437-7655
Cell: 215-760-0500
www.CromedyConstruction.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.CromedyConstruction.com&d=DwQF-g&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=E3QShntXswkQn4uQRlJktvUwmoXhIUSdXZ5BFNqAaRU&m=A6b2r1k6-rloD-5o1e-hoPfgbYCNuEWfW99zHPIiVjk&s=rDultSo6i04or-LCxkGED_Rnl_Tx-O3XIXITy1y0TZU&e=>

*A SBA 8(a) SDB, MBE/DBE Certified Firm


"It's Simple, It's Service"

"Everyone Wants Your Business, It's What They Do With It After They Get It That Matters"

[Cropped Cromedy Construction Logo]
[cid:image005.jpg@01D17613.78722DE0]

Notice: This communication, including attachments, is PRIVATE AND CONFIDENTIAL and may contain information that is proprietary and legally privileged by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, reproduction of, or reliance on this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.




From: Joe Gaffney
[mailto:joeg@fivestarmechanical.com<mailto:joeg@fivestarmechanical.com>]
Sent: Monday, February 29, 2016 2:23 PM
To: rhudson@cromedyconstruction.com<mailto:rhudson@cromedyconstruction.com>
Cc: Mary Ellen Strubilla
Subject: FW: McKinley ES

Rich,
Please find the cuts on the AHU'S for McKinley School.

Please note that they are just going in for approval but being that I am going with the basis of design for the project I would imagine that they should be good to start your drawings.

Joe Gaffney
484-614-0486

_____

This message is from the law firm Post & Schell, P.C. . This message and any attachments may contain legally
privileged or confidential information, and are intended only for the individual or entity identified above
as the addressee. If you are not the addressee, or if this message has been addressed to you in error, you
are not authorized to read, copy, or distribute this message and any attachments, and we ask that you please
delete this message and attachments (including all copies) and notify the sender by return e-mail or by phone
at 215-587-1000. Delivery of this message and any attachments to any person other than the intended recipient(s)
is not intended in any way to waive confidentiality or a privilege. All personal messages express views only
of the sender, which are not to be attributed to Post & Schell, P.C., and may not be copied or distributed
without this statement.

<image003.jpg>

<image004.jpg>

<image005.jpg>

<Cromedy Agreement 16-198.pdf>

# EXHIBIT U

**Zavalas, Stacey**

| | |
|---|---|
| **From:** | Frances Lettieri <FLettieri@fhmslaw.com> |
| **Sent:** | Friday, August 16, 2019 9:27 AM |
| **To:** | Zavalas, Stacey |
| **Subject:** | Re: McKinley ES Agreement  - Wintersteen case |

Thanks Stacey. I will review and confirm with Cromedy. Additionally, can you send the Liberty policy? I understand that Liberty accepted the tender, so, if the Erie policy is triggered, we need to review the other insurance provisions.

**Frances A. Lettieri, Esq.**
Fowler Hirtzel McNulty & Spaulding, LLP
2000 Market Street, Suite 550
Philadelphia, PA 19103
(267) 457-4569 (Phone)
(215) 518-9687 (Cell)
flettieri@fhmslaw.com
www.fhmslaw.com

On Aug 16, 2019, at 9:08 AM, Zavalas, Stacey <SZavalas@postschell.com> wrote:

> Franny,
>
> As you have requested, attached is the email sent to Rich Hudson at Cromedy from Mary Ellen Strubilla at Five Star Mechanical attaching a copy of the subcontract agreement with the Insurance and Indemnity provisions contained within on March 4, 2016.
>
> I believe this shows that Cromedy was in possession of the written contract and all its terms, performed work pursuant to the written contract, sought payment for this work and certified that it was performed pursuant to the written contract, and that change invoices in connection with the written contract were all performed prior to the Wintersteen accident.
>
> Please do not hesitate to call with any questions.
>
> Best regards,
> Stacey
>
> Stacey M. Zavalas<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.postschell.com_attorneys_stacey-2Dzavalas-2Djumper&d=DwMFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=CVh3WYzT6WtDOKD8ztxycawCyasg4oh4izSTv8VfR50&m=ghwEuaSNxj17S4rLkh7t_7aYK3K0eQ23I3GtqHSfTgU&s=b6BxiCiVnPALSghPWjASBAiSIbmaGSFS5jqXDeYXVw8&e=>
> Principal
> Post & Schell, P.C.
> Four Penn Center
> 1600 John F. Kennedy Blvd.
> Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)
215-320-4146 (Fax)
SZavalas@PostSchell.com<mailto:SZavalas@PostSchell.com>
www.postschell.com<https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.postschell.com_&d=DwMFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=CVh3WYzT6WtDOKD8ztxycawCyasg4oh4izSTv8VfR50&m=ghwEu
aSNxj17S4rLkh7t_7aYK3K0eQ23I3GtqHSfTgU&s=njLufZThgui2SUhM4G9h-
IFR08U3R8M16eKmWoxTHBo&e=>


From: Mary Ellen Strubilla
Sent: Friday, March 04, 2016 12:43 PM
To: Rich Hudson
Cc: Joe Gaffney
Subject: McKinley ES Agreement

Rich,
Attached is the subcontractor agreement for the sheetmetal at the McKinley Elementary School.
Please review, sign and return for final execution.
Thanks!
Mary Ellen

Mary Ellen Strubilla
Five Star Mechanical
833 Lincoln Ave, Unit 8
West Chester, PA 19380

610-719-6415 x20

[Five Star Logo BW]



From: Joe Gaffney
Sent: Monday, February 29, 2016 3:14 PM
To: Mary Ellen Strubilla
Subject: FW: McKinley ES

Can you request the cad files for Rich @ Cromedy Construction for the McKinley school

Joe Gaffney

From: Rich Hudson [mailto:rhudson@cromedyconstruction.com]
Sent: Monday, February 29, 2016 2:36 PM
To: Joe Gaffney
Cc: Mary Ellen Strubilla
Subject: RE: McKinley ES

Confirmed…. Do we have access to the cad files.

2

*Please note that our corporate name has change from Advantage Contracting to Cromedy Construction Corporation.  Thank you

Respectfully,


Rich Hudson
Senior Project Manager
Cromedy Construction
Ph: 215-437-7606
Fx: 215-437-7655
Cell: 215-760-0500
www.CromedyConstruction.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.CromedyConstruction.com&d=DwQF-g&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=E3QShntXswkQn4uQRlJktvUwmoXhIUSdXZ5BFNqAaRU&m=A6b2r1k6-rloD-5o1e-hoPfgbYCNuEWfW99zHPIiVjk&s=rDultSo6i04or-LCxkGED_Rnl_Tx-O3XIXITy1y0TZU&e=>

*A SBA 8(a) SDB, MBE/DBE Certified Firm


"It's Simple, It's Service"

"Everyone Wants Your Business, It's What They Do With It After They Get It That Matters"

[Cropped Cromedy Construction Logo]
[cid:image005.jpg@01D17613.78722DE0]

Notice: This communication, including attachments, is PRIVATE AND CONFIDENTIAL and may contain information that is proprietary and legally privileged by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, reproduction of, or reliance on this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.



From: Joe Gaffney [mailto:joeg@fivestarmechanical.com<mailto:joeg@fivestarmechanical.com>]
Sent: Monday, February 29, 2016 2:23 PM
To: rhudson@cromedyconstruction.com<mailto:rhudson@cromedyconstruction.com>
Cc: Mary Ellen Strubilla
Subject: FW: McKinley ES

Rich,
Please find the cuts on the AHU'S for McKinley School.

Please note that they are just going in for approval but being that I am going with the basis of design for the project I would imagine that they should be good to start your drawings.

Joe Gaffney
484-614-0486

---

This message is from the law firm Post & Schell, P.C. . This message and any attachments may contain legally
privileged or confidential information, and are intended only for the individual or entity identified above
as the addressee. If you are not the addressee, or if this message has been addressed to you in error, you
are not authorized to read, copy, or distribute this message and any attachments, and we ask that you please
delete this message and attachments (including all copies) and notify the sender by return e-mail or by phone
at 215-587-1000. Delivery of this message and any attachments to any person other than the intended recipient(s)
is not intended in any way to waive confidentiality or a privilege. All personal messages express views only
of the sender, which are not to be attributed to Post & Schell, P.C., and may not be copied or distributed
without this statement.

<image003.jpg>

<image004.jpg>

<image005.jpg>

<Cromedy Agreement 16-198.pdf>

# EXHIBIT V

**Zavalas, Stacey**

| | |
|---|---|
| **From:** | Frances Lettieri <FLettieri@fhmslaw.com> |
| **Sent:** | Monday, August 19, 2019 5:49 PM |
| **To:** | Zavalas, Stacey |
| **Cc:** | Sullivan, John |
| **Subject:** | Re: Wintersteen: Liberty CGL Policy |

Thank you. Can you also provide the subcontract between Five Star and J. Mann that included the insurance requirements?

**Frances A. Lettieri, Esq.**
Fowler Hirtzel McNulty & Spaulding, LLP
2000 Market Street, Suite 550
Philadelphia, PA 19103
(267) 457-4569 (Phone)
(215) 518-9687 (Cell)
flettieri@fhmslaw.com
www.fhmslaw.com

On Aug 19, 2019, at 12:30 PM, Zavalas, Stacey <SZavalas@postschell.com> wrote:

Hi Franny,

Attached is the CGL Policy you have requested.  For ease of reference, I note that on page 83 of the attached PDF, the CGL Extension, Section H. Primary and Noncontributory Additional Insured Extension reads, in pertinent part:

Regardless of the written agreement between you and an additional insured, this insurance is excess over any other insurance whether primary, excess, contingent or on any other basis for which the additional insured has been added as an additional insured on other policies.

Further, the Cromedy/Five Star contract requires that Five Star be added to Cromedy's insurance policy as an additional insured on a primary and non-contributory basis.

Please do not hesitate to call with any questions.

Best regards,
Stacey

**Stacey M. Zavalas**
**Principal**
**Post & Schell, P.C.**
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)
215-320-4146 (Fax)
SZavalas@PostSchell.com
www.postschell.com

This message is from the law firm Post & Schell, P.C. . This message and any attachments may contain legally privileged or confidential information, and are intended only for the individual or entity identified above as the addressee. If you are not the addressee, or if this message has been addressed to you in error, you are not authorized to read, copy, or distribute this message and any attachments, and we ask that you please delete this message and attachments (including all copies) and notify the sender by return e-mail or by phone at 215-587-1000. Delivery of this message and any attachments to any person other than the intended recipient(s) is not intended in any way to waive confidentiality or a privilege. All personal messages express views only of the sender, which are not to be attributed to Post & Schell, P.C., and may not be copied or distributed without this statement.

<CGL Policy.pdf>

# EXHIBIT W

## Zavalas, Stacey

| | |
|---|---|
| **From:** | Zavalas, Stacey <SZavalas@PostSchell.com> |
| **Sent:** | Thursday, August 22, 2019 2:48 PM |
| **To:** | Frances Lettieri |
| **Cc:** | Sullivan, John; Allan Molotsky |
| **Subject:** | RE: Wintersteen case - Mann Finley Agreement |

Franny,

I notified you of the settlement conference scheduled for today via email on July 9, 2019, the date the court issued the notice scheduling the conference.  Additionally, we have provided you with each document you have requested, almost immediately after we have received it. Five Star first tendered the defense and indemnity of this claim to Cromedy, Erie's insured, on January 18, 2018 and again on September 14, 2018.  Ohio Security followed up with Erie via email on March 5, 2019, to seek Erie's position with respect to coverage for this claim.  On March 11, 2019, Debra Wilson from Erie responded to Ohio Security, attaching a February 27, 2019 letter from you wherein Erie denied additional insured coverage to Five Star because it claimed that the contract between Five Star and Cromedy was not signed. Ohio Security again tendered this claim to Erie on April 16, 2019 and May 5, 2019, in each letter addressing the facts that all parties were aware of, including the fact that the Five Star/Cromedy contract was in writing and that Cromedy had accepted the terms of that contract.  Further, Ohio Security noted that the Erie additional insured provision requires only that a contract be written, not executed.  Likewise, Jack Sullivan sent an email to you on June 17, 2019, detailing this issue and asking Erie to reconsider its denial of Five Star's tender.  Since that time, you and I have corresponded on multiple occasions, wherein I have provided you with all of the documentation you have requested, which shows that a written contract was sent to Cromedy by Five Star, and Cromedy accepted the terms of that contract months before plaintiff's accident.  I also sent you the Ohio Security policy which contains a provision which makes its additional insured coverage provided to Five Star excess over the additional insured coverage contained in the Erie policy.  In addition, I provided you with a copy of the Five Star/J. Mann contract which contains the exact same indemnity provisions as the Five Star/Cromedy contract.  Despite Erie's possession of all of this information, Erie continues to deny that it owes any obligation to Five Star to provide additional insured coverage to it in connection with the underlying Wintersteen action.

Respectfully, we disagree with Erie's further attempts to circumvent having to meet its obligations to Five Star under its policy by claiming that the indemnity provisions in the Five Star/J. Mann contract somehow absolve Erie of any obligation to provide additional insured coverage to Five Star.  First, the cases you cited to are not the law in Pennsylvania and do not excuse Erie from its obligations to provide additional insured coverage to Five Star.  Further, they are all distinguishable from this present matter.  Moreover, it has not been proven that J. Mann has an absolute obligation to provide contractual indemnity to Five Star in this case.  The Five Star/Cromedy and Five Star/J. Mann contracts contain the exact same indemnity language.  Thus, if it is found that Cromedy has no obligation to indemnify Five Star under these provisions because they are ambiguous and do not clearly and unequivocally provide for indemnity of Five Star as Cromedy has asserted, then the same is true for J. Mann.  Further, the Perry-Ruzzi rule does not absolve Cromedy from obligation under these indemnity provisions in the absence of a signed contract.  If anything, it supports the notion that the indemnity provisions clearly and unequivocally state that Cromedy "waives any defense that this Subcontract or any portions thereof was not executed by Subcontractor prior to the date of the occurrence giving rise to the Subcontractor's indemnification responsibility hereunder."

Counsel for the parties to the underlying action have agreed to mediate that action, thus , no settlement offers were made today at the conference.  I believe the demand by underlying plaintiff is $3.8 million. Erie is invited to attend the underlying mediation. We will notify you of the date, location and mediator once it has been set. However, regardless, I have been directed to file a DJ complaint against Erie unless it immediately accepts Five Star's tender in connection with the Wintersteen case.

Please do not hesitate to contact me with any questions.

Best regards,
Stacey

**Stacey M. Zavalas**
**Principal**
**Post & Schell, P.C.**
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)
215-320-4146 (Fax)
SZavalas@PostSchell.com
www.postschell.com

**From:** Frances Lettieri [mailto:FLettieri@fhmslaw.com]
**Sent:** Wednesday, August 21, 2019 3:14 PM
**To:** Zavalas, Stacey
**Cc:** Sullivan, John; Allan Molotsky
**Subject:** RE: Wintersteen case - Mann Finley Agreement

Stacey,

Since the outset of this tender by Five Star, we advised Five Star and, subsequently, Liberty that Five Star needed to demonstrate that a written contract existed and was accepted by Cromedy prior to the loss.  Erie owed no additional insured obligation to Five Star until that burden was satisfied.

For the first time, on August 16, 2019, you produced a string of emails purportedly confirming transmission of the written contract to Cromedy in March of 2016.  As I advised, this process was not consistent with the information previously provided to us by Cromedy.

The Liberty policy was first sent to us on August 19, 2019.  Today, you have produced the subcontract between your named insured and Five Star and advised us that a settlement conference is scheduled for tomorrow morning.

Pursuant to the subcontract, J Mann – R Finley assumed a contractual obligation to defend and indemnify Five Star, an indemnity obligation which is compliant with the terms of Bester.  I note that, consistent with the principles of Perry-Ruzzi, Cromedy does not share this contractual indemnity obligation in the absence of a signed contract.  J Mann's contractual indemnity obligation is not negated by the availability of additional insured coverage under the Erie policy.  Instead, the majority of jurisdictions resolve these competing obligations by looking first to the indemnity contract. See, e.g., Wal-Mart Stores, Inc. v. RLI Ins. Co., 292 F.3d 583 (8th Cir. 2002); J. Walters Constr., Inc. v. Gilman Paper Co., 620 So. 2d 219 (Fla. App. Ct. 1993); Fed. Ins. Co. v. Gulf Ins. Co., 162 S.W.3d 160 (Mo. App. Ct. 2005); Wallace v. AMTRAK, 5 F. Supp. 3d 452, 482 (S.D.N.Y. 2014). Respectfully, I disagree with your assessment of the matter as a black and white issue.  To the extent the Erie policy is required to respond, the Liberty policy, no matter what, also remains implicated to share in the indemnity due to its named insured's indemnity obligations.  If Erie were to assume the defense of Five Star, it will immediately proceed to pursue J Mann's indemnity obligations, which is an insurable claim under the Liberty policy.

In this regard, there may be interest in seeking to mediate all of these issues on a global basis.

**Frances A. Lettieri, Esq.**
**Partner**
**Fowler Hirtzel McNulty & Spaulding, LLP**
2000 Market Street, Suite 550
Philadelphia, PA 19103

(267) 457-4569 (Phone)
(215) 518-9687 (Cell)
flettieri@fhmslaw.com
www.fhmslaw.com

**From:** Zavalas, Stacey [mailto:SZavalas@PostSchell.com]
**Sent:** Wednesday, August 21, 2019 1:17 PM
**To:** Frances Lettieri <FLettieri@fhmslaw.com>
**Cc:** Sullivan, John <jsullivan@postschell.com>
**Subject:** Wintersteen case - Mann Finley Agreement

Franny,

As you have requested, I have attached a copy of the Mann Finley contract with Five Star.  This contract does not change the fact that Erie has an obligation to provide additional insured coverage to Five Star in connection with the Wintersteen action.  Respectfully, J. Mann obtained the requisite additional insured coverage for Five Star required by the contract, as evidenced by the fact that Ohio Security is currently defending this case on behalf of Five Star under the policy Ohio Security issued to J. Mann.  As I have stated to you, the Ohio Security policy contains the following provision: "Regardless of the written agreement between you and an additional insured, this insurance is excess over any other insurance whether primary, excess, contingent or on any other basis for which the additional insured has been added as an additional insured on other policies."  Conversely, Erie's policy states that it's coverage is primary unless there is other *primary* insurance available to the insured for which the insured has been added as an additional insured.  As the Ohio Security policy is not primary when other additional insured coverage is available, the Erie policy is required to respond first to this action on behalf of Five Star.

As you now have in your possession, Cromedy was in receipt of the subcontract between Cromedy and Five Star several months before the accident occurred.  Cromedy submitted a notarized invoice to Five Star requesting payment for work it had done and certified this work was done pursuant to the contract between Cromedy and Five Star after the receipt of the subcontract and before the accident occurred.  In addition, certain change orders to the subcontract were issued after Cromedy received the subcontract and before the underlying plaintiff's injuries.  Further, in its verified response to its discovery responses in the underlying action, Cromedy attaches a full copy of the Five Star/Cromedy subcontract and responds that the work done on the project at issue was done pursuant to that contract.  In those responses, Cromedy does not claim that the work it performed was done pursuant only to the bid, as you suggest.  The underlying plaintiff alleges that his injuries were caused, at least in part, by Cromedy.  Thus, Five Star qualifies for additional insured coverage under the Erie policy.  Erie clearly has an obligation to provide additional insured coverage to Five Star in connection with the Wintersteen action. You argue that a Pennsylvania court would not find that the Ohio Security policy provision stating that its coverage is excess over all other additional insured coverage applies here.  While we disagree with that interpretation, that interpretation still would not entirely absolve Erie of its obligations to provide additional insured coverage to Five Star.  And yet, Erie continues to completely disclaim coverage for Five Star in this action.

You also argue that Erie is not obligated to provide additional insured coverage in the event that J. Mann has some sort of contractual indemnity obligation to Five Star.  Respectfully, these are two separate issues. Ohio Security is requesting that Erie step up and fulfill its obligations to Five Star as an additional insured.  At this point in time, Erie has not assumed its obligations to defend and indemnify Five Star and has no right to pursue contractual indemnity claims on Five Star's behalf.  I will note that Erie's insured, Cromedy, also has contractual indemnity obligations to Five Star under the subcontract.  Incidentally, Cromedy had an obligation to indemnify Five Star for damages even when it has not

3

signed the subcontract as it "waives any defense that this Subcontract or any portions thereof was not executed by Subcontractor prior to the date of the occurrence giving rise to the Subcontractor's indemnification responsibility hereunder."

As I have advised, a settlement conference in the underling case is scheduled for tomorrow at 11 a.m.

I have been directed to file a declaratory judgment complaint against Erie in connection with its failure to provide additional insured coverage for Five Star.  I make this last attempt to try to resolve this issue amicably without either party having to assume substantial costs of litigation.

Please do not hesitate to call with any questions or if you wish to discuss this matter further.

Best regards,
Stacey

**Stacey M. Zavalas**
**Principal**
**Post & Schell, P.C.**
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

215-587-1192 (Phone)
610-761-3667 (Cell)
215-320-4146 (Fax)
SZavalas@PostSchell.com
www.postschell.com

This message is from the law firm Post & Schell, P.C. . This message and any attachments may contain legally privileged or confidential information, and are intended only for the individual or entity identified above as the addressee. If you are not the addressee, or if this message has been addressed to you in error, you are not authorized to read, copy, or distribute this message and any attachments, and we ask that you please delete this message and attachments (including all copies) and notify the sender by return e-mail or by phone at 215-587-1000. Delivery of this message and any attachments to any person other than the intended recipient(s) is not intended in any way to waive confidentiality or a privilege. All personal messages express views only of the sender, which are not to be attributed to Post & Schell, P.C., and may not be copied or distributed without this statement.